# EXHIBIT

# K

**K&LNG**
**Execution Version**

CBA COMMERCIAL ASSETS, LLC,
Depositor


GMAC COMMERCIAL MORTGAGE CORPORATION
Servicer and Special Servicer


DEUTSCHE BANK NATIONAL TRUST COMPANY,
Trustee


POOLING AND SERVICING AGREEMENT


Dated as of April 1, 2006


$166,804,318


CBA Commercial Assets,


Small Balance Commercial Mortgage Pass-Through Certificates
Series 2006-1

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ...............................................................................................3

    Section 1.01   Defined Terms. ..........................................................................3
    Section 1.02   Certain Calculations.................................................................49
    Section 1.03   Loan Identification Convention. ..............................................49

ARTICLE II CONVEYANCE OF MORTGAGE LOANS; ORIGINAL ISSUANCE OF
           CERTIFICATES.................................................................................49

    Section 2.01   Conveyance of Mortgage Loans. .............................................49
    Section 2.02   Acceptance by Trustee..............................................................53
    Section 2.03   Representations, Warranties and Covenants of the Depositor;
                  Repurchase of Mortgage Loans by a Seller for Defects in Mortgage
                  Files and Breaches of Representations and Warranties. ...........55

ARTICLE III ADMINISTRATION AND SERVICING OF THE TRUST FUND ...................60

    Section 3.01   Servicer to Act as Servicer; Special Servicer to Act as Special
                  Servicer; Administration of the Mortgage Loans. ....................60
    Section 3.02   Collection of Loan Payments....................................................62
    Section 3.03   Collection of Taxes, Assessments and Similar Items; Servicing
                  Accounts. .................................................................................62
    Section 3.04   The Collection Account, Certificate Distribution Accounts.....................65
    Section 3.05   Permitted Withdrawals from the Collection Account and the
                  Certificate Distribution Accounts. ...........................................68
    Section 3.06   Investment of Funds in the Collection Account, Servicing
                  Accounts, REO Accounts, and the Cap Agreement Reserve Fund. ..........72
    Section 3.07   Maintenance of Insurance Policies; Errors and Omissions and
                  Fidelity Coverage.....................................................................74
    Section 3.08   Enforcement of Due-On-Sale and Due-On-Encumbrance Clauses;
                  Assumption Agreements............................................................78
    Section 3.09   Realization upon Defaulted Mortgage Loans............................82
    Section 3.10   Trustee to Cooperate; Release of Mortgage Files.....................85
    Section 3.11   Servicing Compensation. ..........................................................86
    Section 3.12   Reports to the Trustee; Collection Account Statements. ..........89
    Section 3.13   Annual Statement as to Compliance. ........................................92
    Section 3.14   Assessment of Compliance with Servicing Criteria. ................93
    Section 3.15   Access to Certain Information. ..................................................93
    Section 3.16   Title to REO Property; REO Account. ......................................94
    Section 3.17   Management of REO Property....................................................95
    Section 3.18   Sale of Defaulted Mortgage Loans and REO Properties. ........98
    Section 3.19   Additional Obligations of the Servicer and Special Servicer;
                  Inspections. .............................................................................101

Section 3.20    Modifications, Waivers, Amendments and Consents. ............................104
Section 3.21    Transfer of Servicing Between Servicer and Special Servicer;
                Record Keeping. ........................................................................107
Section 3.22    Sub-Servicing Agreements. ......................................................110
Section 3.23    Representations, Warranties and Covenants of the Servicer. .................111
Section 3.24    Representations, Warranties and Covenants of the Special
                Servicer. ................................................................................113
Section 3.25    Consultation Rights of the Directing Certificateholder. ........................115
Section 3.26    Limitation on Liability of the Directing Certificateholder. ....................116
Section 3.27    Available Information. ..............................................................116
Section 3.28    Servicing Mortgage Accounts ....................................................118
Section 3.29    [Reserved]. ............................................................................118
Section 3.30    Limitations on and Authorizations of the Servicer and Special
                Servicer with Respect to Certain Mortgage Loans. ..........................118
Section 3.31    REMIC Administration. ............................................................119
Section 3.32    Servicer and Special Servicer May Own Certificates. ...........................123

ARTICLE IV PAYMENTS TO CERTIFICATEHOLDERS ....................................................123

Section 4.01    Distributions. ..........................................................................123
Section 4.02    Disbursement of Funds. ............................................................126
Section 4.03    Cap Agreement Reserve Fund. ....................................................126
Section 4.04    Allocation of Losses. ................................................................128
Section 4.05    Method of Distribution. ............................................................129
Section 4.06    Statements to Certificateholders; Reports by Trustee; Other
                Information Available to the Holders and Others. ...........................130
Section 4.07    P&I Advances. ........................................................................134

ARTICLE V THE CERTIFICATES ................................................................................136

Section 5.01    The Certificates. ......................................................................136
Section 5.02    Certificate Register; Registration of Transfer and Exchange of
                Certificates. ............................................................................137
Section 5.03    Book-Entry Certificates. ............................................................143
Section 5.04    Mutilated, Destroyed, Lost or Stolen Certificates. ...........................146
Section 5.05    Persons Deemed Owners. ..........................................................146
Section 5.06    Access to List of Certificateholders' Names and Addresses. ..................147
Section 5.07    Maintenance of Office or Agency ................................................147

ARTICLE VI THE DEPOSITOR, THE SERVICER AND THE SPECIAL SERVICER ..........147

Section 6.01    Liability of the Depositor, the Servicer and the Special Servicer. ...........147
Section 6.02    Merger, Consolidation or Conversion of the Depositor, the
                Servicer or the Special Servicer. ................................................147
Section 6.03    Limitation on Liability of the Trustee, the Depositor, the Servicer,
                the Special Servicer and Others. ................................................148

iiv}

Section 6.04    Servicer and Special Servicer Not to Resign; Assignment of
                Servicing by Servicer or Special Servicer. ............................................149
Section 6.05    Rights of the Depositor in Respect of the Servicer and the Special
                Servicer. ..................................................................................................150

## ARTICLE VII DEFAULT ........................................................................................150

Section 7.01    Events of Default; Servicer and Special Servicer Termination. ..............150
Section 7.02    Trustee to Act; Appointment of Successor. ...........................................153
Section 7.03    Notification to Certificateholders. ..........................................................155
Section 7.04    Waiver of Events of Default. ...................................................................156
Section 7.05    Trustee Advances. ...................................................................................156

## ARTICLE VIII CONCERNING THE TRUSTEE .....................................................156

Section 8.01    Duties of Trustee. ....................................................................................156
Section 8.02    Certain Matters Affecting the Trustee. ....................................................158
Section 8.03    Trustee Not Liable for Validity or Sufficiency of Certificates or
                Mortgage Loans. ......................................................................................160
Section 8.04    Trustee May Own Certificates. ................................................................160
Section 8.05    Fees and Expenses of Trustee; Indemnification of Trustee. ...................160
Section 8.06    Eligibility Requirements for Trustee. ......................................................161
Section 8.07    Resignation and Removal of the Trustee. ................................................162
Section 8.08    Successor Trustee. ...................................................................................163
Section 8.09    Merger or Consolidation of Trustee. ........................................................163
Section 8.10    Appointment of Co-Trustee or Separate Trustee. ..................................164
Section 8.11    [Reserved.] ..............................................................................................165
Section 8.12    Rule 144A Information. ............................................................................165
Section 8.13    Representations, Warranties and Covenants of the Trustee...................165

## ARTICLE IX TERMINATION ................................................................................167

Section 9.01    Termination Upon Repurchase or Liquidation of All Mortgage
                Loans. ......................................................................................................167
Section 9.02    Additional Termination Requirements. ...................................................168

## ARTICLE X MISCELLANEOUS PROVISIONS .....................................................169

Section 10.01   Amendment. .............................................................................................169
Section 10.02   Recordation of Agreement; Counterparts. ..............................................171
Section 10.03   Limitation on Rights of Certificateholders. ............................................172
Section 10.04   Governing Law; Consent to Jurisdiction; Waiver of Jury Trial. ............173
Section 10.05   Notices. ....................................................................................................173
Section 10.06   Severability of Provisions. .......................................................................175
Section 10.07   Grant of a Security Interest; Intended Characterization. ........................175
Section 10.08   Successors and Assigns; Beneficiaries. ...................................................177
Section 10.09   Article and Section Headings. ..................................................................177
Section 10.10   Notices to Rating Agencies.......................................................................177

## EXHIBITS

| | |
|---|---|
| A | Form of Certificates |
| B | Mortgage Loan Schedule |
| C | Form of Cap Agreement |
| D-1 | Form of QIB Investment Representation Letter – Qualified Institutional Buyer |
| D-2 | Form of Investment Representation Letter – Regulation S |
| D-3 | Form of Investment Representation Letter – Institutional Accredited Investor |
| E-1 | Form of Transfer Affidavit |
| E-2 | Form of Transferor Letter |
| F-1 | Form of Request for Release of Special Servicer |
| F-2 | Form of Request for Release of Servicer |
| G | Form of Affidavit of Lost Note |
| H | Investor Certification |
| I | Reserved |
| J | Reserved |
| K | Reserved |
| L | Reserved |
| M | Reserved |
| N | Legend for Global Certificates |
| O | Legend for Definitive Certificates |
| P-1 | Form of Transfer Affidavit |
| P-2 | Form of Transferor Letter |
| Q | Reserved |
| R | Reserved |
| S | Form of Trustee Certification |

This Pooling and Servicing Agreement (the "Agreement"), is dated as of April 1, 2006, among CBA COMMERCIAL ASSETS, LLC, as Depositor, GMAC COMMERCIAL MORTGAGE CORPORATION, as Servicer and as Special Servicer, and DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee.

## PRELIMINARY STATEMENT

The Depositor is the owner of the Trust Fund that is hereby conveyed to the Trustee in return for the Certificates. As provided herein, the Trustee shall elect that the Trust Fund (other than the Cap Agreement Reserve Fund) be treated for federal income tax purposes as comprising two real estate mortgage investment conduits under Section 860D of the Code (each a "REMIC" or, in the alternative "REMIC 1" and "REMIC 2," with REMIC 2 also be referred to as the "Upper-Tier REMIC"). Any inconsistencies or ambiguities in this Agreement or in the administration of this Agreement shall be resolved in a manner that preserves the validity of such REMIC elections.

Each Certificate, other than the Class R Certificate, represents ownership of a regular interest in the Upper-Tier REMIC for purposes of the REMIC Provisions. The Class R Certificate represents the ownership of the sole residual interest in each of REMIC 1 and the Upper-Tier REMIC.

The Upper-Tier REMIC shall hold as its assets the uncertificated Interests in REMIC 1, other than the Class LT-R Interest, and each such Lower-Tier Interest is hereby designated as a regular interest in REMIC 1 for purposes of the REMIC Provisions. REMIC 1 shall hold as its assets all property of the Trust Fund other than the assets held in the Cap Agreement Reserve Fund (including the Cap Agreements) and the interests in any REMIC formed hereby.

The startup day for each REMIC created hereby for purposes of the REMIC Provisions is the Closing Date. In addition, for purposes of the REMIC Provisions, the latest possible maturity date for each regular interest in each REMIC created hereby is the Latest Possible Maturity Date.

### REMIC 1 Interests:

The following table specifies the designation, interest rate, and initial principal balance for each interest in REMIC 1, each of which (other than the LT-R Interest) is hereby designated as a regular interest in REMIC 1 (the "REMIC 1 Regular Interests"):

| Class Designation | Initial Principal Balance | Interest Rate | Corresponding Class of Certificates |
|---|---|---|---|
| LT-A | $141,367,000 | (1) | A |
| LT-M1 | $ 4,587,000 | (1) | M-1 |
| LT-M2 | $ 4,587,000 | (1) | M-2 |
| LT-M3 | $ 5,004,000 | (1) | M-3 |
| LT-M4 | $ 2,919,000 | (1) | M-4 |
| LT-M5 | $ 1,877,000 | (1) | M-5 |
| LT-M6 | $ 3,753,000 | (1) | M-6 |
| LT-M7 | $ 1,460,000 | (1) | M-7 |

| LT-M8 | $ 1,250,318 | (1) | M-8 |
| LT-R | (2) | (2) | R |

(1)     The interest rate for these REMIC 1 Regular Interests for each Distribution Date (and the related Accrual Period) is a per annum rate equal to the Net WAC Rate.

(2)     The LT-R Interest is the sole class of residual interest in REMIC 1.  It does not have a principal balance or an interest rate.

On each Distribution Date, the Trustee shall first pay or charge as an expense of REMIC 1 all expenses of the Trust for such Distribution Date.

On each Distribution Date, interest distributable in respect of the Mortgage Loans for such Distribution Date shall be distributed to the Interests in REMIC 1 at the rates shown above.

On each Distribution Date, all Applied Loss Amounts and all payments of principal in respect of the Mortgage Loans shall be allocated to the Interests in REMIC 1 other than to the LT-R Interests, pro rata, based on the initial principal balances of such Interests.

On each Distribution Date, all Prepayment Premiums received during the related Collection Period shall be distributed to the Interests in REMIC 1 (other than to the LT-R Interests), pro rata, based on the initial principal balances of such Interests.

**Upper-Tier REMIC:**

The following table sets forth (or describes) the Class designation, Pass-Through Rate, and Initial Class Certificate Principal Balance (or Initial Class Certificate Notional Amount) for each Class of Certificates comprising interests in the Trust Fund created hereunder.  Each Class of Certificates, other than the Class R Certificates, is hereby designated as representing ownership of regular interests in the Upper-Tier REMIC:

| Class Designation | Initial Class Principal Balance | Pass-Through Rate |
| --- | --- | --- |
| Class A | $141,367,000 | (1) |
| Class M-1 | $4,587,000 | (1) |
| Class M-2 | $4,587,000 | (1) |
| Class M-3 | $5,004,000 | (1) |
| Class M-4 | $2,919,000 | (1) |
| Class M-5 | $1,877,000 | (1) |
| Class M-6 | $3,753,000 | (1) |
| Class M-7 | $1,460,000 | (1) |
| Class M-8 | $1,250,318 | (1) |
| Class X-1 | (2) | (2) |
| Class R | (3) | (3) |

(1)     Calculated pursuant to the definition of "Pass-Through Rate."

2

(2)    The Class X-1 Interest shall not have a principal balance, but shall be entitled to receive, on each Distribution Date, a specified portion of the interest accrued during the related Accrual Period on each REMIC 1 Regular Interest at a per annum rate equal to the product of (x) a fraction, the numerator of which is the positive difference, if any, of the Interest Remittance Amount for such Distribution Date minus the Current Interest and any Carryforward Interest for the Certificates (other than the Class X-1 Certificates) for such Distribution Date, and the denominator of which is the aggregate Stated Principal Balance of the Mortgage Loans and (y) 12.

(3)    For purposes of the REMIC Provisions, the Class R Certificate represents the sole class of residual interest in the Upper-Tier REMIC as well as ownership of the Class LT-R Interest (which is the sole class of residual interest in REMIC 1). The Class R Certificate does not have a principal balance or an interest rate. The Class R Certificates shall be issued as a single certificate.

# ARTICLE I

## DEFINITIONS

Section 1.01   Defined Terms.

Whenever used in this Agreement, the following words and phrases, unless the context otherwise requires, shall have the meanings specified in this Article.

"Accountant's Statement":  As defined in Section 3.14.

"Acquisition Date":  With respect to any REO Property, the first day on which such REO Property is considered to be acquired by the Trust Fund and REMIC 1 within the meaning of Treasury Regulation Section 1.856-6(b)(1).

"Advance":  Any P&I Advance or Servicing Advance.

"Advance Interest":  The interest accrued on any Advance at the Reimbursement Rate, which is payable to the party hereto that made that Advance, all in accordance with the provisions hereof.

"Adverse REMIC Event":  As defined in Section 3.31(d).

"Affiliate":  With respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person.  For the purposes of this definition, "control", when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agent":  As defined in Section 5.02(f)(A).

"Agreement":  This Pooling and Servicing Agreement and all amendments hereof and supplements hereto.

"Applied Loss Amount":  With respect to each Distribution Date, after giving effect to all losses incurred with respect to Mortgage Loans during the related Collection Period

and all distributions on the Certificates on such Distribution Date, the amount by which (x) the aggregate Certificate Balance of the Certificates (other than the Class X-1 Certificates) exceeds (y) the aggregate Stated Principal Balance of the Loans and any REO Loans expected to be outstanding immediately following such Distribution Date.

"Appraisal":  With respect to a valuation of a Mortgaged Property (i) a real estate broker's price opinion meeting the qualifications, and applying methodology, generally acceptable to small balance commercial mortgage servicers, (ii) an internal valuation performed by the Servicer or Special Servicer, (iii) a valuation performed by a third-party appraiser, (iv) any appraisal required by applicable law in respect of a foreclosure or otherwise, (v) other property valuation opinion methodology customarily used by small balance commercial mortgage servicers with respect to defaulted loans, or (vi) an appraisal prepared in accordance with 12 C.F.R. § 225.64 by an Appraiser selected by the Servicer or Special Servicer, as applicable; *provided,* that if the Stated Principal Balance of the related Mortgage Loan is two percent (2%) or more of the aggregate Stated Principal Balance of the Mortgage Loans at the time such valuation is required, only the method set forth in clause (vi) of this definition shall be used.

"Appraisal Reduction Amount":  For any Distribution Date and for any Mortgage Loan as to which an Appraisal Reduction Event has occurred, an amount calculated by the Special Servicer equal to the excess, if any, of (a) the Stated Principal Balance of such Mortgage Loan over (b) the excess of (i)(A) 90% of the Appraised Value of the related Mortgaged Property plus (B) any letter of credit, reserve, escrow or similar amount held by the Servicer which may be applied to payments on the Mortgage Loan over (ii) the sum of (X) to the extent not previously advanced by the Servicer or the Trustee, all unpaid interest on such Mortgage Loan at a per annum rate equal to its Mortgage Rate, (Y) all unreimbursed Advances in respect of such Mortgage Loan together with Advance Interest thereon and (Z) all currently due and unpaid real estate taxes and assessments, insurance policy premiums, ground rents and other amounts due and unpaid with respect to the Mortgage Loan, net of any amounts currently escrowed for such items (which taxes, assessments, premiums, ground rents and other amounts have not been the subject of an Advance by the Servicer or the Trustee).

Notwithstanding anything herein to the contrary, the aggregate Appraisal Reduction Amount related to a Mortgage Loan or the related REO Property will be reduced to zero as of the date such Mortgage Loan becomes a Corrected Mortgage Loan or is paid in full, liquidated, repurchased or otherwise removed from the Trust Fund.

"Appraisal Reduction Event":  With respect to any Mortgage Loan with a Stated Principal Balance equal to or greater than (a) $2,000,000.00 or (b) two percent (2%) of the aggregate Stated Principal Balance of the Mortgage Loans at that time, the earliest of (i) 120 days after an uncured delinquency (without regard to the application of any grace period) occurs in respect of such Mortgage Loan, (ii) the date on which a reduction in the amount of Monthly Payments on such Mortgage Loan, or a change in any other material economic term of such Mortgage Loan (other than an extension of the Maturity Date for a period of six months or less), becomes effective as a result of a modification of such Mortgage Loan by the Special Servicer, (iii) 60 days after a receiver has been appointed for the Borrower of the related Mortgaged Property, (iv) 30 days after a Borrower declares bankruptcy; (v) 60 days after the borrower has

become the subject of a decree or order for a bankruptcy proceeding that shall have remained in force undischarged and unstayed, and (vi) immediately after a Mortgage Loan becomes an REO Loan; provided, however, that an Appraisal Reduction Event shall not be deemed to occur at any time on and after the dates when the aggregate Certificate Balances of all Classes of Certificates (other than the Class A Certificates) have been reduced to zero.  The Special Servicer shall notify the Servicer, and the Servicer shall notify the Special Servicer promptly upon the occurrence of any of the foregoing events.

"Appraised Value":  With respect to any Mortgaged Property, the appraised value thereof as determined by an Appraisal.

"Appraiser":  An Independent MAI, state certified organization with five years of experience in properties of like kind and in the same geographic area, or an independent state certified or licensed organization in accordance with USAP and FIRREA regulations.

"Assignment of Leases":  With respect to any Mortgaged Property, any assignment of leases, rents and profits or similar instrument, executed by the related Borrower, assigning to the related mortgagee all of the income, rents and profits derived from the ownership, operation, leasing or disposition of all or a portion of such Mortgaged Property, in the form which was duly executed, acknowledged and delivered, as amended, modified, renewed or extended through the date hereof and from time to time hereafter.

"Assumed Scheduled Payment":  For any Collection Period and with respect to any Mortgage Loan that is delinquent in respect of its Balloon Payment (including any REO Loan as to which the Balloon Payment would have been past due), an amount equal to the sum of (a) the principal portion of the Monthly Payment that would have been due on such Mortgage Loan on the related Due Date based on the constant payment required by the related Note or the original amortization schedule thereof (as calculated with interest at the related Mortgage Rate), if applicable, assuming such Balloon Payment had not become due, after giving effect to any modification of such Mortgage Loan, and (b) interest on the Stated Principal Balance of such Mortgage Loan at the applicable Mortgage Rate (less the Servicing Fee Rate).

"Authenticating Agent":  Deutsche Bank National Trust Company, or any agent of the Trustee appointed to act as Authenticating Agent pursuant to Section 5.01.

"Balloon Loan":  Any Mortgage Loan that by its terms provides for an amortization schedule extending beyond its Maturity Date.

"Balloon Payment":  With respect to any Balloon Loan and any date of determination, the scheduled payment of principal due on the Maturity Date of such Mortgage Loan (less principal included in the applicable amortization schedule or scheduled Monthly Payment).

"Bankruptcy Code":  The federal Bankruptcy Code, as amended from time to time (Title 11 of the United States Code).

"Book-Entry Certificate":  Any Certificate registered in the name of the Depository or its nominee.

5

"Borrower":  With respect to any Mortgage Loan, any obligor or obligors on any related Note or Notes.

"Breach":  As defined in Section 2.03(b).

"Business Day":  Any day other than a Saturday, a Sunday or a day on which banking institutions in the States of New York, Maryland, Minnesota, Connecticut, Pennsylvania and California are authorized or obligated by law or executive order to remain closed.

"Cap Agreements":  The interest rate cap agreements entered into with Bear Stearns Financial Products Inc., attached hereto as Exhibit C, which contractual rights will be accounted for by the Trustee as property that the Trustee holds for the benefit of the Offered Certificateholders (other than the Holders of the Class X-1 Certificates) of regular interests in the Upper-Tier REMIC separate and apart from such regular interests.

"Cap Agreement Reserve Fund":  The Eligible Account, which shall constitute an "outside reserve fund" under Treasury Regulation section 1.860G-2(h), created hereunder pursuant to Section 4.03 into which payments under the Cap Agreements and amounts otherwise distributable on the Class X-1 Certificates shall be deposited from time to time.

"Carryforward Interest":  With respect to each Class of Certificates will equal, with respect to any Distribution Date, the amount, if any, by which (i) the sum of (x) Current Interest for such Class for the immediately preceding Distribution Date and (y) any unpaid Carryforward Interest from previous Distribution Dates exceeds (ii) the amount distributed in respect of interest on such Class on such immediately preceding Distribution Date.

"CERCLA":  The Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

"Certificate":  Any one of the CBA Commercial Assets, Small Balance Commercial Mortgage Pass-Through Certificates, Series 2006-1, as executed, authenticated and delivered by the Trustee, and issued pursuant to this Agreement, substantially in the forms attached hereto as Exhibit A.

"Certificate Balance":  With respect to any Certificate (other than the X-1 and Class R Certificates), (i) on or prior to the first Distribution Date, an amount equal to the Original Certificate Balance of such Class as specified in the Preliminary Statement hereto, and (ii) as of any date of determination after the first Distribution Date, the Certificate Balance of such Class on the Distribution Date immediately prior to such date of determination (determined as adjusted pursuant to Section 1.02(iii)).

"Certificate Distribution Account":  The separate non-interest bearing trust account which shall be an Eligible Account established and maintained by the Trustee pursuant to Section 3.04(b).

"Certificate Owner":  With respect to a Book-Entry Certificate, the Person who is the beneficial owner of such Certificate as reflected on the books of the Depository or on the books of a Depository Participant or on the books of an indirect participating brokerage firm for

which a Depository Participant acts as agent.

"Certificate Register" and "Certificate Registrar":  The register maintained and the registrar appointed pursuant to Section 5.02.

"Certificateholder" or "Holder":  The Person in whose name a Certificate is registered in the Certificate Register; *provided, however,* that solely for the purposes of giving any consent, approval or waiver pursuant to this Agreement with respect to the rights, obligations or liabilities of the Trustee, the Servicer or the Special Servicer, any Certificate registered in the name of the Trustee, the Servicer, the Special Servicer or any Affiliate of any of them shall be deemed not to be outstanding, and the Voting Rights to which it is entitled shall not be taken into account in determining whether the requisite percentage of Voting Rights necessary to effect any such consent, approval or waiver have been obtained; provided that (i) such restrictions shall not apply to the selection of the Controlling Class (or the Directing Certificateholder) or the exercise of the Special Servicer's or its Affiliates' rights as a member of the Controlling Class and (ii) the foregoing shall not apply if the Trustee, the Servicer or the Special Servicer, as the case may be, and/or their Affiliates, own the entire Class of each Class of Certificates affected by such action, vote, consent or waiver.  The Trustee shall be entitled to request and conclusively rely upon a certificate of the Servicer or the Special Servicer in determining whether a Certificate is registered in the name of an Affiliate of such Person. All references herein to "Holders" or "Certificateholders" shall reflect the rights of Certificate Owners as they may indirectly exercise such rights through the Depository and the Depository Participants, except as otherwise specified herein; *provided, however,* that the parties hereto shall be required to recognize as a "Holder" or "Certificateholder" only the Person in whose name a Certificate is registered in the Certificate Register.

"Class":  Any Certificates having the same class designation.

"Class A Pass-Through Rate":  The lesser of (i) LIBOR plus 0.25% and (ii) the Net WAC Rate; provided, that if no one exercises its option to purchase the Mortgage Loans and REO Property in the Trust Fund pursuant to Section 9.01 on the Distribution Date on which they are first entitled to do so, then with respect to such Distribution Date and each subsequent Distribution Date, the per annum rate calculated pursuant to clause (i) will be LIBOR plus 0.500%.

"Class M-1 Pass-Through Rate":  The lesser of (i) LIBOR plus 0.35% and (ii) the Net WAC Rate; provided, that if no one exercises its option to purchase the Mortgage Loans and REO Property in the Trust Fund pursuant to Section 9.01 on the Distribution Date on which they are first entitled to do so, then with respect to such Distribution Date and each subsequent Distribution Date, the per annum rate calculated pursuant to clause (i) will be LIBOR plus 0.525%.

"Class M-2 Pass-Through Rate":  The lesser of (i) LIBOR plus 0.55% and (ii) the Net WAC Rate; provided, that if no one exercises its option to purchase the Mortgage Loans and REO Property in the Trust Fund pursuant to Section 9.01 on the Distribution Date on which they are first entitled to do so, then with respect to such Distribution Date and each subsequent Distribution Date, the per annum rate calculated pursuant to clause (i) will be LIBOR plus

0.825%.

"Class M-3 Pass-Through Rate":  The lesser of (i) 6.50% and (ii) the Net WAC Rate; provided, that if no one exercises its option to purchase the Mortgage Loans and REO Property in the Trust Fund pursuant to Section 9.01 on the Distribution Date on which they are first entitled to do so, then with respect to such Distribution Date and each subsequent Distribution Date, the per annum rate pursuant to clause (i) will be 7.00%.

"Class M-4 Pass-Through Rate":  The lesser of (i) 6.50% and (ii) the Net WAC Rate; provided, that if no one exercises its option to purchase the Mortgage Loans and REO Property in the Trust Fund pursuant to Section 9.01 on the Distribution Date on which they are first entitled to do so, then with respect to such Distribution Date and each subsequent Distribution Date, the per annum rate pursuant to clause (i) will be 7.00%.

"Class M-5 Pass-Through Rate":  The lesser of (i) 6.50% and (ii) the Net WAC Rate; provided, that if no one exercises its option to purchase the Mortgage Loans and REO Property in the Trust Fund pursuant to Section 9.01 on the Distribution Date on which they are first entitled to do so, then with respect to such Distribution Date and each subsequent Distribution Date, the per annum rate pursuant to clause (i) will be 7.00%.

"Class M-6 Pass-Through Rate":  The lesser of (i) 6.50% and (ii) the Net WAC Rate; provided, that if no one exercises its option to purchase the Mortgage Loans and REO Property in the Trust Fund pursuant to Section 9.01 on the Distribution Date on which they are first entitled to do so, then with respect to such Distribution Date and each subsequent Distribution Date, the per annum rate pursuant to clause (i) will be 7.00%.

"Class M-7 Pass-Through Rate":  The lesser of (i) 5.50% and (ii) the Net WAC Rate; provided, that if no one exercises its option to purchase the Mortgage Loans and REO Property in the Trust Fund pursuant to Section 9.01 on the Distribution Date on which they are first entitled to do so, then with respect to such Distribution Date and each subsequent Distribution Date, the per annum rate pursuant to clause (i) will be 6.00%.

"Class M-8 Pass-Through Rate":  The lesser of (i) 5.50% and (ii) the Net WAC Rate; provided, that if no one exercises its option to purchase the Mortgage Loans and REO Property in the Trust Fund pursuant to Section 9.01 on the Distribution Date on which they are first entitled to do so, then with respect to such Distribution Date and each subsequent Distribution Date, the per annum rate pursuant to clause (i) will be 6.00%.

"Class Notional Balance":  The Class Notional Balance of the Class X-1 Certificates will be equal as of any Distribution Date to the aggregate Principal Balance of the Mortgage Loans as of the start of the related Collection Period.  The Class Notional Balance of the Class X-1 Certificates as of the Closing Date will be approximately $166,804,318.

"Class X-1 Pass-Through Rate":  The per annum rate, equal to the product of (x) a fraction, the numerator of which is the positive difference, if any, of the Interest Remittance Amount for such Distribution Date minus the sum of (1) Current Interest and (2) any Carryforward Interest for the Certificates (other than the Class X-1 Certificates) for such Distribution Date, and the denominator of which is the aggregate Stated Principal Balance of the

Mortgage Loans and (y) 12.

Solely for federal income tax purposes, the Class X-1 Pass-Through Rate will be the per annum rate, economically equivalent to the rate described above, equal to the excess, if any, of (i) the weighted average of the interest rates on the REMIC 1 Regular Interests (i.e. the Net Wac Rate), over (ii) the weighted average of the interest rates for such Distribution Date for each Class of Offered Certificates (other than the Class X-1 Certificates), weighted in proportion to their Certifcate Balances as of the beginning of the related Accrual Period.

Notwithstanding the foregoing, on each Distribution Date, the interest that the Class X-1 Certificates would otherwise be entitled to based on the Class X-1 Pass-Through Rate may be reduced by the amount, if any, that is necessary to fund payment of any Net WAC Rate Carryover Amounts after giving effect to payments made by the Cap Agreements.

"Closing Date":  April 27, 2006.

"CMSA":  The Commercial Mortgage Securities Association, or any association or organization that is a successor thereto.  If neither such association nor any successor remains in existence, "CMSA" shall be deemed to refer to such other association or organization as may exist whose principal membership consists of servicers, trustees, issuers, placement agents and underwriters generally involved in the commercial mortgage loan securitization industry, which is the principal such association or organization in the commercial mortgage loan securitization industry and one of whose principal purposes is the establishment of industry standards for reporting transaction-specific information relating to commercial mortgage pass-through certificates and commercial mortgage-backed bonds and the commercial mortgage loans and foreclosed properties underlying or backing them to investors holding or owning such certificates or bonds, and any successor to such other association or organization.  If an organization or association described in one of the preceding sentences of this definition does not exist, "CMSA" shall be deemed to refer to such other association or organization as shall be selected by the Servicer and reasonably acceptable to the Special Servicer and the Directing Certificateholder.

"CMSA Bond Level File":  The report substantially in the form of, and containing the information called for in, the downloadable form of the "Bond Level File" available as of the Closing Date on the CMSA Website, or such other form or information acceptable to the Rating Agencies for the presentation of such information.  The CMSA Bond Level File may contain such additional information as may from time to time be recommended by the CMSA for commercial mortgage-backed securities transactions generally (*provided* that such changes are reasonably acceptable to the Directing Certificateholder, the Servicer and the Special Servicer and do not materially increase the expense of such reporting).

"CMSA Collateral Summary File":  The report substantially in the form of, and containing substantially the information called for in, the downloadable form of the "Collateral Summary File" available as of the Closing Date on the CMSA Website, or such other form or information acceptable to the Rating Agencies for the presentation of such information.  The CMSA Collateral Summary File may contain such additional information as may from time to time be recommended by the CMSA for commercial mortgage securities transactions generally (*provided* that such changes are reasonably acceptable to the Directing Certificateholder and the

Servicer and do not materially increase the expense of such reporting).

"CMSA Comparative Financial Status Report": A report substantially in the form of, and containing substantially the information called for in, the downloadable form of the "Comparative Financial Status Report" available as of the Closing Date on the CMSA Website, or such other form or information acceptable to the Rating Agencies for the presentation of such information. The CMSA Comparative Financial Status Report may contain such additional information as may from time to time be recommended by the CMSA for commercial mortgage securities transactions generally (*provided* that such changes are reasonably acceptable to the Directing Certificateholder, the Servicer and the Special Servicer and do not materially increase the expense of such reporting).

"CMSA Delinquent Loan Status Report": A report substantially in the form of, and containing substantially the information called for in, the downloadable form of the "Delinquent Loan Status Report" available as of the Closing Date on the CMSA Website, or such other form or information acceptable to the Rating Agencies for the presentation of such information. The CMSA Delinquent Loan Status Report may contain such additional information as may from time to time be recommended by the CMSA for commercial mortgage securities transactions generally (*provided* that such changes are reasonably acceptable to the Directing Certificateholder, the Servicer and the Special Servicer and do not materially increase the expense of such reporting).

"CMSA Financial File": A report substantially in the form of, and containing substantially the information called for in, the downloadable form of the "Financial File" available as of the Closing Date on the CMSA Website, or such other form or information acceptable to the Rating Agencies for the presentation of such information. The CMSA Financial File may contain such additional information as may from time to time be recommended by the CMSA for commercial mortgage securities transactions generally (*provided* that such changes are reasonably acceptable to the Directing Certificateholder and the Servicer and do not materially increase the expense of such reporting).

"CMSA Historical Liquidation Report": A report substantially in the form of, and containing substantially the information called for in, the downloadable form of the "Historical Liquidation Report" available as of the Closing Date on the CMSA Website, or such other form or information acceptable to the Rating Agencies for the presentation of such information. The CMSA Historical Liquidation Report may contain such additional information as may from time to time be recommended by the CMSA for commercial mortgage securities transactions generally (*provided* that such changes are reasonably acceptable to the Directing Certificateholder, the Servicer and the Special Servicer and do not materially increase the expense of such reporting).

"CMSA Historical Loan Modification Report": A report substantially in the form of, and containing substantially the information called for in, the downloadable form of the "Historical Loan Modification Report" available as of the Closing Date on the CMSA Website, or such other form or information acceptable to the Rating Agencies for the presentation of such information. The CMSA Historical Loan Modification Report may, contain such additional information as may from time to time be recommended by the CMSA for commercial mortgage

securities transactions generally (*provided* that such changes are reasonably acceptable to the Directing Certificateholder, the Servicer and the Special Servicer and do not materially increase the expense of such reporting).

"CMSA Loan Periodic Update File":  The monthly report substantially in the form of, and containing substantially the information called for in, the downloadable form of the "Loan Periodic Update File" available as of the Closing Date on the CMSA Website, or such other form or information acceptable to the Rating Agencies for the presentation of such information.  The CMSA Loan Periodic Update File may contain such additional information as may from time to time be recommended by the CMSA for commercial mortgage securities transactions generally (*provided* that such changes are reasonably acceptable to the Directing Certificateholder and the Servicer and do not materially increase the expense of such reporting).

"CMSA Loan Setup File":  The report substantially in the form of, and containing substantially the information called for in, the downloadable form of the "Loan Setup File" available as of the Closing Date on the CMSA Website, or such other form or information acceptable to the Rating Agencies for the presentation of such information.  The CMSA Loan Setup File may contain such additional information as may from time to time be recommended by the CMSA for commercial mortgage securities transactions generally (*provided* that such changes are reasonably acceptable to the Directing Certificateholder and the Servicer and do not materially increase the expense of such reporting).

"CMSA NOI Adjustment Worksheet": A report substantially in the form of, and containing substantially the information called for in, the downloadable form of the "NOI Adjustment Worksheet" available as of the Closing Date on the CMSA Website, or such other form or information acceptable to the Rating Agencies for the presentation of such information. The CMSA NOI Adjustment Worksheet may contain such additional information as may from time to time be recommended by the CMSA for commercial mortgage securities transactions generally (*provided* that such changes are reasonably acceptable to the Directing Certificateholder, the Servicer and the Special Servicer and do not materially increase the expense of such reporting).

"CMSA Operating Statement Analysis Report":  A report substantially in the form of, and containing substantially the information called for in, the downloadable form of the "Operating Statement Analysis Report" available as of the Closing Date on the CMSA Website or in such other form or information acceptable to the Rating Agencies for the presentation of such information.  The CMSA Operating Statement Analysis Report may contain such additional information as may from time to time be recommended by the CMSA for commercial mortgage-backed securities transactions generally (*provided* that such changes are reasonably acceptable to the Directing Certificateholder, the Servicer and the Special Servicer and do not materially increase the expense of such reporting).

"CMSA Property File":  A report substantially in the form of, and containing substantially the information called for in, the downloadable form of the "Property File" available as of the Closing Date on the CMSA Website, or such other form or information acceptable to the Rating Agencies for the presentation of such information.  The CMSA Property File may contain such additional information as may from time to time be recommended by the

CMSA for commercial mortgage securities transactions generally (*provided* that such changes are reasonably acceptable to the Directing Certificateholder, the Servicer and the Special Servicer and do not materially increase the expense of such reporting).

"CMSA REO Status Report":  A report substantially in the form of, and containing substantially the information called for in, the downloadable form of the "REO Status Report" available as of the Closing Date on the CMSA Website, or in such other form or information acceptable to the Rating Agencies for the presentation of such information.  The CMSA REO Status Report may contain such additional information as may from time to time be recommended by the CMSA for commercial mortgage securities transactions generally (*provided* that such changes are reasonably acceptable to the Directing Certificateholder and the Special Servicer and do not materially increase the expense of such reporting).

"CMSA Servicer Watch List":  A report substantially in the form of, and containing substantially the information called for in such form, or in such other form or information acceptable to the Rating Agencies for the presentation of such information.  The CMSA Servicer Watch List may contain such additional information as may from time to time be recommended by the CMSA for commercial mortgage-backed securities transactions generally, it being acknowledged that Servicer shall use the form recommended by the CMSA for use beginning in April 2003 for any time period subsequent to the Closing Date (*provided* that such changes are reasonably acceptable to the Directing Certificateholder and the Servicer and do not materially increase the expense of such reporting).

"CMSA Special Servicer Loan File":  The monthly file substantially in the CMSA Special Servicer Loan File format prescribed by the CMSA and containing the information called for in, the downloadable form of the "CMSA Special Servicer Loan File" available as of the Closing Date on the CMSA Website, or such other form or information acceptable to the Rating Agencies for the presentation of such information.  The CMSA Special Servicer Loan File may contain such additional information as may from time to time be recommended by the CMSA for commercial mortgage securities transactions generally (*provided* that such changes are reasonably acceptable to the Directing Certificateholder, the Servicer and the Special Servicer and do not materially increase the expense of such reporting).

"CMSA Website":  CMSA's website located at "www.cmbs.org" or such other primary website as CMSA may establish for dissemination of its report forms.

"Code":  The Internal Revenue Code of 1986, as amended from time to time, and applicable final or temporary regulations of the U.S. Department of the Treasury issued pursuant thereto.

"Collection Account":  One or more separate custodial accounts created and maintained by the Servicer or any Sub-Servicer on behalf of the Servicer pursuant to Section 3.04(a) in the name of the Trustee on behalf of the Certificateholders into which the amounts set forth in Section 3.04(a) shall be deposited directly, which account shall be entitled "GMAC Commercial Mortgage Corporation, in trust for Deutsche Bank National Trust Company, as Trustee for the benefit of Holders of CBA Commercial Assets, Small Balance Commercial Mortgage Pass-Through Certificates, Series 2006-1, as their interest may appear Collection

Account."  Any such account or accounts shall be an Eligible Account.

"Collection Period":  With respect to the first Distribution Date, the period beginning on the Cut-off Date and ending on the 16th day of the month in which such Distribution Date occurs.  With respect to any other Distribution Date, the one-month period beginning on the 17th day of the calendar month immediately preceding the month in which such Distribution Date occurs and ending on the 16th day of the month in which such Distribution Date occurs.

"Commission":  The Securities and Exchange Commission.

"Compensating Interest":  Prepayment Interest Shortfalls paid by the Servicer.

"Controlling Class":  As of any date of determination, the most subordinate Class of Certificates then outstanding that has a Certificate Balance at least equal to 25% of the initial Certificate Balance of such Class (or, if no such Class exists, the most subordinate Class then outstanding).  As of the Closing Date, the Controlling Class shall be the Class M-8 Certificates.

"Controlling Class Certificateholder":  Each Holder (or Certificate Owner, if applicable) of a Certificate of the Controlling Class as certified by the Certificate Registrar to the Trustee from time to time.

"Corporate Trust Office":  The principal corporate trust office of the Trustee at which at any particular time its corporate trust business with respect to this Agreement shall be administered, which office at the date of the execution of this Agreement is located at (i) 1761 East St. Andrew Place, Santa Ana, California 92705, Attention: Trust Administration-CC0601, and (ii) for certificate transfer purposes at DB Services Tennessee, 648 Grassmere Park Road, Nashville, Tennessee 37211-3658, Attention: Transfer Unit.

"Corrected Mortgage Loan":  Any Specially Serviced Loan that has become current and remained current for three consecutive Monthly Payments (for such purposes taking into account any modification or amendment of such Mortgage Loan) and as to which Mortgage Loan the Special Servicer has returned servicing to the Servicer pursuant to Section 3.21(a).

"Current Interest":  As to any Distribution Date and any Class of Certificates other than the Class X-1 Certificates, the amount of interest accrued during the related Interest Accrual Period at the related Pass-Through Rate on the Certificate Balance of such Class immediately prior to such Distribution Date.  As to any Distribution Date and the Class X-1 Certificates, the amount of interest accrued during the related Interest Accrual Period at the Pass-Through Rate thereof on the related Class Notional Balance thereof as of such Distribution Date.

"Cut-off Date":  April 1, 2006.

"Cut-off Date Principal Balance":  With respect to any Mortgage Loan, the outstanding principal balance of such Mortgage Loan as of the Cut-off Date, after application of all payments of principal due on or before such date, whether or not received.

"Debt Service Coverage Ratio": With respect to any Mortgage Loan for any

twelve-month period covered by an annual operating statement for the related Mortgaged Property, the ratio of (i) Net Operating Income produced by the related Mortgaged Property during such period not adjusted for any reserves, other than taxes and insurance (whether or not such reserves are escrowed by the Servicer) to (ii) the aggregate amount of Monthly Payments (other than any Balloon Payment) due under such Mortgage Loan during such period; *provided* that any such calculation of Debt Service Coverage Ratio hereunder shall not include any potential draws from a debt service reserve, letter of credit or guaranty/surety bond.

"Default Interest":  With respect to any Mortgage Loan (or successor REO Loan) and to the extent billed and received by the Servicer interest accrued on such Mortgage Loan (or REO Loan) at the excess of (i) the related Default Rate over (ii) the related Mortgage Rate.

"Default Rate":  With respect to any Mortgage Loan, the per annum rate at which interest accrues on such Mortgage Loan following any event of default on such Mortgage Loan, including a default in the payment of a Monthly Payment or a Balloon Payment.

"Defaulted Mortgage Loan":  A Mortgage Loan that is at least 90 days delinquent in respect of its Monthly Payments by the Borrower or more than 60 days delinquent in respect of its Balloon Payment (unless the Servicer has a firm commitment from the Borrower to close on a refinance of the Mortgage Loan within 90 days of the date such Loan was first delinquent, then 90 days if the Servicer or Special Servicer, as the case may be, determines, in accordance with the Servicing Standard, such extension would be in the best interest of the Certificateholders), if any, in each case without giving effect to any grace period permitted by the related Mortgage or Note and without regard to any acceleration of payments under the related Mortgage and Note; provided, however, that no Monthly Payment (other than a Balloon Payment) shall be deemed delinquent if less than ten dollars of all amounts due and payable on such Mortgage Loan has not been received.

"Defaulting Party":  As defined in Section 7.01(b).

"Defect":  As defined in Section 2.02(e).

"Deficient Valuation":  With respect to any Mortgage Loan, a valuation by a court of competent jurisdiction of the Mortgaged Property in an amount less than the then outstanding principal balance of the Mortgage Loan, which valuation results from a proceeding initiated under the Bankruptcy Code.

"Definitive Certificate":  A Certificate issued in registered, definitive physical form.

"Denomination":  As defined in Section 5.01.

"Depositor":  CBA Commercial Assets, LLC, a Delaware limited liability company, or its successor in interest.

"Depository":  The Depository Trust Company, or any successor Depository hereafter named.  The nominee of the initial Depository for purposes of registering those Certificates that are to be Book-Entry Certificates, is Cede & Co.  The Depository shall at all

times be a "clearing corporation" as defined in Section 8-102(3) of the Uniform Commercial Code of the State of New York and a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act.

"Depository Participant":  A broker, dealer, bank or other financial institution or other Person for whom from time to time the Depository effects book-entry transfers and pledges of securities deposited with the Depository.

"Depository Rules":  As defined in Section 5.02(b).

"Determination Date":  With respect to any Distribution Date, the close of business on the 16th day of the month in which such Distribution Date occurs, or if such day is not a Business Day, the Business Day immediately following such day.

"Directing Certificateholder":  The Controlling Class Certificateholder selected by the Holders of more than 50% of the Percentage Interests in the Controlling Class, by Certificate Balance, as certified by the Trustee from time to time and as shall be evidenced by notice delivered by the Directing Certificateholder to the parties hereto and the prior Directing Certificateholder, if any; provided, however, that until a Directing Certificateholder is so selected or after receipt of a notice from the Holders of more than 50% of the Percentage Interests in the Controlling Class that a Directing Certificateholder is no longer designated, the Controlling Class Certificateholder that beneficially owns the largest aggregate Certificate Balance of the Controlling Class shall be the Directing Certificateholder.  The initial Directing Certificateholder will be CBA Commercial Securities, LLC.  No appointment of any Person as a Directing Certificateholder shall be effective until such Person provides the Trustee, the Servicer and the Special Servicer with written confirmation of its acceptance of such appointment, an address and telecopy number for the delivery of notices and other correspondence and a list of officers or employees of such Person with whom the parties to this Agreement may deal (including their names, titles, work addresses and telecopy numbers).  If no Person is appointed a Directing Certificateholder, the Servicer, the Special Servicer and the Trustee shall not be required to recognize the Controlling Class Certificateholder that beneficially owns the largest aggregate Certificate Balance of the Controlling Class as the Directing Certificateholder until such Certificateholder provides an address and telecopy number for the delivery of notices and other correspondence and a list of officers or employees of such Person with whom the parties to this Agreement may deal (including their names, titles, work addresses and telecopy numbers).  Notwithstanding the foregoing, the transfer of any Controlling Class Certificate to any repurchase agreement counterparty for the purposes of financing shall not operate to change the designation of the Directing Certificateholder.

"Directly Operate":  With respect to any REO Property, the furnishing or rendering of services to the tenants thereof that are not (within the meaning of Treasury Regulation Section 1.512(b)-1(c)(5)) customarily provided to tenants in connection with the rental of space for occupancy, the management or operation of such REO Property, the holding of such REO Property primarily for sale to customers in the ordinary course of a trade or business, the performance of any construction work thereon or any use of such REO Property in a trade or business conducted by the Trust Fund, in each case other than through an Independent Contractor; *provided, however,* that the Trustee (or the Servicer or the Special Servicer on behalf

of the Trustee) shall not be considered to Directly Operate an REO Property solely because the Trustee (or the Servicer or the Special Servicer on behalf of the Trustee) establishes rental terms, chooses tenants, enters into or renews leases, deals with taxes and insurance or makes decisions as to repairs (of the type that would be deductible under Section 162 of the Code) or capital expenditures with respect to such REO Property.

"<u>Disqualified Organization</u>":  Any of (i) the United States, any State or political subdivision thereof, any possession of the United States or any agency or instrumentality of any of the foregoing (other than an instrumentality that is a corporation if all of its activities are subject to tax and, except for FHLMC, a majority of its board of directors is not selected by such governmental unit), (ii) a foreign government, any international organization or any agency or instrumentality of any of the foregoing, (iii) any organization (other than certain farmers' cooperatives described in Section 521 of the Code) that is exempt from the tax imposed by Chapter 1 of the Code (including the tax imposed by Section 511 of the Code on unrelated business taxable income), (iv) rural electric and telephone cooperatives described in Section 1381(a)(2)(C) of the Code and (v) any other Person so designated by the Depositor based upon an Opinion of Counsel that the holding of an Ownership Interest in a Residual Certificate by such Person may cause the any REMIC created hereunder to fail to qualify as a REMIC or any Person having an Ownership Interest in any Class of Certificates (other than such Person) to incur a liability for any federal tax imposed under the Code that would not otherwise be imposed but for the Transfer of an Ownership Interest in a Residual Certificate to such Person.  The terms "United States," "State" and "international organization" shall have the meanings set forth in Section 7701 of the Code or successor provisions.

"<u>Distribution Date</u>":  With respect to any month, the 25th day of the month or if such day is not a Business Day, the next Business Day of such month, commencing on May 25, 2006.

"<u>Due Date</u>":  With respect to (i) any Mortgage Loan on or prior to its Maturity Date, the day of the month set forth in the related Note on which each Monthly Payment thereon is scheduled to be first due (without giving effect to any grace period), (ii) any Mortgage Loan after the Maturity Date therefor, the day of the month set forth in the related Note on which each Monthly Payment on such Mortgage Loan had been scheduled to be first due (without giving effect to any grace period) and (iii) any REO Loan, the day of the month set forth in the related Note on which each Monthly Payment on the related Loan had been scheduled to be first due (without giving effect to any grace period).

"<u>Eligible Account</u>":  Either (i) an account, accounts or subaccount maintained with a federal or state chartered depository institution or trust company (including the Trustee, provided the ratings requirements in this clause (i) are met) whose short-term unsecured debt obligations or other short-term deposits are rated at least "A-1" by S&P, "F-1" by Fitch, and "P-1" from Moody's if the deposits are to be held in the account for 30 days or less, or the long-term unsecured debt obligations of which are rated at least "AA-" by S&P (or "A-" if the short-term debt obligations have a short-term rating of not less than "A-1"), which has a long-term unsecured debt rating of at least "Aa3" from Moody's and a short-term unsecured debt rating of at least "P-1" from Moody's and "A" by Fitch, if the deposits are to be held in such account for more than 30 days or the short-term debt obligations of which have a short-term rating of not less

16

than "A-1" by S&P and "F-1" by Fitch if the deposits are to be held in such account for 30 days or less, or such other account or accounts with respect to which each of the Rating Agencies shall have confirmed in writing that the then-current rating assigned to any of the Certificates that are currently being rated by such Rating Agency will not be qualified (as applicable), downgraded or withdrawn by reason thereof, (ii) a segregated trust account or accounts maintained with the corporate trust department of a federal- or state-chartered depository institution or trust company (including the Trustee, provided the ratings requirements in this clause (ii) are met) that, in either case, has a combined capital and surplus of at least $50,000,000 and has corporate trust powers, acting in its fiduciary capacity; *provided* that any state-chartered depository institution or trust company is subject to regulation regarding fiduciary funds substantially similar to 12 C.F.R. § 9.10(b), (iii) such other account or accounts with respect to which each of the Rating Agencies shall have confirmed in writing that the then-current rating assigned to any of the Certificates that are currently being rated by such Rating Agency will not be qualified (as applicable), downgraded or withdrawn by reason thereof, or (iv) for so long as GMAC Commercial Mortgage Corporation is acting as the Servicer, a segregated trust account or accounts maintained at Escrow Bank, Midvale, Utah; provided that Escrow Bank has corporate trust powers, is acting in its fiduciary capacity, is rated at least Baa3 by Moody's and is subject to a regulation regarding fiduciary funds substantially similar to Section 9.10(b) of Title 12 of the Code of Federal Regulations.

"Environmental Assessment": A "Phase I assessment" as described in, and meeting the criteria of, (i) Chapter 5 of the FNMA Multifamily Guide or any successor provisions covering the same subject matter, in the case of a Specially Serviced Loan as to which the related Mortgaged Property is multifamily property or (ii) the American Society for Testing and Materials in the case of a Specially Serviced Loan as to which the related Mortgaged Property is not a multifamily property.

"Environmental Insurance Policy":  With respect to any Loan, any insurance policy covering Insured Environmental Events that is maintained from time to time in respect of such Loan or the related Mortgaged Property.

"ERISA":  The Employee Retirement Income Security Act of 1974, as amended.

"ERISA Prohibited Holder":  As defined in Section 5.02(f)(A).

"ERISA Qualifying Underwriting":  A best efforts or firm commitment underwriting or private placement that meets the requirements of Prohibited Transaction Exemption 2002-41, 67 Fed. Reg. 54487 (2002), as amended (or any successor thereto), or any substantially similar administrative exemption granted by the U.S. Department of Labor.

"ERISA Restricted Certificate":  Any Class M-6, Class M-7, Class M-8 or Residual Certificate; provided, that any such Certificate (a) will cease to be considered an ERISA Restricted Certificate and (b) will cease to be subject to the transfer restrictions contained in Section 5.02(e) if, as of the date of a proposed transfer of such Certificate, either (i) it is rated in one of the four highest generic ratings categories by a Rating Agency or (ii) relevant provisions of ERISA would permit transfer of such Certificate to a Plan (in the case of clause (ii), as evidenced by an Opinion of Counsel).

"Escrow Payment":  Any payment received by the Servicer for the account of any Borrower for application toward the payment of real estate taxes, assessments, Insurance Policy premiums and similar items in respect of the related Mortgaged Property, including amounts for deposit to any reserve account.

"Event of Default":  One or more of the events described in Section 7.01(a).

"Exchange Act":  The Securities Exchange Act of 1934, as amended from time to time.

"Fair Value":  As defined in Section 3.18(b).

"FDIC":  Federal Deposit Insurance Corporation or any successor.

"FHLMC":  Federal Home Loan Mortgage Corporation or any successor.

"Final Recovery Determination":  A determination by the Special Servicer with respect to any Specially Serviced Loan or REO Property (other than a Loan or REO Property, as the case may be, that was purchased (i) by the Seller pursuant to Section 7 of the Mortgage Loan Purchase Agreement, (ii) solely with respect to a Defaulted Mortgage Loan, by the Directing Certificateholder or the Special Servicer pursuant to Section 3.18(b), or (iii) by the Special Servicer, the Holders of more than 50% of the Percentage Interests in the Controlling Class or the Servicer pursuant to Section 9.01), that there has been a recovery of all Insurance and Condemnation Proceeds, Liquidation Proceeds and other payments or recoveries (including any borrower recourse if received by the Servicer or the Special Servicer and if the Special Servicer determines application of such recourse to be in the best interest of the Certificateholders) that, in the Special Servicer's reasonable good faith judgment, exercised without regard to any obligation of the Special Servicer to make payments from its own funds pursuant to Section 4.07, will ultimately be recoverable.

"Financial Statements Report":  The report prepared by the Servicer described in Section 3.12(e).

"Fitch":  Fitch, Inc., and its successors in interest.

"Fixed Certificates":  The Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, and Class M-8 Certificates.

"FNMA":  Federal National Mortgage Association or any successor thereto.

"Global Certificate":  As defined in Section 5.01.

"GMAC":  GMAC Commercial Mortgage Corporation.

"Hazardous Materials":  Any dangerous, toxic or hazardous pollutants, chemicals, wastes or substances, including, without limitation, those so identified pursuant to CERCLA or any other federal, state or local environmental-related laws and regulations, and specifically including, without limitation, asbestos and asbestos-containing materials, polychlorinated

biphenyls, radon gas, petroleum and petroleum products, urea formaldehyde and any substances classified as being "in inventory," "usable work in process" or similar classification which would, if classified as unusable, be included in the foregoing definition.

"Independent":  When used with respect to any specified Person, any such Person that (i) is in fact independent of the Depositor, the Servicer, the Special Servicer, the Trustee and any and all Affiliates thereof, (ii) does not have any material direct financial interest in or any material indirect financial interest in any of the Depositor, the Servicer, the Special Servicer or any Affiliate thereof and (iii) is not connected with the Depositor, the Servicer, the Special Servicer or any Affiliate thereof as an officer, employee, promoter, underwriter, trustee, partner, director or Person performing similar functions; *provided, however,* that a Person shall not fail to be Independent of the Depositor, the Servicer, the Special Servicer, the Trustee or any Affiliate thereof merely because such Person is the beneficial owner of 1% or less of any Class of debt or equity securities issued by the Depositor, the Servicer, the Special Servicer, the Trustee or any Affiliate thereof, as the case may be; *provided,* further, that such debt or equity securities constitute less than 1% of such Person's total assets.

"Independent Contractor":  Either (i) any Person that would be an "independent contractor" with respect to the Trust Fund within the meaning of Section 856(d)(3) of the Code if the Trust Fund were a real estate investment trust (except that the ownership test set forth in that Section shall be considered to be met by any Person that owns, directly or indirectly, 35% or more of any Class of Certificates, or such other interest in any Class of Certificates as is set forth in an Opinion of Counsel, which shall be at no expense to the Trustee, the Servicer or the Trust, delivered to the Trustee and the Servicer), so long as the Trust Fund does not receive or derive any income from such Person and *provided* that the relationship between such Person and the Trust Fund is at arm's length, all within the meaning of Treasury Regulation Section 1.856-4(b)(5) (except that the Servicer or the Special Servicer shall not be considered to be an Independent Contractor under the definition in this clause (i) unless an Opinion of Counsel (at the expense of the party seeking to be deemed an Independent Contractor) has been delivered to the Trustee to that effect or (ii) any other Person (including the Servicer and the Special Servicer), upon receipt by the Trustee, the Special Servicer and the Servicer of an Opinion of Counsel (at the expense of the party seeking to be deemed an Independent Contractor), to the effect that the taking of any action in respect of any REO Property by such Person, subject to any conditions therein specified, that is otherwise herein contemplated to be taken by an Independent Contractor, will not cause such REO Property to cease to qualify as "foreclosure property" within the meaning of Section 860G(a)(8) of the Code or cause any income realized in respect of such REO Property to fail to qualify as Rents from Real Property (provided that such income would otherwise so qualify).

"Initial Purchasers":  Greenwich Capital Markets, Inc., Deutsche Bank Securities Inc. and CBA Securities, LLC as initial purchasers of the Certificates (other than the Class M-7 and Class M-8 Certificates).

"Initial Resolution Period":  As defined in Section 2.03(b).

"Insurance and Condemnation Proceeds":  All proceeds (net of expenses of collection) paid under any Insurance Policy or pursuant to Section 3.07(a) or in connection with

the full or partial condemnation of a Mortgaged Property, in either case, to the extent such proceeds are not applied to the restoration of the related Mortgaged Property or released to the Borrower, in either case, in accordance with the Servicing Standard.

"Insurance Policy":  With respect to any Loan, any hazard insurance policy, flood insurance policy, title policy or other insurance policy that is maintained from time to time in respect of such Loan or the related Mortgaged Property.

"Insured Environmental Event": As defined in Section 3.07(g).

"Interest Accrual Period":  With respect to the LIBOR Certificates and any Distribution Date, the period beginning on the immediately preceding Distribution Date and ending on the day immediately preceding such Distribution Date.  The first Interest Accrual Period for the LIBOR Certificates shall begin on the Closing Date and end on the day immediately preceding the first Distribution Date.  Each Interest Accrual Period for the LIBOR Certificates shall consist of the actual number of days in such period.  With respect to the Fixed Certificates and the Class X-1 Certificates and any Distribution Date, the Interest Accrual Period is the calendar month preceding the month in which such Distribution Date occurs.  With respect to the Fixed Certificates and the Class X-1 Certificates, each Interest Accrual Period shall be deemed for purposes of this definition to consist of 30 days.

"Interest Rate":  With respect to any Class of Certificates and any Distribution Date shall be the related Class A Pass-Through Rate, Class M-1 Pass-Through Rate, Class M-2 Pass-Through Rate, Class M-3 Pass-Through Rate, Class M-4 Pass-Through Rate, Class M-5 Pass-Through Rate, Class M-6 Pass-Through Rate, Class M-7 Pass-Through Rate, Class M-8 Pass-Through Rate, or Class X-1 Pass-Through Rate as of such Distribution Date.

"Interest Remittance Amount":  With respect to any Distribution Date, to the extent conveyed to the Trustee hereunder and received by the Servicer and to the extent provided in this Agreement the sum of without duplication (i) all interest collected (other than the interest portion of Payaheads, if any) or advanced or otherwise remitted in respect of Monthly Payments during the related Collection Period (other than any Prepayment Premiums received by the Servicer which will be distributed to the Class X-1 Certificates and will not be available to make payments on any other Class of Certificates), less without duplication and subject to Section 3.05(a) (w) the Servicing Fee and Special Servicing Fees, (x) Trustee Fee, and (y) unreimbursed Advances and Advance Interest and other amounts due to the Servicer (including Workout Fees, the amount of any Prepayment Interest Excess over Prepayment Interest Shortfalls) or the Trustee, to the extent allocable to interest and (z) any applicable trust fund expenses, (ii) any Compensating Interest paid by the Servicer with respect to such Distribution Date, (iii) the portion of the Purchase Price of each Mortgage Loan that was purchased from the Trust Fund during the related Collection Period allocable to interest (less amounts due the Servicer, Special Servicer and the Trustee, to the extent allocable to interest for such Mortgage Loan), (iv) the portion of any Substitution Shortfall Amount allocable to interest paid during the related Collection Period, and (v) all Net Liquidation Proceeds, REO Revenues, Insurance and Condemnation Proceeds, Subsequent Recoveries in excess of unreimbursed Applied Loss Amounts (to the extent allocable to interest) and other recoveries collected and remittances made during the related Collection Period, to the extent allocable to interest, less (without duplication)

amounts due the Servicer, Special Servicer and the Trustee.  Prepayment Premiums paid by Borrowers will not be included in the Interest Remittance Amount and will not be available to pay interest on the Certificates.

"Interested Person":  The Depositor, the Servicer, the Special Servicer, any Independent Contractor engaged by the Special Servicer, any Holder of a Certificate or any Affiliate of any such Person.

"Investment Account":  As defined in Section 3.06(a).

"Issue Price":  With respect to each Class of Certificates, the "issue price" as defined in the REMIC Provisions.

Latest Possible Maturity Date:  The Distribution Date following the third anniversary of the scheduled maturity date of the Mortgage Loan having the latest scheduled maturity date as of the Closing Date.

LIBOR:  The rate for one-month United States dollar deposits that appears on the Telerate Screen Page 3750 as of 11:00 a.m., London time, on such LIBOR Rate Adjustment Date. "Telerate Screen Page 3750" means the display designated as page 3750 on the Telerate Service (or such other page as may replace page 3750 on that service for the purpose of displaying London interbank offered rates of major banks). If such rate does not appear on such page (or such other page as may replace that page on that service, or if such service is no longer offered, such other service for displaying LIBOR or comparable rates as may be selected by the Trustee after consultation with the Depositor), the rate will be the Reference Bank Rate. The "Reference Bank Rate" will be determined on the basis of the rates at which deposits in U.S. Dollars are offered by the reference banks (which shall be three major banks that are engaged in transactions in the London interbank market, selected by the Depositor) as of 11:00 a.m., London time, on the LIBOR Rate Adjustment Date to prime banks in the London interbank market for a period of one month in amounts approximately equal to the aggregate Stated Principal Balance of the LIBOR Certificates then outstanding. The Trustee will request the principal London office of each of the reference banks to provide a quotation of its rate. If at least two such quotations are provided, the rate will be the arithmetic mean of the quotations. If on such date fewer than two quotations are provided as requested, the rate will be the arithmetic mean of the rates quoted by one or more major banks in New York City, selected by the Trustee after consultation with the Depositor, as of 11:00 a.m., New York City time, on such date for loans in U.S. Dollars to leading European banks for a period of one month. If no such quotations can be obtained, the rate will be LIBOR for the prior Distribution Date.

(a)     The establishment of LIBOR by the Trustee and the Trustee's subsequent calculation of the Certificate Interest Rate applicable to the Certificates (other than the Class X-1 Certificates) for the relevant Accrual Period, in the absence of manifest error, will be final and binding.

"LIBOR Certificates": The Class A, Class M-1 and Class M-2 Certificates.

"LIBOR Mortgage Loan":  A Mortgage Loan that provides for semi-annual adjustment of the related Mortgage Rate based on the Six-Month LIBOR Index and is designated

as such on the Mortgage Loan Schedule.

"Liquidated Mortgage Loan":  With respect to any Distribution Date, any Mortgage Loan in respect of which the Servicer or Special Servicer, as the case may be, has determined, in accordance with the Servicing Standard, that as of the end of the related Collection Period, all Liquidation Proceeds which it expects to recover with respect to the liquidation of the Mortgage Loan or the disposition of the REO Property has been recovered.

"Liquidation Event":  With respect to any Mortgage Loan or REO Property, any of the following events: (i) payment in full of such Mortgage Loan; (ii) the making of a Final Recovery Determination with respect to such Mortgage Loan or REO Property; (iii) the repurchase of such Mortgage Loan by the Seller pursuant to Section 7 of the related Mortgage Loan Purchase Agreement; (iv) the purchase of such Mortgage Loan or REO Property pursuant to Section 3.18; or (v) the purchase of such Mortgage Loan or REO Property by the Directing Certificateholder or the Servicer pursuant to Section 9.01.

"Liquidation Expenses":  All customary, reasonable and necessary "out of pocket" costs and expenses incurred by the Special Servicer in connection with the liquidation of any Specially Serviced Loan or REO Property pursuant to Section 3.09 or 3.18 (including, without limitation, legal fees and expenses, and, if applicable, brokerage commissions and conveyance taxes), and accrued and (without duplication) unpaid Special Servicing Fees, Liquidation Fees, and Workout Fees, if any, owed with respect to such liquidation, and any unreimbursed Advances and interest on such Advances.

"Liquidation Fee":  A fee payable to the Special Servicer with respect to each Specially Serviced Loan or REO Loan as to which the Special Servicer receives a full or discounted payoff with respect thereto from the related Borrower or any Liquidation Proceeds with respect thereto or any Insurance and Condemnation Proceeds, equal to the product of the Liquidation Fee Rate and the proceeds of such full or discounted payoff or the Net Liquidation Proceeds or Insurance and Condemnation Proceeds (net of the related costs and expenses associated with the related liquidation) related to such liquidated Specially Serviced Loan or REO Loan, as the case may be; *provided, however,* that no Liquidation Fee shall be payable with respect to clause (iii) of the definition of Liquidation Proceeds; *provided, however,* this exclusion only relates to a sale to the Directing Certificateholder, Servicer or Special Servicer for their sole benefit and not as relates to a sale to an assignee of the Servicer or Special Servicer or on behalf of a non-Affiliate, or clause (iv) of the definition of Liquidation Proceeds (so long as such repurchase occurs within 180 days of the receipt by the Seller of notice of a Breach or Defect that gave rise to the repurchase obligation), or clause (v) (so long as such purchase occurs more than 180 days after the date upon which such Mortgage Loan became a Specially Serviced Loan) of the definition of Liquidation Proceeds.

"Liquidation Fee Rate":  As defined in Section 3.11(b).

"Liquidation Proceeds":  Cash amounts (other than REO Revenues) received by the Servicer or Special Servicer, net of expenses, in connection with: (i) the liquidation of a Mortgaged Property or other collateral constituting security for a Specially Serviced Loan or REO Property, through trustee's sale, foreclosure sale, REO Disposition or otherwise, exclusive

of any portion thereof required to be released to the related Borrower; (ii) the realization upon any deficiency judgment obtained against a Borrower; (iii) the purchase of a Defaulted Mortgage Loan pursuant to <u>Section 3.18</u>; (iv) the repurchase or substitution of a Loan by the Seller pursuant to Section 7 of the Mortgage Loan Purchase Agreement; or (v) the purchase of all Mortgage Loans by the Holders of more than 50% of the Percentage Interests in the Controlling Class or the Servicer pursuant to <u>Section 9.01</u>.

"<u>Loan</u>":  Any Mortgage Loan.

"<u>Loan Agreement</u>":  With respect to any Loan, the loan agreement, if any, between the related Mortgage Loan Originator and the Borrower, pursuant to which such Loan was made.

"<u>Loan Documents</u>":  With respect to each Loan, to the extent applicable, the Loan Agreement, the Mortgage, the Note, the Assignment of Leases (if separate from the Mortgage), the Security Agreement, any letters of credit, escrow or reserve account information, any UCC Financing Statements, the title insurance policy, all surveys, all insurance policies, any environmental liability agreements, any escrow agreements for improvements or lease-up, any guaranties related to such Loan, any prior assignments of mortgage in the event that the originator is not the originator of record, any collateral assignments of property management agreements and other service agreements required by the applicable commitment and other loan documents, and all modification, consolidation and extension agreements, if any.

"<u>Loan-to-Value Ratio</u>":  With respect to any Loan, as of the date of determination, the fraction, expressed as a percentage, the numerator of which is the principal balance of such Loan at the time of determination, and the denominator of which is the Original Value of the related Mortgaged Property.

"<u>MAI</u>":  Member of the Appraisal Institute.

"<u>Management Agreement</u>":  With respect to any Loan, the Management Agreement, if any, by and between the Manager and the related Borrower, or any successor Management Agreement between such parties.

"<u>Manager</u>":  With respect to any Loan, any property manager for the related Mortgaged Property or Mortgaged Properties.

"<u>Material Breach</u>":  As defined in <u>Section 2.03(b)</u>.

"<u>Material Document Defect</u>":  As defined in <u>Section 2.03(b)</u>.

"<u>Maturing Mortgage Loan Report</u>":  The report prepared by the Servicer described in <u>Section 3.12(e)</u>.

"<u>Maturity Date</u>":  With respect to any Loan as of any date of determination, the date on which the last payment of principal is due and payable under the related Note, after taking into account all Principal Prepayments received prior to such date of determination, but without giving effect to (i) any acceleration of the principal of such Loan by reason of default

thereunder, (ii) any grace period permitted by the related Note or (iii) any modification, waiver or amendment of such Loan granted or agreed to by the Servicer or the Special Servicer pursuant to <u>Section 3.20</u> occurring prior to such date of determination.

"<u>MERS</u>":   Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the State of Delaware, or any successor thereto.

"<u>MERS® System</u>":   The system of recording transfers of Mortgages electronically maintained by MERS.

"<u>MIN</u>":  The Mortgage Identification Number for Mortgage Loans registered with MERS on the MERS® System.

"<u>MOM Loan</u>":  Any Mortgage Loan, as to which MERS is acting as mortgagee, solely as nominee for the originator of such Mortgage Loan and its successors and assigns.

"<u>Monthly Payment</u>":  With respect to any Loan (other than any REO Loan) and any Due Date, the scheduled monthly payment of principal, if any, and interest at the Mortgage Rate, excluding any Balloon Payment, which is payable by the related Borrower on such Due Date under the related Note (as such terms may be changed or modified in connection with a bankruptcy or similar proceeding involving the related Borrower or by reason of a modification, waiver or amendment of such Loan granted or agreed to by the Servicer or Special Servicer pursuant to <u>Section 3.20</u>) and applicable law, without regard to any acceleration of principal of such Loan by reason of a default thereunder.   With respect to an REO Loan, the monthly payment, excluding any Balloon Payment, that would otherwise have been payable on the related Due Date had the related Note not been discharged, determined as set forth in the preceding sentence and on the assumption that all other amounts, if any, due thereunder are paid when due.

"<u>Moody's</u>":  Moody's Investors Service, Inc., or any successor thereto.

"<u>Mortgage</u>":  With respect to any Loan, the mortgage, deed of trust, deed to secure debt or other instrument securing a Note and creating a lien on the related Mortgaged Property.

"<u>Mortgage File</u>":  With respect to any Mortgage Loan, the following documents:

(i)            the original Note (or a lost note affidavit), bearing, or accompanied by, all prior and intervening endorsements or assignments showing a complete chain of endorsement or assignment from the applicable Mortgage Loan Originator either in blank or to the Seller, and further endorsed (at the direction of the Depositor given pursuant to the Mortgage Loan Purchase Agreement) by the Seller, on its face or by allonge attached thereto, without recourse, to the order of the Trustee in the following form: "Pay to the order of Deutsche Bank National Trust Company, as trustee for the registered Holders of CBA Commercial Assets, Small Balance Commercial Mortgage Pass-Through Certificates, Series 2006-1, without recourse, representation or warranty, express or implied,";

(ii)                a duplicate original Mortgage or a copy thereof or, noting the presence of the MIN of the Mortgage Loan and language indicating that the Mortgage Loan is a MOM Loan if the Mortgage Loan is a MOM Loan, if such Mortgage has been returned by the related recording office, (A) an original, (B) a copy of a certified copy or (C) a copy thereof from the applicable recording office and originals or copies (or originals or copies of certified copies from the applicable recording office) of any assignments thereof showing a complete chain of assignment from the related Mortgage Loan Originator to the Seller, in each case in the form submitted for recording or, if recorded, with evidence of recording indicated thereon;

(iii)                unless the Mortgage Loan is registered on the MERS® System, an original assignment of the Mortgage, in recordable form, either in blank or from the Seller (or the Mortgage Loan Originator) to "Deutsche Bank National Trust Company, as trustee for the registered Holders of CBA Commercial Assets, Small Balance Commercial Mortgage Pass-Through Certificates, Series 2006-1," and *provided*, if the related Mortgage has been recorded in the name of MERS or its designee, no assignment of Mortgage in favor of the Trustee will be required to be prepared or delivered and instead, the Servicer shall take all actions as are necessary to cause the Trustee to be shown as, and the Trustee shall take all actions necessary to confirm that it is shown as, the owner of the related Mortgage on the records of MERS for purposes of the system of recording transfers of beneficial ownership of mortgages maintained by MERS;

(iv)                an original or copy of any related Assignment of Leases (if such item is a document separate from the Mortgage) and the originals or copies of any assignments thereof showing a complete chain of assignment from the related Mortgage Loan Originator to the Seller (or to MERS, if the Mortgage Loan is registered on the MERS® System and noting the presence of the MIN), in each case in the form submitted for recording or, if recorded, with evidence of recording thereon;

(v)                an original assignment of any related Assignment of Leases (if such item is a document separate from the Mortgage), in recordable form, either in blank or from the Seller (or the Mortgage Loan Originator) to "Deutsche Bank National Trust Company, as trustee for the registered Holders of CBA Commercial Assets, Small Balance Commercial Mortgage Pass-Through Certificates, Series 2006-1";

(vi)                an original or copy of any related Security Agreement (if such item is a document separate from the Mortgage) and the originals or copies of any assignments thereof showing a complete chain of assignment from the related Mortgage Loan Originator to the Seller;

(vii)                an original assignment of any related Security Agreement (if such item is a document separate from the Mortgage), either in blank or from

the Seller or the related Mortgage Loan Originator to "Deutsche Bank National Trust Company as trustee for the registered Holders of CBA Commercial Assets, Small Balance Commercial Mortgage Pass-Through Certificates, Series 2006-1," which assignment may be included as part of an omnibus assignment covering other documents relating to the Mortgage Loan; provided that such omnibus assignment is effective under applicable law;

(viii) originals or copies of all (A) assumption agreements, (B) modifications, (C) written assurance agreements and (D) substitution agreements, together with any evidence of recording thereon or in the form submitted for recording, in those instances where the terms or provisions of the Mortgage, Note or any related security document have been modified or the Mortgage Loan has been assumed, if any;

(ix) the original lender's title insurance policy or a copy thereof (together with all endorsements or riders that were issued with or subsequent to the issuance of such policy), or if the policy has not yet been issued, a binding written commitment (which may be a pro forma or specimen title insurance policy which has been accepted or approved in writing by the related title insurance company) or interim binder that is marked as binding and countersigned by the title company, insuring the priority of the Mortgage as a first lien on the related Mortgaged Property, relating to such Mortgage Loan;

(x) the original or a counterpart of any guaranty of the obligations of the Borrower under the Mortgage Loan, if any;

(xi) certified or other copies of all UCC Financing Statements and continuation statements, if any, which show the filing or recording thereof (or copies thereof in the form submitted for filing or recording, along with a certification by the applicable recording or filing office, applicable title insurance company or the Seller that such form was submitted)) sufficient to perfect (and maintain the perfection of) the security interest held by the Mortgage Loan Originator (and each assignee prior to the Trustee) in and to the personalty of the Borrower at the Mortgaged Property, and original UCC assignments in a form suitable for filing or recording, sufficient to transfer such UCC Financing Statements to the Trustee;

(xii) the original or copy of the power of attorney, if any, (with evidence of recording thereon) granted by the Borrower if the Mortgage, Note or other document or instrument referred to above was not signed by the Borrower;

(xiii) the original or a copy of each guaranty, if any, constituting additional security for repayment of such Mortgage Loan;

(xiv) copies of third-party Management Agreements, if any, related to any Mortgage Loan;

(xv) an original or counterpart of any Loan Agreement, if any;

26

(xvi)          a copy of any affidavit and indemnification agreement in favor of the lender, if any;

(xvii)          the original environmental indemnity agreement, if any, related to any Mortgage Loan or a copy thereof;

(xviii)          any environmental insurance policies or copies thereof;

(xix)          for any Mortgaged Property, copies of the related franchise agreement, if any, and franchisor comfort letters, if any;

(xx)          the original ground lease, if any, or a copy thereof;

(xxi)          Reserved; and

(xxii)          any additional documents required to be added to the Mortgage File pursuant to Section 3.20.

Whenever the term "Mortgage File" is used to refer to documents actually received by the Trustee, such term shall not be deemed to include such documents and instruments required to be included therein unless they are actually so received.

"Mortgage Interest Accrual Period":  With respect to any Loan, the period during which interest accrues pursuant to the related Note.

"Mortgage Loan":  Each of the mortgage loans transferred and assigned to the Trustee pursuant to Section 2.01, and from time to time held in the Trust Fund, including any Mortgage Loan that becomes a Specially Serviced Loan or REO Loan.  As used herein, the term "Mortgage Loan" includes the related Note, Mortgage and other documents contained in the related Mortgage File and any related agreements.

"Mortgage Loan Originator":  Any institution that originated a Mortgage Loan.

"Mortgage Loan Purchase Agreement":  The Mortgage Loan Purchase Agreement dated as of April 1, 2006, by and between the Seller and the Depositor, providing for the transfer of the Mortgage Loans to the Depositor.

"Mortgage Loan Schedule":  The list of Mortgage Loans transferred on the Closing Date to the Trustee as part of the Trust Fund, attached hereto as Exhibit B, which list sets forth the following information with respect to each Mortgage Loan:

(i)     the loan number;

(ii)     the Borrower name;

(iii)     the street address (including city, state and zip code) of the related Mortgaged Property;

(iv)     the Mortgage Rate in effect at the Cut-off Date;

27

(v)      the original principal balance;

(vi)     the Cut-off Date Principal Balance;

(vii)    the (a) remaining term to stated maturity and (b) Maturity Date;

(viii)   the original and remaining amortization terms;

(ix)     the amount of the Monthly Payment due on the first Due Date following the Cut-off Date;

(x)      the number of units, rooms or square footage with respect to the Mortgaged Property, if available;

(xi)     the Loan interest accrual method;

(xii)    the applicable Servicing Fee Rate and Trustee Fee Rate;

(xiii)   the Due Date;

(xiv)    whether such loan is a LIBOR Mortgage Loan;

(xv)     in the case of each LIBOR Mortgage Loan, the gross margin;

(xvi)    in the case of each LIBOR Mortgage Loan, the maximum mortgage rate;

(xvii)   in the case of each LIBOR  Mortgage Loan, the minimum mortgage rate;

(xviii)  in the ease of each LIBOR Mortgage Loan, the periodic rate cap;

(xix)    in the case of each LIBOR Mortgage Loan, the first adjustment date immediately following the Cut-off Date;

(xx)     in the case of each LIBOR Mortgage Loan, the rounding code (nearest 0.125%);

(xxi)    whether such Mortgage Loan has the benefit of an Environmental Insurance Policy, if available;

(xxii)   whether such Mortgage Loan is secured by the related Borrower's interest in ground leases, and

(xxiii)  whether such Mortgage Loan is subject to an operations and maintenance plan.

Such Mortgage Loan Schedule also shall set forth the aggregate of the amounts described under clause (vi) above for all of the Mortgage Loans.  The Mortgage Loan Schedule

may be in the form of more than one list, collectively setting forth all of the information required.

"Mortgage Rate":  With respect to: (i) any Loan on or prior to its Maturity Date, the annual rate at which interest is scheduled (in the absence of a default) to accrue on such Loan from time to time in accordance with the related Note and applicable law; (ii) any Loan after its Maturity Date, the annualized rate described in clause (i) above determined without regard to the passage of such Maturity Date; and (iii) any REO Loan, the annualized rate described in clause (i) or (ii), as applicable, above, determined as if the predecessor Mortgage Loan had remained outstanding.  For purposes of calculating the Net Mortgage Rate, the Mortgage Rate for any Loan whose interest rate is reduced will be the Mortgage Rate of such Loan without taking into account any reduction in the interest rate by a bankruptcy court pursuant to a plan of reorganization or pursuant to any of its equitable powers or any reduction in the interest rate resulting from a work-out or modification by the Special Servicer or the Servicer, if applicable.

"Mortgaged Property":   The underlying real property (including any REO Property) that secures a Loan, in each case consisting of a parcel or parcels of land improved by a commercial, multifamily, or mixed-use building or facility, together with any personal property (to the extent the same are owned by the Borrower and necessary in connection with the operation of the related property), fixtures, leases and other property or rights pertaining thereto.

"Net Investment Earnings":  With respect to any of the Collection Account, any Servicing Account or the REO Account, for any period from any Distribution Date to the immediately succeeding P&I Advance Date, the amount, if any, by which the aggregate of all interest and other income realized during such period on funds relating to the Trust Fund held in such account (and which is not required to be paid to the related Borrower) exceeds the aggregate of all losses, if any, incurred during such period in connection with the investment of such funds in accordance with Section 3.06.

"Net Investment Loss":  With respect to any of the Collection Account, any Servicing Account or the REO Account for any period from any Distribution Date to the immediately succeeding P&I Advance Date, the amount, if any, by which the aggregate of all losses, if any, incurred during such period in connection with the investment of funds relating to the Trust Fund held in such account (and which investment is not directed by the related Borrower) in accordance with Section 3.06 exceeds the aggregate of all interest and other income realized during such period on such funds; *provided,* that neither the Trustee, the Servicer nor the Special Servicer shall be required to deposit any loss on an investment of funds in any of the Distribution Account, the Collection Account, any Servicing Account or the REO Account if such loss is incurred solely as a result of the insolvency of the federal or state chartered depository institution or trust company that holds any of the such accounts, so long as such depository institution or trust company is not the Trustee, the Servicer or Special Servicer, as applicable, and satisfied the qualifications set forth in the definition of Eligible Account when the Permitted Investment was made.

"Net Liquidation Proceeds:  With respect to any Liquidated Mortgage Loan the amount of Liquidation Proceeds less the amount of Liquidation Expenses.

"Net Mortgage Rate":  With respect to each Mortgage Loan and any Interest Accrual Period will equal the Mortgage Rate of such Mortgage Loan, minus the sum of (x) the Servicing Fee Rate and (y) the Trustee Fee Rate.

"Net Operating Income":  With respect to any Mortgaged Property, for any time period chosen, the total operating revenues derived from such Mortgaged Property during such period, minus the total operating expenses incurred in respect of such Mortgaged Property during such period, other than (i) non-cash items such as depreciation, (ii) amortization, (iii) actual capital expenditures, (iv) debt service on the related Loan and (v) reserves other than taxes and insurance escrowed by the Servicer.

"Net WAC Rate": With respect to the LIBOR Certificates and any Distribution Date, expressed as a percentage, equals the weighted average of the Net Mortgage Rates on the first day of the month prior to such Distribution Date multiplied by the fraction, expressed as percentage, the numerator of which is 30 and the denominator of which is the actual number of days in the related Accrual Period.  With respect to the Fixed Certificates and any Distribution Date, expressed as a percentage, equals the weighted average of the Net Mortgage Rates on the first day of the month immediately prior to such Distribution Date.

"Net WAC Rate Carryover Amount" with respect to each Class of Offered Certificates (other than the Class X-1 Certificates) and any Distribution Date, will equal the sum of (i) the excess, if any, of the interest calculated at the Interest Rate applicable to such Class for such date determined without regard to the Net WAC Rate over the amount of interest calculated at the Net WAC Rate, and (ii) the unpaid portion of the excess described in clause (i) for prior Distribution Dates together with accrued interest thereon at the applicable interest rate without regard to any Net WAC Rate.  The Net WAC Rate Carryover Amount for any Class will be reduced by any amounts repaid to such Class in respect to such Net WAC Rate Carryover Amount.

"New Lease":  Any lease of REO Property entered into at the direction of the Special Servicer on behalf of the Trust, including any lease renewed, modified or extended on behalf of the Trust, if the Trust Fund has the right to renegotiate the terms of such lease.

"Non-U.S. Person":  Any person (A) other than a U.S. Person, unless, with respect to the Transfer of a Residual Certificate, (i) such person holds such Residual Certificate in connection with the conduct of a trade or business within the United States and furnishes the Transferor and the Trustee with an effective Internal Revenue Service Form W-8ECI (or successor form) or (ii) the Transferee delivers to both the Transferor and the Trustee an opinion of a nationally recognized tax counsel to the effect that such Transfer is in accordance with the requirements of the Code and the regulations promulgated thereunder and that such Transfer of the Residual Certificate will not be disregarded for federal income tax purposes or (B) a U.S. Person with respect to whom income from a Residual Certificate is attributable to a foreign permanent establishment or fixed base, within the meaning of an applicable income tax treaty, of such Person or any other U.S. Person.

"Nonrecoverable Advance":  Any Nonrecoverable P&I Advance or Nonrecoverable Servicing Advance or any portion thereof.

"Nonrecoverable P&I Advance" shall mean, as evidenced by the Officer's Certificate and supporting documentation contemplated by Section 4.07(c), any P&I Advance previously made or proposed to be made in respect of any Mortgage Loan or any REO Loan that, as determined by the Servicer or, if applicable, the Trustee, in accordance with the Servicing Standard, will not be ultimately recoverable (together with Advance Interest) from late payments, Insurance and Condemnation Proceeds, Liquidation Proceeds and, only with respect to the recovery of Advance Interest, from Default Interest, or any other recovery on or in respect of such Mortgage Loan or REO Mortgage Loan.  In determining whether any P&I Advance previously made or to be made is or would be a Nonrecoverable P&I Advance, such Person will be entitled (i) to consider, among other things, the obligations of the Borrower under the terms of the related Mortgage Loan Documents as they may have been modified, (ii) to consider the related Mortgaged Properties in their "as is" or then current conditions and occupancies, as modified by such party's assumptions (consistent with the Servicing Standard) regarding the possibility and effects of future adverse change with respect to such Mortgaged Properties and (iii) to estimate and consider (consistent with the Servicing Standard), among other things, future expenses and to estimate and consider (consistent with the Servicing Standard), among other things, the timing of recoveries.  In addition, any such Person may (consistent with the Servicing Standard) update or change its own determination of recoverability at any time and (consistent with the Servicing Standard) may obtain from the Special Servicer any reasonably required analysis, Appraisals (which Appraisal shall be paid by the Servicer as a Servicing Advance or a trust expense if determined to be nonrecoverable) or market value estimates or other information in the Special Servicer's possession for such purposes.

"Nonrecoverable Servicing Advance" shall mean, as evidenced by the Officer's Certificate and supporting documentation contemplated by Section 3.03(c), any Servicing Advance previously made or proposed to be made in respect of a Mortgage Loan or REO Loan that, as determined by the Servicer or, if applicable, the Trustee, in accordance with the Servicing Standard, will not be ultimately recoverable (together with Advance Interest) from late payments, Insurance and Condemnation Proceeds, Liquidation Proceeds, and only with respect to the recovery of Advance Interest, from Default Interest, or any other recovery on or in respect of such Mortgage Loan or REO Property.  In determining whether any Servicing Advance previously made or to be made is or would be a Nonrecoverable Servicing Advance, such Person will be entitled (i) to consider, among other things, the obligations of the Mortgagor under the terms of the related Mortgage Loan Documents as they may have been modified, (ii) to consider the related Mortgaged Properties in their "as is" or then current conditions and occupancies, as modified by such party's assumptions (consistent with the Servicing Standard) regarding the possibility and effects of future adverse change with respect to such Mortgaged Properties and (iii) to estimate and consider (consistent with the Servicing Standard), among other things, future expenses and to estimate and consider (consistent with the Servicing Standard), among other things, the timing of recoveries.  In addition, any such Person may (consistent with the Servicing Standard) update or change its own determination of recoverability at any time and (consistent with the Servicing Standard), may obtain from the Special Servicer any reasonably required analysis, Appraisals (which Appraisal shall be paid by the Servicer as a Servicing Advance or a trust expense if determined to be nonrecoverable) or market value estimates or other information in the Special Servicer's possession for such purposes.

"Note": The original executed note evidencing the indebtedness of a Borrower

under a Loan, together with any rider, addendum or amendment thereto.

"NRSRO":  Nationally recognized statistical rating organization, as the term is used in federal securities laws.

"Offered Certificates":  The Class X-1, Class A, Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, and Class M-8 Certificates.

"Officer's Certificate":  A certificate signed by a Servicing Officer of the Servicer or the Special Servicer, as the case may be, or a Responsible Officer of the Trustee.

"Opinion of Counsel":  A written opinion of counsel, who may be salaried counsel for the Depositor, the Servicer or the Special Servicer, acceptable in form and delivered to the Trustee, except that any opinion of counsel relating to (a) the qualification of any REMIC created hereunder as a REMIC, (b) compliance with the REMIC Provisions or (c) the resignation of the Depositor, the Servicer or the Special Servicer pursuant to Section 6.04 must be an opinion of counsel that is in fact Independent of the Depositor, the Servicer or the Special Servicer, as applicable.

"Original Certificate Balance":  With respect to any Class of Certificates (other than the Class X-1 and Class R Certificates), the initial aggregate principal amount thereof as of the Closing Date, in each case as specified in the Preliminary Statement.

"Original Value":  The Appraised Value of a Mortgaged Property based upon the Appraisal conducted in connection with the origination of the related Mortgage Loan.

"OTS":  The Office of Thrift Supervision or any successor thereto.

"Ownership Interest":  As to any Certificate, any ownership or security interest in such Certificate as the Holder thereof and any other interest therein, whether direct or indirect, legal or beneficial, as owner or as pledgee.

"Payahead":  Is any Monthly Payment intended by the related Borrower to be applied in a Collection Period after the Collection Period in which such payment was received.

"P&I Advance":  As to any Mortgage Loan or REO Loan, any advance made by the Servicer or the Trustee, as applicable, pursuant to Section 4.07 or Section 7.05.

"P&I Advance Date":  The Business Day immediately prior to each Distribution Date.

"P&I Advance Determination Date":  With respect to any Distribution Date, the second Business Day immediately prior thereto.

"Pass-Through Rate":  With respect to each Class of Certificates, the respective per annum rate listed below:

Class X-1:          Class X-1 Pass-Through Rate

| Class A: | Class A Pass-Through Rate |
|----------|---------------------------|
| Class M-1: | Class M-1 Pass-Through Rate |
| Class M-2: | Class M-2 Pass-Through Rate |
| Class M-3: | Class M-3 Pass-Through Rate |
| Class M-4: | Class M-4 Pass-Through Rate |
| Class M-5: | Class M-5 Pass-Through Rate |
| Class M-6: | Class M-6 Pass-Through Rate |
| Class M-7: | Class M-7 Pass-Through Rate |
| Class M-8: | Class M-8 Pass-Through Rate |

"Penalty Charges":  With respect to any Loan or REO Loan, any amounts actually collected thereon from the Borrower that represent late payment charges and Default Interest.

"Percentage Interest":  As to any Certificate, the percentage interest evidenced thereby in distributions required to be made with respect to the related Class.  With respect to any Certificate, the percentage interest is equal to the denomination of such Certificate divided by the initial Certificate Balance (or, in the case of the Class X-1 Certificates, Class Notional Balance) of such Class of Certificates as of the Closing Date.  With respect to a Residual Certificate, the percentage interest as set forth on the face thereof.

"Permitted Investments":  Any one or more of the following obligations or securities, regardless of whether issued by the Depositor, the Servicer, the Special Servicer, the Trustee or any of their respective Affiliates, and having the required ratings, if any, provided for in this definition:

(i)    direct obligations of, and obligations fully guaranteed as to timely payment of principal and interest by, the United States of America, FNMA, FHLMC or any agency or instrumentality of the United States of America; provided such obligations have a remaining term to maturity of one year or less from the date of acquisition and which are backed by the full faith and credit of the United States of America; provided that any obligation of, or guarantee by, FNMA or FHLMC, other than an unsecured senior debt obligation of FNMA or FHLMC, shall be a Permitted Investment only if such investment would not result in the downgrading, withdrawal or qualification of the then-current rating assigned by each Rating Agency to any Certificate as confirmed in writing;

(ii)    time deposits, unsecured certificates of deposit or bankers' acceptances that mature in one year or less after the date of issuance and are issued or held by any depository institution or trust company incorporated or organized under the laws of the United States of America or any State thereof and subject to supervision and examination by federal or state banking authorities, so long as the commercial paper or other short-term debt obligations of such depository institution or trust company are rated in the highest short-term debt rating category of each Rating Agency or such other ratings as will not result in the downgrading, withdrawal or qualification of the then-current rating assigned by each Rating Agency to any Certificate, as confirmed in writing by such Rating Agency;

33

(iii)     repurchase agreements or obligations with respect to any security described in clause (i) above where such security has a remaining maturity of one year or less and where such repurchase obligation has been entered into with a depository institution or trust company (acting as principal) described in clause (ii) above;

(iv)     debt obligations maturing in one year or less from the date of acquisition bearing interest or sold at a discount issued by any corporation incorporated under the laws of the United States of America or any state thereof, which securities have (i) long-term unsecured debt ratings from S&P and Moody's at least equal to "AAA" and "Aaa", respectively, and long-term unsecured debt ratings from Fitch at least equal to "AA+" or (ii) such other ratings (as confirmed by the applicable Rating Agency in writing) as will not result in a downgrade, qualification or withdrawal of the then-current rating of the Certificates that are currently being rated by such Rating Agency; provided, however, that securities issued by any particular corporation will not be Permitted Investments to the extent that investment therein will cause the then outstanding principal amount of securities issued by such corporation and held in the accounts established hereunder to exceed 10% of the sum of the aggregate principal balance and the aggregate principal amount of all Permitted Investments in such accounts;

(v)     commercial paper (including both non-interest-bearing discount obligations and interest-bearing obligations) payable on demand or on a specified date maturing in one year or less after the date of issuance thereof and which is rated in the highest short-term unsecured debt rating category of each Rating Agency;

(vi)     units of investment funds that maintain a constant net asset value and money market funds (a) rated "AAAm" or "AAAm-G" by S&P, (b) "Aaa" by Moody's  and (c) rated "AAA" by Fitch;

(vii)     Reserved; and

(viii)     any other demand, money market or time deposit, obligation, security or investment, with respect to which each Rating Agency shall have confirmed in writing that such investment will not result in a downgrade, qualification or withdrawal of the then-current rating of the Certificates that are currently being rated by such Rating Agency;

*provided* that such instrument or security qualifies as a "cashflow investment" pursuant to Section 860G(a)(6) of the Code; *provided, further, however,* that in each case, if the instrument or security is rated by S&P, (a) it shall not have an "r" highlighter affixed to its rating from S&P, (b) it shall have a predetermined fixed dollar of principal due at maturity that cannot vary or change and (c) any such investment that provides for a variable rate of interest must have an interest rate that is tied to a single interest rate index plus a fixed spread, if any, and move proportionately with such index.

"Permitted Transferee":  Any transferee of a Residual Certificate other than a Disqualified Organization or a non U.S. Person.

"Person":  Any individual, corporation, partnership, limited liability company,

joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"Plan":  Any employee benefit plan or plans that is subject to Title I of ERISA, Section 4975 of the Code or any entity or association that is deemed to hold assets of such a plan pursuant to 29 C.F.R. § 2510.3-101.

"Prepayment Assumption":  With respect to all Mortgage Loans, the assumption that all payments required to be made on such Mortgage Loans according to their contractual terms (including repayment in full on their respective maturity dates) are so made.

"Prepayment Interest Excess": With respect to any Distribution Date, the amount, with respect to any Mortgage Loan that was subject to Principal Prepayment in full or in part, or as to which Insurance and Condemnation Proceeds were received by the Servicer or Special Servicer for application to such Mortgage Loans, in each case after the Due Date in the month of such Distribution Date and on or prior to the related Determination Date, of interest accrued at the Net Mortgage Pass-Through Rate for such Mortgage Loans on the amount of such Principal Prepayments or Insurance and Condemnation Proceeds after the Mortgage Interest Accrual Period relating to such Due Date and accruing in the manner set forth in the Loan Documents relating to such Mortgage Loans, to the extent such interest is collected by the Servicer or the Special Servicer.

"Prepayment Interest Shortfall":  With respect to any Distribution Date, the amount, with respect to any Mortgage Loan that was subject to a Principal Prepayment in full or in part, or as to which Insurance and Condemnation Proceeds were received by the Servicer or Special Servicer for application to such Mortgage Loans, in each case after the Determination Date in the month preceding such Distribution Date, and on or prior to the Due Date in the related Collection Period, the amount of interest that would have accrued at the Net Mortgage Pass-Through Rate for such Mortgage Loan on the amount of such Principal Prepayment or Insurance and Condemnation Proceeds during the period commencing on the date as of which such Principal Prepayment or Insurance and Condemnation Proceeds were applied to the unpaid principal balance of the Mortgage Loan and ending on (and including) the day immediately preceding such Due Date.

"Prepayment Premium":  Any premium, penalty or fee paid or payable, as the context requires, by a Borrower in connection with a Principal Prepayment.

"Principal Distribution Amount":  With respect to any Distribution Date, to the extent received by the Servicer and conveyed to the Trustee hereunder, the sum without duplication of (i) all principal collected (other than the principal portion of Payaheads, if any) or advanced or otherwise remitted in respect of Monthly Payments during the related Collection Period, (ii) all Principal Prepayments collected during the related Collection Period, (iii) the portion of the Purchase Price of each Mortgage Loan that was purchased from the Trust Fund during the related Collection Period allocable to principal, (iv) the portion of any Substitution Shortfall Amount allocable to principal paid during the related Collection Period, and (v) all Net Liquidation Proceeds, REO Revenues, Insurance and Condemnation Proceeds, Subsequent Recoveries in excess of unreimbursed Applied Loss Amounts (to the extent allocable to

principal), and other recoveries collected and remittances made during the related Collection Period, to the extent allocable to principal, as reduced (without duplication), in each case, to the extent provided in this Agreement (including, without limitation, pursuant to Section 3.05), by unreimbursed Advances, to the extent allocable to principal, and other amounts due to the Servicer, the Special Servicer, or the Trustee, hereunder to the extent not reimbursed from the Interest Remittance Amount for such Distribution Date.

"Principal Prepayment":  Any payment of principal made by the Borrower on a Loan that is received in advance of its scheduled Due Date and which is not accompanied by an amount of interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment.

"Privileged Person":  Each holder of a Certificate, each of the parties to this Agreement, each of the Rating Agencies, the Initial Purchasers, any Person identified to the Trustee as a Certificate Owner or prospective purchaser of a Certificate upon receipt from such Certificate Owner or prospective purchaser of an investor certification (which may be in electronic form), the form of which is attached hereto as Exhibit H, and any other Person designated by the Depositor.  The Trustee or the Servicer, as applicable, shall provide all Privileged Persons with access to certain restricted information on its Website (in the case of any Certificate Owner or prospective purchaser, upon receipt of such investor certification) through the use of a restriction mechanism on its Website.

"Private Placement Memorandum":  The Private Placement Memorandum, dated April 24, 2006, relating to the offering of the Offered Certificates.

"Purchase Price":  With respect to any Mortgage Loan to be purchased by the Seller pursuant to Section 7 of the Mortgage Loan Purchase Agreement, the Directing Certificateholder or the Special Servicer pursuant to Section 3.18(b) or Section 3.18(c), or an assignee of either thereof, or by the Directing Certificateholder or the Servicer pursuant to Section 9.01, a price equal to the sum of the following without duplication:

      (i)     the outstanding principal balance of such Mortgage Loan as of the date of purchase;

      (ii)     all accrued and unpaid interest on such Mortgage Loan at the related Mortgage Rate in effect from time to time to but not including the Due Date in the Collection Period of purchase (which includes unpaid Servicing Fees);

      (iii)     without duplication of the amount set forth in paragraph (ii) above, all related unreimbursed Advances plus Advance Interest on the related Advances;

      (iv)     to the extent not duplicative of clause (vi), accrued and unpaid Special Servicing Fees related to such Mortgage Loan;

      (v)     accrued and unpaid Workout Fees, if any, and accrued and unpaid Liquidation Fees, if any;

(vi)    if such Mortgage Loan is being purchased by the Seller pursuant to Section 7 of the related Mortgage Loan Purchase Agreement, all related accrued Special Servicing Fees to the extent that such Mortgage Loan is or became a Specially Serviced Loan as a result of the Material Breach or Material Document Defect as to which the purchase obligation of the Seller arose; and

(vii)   if such Mortgage Loan is being purchased by a Seller pursuant to Section 7 of the related Mortgage Loan Purchase Agreement, all reasonable out-of-pocket expenses incurred or arising out of the enforcement of the repurchase obligation and Advance Interest (to the extent, if any, not included in clause (iii) above) in respect of related Advances and any Realized Losses and Trust Fund expenses incurred prior to such purchase date with respect to such Mortgage Loan.

With respect to any REO Property to be sold pursuant to Section 3.18 (d) and 3.18 (e), the Purchase Price will equal the amount calculated in accordance with the immediately preceding sentence.  With respect to any Defaulted Mortgage Loan to be purchased by the Directing Certificateholder (or any assignee thereof) or Special Servicer pursuant to Section 3.18(c) following determination of Fair Value, the Purchase Price will equal the Fair Value of such Defaulted Mortgage Loan.

"QIB Investment Representation Letter": As defined in Section 5.02(b)(i).

"Qualified Institutional Buyer": As defined in Section 5.02(b)(i).

"Qualified Insurer": (i) With respect to any Mortgage Loan, REO Loan or REO Property, an insurance company or security or bonding company qualified to write the related Insurance Policy in the relevant jurisdiction and a minimum claims paying ability rating of at least "A-" by S&P, "A2" by Moody's, and "A" by Fitch, (ii) with respect to the fidelity bond and errors and omissions Insurance Policy required to be maintained pursuant to Section 3.07(c), an insurance company that has a claims paying ability (or backed or guaranteed by a company having such claims paying ability) rated no lower than two ratings below the rating assigned to the then highest rated outstanding Certificate, but in no event lower than "A" by S&P, "A2" by Moody's, "A" by Fitch or, in the case of clauses (i) and (ii), such other rating as each Rating Agency shall have confirmed in writing will not cause such Rating Agency to downgrade, qualify or withdraw the then-current rating assigned to any of the Certificates that are then currently being rated by such Rating Agency.

"Qualified Substitute Mortgage Loan": A mortgage loan which must, on the date of substitution:  (i) have an outstanding principal balance, after application of all scheduled payments of principal and interest due during or prior to the month of substitution, not in excess of the Stated Principal Balance of the deleted Mortgage Loan as of the Due Date in the calendar month during which the substitution occurs; (ii) have a Mortgage Rate not less than (and not more than one percentage point in excess of the Mortgage Rate of the deleted Mortgage Loan; (iii) not be more than 29 days delinquent in payment, except to the same extent that the Deleted Mortgage Loan is delinquent; (iv) have the same Due Date as the deleted Mortgage Loan; (v) in the case of any LIBOR Mortgage Loan, have a maximum Mortgage Rate not less than the maximum Mortgage Rate on the deleted Mortgage Loan, or a minimum Mortgage Rate less than

the minimum Mortgage Rate on the deleted Mortgage Loan or have a gross margin that is equal to the gross margin on the deleted Mortgage Loan, or have a next interest rate adjustment date not more than six months later than the next interest rate adjustment date on the deleted Mortgage Loan; (vi) have a remaining term to stated maturity not greater than, and not more than two years less than, the remaining term to stated maturity of the deleted Mortgage Loan; (vii) have an original Loan-to-Value Ratio not higher than that of the deleted Mortgage Loan and a current Loan-to-Value Ratio not higher than the then current Loan-to-Value Ratio of the deleted Mortgage Loan; (viii) materially comply as of the date of substitution with all of the representations and warranties set forth in the applicable Mortgage Loan Purchase Agreement; (ix) have an Environmental Assessment (dated no more than 12 months prior to the date of such substitution) that indicates no material adverse environmental conditions with respect to the related Mortgaged Property and which will be delivered as a part of the related Mortgage File or be covered by an environmental insurance policy providing the same coverage as the Environmental Insurance Policy covering the deleted Mortgage Loan; (x) have an original Debt Service Coverage Ratio of not less than the original Debt Service Coverage Ratio of the deleted Mortgage Loan and a current Debt Service Coverage Ratio of not less than the current Debt Service Coverage Ratio of the deleted Mortgage Loan; (xi) *be determined by an Opinion of Counsel (at the Seller's expense) to be a "qualified replacement mortgage" within the meaning of Section 860G(a)(4) of the Code;* (xii) not have a maturity date after the date three years prior to the Latest Possible Maturity Date; (xiii) not be substituted for a deleted Mortgage Loan unless the Trustee has received prior confirmation in writing by each Rating Agency that such substitution will not result in the withdrawal, downgrade, or qualification of the rating assigned by the Rating Agency to any Class of Certificates then rated by the Rating Agency (the cost, if any, of obtaining such confirmation to be paid by the Seller); (xiv) conform to each representation and warranty set forth in the Mortgage Loan Purchase Agreement, applicable to the deleted Mortgage Loan; (xv) prohibit defeasance within two years of the Closing Date, and (xvi) not be substituted for a deleted Mortgage Loan if it would result in the termination of the REMIC status of any REMIC created hereunder or the imposition of tax on any such Trust REMIC other than a tax on income expressly permitted or contemplated to be received by the terms of this Agreement, as determined by an Opinion of Counsel.  In the event that one or more Mortgage Loans are substituted for one or more deleted Mortgage Loans, then the amounts described in clause (i) shall be determined on the basis of aggregate principal balances and the rates described in clause (ii) above (*provided* that no Net Mortgage Rate shall be less than the Pass-Through Rate of any Class of Certificates (other than Class X-1 Certificates) then outstanding) and the remaining term to stated maturity referred to in clause (vi) above shall be determined on a weighted average basis.  When a Qualified Substitute Mortgage Loan is substituted for a deleted Loan, the Seller shall certify that the Mortgage Loan meets all of the requirements of the above definition and shall send such certification to the Trustee.

"Rating Agency":  Each of S&P, Moody's, and Fitch or their successors in interest.  If any of such rating agencies or any successor thereto ceases to remain in existence, "Rating Agency" shall be deemed to refer to any other NRSRO, or other comparable Person, designated by the Depositor to replace the Rating Agency that has ceased to exist.  Notice of such designation shall be given to the Trustee and the Servicer, and the specific ratings of S&P, Moody's, and Fitch herein referenced shall be deemed to refer to the equivalent ratings of the party so designated.

"Rated Final Distribution Date":  As to each Class of Certificates, the Distribution Date occurring in 2038.

"Realized Loss":  An amount determined by the applicable Servicer in connection with any Mortgage Loan equal to (a) with respect to any Liquidated Mortgage Loan (other than a Liquidated Mortgage Loan with respect to which a Deficient Valuation has occurred), the excess of the Principal Balance of such Liquidated Mortgage Loan plus interest thereon at a rate equal to the sum of the applicable Net Mortgage Rate from the Due Date as to which interest was last paid up to the Due Date next succeeding such liquidation over proceeds, if any, received in connection with such liquidation, after application of all withdrawals permitted to be made by the related Servicer or the Special Servicer from the Collection Account with respect to such Mortgage Loan, or (b) with respect to any Mortgage Loan which has become the subject of a Deficient Valuation, the excess of the Principal Balance of the Mortgage Loan over the principal amount as reduced in connection with the proceedings resulting in the Deficient Valuation.

"Record Date":  With respect to any Distribution Date and the Offered Certificates (other than the Class X-1, Class M-7, and Class M-8 Certificates), the day immediately preceding the relevant Distribution Date.  The Record Date with respect to any Distribution Date and each of the Class X-1, Class M-7, and Class M-8 Certificates will be the last day of the month preceding the relevant Distribution Date

"Registrar Office":  As defined in Section 5.02(a).

"Regulation AB":  Subpart 229.1100 – Asset Backed Securities (Regulation AB), 17 C.F.R. §§229.1100-229.1123, as such may be amended from time to time, and subject to such clarification and interpretation as have been provided by the Commission in the adopting release (Asset-Backed Securities, Securities Act Release No. 33-8518, 70 Fed. Reg. 1,506, 1,531 (Jan. 7, 2005)) or by the staff of the Commission, or as may be provided by the Commission or its staff from time to time.

"Reimbursement Rate":  The rate per annum applicable to the accrual of interest on Servicing Advances and P&I Advances, which rate per annum shall equal the "Prime Rate" (the "Prime Rate") published in the "Money Rates" Section of *The Wall Street Journal* (or, if such Section or publication is no longer available, such other comparable publication as is determined by the Trustee in its sole discretion) as may be in effect from time to time, or, if the "Prime Rate" no longer exists, such other comparable rate (as determined by the Depositor in its reasonable discretion) as may be in effect from time to time.

"REMIC":  A "real estate mortgage investment conduit" as defined in Section 860D of the Code (or any successor thereto).

"REMIC 1":  As described in the Preliminary Statement to this Agreement.

"REMIC 1 Regular Interests":  As described in the Preliminary Statement to this Agreement.

"REMIC 2":  As described in the Preliminary Statement to this Agreement.

39

"REMIC Provisions":  Provisions of the federal income tax law relating to real estate mortgage investment conduits, which appear at Sections 860A through 860G of Subchapter M of Chapter 1 of Subtitle A of the Code, and related provisions, and temporary and final regulations and, to the extent not inconsistent with such temporary and final regulations, proposed regulations, and published rulings, notices and announcements promulgated thereunder, as the foregoing may be in effect from time to time.

"Rents from Real Property":  With respect to any REO Property, gross income of the character described in Section 856(d) of the Code, which income, subject to the terms and conditions of that Section of the Code in its present form, does not include:

(i)     except as provided in Section 856(d)(4) or (6) of the Code, any amount received or accrued, directly or indirectly, with respect to such REO Property, if the determination of such amount depends in whole or in part on the income or profits derived by any Person from such property (unless such amount is a fixed percentage or percentages of receipts or sales and otherwise constitutes Rents from Real Property);

(ii)    any amount received or accrued, directly or indirectly, from any Person if the Trust Fund owns directly or indirectly (including by attribution) a ten percent or greater interest in such Person determined in accordance with Sections 856(d)(2)(B) and (d)(5) of the Code;

(iii)   any amount received or accrued, directly or indirectly, with respect to such REO Property if any Person Directly Operates such REO Property;

(iv)    any amount charged for services that are not customarily furnished in connection with the rental of property to tenants in buildings of a similar Class in the same geographic market as such REO Property within the meaning of Treasury Regulations Section 1.856-4(b)(1) (whether or not such charges are separately stated); and

(v)     rent attributable to personal property unless such personal property is leased under, or in connection with, the lease of such REO Property and, for any taxable year of the Trust Fund, such rent is no greater than 15 percent of the total rent received or accrued under, or in connection with, the lease.

"REO Account":  A segregated custodial account or accounts created and maintained by the Special Servicer pursuant to Section 3.16 on behalf of the Trustee in trust for the Certificateholders, which shall be entitled "GMAC Commercial Mortgage Corporation, as Special Servicer or the name of any successor Special Servicer, in trust for Deutsche Bank National Trust Company, as Trustee, for Holders of CBA Commercial Assets, Small Balance Commercial Mortgage Pass-Through Certificates, Series 2006-1, REO Account."  Any such account or accounts shall be an Eligible Account.

"REO Acquisition":  With respect to any Mortgage Loan, the acquisition by the Trust Fund of REO Property related to such Mortgage Loan.

"REO Disposition":  The sale or other disposition of the REO Property pursuant

to Section 3.18.

"REO Extension":  As defined in Section 3.16(a).

"REO Loan":  The Mortgage Loan deemed to be outstanding with respect to each REO Property.  Each REO Loan shall be deemed to be outstanding for so long as the related REO Property remains part of the Trust Fund, and, if a Balloon Loan, shall be deemed to provide for Assumed Scheduled Payments on each such Due Date and otherwise have the same terms and conditions as its predecessor Mortgage Loan, including, without limitation, with respect to the calculation of the Mortgage Rate in effect from time to time (such terms and conditions to be applied without regard to the default on such predecessor Mortgage Loan).  Each REO Loan shall be deemed to have an initial outstanding principal balance and Stated Principal Balance equal to the outstanding principal balance and Stated Principal Balance, respectively, of its predecessor Mortgage Loan as of the related REO Acquisition Date.  All amounts due and owing in respect of the predecessor Mortgage Loan as of the related REO Acquisition date, including, without limitation, accrued and unpaid interest, shall continue to be due and owing in respect of an REO Loan.  All amounts payable or reimbursable to the Servicer, the Special Servicer or the Trustee, as applicable, in respect of the predecessor Mortgage Loan as of the related REO Acquisition Date, including, without limitation, any unpaid Special Servicing Fees and Servicing Fees and any unreimbursed Advances, together with any Advance Interest accrued and payable to the Servicer or the Trustee in respect of such Advances, shall continue to be payable or reimbursable to the Servicer, the Special Servicer, or the Trustee in respect of an REO Loan. Collections in respect of each REO Loan (exclusive of amounts to be applied to the payment of, or to be reimbursed to the Servicer or the Special Servicer for the payment of, the costs of operating, managing and maintaining the related REO Property) shall be treated, without duplication:  first, as a recovery of accrued and unpaid Advances and Servicing Fees and Advance Interest due the Servicer or the Trustee, as applicable; second, as a recovery of accrued and unpaid interest on such REO Loan at the related Mortgage Rate to but not including the Due Date in the Collection Period of receipt, and, if applicable, any unpaid Liquidation Expenses; third, as a recovery of principal of such REO Loan to the extent of its entire unpaid principal balance; and fourth, in accordance with the Servicing Standard, as a recovery of any other amounts due and owing in respect of such REO Loan, including, without limitation, Prepayment Premiums, and Penalty Charges.

"REO Property":  A Mortgaged Property acquired by the Special Servicer on behalf of and in the name of the Trustee (or its nominee) for the benefit of the Certificateholders through foreclosure, acceptance of a deed in lieu of foreclosure or otherwise in accordance with applicable law in connection with the default or imminent default of a Loan.

"REO Revenues":  All income, rents and profits derived from the ownership, operation or leasing of any REO Property.

"Request for Release":  A release signed by a Servicing Officer of the Servicer or the Special Servicer, as applicable, in the form of Exhibit F attached hereto.

"Reporting Subcontractor":  With respect to the Servicer or the Trustee, any Subcontractor determined by such Person pursuant to Section 11.08(b) to be "participating in the

servicing function" within the meaning of Item 1122 of Regulation AB. References to a Reporting Subcontractor shall refer only to the Subcontractor of such Person and shall not refer to Subcontractors generally.

"Residual Certificate": The Class R Certificate issued, authenticated and delivered hereunder.

"Responsible Officer": When used with respect to the initial Trustee, any principal, director, vice president, assistant vice president, associate or any other officer of the Trustee having direct responsibility for the administration of this Agreement, and with respect to any successor Trustee, any officer or assistant officer in the corporate trust department of the Trustee or any other officer of the Trustee customarily performing functions similar to those performed by any of the above designated officers to whom a particular matter is referred by the Trustee because of such officer's knowledge of and familiarity with the particular subject and having direct responsibility for the administration of this Agreement.

"Securities Act": The Securities Act of 1933, as amended.

"Security Agreement": With respect to any Mortgage Loan, any security agreement or equivalent instrument, whether contained in the related Mortgage or executed separately, creating in favor of the holder of such Mortgage a security interest in the personal property constituting security for repayment of such Mortgage Loan.

"Security Position Listing": A listing prepared by the Depository of the holdings of Depository Participants with respect to the Certificates.

"Seller": CBA Commercial Assets, LLC, a Delaware limited liability company, and its successors in interest.

"Senior Certificates": The Class X-1, and Class A Certificates.

"Servicer": GMAC Commercial Mortgage Corporation, and its successors in interest and assigns, or any successor servicer appointed as herein provided.

"Servicer Remittance Date": With respect to any Distribution Date, the Business Day preceding such Distribution Date.

"Servicer Reports": Collectively, the CMSA Servicer Watch List, the CMSA Delinquent Loan Status Report, CMSA Historical Loan Modification Report, CMSA Historical Liquidation Report, CMSA Property File, CMSA Financial File and CMSA REO Status Report.

"Servicing Account": The account or accounts created and maintained pursuant to Section 3.03.

"Servicing Advances": All customary, reasonable and necessary "out of pocket" costs and expenses (including attorneys' fees and expenses and fees of real estate brokers) incurred by the Servicer in connection with the servicing and administering of (a) a Loan in respect of which a default, delinquency or other unanticipated event has occurred or is

reasonably foreseeable or (b) an REO Property, including, in the case of both (a) and (b), but not limited to, the cost of (i) compliance with the Servicer's obligations set forth in <u>Section 3.03(c)</u>, (ii) the preservation, restoration and protection of a Mortgaged Property, (iii) obtaining any Insurance and Condemnation Proceeds or any Liquidation Proceeds of the nature described in clauses (i) through (iv) of the definition of "Liquidation Proceeds," (iv) any enforcement or judicial proceedings with respect to a Mortgaged Property, including foreclosures, (v) the operation, leasing, management, maintenance and liquidation of any REO Property, (vi) any Appraisal, (vii) any "forced placed" insurance policy purchased, (viii) payment of real estate taxes pursuant to <u>Section 3.03(b)</u>, and (viii) any other expenditure which is expressly designated as a Servicing Advance herein.  Any amounts so advanced as a Servicing Advance shall not, for purposes of calculating monthly distributions to Certificateholders, be added to the unpaid principal balance of the related Mortgage Loan, notwithstanding that the terms of such Mortgage Loan so permit.

"<u>Servicing Fee</u>":  With respect to each Loan and REO Loan, the fee payable to the Servicer pursuant to the first paragraph of <u>Section 3.11(a)</u>.

"<u>Servicing Fee Rate</u>":  With respect to the Servicer and each Loan, Specially Serviced Loan, and REO Loan, a rate equal to 0.2842% per annum (exclusive of any Trustee Fee) computed on the same basis and in the same manner as interest is computed on the related Loan.

"<u>Servicing File</u>": All documents and records in the Seller's possession relating to the Mortgage Loans (including any reserve and escrow agreements, asset summaries, appraisals, insurance policies, tax bills, engineering reports, environmental reports, cash management agreements, lockbox agreements, financial statements, operating statements and any other information provided by the respective Borrower from time to time, but excluding any documents and other writings not enumerated in this parenthetical that have been prepared by the Seller or any of its Affiliates solely for internal communication) that are not required to be a part of the related Mortgage File in accordance with the definition thereof, together with copies of all instruments and documents which are required to be a part of the Mortgage File in accordance with the definition thereof.

"<u>Servicing Officer</u>":  Any officer and/or employee of the Servicer or the Special Servicer involved in, or responsible for, the administration and servicing of the Mortgage Loans, whose name and specimen signature appear on a list of servicing officers furnished by the Servicer to the Trustee and the Depositor on the Closing Date as such list may be amended from time to time thereafter.

"<u>Servicing Standard</u>":  As defined in <u>Section 3.01(a)</u>.

"<u>Servicing Transfer Event</u>":  With respect to any Mortgage Loan, the occurrence of any of the following events:

(i)    a payment default shall have occurred on such Mortgage Loan at its Maturity Date and continues unremedied for 30 days or, if the Servicer has received evidence that the Borrower has obtained a firm commitment to close a refinance within

60 days of the related default date, 60 days which may be extended to 90 days by the Servicer if in the best interest of the Certificateholders as a collective whole, determined in accordance with the Servicing Standard; or

(ii)     with respect to any Mortgage Loan with a Stated Principal Balance equal or greater than (a) $2,000,000.00 or (b) two percent (2%) of the aggregate Stated Principal Balance of the Mortgage Loans at that time, any Monthly Payment is 60 days or more delinquent, and with respect to all other Mortgage Loans, any Monthly Payment is 120 days or more delinquent; or

(iii)    the Servicer or Directing Certificateholder determines that a payment default has occurred or is imminent and is not likely to be cured by the related Borrower within, with respect to any Mortgage Loan with a Stated Principal Balance equal or greater than (a) $2,000,000.00 or (b) two percent (2%) of the aggregate Stated Principal Balance of the Mortgage Loans at that time, 60 days, or with respect to all other Mortgage Loans, within 120 days, and in the judgment of the Servicer and Directing Certificateholder, has materially and adversely affected the value of the related Mortgage Loan; or

(iv)    a decree or order of a court or agency or supervisory authority having jurisdiction in the premises in an involuntary case under any present or future federal or state bankruptcy, insolvency or similar law or the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs is entered against the related Borrower has materially and adversely affected the value of the related Mortgage Loan; provided that if such decree or order is discharged or stayed within 60 days of being entered, such Loan shall not be a Specially Serviced Loan (and no Special Servicing Fees, Workout Fees or Liquidation Fees will be payable with respect thereto); or

(v)     the related Borrower shall file for or consent to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to such Borrower or of or of or relating to all or substantially all of its property has materially and adversely affected the value of the related Mortgage Loan; or

(vi)    the related Borrower shall file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations; or

(vii)   the Servicer has received notice of the foreclosure of any lien on the related Mortgaged Property; or

(viii)  any other default has occurred under the Loan Documents that, in the judgment of the Servicer and Directing Certificateholder, has materially and adversely affected the value of the related Mortgage Loan.

"Six-Month LIBOR Index":  The average of the interbank offered rates for six-

month United States dollar deposits in the London market, calculated as provided in the related Mortgage Note

"S&P":  Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and its successors in interest.

"Special Servicer": GMAC Commercial Mortgage Corporation and its successors in interest and assigns, or any successor special servicer appointed as herein provided.

"Special Servicing Fee":  With respect to each Specially Serviced Loan and REO Loan, the fee payable to the Special Servicer pursuant to the first paragraph of Section 3.11(b).

"Special Servicing Fee Rate":  With respect to each Specially Serviced Loan and each REO Loan, 0.75% per annum computed on the basis of the Stated Principal Balance of the related Loan and for the same period for which any related interest payment on the related Specially Serviced Loan is computed, as more particularly described in Section 3.11.

"Specially Serviced Loan":  As defined in Section 3.01(a).

"Startup Day":  The Closing Date.

"Stated Principal Balance":  With respect to any Mortgage Loan (other than an REO Loan), as of any date of determination, an amount equal to (x) the Cut-off Date Principal Balance of such Mortgage Loan (or, in the case of a Qualified Substitute Mortgage Loan, the principal balance as of the date it was added to the Trust), minus (y) the sum of, without duplication:

(i)     the principal portion of each Monthly Payment due on such Mortgage Loan after the Cut-off Date, to the extent received from the Borrower or advanced by the Servicer or Trustee, as applicable, and distributed to Certificateholders on or before such date of determination;

(ii)    all Principal Prepayments received with respect to such Mortgage Loan after the Cut-off Date, to the extent distributed to Certificateholders on or before such date of determination (except Payaheads, to the extent not yet applied);

(iii)   the principal portion of all Insurance and Condemnation Proceeds and Liquidation Proceeds received with respect to such Mortgage Loan after the Cut-off Date, to the extent distributed to Certificateholders on or before such date of determination;

(iv)    any reduction in the outstanding principal balance of such Mortgage Loan resulting from a Deficient Valuation that occurred prior to the end of the Collection Period for the most recent Distribution Date; and

(v)     any reduction in the outstanding principal balance of such Mortgage Loan due to a modification by the Special Servicer pursuant to Section 3.20.

With respect to any REO Loan, as of any date of determination, an amount equal to (x) the Stated Principal Balance of the predecessor Loan as of the related Acquisition Date, minus (y) the sum of, without duplication:

(i)       the principal portion of any P&I Advance or Assumed Scheduled Payment made with respect to an REO Loan on or after the related REO Acquisition Date, to the extent distributed to Certificateholders on or before such date of determination; and

(ii)      the principal portion of all Insurance and Condemnation Proceeds, Liquidation Proceeds and REO Revenues received with respect to such REO Loan, to the extent distributed to Certificateholders on or before such date of determination.

A Loan or an REO Loan shall be deemed to be part of the Trust Fund and to have an outstanding Stated Principal Balance until the Distribution Date on which the payments or other proceeds, if any, received in connection with a Liquidation Event in respect thereof are to be distributed to Certificateholders.

"Statement to Certificateholders":  As defined in Section 4.06(a).

"Subcontractor":   Any vendor, subcontractor or other Person that is not responsible for the overall servicing (as "servicing" is commonly understood by participants in the mortgage-backed securities market) of Mortgage Loans but performs one or more discrete functions identified in Item 1122(d) of Regulation AB with respect to Mortgage Loans under the direction or authority of the Servicer or Subservicer.

"Sub-Servicer":  Any Person with which the Servicer or the Special Servicer, as applicable, has entered into a Sub-Servicing Agreement.

"Sub-Servicing Agreement":  The subservicing agreements between the Servicer or the Special Servicer, as the case may be, and any Sub-Servicer relating to servicing and administration of Mortgage Loans by such Sub-Servicer as provided in Section 3.22.

"Subordinate Certificate":   Any Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, and Class M-8 Certificates.

"Subsequent Recoveries":  As defined in Section 4.01(e).

"Substitution Shortfall Amount":   With respect to a substitution pursuant to Section 2.03(b), an amount equal to the excess, if any, of the Purchase Price of the Loan being replaced calculated as of the date of substitution over the Stated Principal Balance of the related Qualified Substitute Mortgage Loan as of the date of substitution.  In the event that one or more Qualified Substitute Mortgage Loans are substituted (at the same time) for one or more deleted Mortgage Loans, the Substitution Shortfall Amount shall be determined as provided in the preceding sentence on the basis of the aggregate Purchase Prices of the Mortgage Loan or Mortgage Loans being replaced and the aggregate Stated Principal Balances of the related Qualified Substitute Mortgage Loan or Qualified Substitute Mortgage Loans.

"Successor Manager":  As defined in Section 3.19(b).

"Termination Notice":  As defined in Section 7.01(b).

"Total Distribution Amount": With respect to any Distribution Date, the sum (without duplication) of the Interest Remittance Amount and the Principal Distribution Amount for such date.

"Transfer": Any direct or indirect transfer, sale, pledge, hypothecation, or other form of assignment of any Ownership Interest in a Certificate.

"Transfer Affidavit":  As defined in Section 5.02(f)(B).

"Transferee":  Any Person who is acquiring by Transfer any Ownership Interest in a Certificate.

"Transferor":  Any Person who is disposing by Transfer any Ownership Interest in a Certificate.

"Transferor Letter":  As defined in Section 5.02(f)(D).

"Trust":  As defined in the Preliminary Statement.

"Trust Fund":  Except as otherwise provided herein, the segregated pool of assets subject hereto, constituting the Trust, consisting of: (i) the Mortgage Loans subject to this Agreement and all interest and principal received or receivable on or with respect to the Mortgage Loans (other than payments of principal and interest due and payable on the Mortgage Loans on or before the Cut-off Date and Principal Prepayments paid on or before the Cut-off Date), together with all documents included in the related Mortgage Files; (ii) such funds or assets as from time to time are deposited in the Collection Account, the Certificate Distribution Accounts, in Servicing Accounts held by the Servicer and, if established, the REO Account; (iii) any REO Property; (iv) the rights of the mortgagee under all Insurance Policies with respect to the Mortgage Loans, (v) the Cap Agreements and any related Cap Agreement Reserve Fund; and (vi) the rights of the Depositor under the Mortgage Loan Purchase Agreement. Notwithstanding the foregoing, if and to the extent that any interest and investment income may be withdrawn (i) by the Servicer or Special Servicer, as the case may be, pursuant to Section 3.06(b), or (ii) by the Trustee pursuant to Section 3.06(c), such income shall not be part of the Trust Fund. In addition, all of the assets of the Trust Fund shall be assets of REMIC 1, except for the Cap Agreements and the Cap Agreement Reserve Fund which shall not be assets of any REMIC created hereunder, although they shall be assets of the Trust Fund.

"Trustee":  Deutsche Bank National Trust Company, in its capacity as trustee and its successors in interest, or any successor trustee appointed as herein provided.

"Trustee Exception Report":  As defined in Section 2.02(e).

"Trustee Fee":  The fee to be paid to the Trustee as compensation for the Trustee's activities under this Agreement.

"Trustee Fee Rate":   A rate equal to 0.01% per annum computed on the same interest accrual basis as the related Loan, which will be a 30/360 basis, on the Stated Principal Balance of the subject Loan (including any related REO Loans and Specially Serviced Loans).

"UCC":  The Uniform Commercial Code, as enacted in each applicable state.

"UCC Financing Statement":  A financing statement executed and filed pursuant to the UCC, as in effect in the relevant jurisdiction.

"Upper-Tier REMIC":   As described in the Preliminary Statement to this Agreement.

"U.S. Person":   A citizen or resident of the United States, a corporation or partnership (including an entity treated as a corporation or partnership for federal income tax purposes) created or organized in, or under the laws of, the United States or any State thereof or the District of Columbia (other than a partnership that is not treated as a United States person under any applicable Treasury regulations), or an estate whose income is subject to United States federal income tax purposes regardless of its source, or a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have authority to control all substantial decisions of the trust. Notwithstanding the preceding sentence, to the extent provided in Treasury Regulations, certain trusts in existence on August 20, 1996 and treated as United States persons prior to such date that elect to continue to be so treated also shall be considered U.S. Persons.

"Voting Rights":  The portion of the voting rights of all of the Certificates, which is allocated to any Certificate. At all times during the term of this Agreement and for any date of determination, the Voting Rights shall be allocated among the various Classes of Certificateholders as follows: (i) 2% in the case of the Class X-1 Certificates, and (ii) 98% of the voting rights will be allocated to the Class A, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, and Class M-8 Certificates, in proportion to the respective total Certificate Balances of those Classes.  For purposes of determining Voting Rights, the Certificate Balance of any Class shall be deemed to be reduced by allocation of the Applied Loss Amount to such Class. Voting Rights allocated to a Class of Certificateholders shall be allocated among such Certificateholders in proportion to the Percentage Interests evidenced by their respective Certificates.

"Website":   The internet website maintained by the Trustee initially located at https://www.tss.db.com/invr or the internet website of the Servicer initially located at https://www.investorquery.com/iq2_Login.aspx.

"Workout Fee":   The fee paid to the Special Servicer with respect to each Corrected Mortgage Loan.

"Workout Fee Rate":  As defined in Section 3.11(b).

Section 1.02    Certain Calculations.

(a)    Unless otherwise specified herein, for purposes of determining amounts with respect to the Certificates and the rights and obligations of the parties hereto, the following provisions shall apply:

(i)    All calculations of interest with respect to the Mortgage Loans and of interest earned on Advances provided for herein shall be made on the basis of a 360-day year consisting of twelve 30-day months;

(ii)    Any Loan payment is deemed to be received on the date such payment is actually received by the Servicer, the Special Servicer or the Trustee; and

(iii)    Any reference to the Certificate Balance of any Class of Certificates on or as of a Distribution Date shall refer to the Certificate Balance of such Class of Certificates on such Distribution Date after giving effect to (a) any distributions made on such Distribution Date pursuant to Section 4.01(a) and (b) any Applied Loss Amount allocated to such Class on such Distribution Date pursuant to Section 4.04.

Section 1.03    Loan Identification Convention.

Mortgage Loans shall be identified in this Agreement by reference to their respective loan numbers, as set forth under the column heading "Loan #" in Exhibit A-1 to the Private Placement Memorandum.

## ARTICLE II

## CONVEYANCE OF MORTGAGE LOANS; ORIGINAL ISSUANCE OF CERTIFICATES

Section 2.01    Conveyance of Mortgage Loans.

(a)    The Depositor, concurrently with the execution and delivery hereof, does hereby assign, sell, transfer, set over and otherwise convey to the Trustee, without recourse, for the benefit of the Certificateholders all the right, title and interest of the Depositor, including any security interest therein for the benefit of the Depositor, in, to and under (i) the Loans identified on the Mortgage Loan Schedule, (ii) the Mortgage Loan Purchase Agreement, (iii) the Cap Agreements, and (iv) all other assets included or to be included in the Trust Fund.  Such assignment includes all interest and principal received or receivable on or with respect to the Mortgage Loans (other than payments of principal and interest due and payable on the Loans on or before the Cut-off Date and Principal Prepayments paid on or before the Cut-off Date).  The transfer of the Mortgage Loans and the related rights and property accomplished hereby is absolute and, notwithstanding Section 10.07, is intended by the parties to constitute a sale.  The Trustee hereby accepts such transfer and assignment of rights under such agreements, and, subject to the provisions hereof, shall be entitled to exercise all of the rights of the Depositor under such agreements as if for such purpose it were the Depositor.

49

(b)      In connection with the Depositor's assignment pursuant to subsection (a) above, the Depositor shall direct, and hereby represents and warrants that it has directed the Seller pursuant to the Mortgage Loan Purchase Agreement to deliver to and deposit with, or cause to be delivered to and deposited with the Trustee (with a copy to the Servicer and the Special Servicer as provided in Section 2.01(d)), on or before the Closing Date, the Mortgage File for each Mortgage Loan so assigned.  If the Seller cannot deliver, or cause to be delivered as to any Mortgage Loan, the original Note, the Seller shall deliver a copy or duplicate original of such Note, together with an affidavit substantially in the form attached as Exhibit G hereto, certifying that the original thereof has been lost or destroyed.

If the Seller cannot deliver, or cause to be delivered, as to any Mortgage Loan, any of the documents and/or instruments referred to in clauses (ii), (iii), (iv), (viii), (xi) and (xii) (other than assignments of UCC financing statements to be recorded or filed in accordance with the transfer contemplated by this Agreement) of the definition of "Mortgage File," with evidence of recording or filing thereon, solely because of a delay caused by the public recording or filing office where such document or instrument has been delivered for recordation or filing, the delivery requirements of the Mortgage Loan Purchase Agreement and this Section 2.01(b) shall be deemed to have been satisfied and such non-delivered document or instrument shall be deemed to have been included in the Mortgage File, *provided* that a photocopy of such non-delivered document or instrument (certified by the applicable public recording or filing office, the applicable title insurance company or the Seller to be a true and complete copy of the original thereof submitted for recording or filing) is delivered to the Trustee on or before the Closing Date, and either the original of such non-delivered document or instrument, or a photocopy thereof (certified by the appropriate public recording or filing office to be a true and complete copy of the original thereof submitted for recording or filing), with evidence of recording or filing thereon, is delivered to the Trustee (with a copy to the Servicer) within 120 days after the Closing Date, which period may be extended up to two times, in each case for an additional period of 45 days provided that the Seller, as certified in writing to the Trustee prior to each such 45 day extension, is in good faith attempting to obtain from the appropriate county recorder's or filing office such original or photocopy.

If the Seller cannot deliver, or cause to be delivered, as to any Mortgage Loan, any of the documents and/or instruments referred to in clauses (ii), (iii), (iv), (viii), (xi), and (xii) (other than assignments of UCC financing statements to be recorded or filed in accordance with the transfer contemplated by this Agreement) of the definition of "Mortgage File," with evidence of recording or filing thereon, for any other reason, including, without limitation, that such non-delivered document or instrument has been lost, the delivery requirements of the Mortgage Loan Purchase Agreement and this Section 2.01(b) shall be deemed to have been satisfied and such non-delivered document or instrument shall be deemed to have been included in the Mortgage File if a photocopy of such non-delivered document or instrument (with evidence of recording or filing thereon and certified by the appropriate public recording or filing office to be a true and complete copy of the original thereof submitted for recording or filing) is delivered to the Trustee on or before the Closing Date.

None of the Trustee, Special Servicer or the Servicer shall be liable for any failure by the Seller or the Depositor to comply with the delivery requirements of the Mortgage Loan Purchase Agreement and this Section 2.01(b).  Notwithstanding the foregoing, if the Seller fails

to deliver a UCC-3 assignment on or before the Closing Date as required above solely because the related UCC Financing Statement has not been returned to the Seller by the applicable filing office, the Seller shall not be in breach of its obligations with respect to such delivery; *provided* that the Seller promptly forwards such UCC Financing Statement to the Trustee (with a copy to the Servicer) upon its return, together with the related original UCC-3 assignment in a form appropriate for filing.

(c)     Notwithstanding the foregoing, at the expense of the Seller, the Depositor (directly or through its designee) shall, as to each Mortgage Loan, use its reasonable best efforts to promptly (and in any event no later than the later of (i) 120 days after the Closing Date and (ii) 90 days from receipt of documents in form suitable for recording or filing, as applicable, including, without limitation, all necessary recording and filing information) cause to be submitted for recording or filing, as the case may be, each assignment referred to in clauses (iii) and (v) of the definition of "Mortgage File," each UCC-3 assignment to the Trustee referred to in clause (xi) of the definition of "Mortgage File" and each power of attorney referred to in clause (xii) of the definition of "Mortgage File."  Each such assignment shall reflect that it should be returned by the public recording office to the Trustee following recording, and each such UCC-3 assignment shall reflect that the file copy thereof should be returned to the Trustee following filing.  If any such document or instrument is lost or returned unrecorded or unfiled because of a defect therein, the Depositor shall prepare or cause to be prepared a substitute therefor or cure such defect, as the case may be, and thereafter the Depositor shall upon receipt thereof cause the same to be duly recorded or filed, as appropriate.

Notwithstanding the foregoing, the Seller may elect, at its sole cost and expense, to engage a third party contractor to prepare or complete in proper form for filing and recording any and all of the assignments described in the immediately preceding paragraph, together with each UCC-3 assignment to the Trustee referred to in clause (xi) of the definition of "Mortgage File," with respect to the Mortgage Loans conveyed by it to the Depositor under the Mortgage Loan Purchase Agreement, to submit such assignments for filing and recording, as the case may be, in the applicable public filing and recording offices and to deliver such assignments to the Trustee or its designee as such assignments (or certified copies thereof) are received from the applicable filing and recording offices with evidence of such filing or recording indicated thereon.  Notice shall be provided to the Trustee by the Seller if delivery pursuant to the third paragraph of <u>Section 2.01(b)</u> above will be made more than 180 days after the Closing Date together with the certifications and photocopy required thereby. If the original lender's title insurance policy was not delivered pursuant to <u>Section 2.01(b)</u> above, the Depositor shall deliver or cause to be delivered to the Trustee, promptly after receipt thereof, but in no event later than within 180 days after the Closing Date, the original lender's title insurance policy. The Depositor shall deliver or cause to be delivered to the Trustee promptly upon receipt thereof, but in no event later than within 180 days after the Closing Date, any other original documents constituting a part of a Mortgage File received with respect to any Mortgage Loan, including, but not limited to, any original documents evidencing an assumption or modification of any Mortgage Loan.

(d)     All documents and records in the Depositor's or the Seller's possession relating to the Mortgage Loans (including reserve and escrow agreements, cash management agreements, lockbox agreements, financial statements, operating statements and any other

information provided by the respective Borrowers from time to time, but excluding any documents and other writings not enumerated in this parenthetical that have been prepared by the Seller or any of its Affiliates solely for internal communication) that are not required to be a part of a Mortgage File in accordance with the definition thereof together with all copies of all instruments and documents which are required to be part of the related Mortgage File in accordance with the definition thereof, shall be delivered to the Servicer no later than 30 days after the Closing Date (provided that the original Mortgage Note (or a lost note affidavit of Seller in form reasonably acceptable to the Trustee) shall be delivered to the Trustee by the Seller or the Depositor on or prior to the Closing Date) and shall be delivered to the Trustee in trust for the benefit of the Certificateholders.

In connection with the assignment of any Mortgage Loan registered on the MERS® System, the Depositor further agrees that it will cause, within 30 Business Days after the Closing Date, the MERS® System to indicate that such Mortgage Loans have been assigned by the Depositor to the Trustee in accordance with this Agreement for the benefit of the Certificateholders by including (or deleting, in the case of Mortgage Loans which are repurchased in accordance with this Agreement) in such computer files (a) the code in the field which identifies the specific Trustee and (b) the code in the field "Pool Field" which identifies the series of the Certificates issued in connection with such Mortgage Loans. The Depositor further agrees that it will not, and will not permit the Servicer to, and the Servicer agrees that it will not, alter the codes referenced in this paragraph with respect to any Mortgage Loan during the term of this Agreement unless and until such Mortgage Loan is repurchased sold or released in accordance with the terms of this Agreement.

(e)     In connection with the Depositor's assignment pursuant to subsection (a) above, the Depositor shall deliver, and hereby represents and warrants that it has delivered, to the Trustee and the Servicer, on or before the Closing Date, a fully executed original counterpart of the Mortgage Loan Purchase Agreement, as in full force and effect, without amendment or modification, on the Closing Date.

(f)     The Depositor shall use its reasonable best efforts to require that, promptly after the Closing Date, but in all events within three Business Days after the Closing Date, the Seller shall cause all funds on deposit in escrow accounts maintained with respect to the Mortgage Loans in the name of the Seller or any other name to be transferred to the Servicer (or a Sub-Servicer at the direction of the Servicer) for deposit into the applicable Servicing Accounts.

(g)     The Depositor shall have delivered to the Trustee, on or before the Closing Date, five limited powers of attorney in favor of the Servicer and the Special Servicer empowering the Servicer and, in the event of the failure or incapacity of the Servicer, the Special Servicer, to record, at the expense of the Seller, any Loan Documents required to be recorded and any intervening assignments with evidence of recording thereon that are required to be included in the Mortgage Files.   The Seller has agreed in the Mortgage Loan Purchase Agreement to reasonably cooperate with the Trustee, the Servicer and the Special Servicer in connection with any additional powers of attorney or revisions thereto that are requested by such parties.   The Trustee and each other party hereto agrees that no such power of attorney shall be used with respect to any Mortgage Loan by or under authorization by any party hereto except to

the extent that the absence of a document described in the second preceding sentence with respect to such Mortgage Loan remains unremedied as of the earlier of (i) the date that is 180 days following the delivery of notice of such absence to the Seller, but in no event earlier than 18 months from the Closing Date, and (ii) the date (if any) on which such Mortgage Loan becomes a Specially Serviced Loan.

Section 2.02    Acceptance by Trustee.

(a)    The Trustee, by the execution and delivery of this Agreement, acknowledges receipt by it, subject to the provisions of Sections 2.01 and 2.02(d), to any exceptions noted on the Trustee Exception Report, and to the further review provided for in Section 2.02(b), of the Notes, fully executed original counterparts of the Mortgage Loan Purchase Agreement, and of all other assets included in the Trust Fund, in good faith and without notice of any adverse claim, and declares that it holds and will hold such documents and any other documents delivered or caused to be delivered by the Seller constituting the Mortgage Files, and that it holds and will hold such other assets included in the Trust Fund, in trust for the exclusive use and benefit of all present and future Certificateholders.

(b)    Within 45 days of the Closing Date, except as set forth on the list attached to the form set forth in Exhibit S, the Trustee shall review and, subject to Sections 2.01 and 2.02(d), certify in writing substantially in the form of Exhibit S hereto to each of the Depositor, the Servicer, the Special Servicer, the Seller and the Directing Certificateholder that, as to each Mortgage Loan listed in the Mortgage Loan Schedule (other than any Mortgage Loan paid in full or any Mortgage Loan specifically identified in any exception report annexed thereto as not being covered by such certification), (i) all documents specified in clauses (i) through (vi) and (ix) (without regard to the parenthetical clause) and, if any, items (xii) and (xiii) of the definition of "Mortgage File" and, to the extent actually delivered to it, items (viii), (x) and (xiv) through (xxii) of the definition of "Mortgage File" are in its possession, and (ii) all documents delivered or caused to be delivered by the Seller constituting the Mortgage Files have been received as noted above, documents delivered under items (i) through (x), (xii) and (xiii) of the definition of "Mortgage File" have been executed, documents delivered under items (i) and (ii) of the definition of "Mortgage File" accurately reflect the information set forth in items (i) through (v), (vii)(b) and (ix) (solely with respect to items (iv) and (ix) to the extent of the first Due Date after origination, not as of the Cut-off Date) in the Mortgage Loan Schedule, purport to be recorded or filed (if recordation or filing is specified for such document in the definition of "Mortgage File") and have not been torn, mutilated or otherwise defaced, and that such documents relate to the Mortgage Loans identified on the Mortgage Loan Schedule.  Within 45 days of the Closing Date, the Trustee shall also certify that each Note appears regular on its face (without inquiry as to the authenticity of such signatory), has no marks or other indication of payment and is executed by the appropriate party.

(c)    The Trustee shall review each of the Loan Documents received after the Closing Date within 45 days of receipt; and every 90 days following the initial certification until the earlier of (i) the second anniversary of the Closing Date, (ii) the date on which all such exceptions are eliminated (any such elimination resulting from the fact that recordation and/or filing has been completed shall be based solely on receipt by the Trustee showing evidence of recordation and/or filing) and (iii) the date on which all the affected Mortgage Loans are

removed from the Trust, the Trustee shall, subject to <u>Sections 2.01</u> and <u>2.02(d)</u>, certify in writing substantially in the form of Exhibit S hereto to each of the Depositor, the Servicer, the Special Servicer and the Seller and to the Directing Certificateholder in electronic format that, as to each Mortgage Loan listed on the Mortgage Loan Schedule (excluding any Mortgage Loan as to which a Liquidation Event has occurred or any Mortgage Loan specifically identified in any exception report annexed thereto as not being covered by such certification), (i) all documents specified in clauses (i) through (vii) and (ix) (without regard to the parenthetical clause), and, if any, items (xii) and (xiii) of the definition of "Mortgage File" and to the extent actually delivered to it, items (viii), (x), (xi) and (xiv) through (xxii) of the definition of "Mortgage File" are in its possession, (ii) it has received either a recorded original of each of the assignments specified in clause (iii) and clause (v) of the definition of "Mortgage File," insofar as an unrecorded original thereof had been delivered or caused to be delivered by the Seller, or a copy of such recorded original certified by the applicable public recording office to be true and complete and (iii) all such Loan Documents have been received as noted above, documents delivered under items (i) through (x), (xii) and (xiii) of the definition of "Mortgage File" have been executed, documents under items (i) and (ii) of the definition of "Mortgage File" accurately reflect the information set forth in items (i) through (v), (vii)(b) and (ix) (solely with respect to items (iv) and (ix), to the extent of the first Due Date after origination , not as of the Cut-off Date) in the Mortgage Loan Schedule, purport to be recorded or filed (if recordation or filing is specified for such document in the definition of "Mortgage File") and have not been torn, mutilated or otherwise defaced, and that such documents relate to the Mortgage Loans identified on the Mortgage Loan Schedule; *provided* that the original lender's title insurance policy or a copy thereof described in clause (ix) of the definition of "Mortgage File" must be delivered within 270 days of the Closing Date, which period may be extended up to two times by Trustee, in each case for an additional period of 45 days provided that such original policy is unavailable from the related title insurance company due to a delay in originals or certified copies of recorded documents being returned from the applicable recording or filing office, and the Seller, as certified in writing to the Trustee prior to each such 45-day extension, is in good faith attempting to obtain from the title insurance company such original or certified copy.  Following any request made later than two years following the Closing Date, by the Depositor, Seller, Servicer, Special Servicer, Directing Certificateholder or any Certificateholder, the Trustee shall deliver an updated schedule of exceptions, in electronic format (to the extent the prior schedule showed exceptions), to the requesting person.  The Depositor shall, upon request, provide the Servicer with recording and filing information as to recorded Mortgages, Assignments of Lease and UCC financing statements.

(d)     It is herein acknowledged that the Trustee is not under any duty or obligation (i) to determine whether any of the documents specified in clauses (iv), (v), (vi), (vii), (viii), (x), (xii) through (xxii) of the definition of "Mortgage File" exist or are required to be delivered by the Depositor, the Seller or any other Person other than to the extent identified on the related Mortgage Loan Schedule, (ii) to inspect, review or examine any of the documents, instruments, certificates or other papers relating to the Mortgage Loans delivered to it to determine that the same are valid, legal, duly authorized, effective, in recordable form, genuine, enforceable, sufficient or appropriate for the represented purpose or that they are other than what they purport to be on their face, (iii) to determine collectability, perfection or priority of any Mortgage Loan, (v) to determine whether any omnibus assignment specified in clause (vii) of the

definition of "Mortgage File" is effective under applicable law or (iv) to determine whether a county and state financing statement is required to be filed for any given Mortgage.

(e)     If, in the process of reviewing the Mortgage Files or at any time thereafter, the Trustee finds that (a) any document required to be included in the Mortgage File is not in its possession within the time required hereunder or when such document is needed for enforcement of the Mortgage Loan Documents, whichever is earlier, or (b) such document has not been properly executed or does not conform to the review criteria under Section 2.02(b) or 2.02(c), as applicable, is otherwise defective on its face (each, a "Defect" in the related Mortgage File), the Trustee shall promptly so notify the Depositor, the Servicer, the Special Servicer and the Seller by providing a written report (the "Trustee Exception Report") setting forth for each affected Mortgage Loan, with particularity, the nature of such Defect.  The Trustee shall not be required to verify the conformity of any document with the Mortgage Loan Schedule (except that such documents have been executed and have been recorded or filed (if recordation is specified for such document in the definition of "Mortgage File" appear to be related to the Mortgage Loans identified on the Mortgage Loan Schedule, accurately reflect the information set forth in the Mortgage Loan Schedule, or have been torn, mutilated or otherwise defaced.  In addition, upon the discovery by the Trustee, the Depositor or the Servicer (or upon receipt by the Trustee of written notification of such breach) of a breach of any of the representations and warranties made by the Seller in the Mortgage Loan Purchase Agreement or a Material Document Defect in respect of any other Mortgage Loan or by the Depositor in this Agreement which materially adversely affects such Mortgage Loan or the interests of the related Certificateholders in such Mortgage Loan, the party discovering such breach or Material Document Defect shall give prompt written notice to the other parties, including the Seller.

(f)     Upon the second anniversary of the Closing Date, the Trustee shall deliver a final exception report as to any remaining Defects or required Loan Documents that are not in its possession and that it was required to review pursuant to Section 2.01(c).

Section 2.03   Representations, Warranties and Covenants of the Depositor; Repurchase of Mortgage Loans by a Seller for Defects in Mortgage Files and Breaches of Representations and Warranties.

(a)     The Depositor hereby represents and warrants as of the Closing Date that:

(i)     The Depositor is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware, and the Depositor has taken all necessary entity action to authorize the execution, delivery and performance of this Agreement by it, and has the power and authority to execute, deliver and perform this Agreement and all the transactions contemplated hereby, including, but not limited to, the power and authority to sell, assign and transfer the Mortgage Loans in accordance with this Agreement; the Depositor has duly authorized the execution, delivery and performance of this Agreement, and has duly executed and delivered this Agreement;

(ii)     Assuming the due authorization, execution and delivery of this Agreement by each other party hereto, this Agreement and all of the obligations

of the Depositor hereunder are the legal, valid and binding obligations of the Depositor, enforceable against the Depositor in accordance with the terms of this Agreement, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally, and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law);

(iii)     The execution and delivery of this Agreement and the performance of its obligations hereunder by the Depositor will not conflict with any provisions of any law or regulations to which the Depositor is subject, or conflict with, result in a breach of or constitute a default under any of the terms, conditions or provisions of the certificate of formation or the limited liability company agreement of the Depositor or any indenture, agreement, or instrument to which the Depositor is a party or by which it is bound, or any order or decree applicable to the Depositor, or result in the creation or imposition of any lien on any of the Depositor's assets or property, which would materially and adversely affect the ability of the Depositor to carry out the transactions contemplated by this Agreement; the Depositor has obtained any consent, approval, authorization or order of any court or governmental agency or body required for the execution, delivery and performance by the Depositor of this Agreement;

(iv)     There is no action, suit or proceeding pending or, to the Depositor's knowledge, threatened against the Depositor in any court or by or before any other governmental agency or instrumentality which would materially and adversely affect the validity of the Mortgage Loans or the ability of the Depositor to carry out the transactions contemplated by this Agreement;

(v)     The Depositor is conveying to the Trustee the entire interest in which the Depositor has acquired from the Seller the Mortgage Loans free and clear of any liens, pledges, charges or security interests of any nature encumbering such Loan with the full right to transfer the Mortgage Loans to the Trust Fund and upon the assignment of the Mortgage Loans to the Trust, the Mortgage Loans will be validly transferred to the Trust;

(vi)     Following consummation of the conveyance of the Mortgage Loans by the Depositor to the Trustee, the Depositor shall take no action inconsistent with the Trust Fund's ownership of the Mortgage Loans, and if a third party, including a potential purchaser of the Mortgage Loans, should inquire, the Depositor shall promptly indicate that the Mortgage Loans have been sold and shall claim no ownership interest therein; and

(vii)     Each Mortgage Loan is a "qualified mortgage" within the meaning of Code Section 860G(a)(3) (but without regard to the rule in Treasury Regulations Section 1.860G-2(f)(2) that treats a defective obligation as a qualified mortgage).

(b)     If any Certificateholder, the Servicer, the Special Servicer or the Trustee discovers or receives notice of a Defect or breach of any representation or warranty set forth in, or required to be made with respect to a Mortgage Loan by the Seller pursuant to the Mortgage Loan Purchase Agreement (a "Breach"), it shall give notice to the Servicer, the Special Servicer, the Rating Agencies and the Trustee.  If the Servicer or the Special Servicer (with respect to Specially Serviced Loans) determines that such Defect or Breach materially and adversely affects the value of any Mortgage Loan or the interests of the Certificateholders therein (any Defect or Breach that materially and adversely affects the value of any Mortgage Loan or the interests of the Certificateholders therein, a "Material Document Defect" or a "Material Breach", respectively), it shall give prompt written notice of such Defect or Breach to the Depositor, the Trustee, the Servicer, the Special Servicer and the Seller and shall request that such Seller, not later than 90 days from the earlier of the receipt by the Seller of such notice or discovery by the Seller of such Material Document Defect or Material Breach (the "Initial Resolution Period"), (i) cure such Material Document Defect or Material Breach in all material respects, (ii) repurchase the affected Mortgage Loan at the applicable Purchase Price in conformity with the Mortgage Loan Purchase Agreement or (iii) substitute a Qualified Substitute Mortgage Loan for such affected Mortgage Loan (provided that in no event shall such substitution occur later than the second anniversary of the Closing Date) and pay to the Servicer for deposit into the Collection Account any Substitution Shortfall Amount in connection therewith in conformity with the Mortgage Loan Purchase Agreement; provided, however, that if (i) such Material Document Defect or Material Breach is capable of being cured but not within the Initial Resolution Period, (ii) such Material Document Defect or Material Breach is not related to any Mortgage Loan's not being a "qualified mortgage" within the meaning of the REMIC Provisions and (iii) the Seller has commenced and is diligently proceeding with the cure of such Material Document Defect or Material Breach within the Initial Resolution Period, then the Seller shall have an additional 90 days to cure such Material Document Defect or Material Breach, provided that the Seller has delivered to the Servicer, the Rating Agencies and the Trustee an officer's certificate from an officer of the Seller that describes the reasons that the cure was not effected within the Initial Resolution Period and the actions that it proposes to take to effect the cure and that states that it anticipates that the cure will be effected within the additional 90-day period.

Any of the following Defects shall be conclusively presumed to materially and adversely affect the interests of Certificateholders and the value of a Mortgage Loan: (a) the absence from the Mortgage File of the original signed Mortgage Note, unless the Mortgage File contains a signed lost note affidavit and indemnity that appears to be regular on its face; (b) the absence from the Mortgage File of the original signed Mortgage that appears to be regular on its face, unless there is included in the Mortgage File a certified copy of the Mortgage as recorded or as sent for recordation and a certificate stating that the original signed Mortgage was sent for recordation or a copy of the Mortgage with the related recording information; (c) the absence from the Mortgage File of the item called for by paragraph (ix) of the definition of Mortgage File; (d) the absence from the Mortgage File of any intervening assignments required to create a complete chain of assignment to the Trustee on behalf of the Trust, unless there is included in the Mortgage File a certified copy of the intervening assignment as recorded or as sent for recordation and a certificate stating that the original intervening assignments were sent for recordation; (e) the absence from the Mortgage File of any required original letter of credit (provided that at any time when the Servicer holds the original letter of credit and the Trustee holds a copy thereof, such absence of the original letter of credit from the Mortgage File will not

be deemed a Material Document Defect); (f) the absence from the Mortgage File of any Ground Lease or a copy thereof; or (g) the absence from the Mortgage File of any item required to be in the Mortgage File at a time which such item is required to enforce the rights and remedies of the Trustee as holder of the related Mortgage Loan.

In addition, notwithstanding the foregoing, (a) if the Seller has received written notice that a Mortgage Loan is a Specially Serviced Loan at or before the time that the Seller receives written notice of or discovers the existence of a Material Document Defect with respect to the related Mortgage File, the Seller shall not be entitled to any extension of the Initial Resolution Period with respect to such Mortgage Loan; (b) if the Seller receives written notice that a Mortgage Loan is a Specially Serviced Loan after the Seller has received notice of or discovered the existence of a Material Document Defect with respect to the related Mortgage File but prior to the expiration of the applicable Initial Resolution Period, any extension of such Initial Resolution Period shall end 90 days after the Seller has received notice of such Mortgage Loan being a Specially Serviced Loan; *provided, however,* that if the Material Document Defect would cause a Mortgage Loan not to be a "qualified mortgage loan" (within the meaning of Section 860G(a)(3) of the Code and Treasury Regulation Section 1.860G-2(f)(2)), then the Initial Resolution Period shall not be extended and the provisions of the next immediately succeeding paragraph shall apply; and (c) prior to the third anniversary of the Closing Date (in the case of assignment and other transfer documents) or the second anniversary (in the case of the other Loan Documents) of the Closing Date, any Defect with respect to a Mortgage File that arises solely as a result of the delays of a public recording or filing office or offices in returning one or more Loan Documents submitted for recording or filing shall not constitute a Material Document Defect unless the related Mortgage Loan is a Specially Serviced Loan and the Defect would, in the absence of this clause, constitute a Material Document Defect.

Any Defect or Breach which causes any Mortgage Loan not to be a "qualified mortgage" (within the meaning of Section 860G(a)(3) of the Code) shall be deemed to materially and adversely affect the interest of Certificateholders therein and the affected Mortgage Loan shall be repurchased or substituted for by the Seller within 90 days following its receipt of notice, *provided* that in no event shall such substitution occur later than the second anniversary of the Closing Date.  If the affected Mortgage Loan is to be repurchased, the Collection Account shall be the account into which funds in the amount of the Purchase Price are to be deposited by wire transfer.

In connection with any repurchase of or substitution for a Mortgage Loan contemplated by this Section 2.03, the Trustee, the Servicer and the Special Servicer shall each tender to the Seller upon delivery to each of the Trustee, the Servicer and the Special Servicer of a trust receipt executed by the Seller, all portions of the Mortgage File and other documents pertaining to such Mortgage Loan possessed by it, and each document that constitutes a part of the Mortgage File that was endorsed or assigned to the Trustee, shall be endorsed or assigned, as the case may be, to the Seller in the same manner as provided in Section 7 of the Mortgage Loan Purchase Agreement.

Section 7 of the Mortgage Loan Purchase Agreement provides the sole remedy available to the Certificateholders, or the Trustee on behalf of the Certificateholders, respecting any Breach.  Section 7 of the Mortgage Loan Purchase Agreements provides the sole remedy

available to the Certificateholders, or the Trustee on behalf of the Certificateholders, respecting any Defect.

If the Seller defaults on its obligations to repurchase any Mortgage Loan as contemplated by this Section 2.03(b), the Trustee shall promptly notify the Certificateholders, the Rating Agencies, the Servicer and the Special Servicer of such default.  The Trustee shall enforce the obligations of the Seller under Section 7 of the related Mortgage Loan Purchase Agreement.  Such enforcement, including, without limitation, the legal prosecution of claims, shall be carried out in such form, to such extent and at such time as if the Trustee were, in its individual capacity, the owner of the affected Mortgage Loan(s).  The Trustee, the Servicer and the Special Servicer, as applicable, shall be reimbursed for the reasonable costs of such enforcement: first, from a specific recovery of costs, expenses or attorneys' fees against the defaulting Seller; second, pursuant to Section 3.05(a)(vii) out of the related Purchase Price, to the extent that such expenses are a specific component thereof; and third, if at the conclusion of such enforcement action it is determined that the amounts described in clauses first and second are insufficient, then pursuant to Section 3.05(a)(viii) out of general collections on the Mortgage Loans on deposit in the Collection Account.

If the Seller incurs any expense in connection with the curing of a Breach which also constitutes a default under the related Mortgage Loan, the Seller shall have a right, and shall be subrogated to the rights of the Trustee, as successor to the mortgagee, to recover the amount of such expenses from the related Borrower; provided, however, that the Seller's rights pursuant to this paragraph shall be junior, subject and subordinate to the rights of the Trust Fund, the Servicer or the Special Servicer to recover amounts owed by the related Borrower under the terms of such Mortgage Loan, including, without limitation, the rights to recover unreimbursed Advances, accrued and unpaid Advance Interest and unpaid or unreimbursed expenses of the Trust Fund, the Servicer or the Special Servicer allocable to such Mortgage Loan; provided, further, that in the event and to the extent that such expenses of the Seller in connection with any Mortgage Loan exceeds five percent of the then outstanding principal balance of such Mortgage Loan, then the Seller's rights to reimbursement pursuant to this paragraph with respect to such Mortgage Loan and such excess expenses shall not be exercised until the payment in full of such Mortgage Loan (as such Mortgage Loan may be amended or modified pursuant to the terms of this Agreement).  Notwithstanding any other provision of this Agreement to the contrary, the Servicer shall not have any obligation pursuant to this Agreement to collect such reimbursable amounts on behalf of the Seller; provided, however, that the preceding clause shall not operate to prevent the Servicer from using reasonable efforts, exercised in the Servicer's sole discretion, to collect such amounts to the extent consistent with the Servicing Standard.  The Seller may pursue its rights to reimbursement of such expenses directly against the Borrower, by suit or otherwise; provided that (a) the Servicer or, with respect to a Specially Serviced Loan, the Special Servicer, determines in the exercise of its sole discretion consistent with the Servicing Standard that such actions by the Seller will not impair the Servicer's and/or the Special Servicer's collection or recovery of principal, interest and other sums due with respect to the related Mortgage Loan which would otherwise be payable to the Servicer, the Special Servicer, the Trustee and the Certificateholders pursuant to the terms of this Agreement, (b) such actions will not include an involuntary bankruptcy, receivership or insolvency proceeding against the Borrower, (c) such actions will not include the foreclosure or enforcement of any lien or security interest under the related Mortgage or other Loan Documents and (d) such actions will not result in the imposition

59

of an additional lien against the Mortgaged Property.

## ARTICLE III

## ADMINISTRATION AND
## SERVICING OF THE TRUST FUND

Section 3.01    Servicer to Act as Servicer; Special Servicer to Act as Special Servicer; Administration of the Mortgage Loans.

(a)    Each of the Servicer and the Special Servicer shall service and administer the Loans that it is obligated to service and administer pursuant to this Agreement on behalf of the Trustee and in the best interests of and for the benefit of the Certificateholders (as determined by the Servicer or the Special Servicer, as the case may be, in its good faith and reasonable judgment), in accordance with applicable law, the terms of this Agreement and the terms of the respective Loans and, to the extent consistent with the foregoing, further as follows: (i) with the same care, skill and diligence as is normal and usual in its general commercial mortgage servicing and REO property management activities on behalf of third parties or on behalf of itself, whichever is higher, with respect to commercial mortgage loans and REO properties that are comparable to those for which it is responsible hereunder; (ii) with a view to the timely collection of all scheduled payments of principal and interest under the Mortgage Loans or, if a Mortgage Loan comes into and continues in default and if, in the reasonable judgment of the Servicer or the Special Servicer, as applicable, no satisfactory arrangements can be made for the collection of the delinquent payments, the maximization of the recovery on such Mortgage Loan to the Certificateholders (as a collective whole) on a present value basis the relevant discounting of anticipated collections that will be distributable to Certificateholders to be performed at the related Net Mortgage Rate; and (iii) without regard to (A) any relationship that the Servicer or the Special Servicer, as applicable or any of their respective affiliates may have with the related borrower, (B) the ownership of any Certificate by the Servicer or the Special Servicer, as applicable or by any of its respective affiliates, (C) the Servicer's or the Special Servicer's, as applicable obligation to make or request Advances, or (D) the right of the Servicer or the Special Servicer (or any of their respective affiliates), as applicable to receive reimbursement of costs, or the sufficiency of any compensation payable to it, hereunder or with respect to any particular transaction (the conditions set forth in this paragraph, the "Servicing Standard").  Nothing herein contained shall be construed as an express or implied guarantee by any Servicer or the Special Servicer of the collectability of payments on the Loans or shall be construed as impairing or adversely affecting any rights or benefits specifically provided by this Agreement to the Servicer and Special Servicer, including with respect to Servicing Fees or the Special Servicing Fees or, with respect to the Servicer, the right to be reimbursed for Advances.

Without limiting the foregoing, subject to Section 3.21, the Special Servicer shall be obligated to service and administer (i) any Mortgage Loans as to which a Servicing Transfer Event has occurred and is continuing and (ii) any REO Loans (the "Specially Serviced Loans"). Notwithstanding the foregoing, the Servicer shall continue to make all calculations, and prepare and deliver to the Trustee all reports required to be prepared by the Servicer hereunder with respect to the Specially Serviced Loans as if no Servicing Transfer Event had occurred and with respect to the REO Properties (and the related REO Loans) as if no REO Acquisition had

occurred, and to render such incidental services with respect to such Specially Serviced Loan and REO Properties as are specifically provided for herein; *provided, however,* that the Servicer (provided that the Servicer is not acting as the Special Servicer) shall not be liable for failure to comply with such duties insofar as such failure results from a failure of the Special Servicer to provide sufficient information to the Servicer to comply with such duties or a failure of the Special Servicer to prepare and deliver to the Servicer reports required hereunder to be delivered by the Special Servicer to the Servicer; and *provided, further,* that the Special Servicer (provided that the Special Servicer is not acting as the Servicer) shall not be liable for failure to comply with its duties hereunder insofar as such failure results from a failure of the Servicer to provide sufficient information to the Special Servicer to comply with such duties or a failure of the Servicer to prepare and deliver to the Special Servicer reports required hereunder to be delivered by the Servicer to the Special Servicer. Each Mortgage Loan that becomes a Specially Serviced Loan shall continue as such until satisfaction of the conditions specified in Section 3.21(a). Without limiting the foregoing, subject to Section 3.21, the Servicer shall be obligated to service and administer all Loans that are not Specially Serviced Loans; *provided, however,* that the Special Servicer shall make the inspections, use its reasonable efforts to collect the statements and shall prepare the reports in respect of the related Mortgaged Properties with respect to Specially Serviced Loans in accordance with Section 3.12.

The Servicer further is authorized and empowered by the Trustee, on behalf of the Certificateholders and the Trustee, when the Servicer believes it is appropriate in its best judgment to register any Mortgage Loan on the MERS® System, or cause the removal from the registration of any Mortgage Loan on the MERS® System, to execute and deliver, on behalf of the Trustee and the Certificateholders or any of them, any and all instruments of assignment and other comparable instruments with respect to such assignment or re-recording of a Mortgage in the name of MERS, solely as nominee for the Trustee and its successors and assigns. Any reasonable expenses incurred in connection with the actions described in the preceding sentence or as a result of MERS discontinuing or becoming unable to continue operations in connection with the MERS® System, shall be reimbursable to the Servicer by withdrawal from the Collection Account pursuant to Section 3.11.

(b)     Subject only to the Servicing Standard and the terms of this Agreement and of the respective Loans, the Servicer and, with respect to the Specially Serviced Loans, the Special Servicer, each shall have full power and authority, acting alone, to do or cause to be done any and all things in connection with such servicing and administration which it may deem necessary or desirable. Without limiting the generality of the foregoing, the Servicer and Special Servicer, in its own name, is hereby authorized and empowered by the Trustee and obligated to execute and deliver, on behalf of the Certificateholders and the Trustee or any of them, with respect to each Mortgage Loan or REO Loan it is obligated to service under this Agreement, any and all financing statements, continuation statements and other documents or instruments necessary to maintain the lien created by the related Mortgage or other security document in the related Mortgage File on the related Mortgaged Property and related collateral; subject to Section 3.20, any and all modifications, waivers, amendments or consents to or with respect to any documents contained in the related Mortgage File; and any and all instruments of satisfaction or cancellation, or of partial or full release or discharge, and all other comparable instruments. Subject to Section 3.10, the Trustee shall furnish, or cause to be furnished, to the Servicer and Special Servicer any limited powers of attorney and other documents necessary or appropriate to

enable the Servicer or the Special Servicer, as the case may be, to carry out its servicing and administrative duties hereunder; provided, however, that the Trustee shall not be held liable for any negligence with respect to, or willful misuse of, any such power of attorney by the Servicer or Special Servicer.

(c)     The relationship of the Servicer and Special Servicer to the Trustee and each other under this Agreement is intended by the parties to be that of an independent contractor and not that of a joint venturer, partner or agent.

Section 3.02    Collection of Loan Payments.

(a)     The Servicer (or the Special Servicer with respect to Specially Serviced Loans) shall make reasonable efforts to collect all payments called for under the terms and provisions of the Loans, and shall follow such collection procedures as are consistent with this Agreement (including, without limitation, the Servicing Standard) and the terms and conditions of the Loans.  Consistent with the foregoing, the Servicer or Special Servicer (with respect to Specially Serviced Loans) may in its discretion waive Penalty Charges in connection with any delinquent payment on a Loan it is obligated to service hereunder.

(b)     All amounts collected on any Loan in the form of payments from Borrowers, Insurance and Condemnation Proceeds or Liquidation Proceeds shall be applied to amounts due and owing under the related Note and Mortgage (including any modifications to either of them) in accordance with the express provisions of such Note and Mortgage (unless a payment default exists under such Loan and the related Note and Mortgage permit application in the order and priority determined by the lender) and, in the absence of such express provisions, shall be applied (after payment without duplication to the Servicer, the Special Servicer, and/or the Trustee for any related Servicing Fees, Special Servicing Fees and Trustee Fees and the application to any P&I Advances, Servicing Advances and Advance Interest from such Loan and, if applicable, any unpaid Liquidation Expenses): first, as a recovery of accrued and unpaid interest on such Loan at the related Mortgage Rate in effect from time to time to but not including the Due Date in the Collection Period of receipt; second, as a recovery of principal of such Loan; and third, to the payment of Prepayment Premiums.  Notwithstanding the terms of any Loan, the Servicer shall not be entitled to the payment of any Penalty Charge in excess of outstanding Advance Interest made with respect to such Loan, except to the extent that (i) all reserves required to be established with the Servicer and then required to be funded pursuant to the terms of such Loan have been so funded, and (ii) all payments of principal and interest then due on such Mortgage Loan have been paid.  Amounts collected on any REO Loan shall be deemed to be applied in accordance with the definition thereof.

Section 3.03    Collection of Taxes, Assessments and Similar Items; Servicing Accounts.

(a)     The Servicer shall establish and maintain one or more accounts (the "Servicing Accounts"), into which all Escrow Payments shall be deposited and retained, and shall administer such Servicing Accounts in accordance with the related Loan Documents.  Each Servicing Account shall be maintained in accordance with the requirements of the related Loan and in accordance with the Servicing Standard and to the extent not inconsistent with the terms

of the Loans, and shall be an Eligible Account.  Funds on deposit in the Servicing Accounts may be invested in Permitted Investments in accordance with the provisions of <u>Section 3.06</u>. Withdrawals of amounts so deposited from a Servicing Account may be made only to: (i) effect payment of real estate taxes, assessments, Insurance Policy premiums, ground rents (if applicable) and other items for which funds have been escrowed in the Servicing Accounts; (ii) reimburse the Servicer or the Trustee for any related Servicing Advances and Advance Interest thereon; (iii) refund to Borrowers any sums as may be determined to be overages; (iv) pay interest to Borrowers on balances in the Servicing Account, if required by applicable law or the terms of the related Loan and as described below or, if not so required, to the Servicer; (v) withdraw amounts deposited in error; (vi) clear and terminate the Servicing Accounts at the termination of this Agreement in accordance with <u>Section 9.01</u>; and (vii) pay the Servicer, as additional servicing compensation in accordance with <u>Section 3.11(a)</u>, interest and investment income earned in respect of amounts relating to the Trust Fund held in the Servicing Accounts as provided in <u>Section 3.06(b)</u> (but only to the extent of the Net Investment Earnings with respect to the Servicing Accounts maintained by the Servicer for any period from any Distribution Date to the immediately succeeding P&I Advance Date) to the extent not required by law or the terms of the related Loan to be paid to the Borrowers.

(b)     The Special Servicer, in the case of REO Loans and Specially Serviced Loans, and the Servicer, in the case of all other Loans that it is required to service, shall maintain accurate records with respect to each related REO Property or Mortgaged Property, as applicable, reflecting the status of real estate taxes, assessments and other similar items that are or may become a lien thereon (including related penalty or interest charges), the status of Insurance Policy premiums and any ground rents payable in respect thereof and the status of any letters of credit.  The Special Servicer, in the case of REO Loans and Specially Serviced Loans, and Servicer, in the case of all other Loans that it is required to service, shall obtain all bills for the payment of such items (including renewal premiums) and shall effect payment thereof from the REO Account or the Servicing Accounts, and, if such amounts are insufficient to pay such items in full, the Servicer shall make a Servicing Advance prior to the earlier of the applicable penalty or termination date, as allowed under the terms of the related Loan and, in any event, consistent with the Servicing Standard.  Notwithstanding anything to the contrary in the preceding sentence, with respect to Loans that do not provide for escrows for the payment of taxes and assessments, the Servicer shall make a Servicing Advance for the payment of such items in accordance with the Servicing Standard (which Servicing Advance shall in each case be so applied by the Servicer at the written direction of the Special Servicer in the case of Specially Serviced Loans and REO Loans); provided that such Servicing Advance shall only be made upon the earlier of (i) five Business Days after the Servicer has received written confirmation that such item has not been paid and (ii) the earlier of (A) 30 days after the date such payments first become due and (B) five Business Days before the scheduled date of imposition of penalties on such property or foreclosure of any lien arising from nonpayment of such items.  In no event shall the Servicer be required to make any such Servicing Advance that would, if made, be a Nonrecoverable Servicing Advance.  To the extent that a Loan does not require a Borrower to escrow for the payment of real estate taxes, assessments, Insurance Policy premiums, ground rents (if applicable) and similar items, the Special Servicer, in the case of Specially Serviced Loans and REO Loans, and the Servicer, in the case of all other Loans, shall use reasonable efforts consistent with the Servicing Standard to require that payments in respect of such items be made by the Borrower at the time they first become due.

(c)    In accordance with the Servicing Standard and for all Loans, the Servicer shall make a Servicing Advance with respect to each related Mortgaged Property (including any REO Property) of all such funds as are necessary for the purpose of effecting the payment of (i) ground rents (if applicable), (ii) premiums on Insurance Policies, (iii) operating, leasing, managing and liquidation expenses for REO Properties, (iv) environmental inspections, (v) real estate taxes, assessments and other similar items that are or may become a lien thereon and (vi) any other amount specifically required to be paid as a Servicing Advance hereunder, if and to the extent monies in the Servicing Accounts are insufficient to pay such item when due and the related Borrower has failed to pay such item on a timely basis (and upon Servicer obtaining knowledge of such non-payment); provided that the Servicer shall not be required to make any such Servicing Advance that would, if made, constitute a Nonrecoverable Servicing Advance.

The Special Servicer shall give the Servicer and the Trustee not less than five Business Days' notice before the date on which the Special Servicer is required to make any Servicing Advance with respect to a given Loan that the Special Servicer is required to service or related REO Property; *provided, however,* that only two Business Days' notice shall be required in respect of Servicing Advances required to be made on an urgent or emergency basis (which may include, without limitation, Servicing Advances required to make tax or insurance payments); *provided, further,* that the Special Servicer shall not be entitled to make such a request (other than for Servicing Advances required to be made on an urgent or emergency basis) more frequently than once per calendar month (although such request may relate to more than one Servicing Advance).  The Servicer may pay the aggregate amount of such Servicing Advance listed on a monthly request to the Special Servicer, in which case the Special Servicer shall remit such Servicing Advances to the ultimate payees.  In addition, the Special Servicer shall provide the Servicer and the Trustee with such information in its possession as the Servicer or the Trustee, as applicable, may reasonably request to enable the Servicer or the Trustee, as applicable, to determine whether a requested Servicing Advance would constitute a Nonrecoverable Servicing Advance.  Any request by the Special Servicer that the Servicer make a Servicing Advance shall be deemed to be a determination by the Special Servicer that such requested Servicing Advance is not a Nonrecoverable Servicing Advance, and the Servicer shall be entitled to conclusively rely on such determination, *provided* that such determination shall not be binding upon the Servicer.  On the fourth Business Day before each Distribution Date, the Special Servicer shall report to the Servicer the Special Servicer's determination as to whether any Servicing Advance previously made with respect to a Specially Serviced Loan or REO Loan is a Nonrecoverable Servicing Advance.  The Servicer shall be entitled to conclusively rely on such a determination, *provided* that such determination shall not be binding upon the Servicer.

Notwithstanding anything to the contrary set forth herein, the Servicer shall (at the direction of the Special Servicer if a Specially Serviced Loan is involved) pay directly out of the Collection Account any servicing expense that, if paid by the Servicer or the Special Servicer, would constitute a Nonrecoverable Servicing Advance; *provided* that such payment shall be made only if the Servicer (or the Special Servicer, if a Specially Serviced Loan is involved) has determined in accordance with the Servicing Standard that making such payment is in the best interests of the Certificateholders (as a collective whole), as evidenced by an Officer's Certificate delivered promptly to the Trustee, the Depositor, each Rating Agency and the Directing Certificateholder, setting forth the basis for such determination and accompanied by any information that the Servicer or the Special Servicer may have obtained that supports

such determination.

All such Servicing Advances and Advance Interest thereon shall be reimbursable in the first instance from related collections from the Borrowers and further as provided in Section 3.05. If the Servicer fails to make any required Servicing Advance as and when due to the extent a Responsible Officer of the Trustee has been notified of such failure in writing by the Servicer, the Special Servicer or Depositor, the Trustee shall make such Servicing Advance pursuant to Section 7.05.

(d)     In connection with its recovery of any Advance out of a Collection Account pursuant to clauses (iv) or (v) of Section 3.05(a) or from a Servicing Account pursuant to Section 3.03(a)(ii), the Servicer and the Trustee, as the case may be, shall be entitled to receive, out of any amounts then on deposit in such Collection Account, Advance Interest from time to time, accrued on the amount of such Advance from and including the date made to, but not including, the date of reimbursement. The Servicer shall reimburse itself or the Trustee, as the case may be, for any outstanding Advance made by the Servicer or the Trustee, as soon as practically possible after funds available for such purpose are deposited in the related Collection Account.

(e)     To the extent an operations and maintenance plan is required to be established and executed pursuant to the terms of a Mortgage Loan, the Servicer or, with respect to Specially Serviced Loans, the Special Servicer, shall request from the Borrower written confirmation thereof within a reasonable time after the later of the Closing Date and the date as of which such plan is required to be established or completed. To the extent any repairs, capital improvements, actions or remediations are required to have been taken or completed pursuant to the terms of the Mortgage Loan, the Servicer or, with respect to Specially Serviced Loans, the Special Servicer shall request from the Borrower written confirmation of such actions and remediations within a reasonable time after the later of the Closing Date and the date as of which such action or remediations are required to be or to have been taken or completed. To the extent a Borrower fails to promptly respond to any inquiry described in this Section 3.03(e), the Servicer (with respect to Loans that are not Specially Serviced Loans) shall determine whether the related Borrower has failed to perform its obligations under the Loan and report any such failure to the related Special Servicer (who shall have no duty or obligation to act upon such information) and the Directing Certificateholder within a reasonable time after the date as of which such operations and maintenance plan is required to be established or executed or the date as of which such actions or remediations are required to be or to have been taken or completed.

Section 3.04     The Collection Account, Certificate Distribution Accounts.

(a)     The Servicer shall establish and maintain, or cause to be established and maintained a Collection Account, into which the Servicer shall deposit or cause to be deposited on a daily basis (and in no event later than the Business Day following receipt of available funds), except as otherwise specifically provided herein, the following payments and collections (without duplication) received after the Cut-off Date (other than payments of principal and interest on the Mortgage Loans due and payable on or before the Cut-off Date) and payments (other than Principal Prepayments) received by it on or prior to the Cut-off Date but allocable to a period subsequent thereto, without duplication:

(i)      all payments on account of principal, including Principal Prepayments, on such Mortgage Loans;

(ii)      all payments on account of interest on such Mortgage Loans, net of (A) the Servicing Fees (net of any amount utilized to offset Prepayment Interest Shortfalls) and (B) Penalty Charges (net of any amount thereof utilized to offset Advance Interest);

(iii)      all Insurance and Condemnation Proceeds and Liquidation Proceeds received in respect of any such Mortgage Loan or related REO Property (other than Liquidation Proceeds that are to be deposited in the Certificate Distribution Account pursuant to Section 9.01);

(iv)      any amounts required to be transferred from the REO Account pursuant to Section 3.16(c);

(v)      any amounts required to be deposited by the Servicer pursuant to Section 3.06 in connection with losses incurred with respect to Permitted Investments of funds held in the Collection Account;

(vi)      any amounts required to be deposited by the Servicer or the Special Servicer pursuant to Section 3.07(b) in connection with losses resulting from a deductible clause in a blanket hazard policy;

(vii)      any Compensating Interest required to be deposited by the Servicer pursuant to the last paragraph of Section 3.11(a);

(viii)      any Prepayment Interest Excess to which the Servicer is not entitled as provided in Section 3.11(a);

(ix)      any Prepayment Premiums;

(x)      any other amounts required to be deposited by the Servicer pursuant to Section 3.11(a); and

(xi)      any amounts paid by the Seller to the Servicer in connection with the repurchase or replacement of a Mortgage Loan.

The foregoing requirements for deposit by the Servicer in the Collection Account shall be exclusive, it being understood and agreed that actual payments from Borrowers in the nature of Escrow Payments, charges for beneficiary statements or demands, assumption fees, modification fees, extension fees, amounts collected for Borrower checks returned for insufficient funds or other amounts that the Servicer or the Special Servicer is entitled to as additional servicing compensation pursuant to Section 3.11 need not be deposited by the Servicer in the Collection Account.  If the Servicer shall deposit in the Collection Account any amount not required to be deposited therein, it may at any time withdraw such amount from the Collection Account.

Within one Business Day of receipt of any of the foregoing amounts with respect to any Specially Serviced Loan which is not an REO Loan, the Special Servicer shall remit such amounts to the Servicer for deposit into the Collection Account in accordance with the second preceding paragraph, unless the Special Servicer determines, consistent with the Servicing Standard, that a particular item should not be deposited because of a restrictive endorsement or other appropriate reason.  Any amounts received by the Special Servicer with respect to an REO Property shall be deposited into the REO Account and remitted to the Servicer for deposit into the Collection Account pursuant to Section 3.16(c).  With respect to any such amounts paid by check to the order of the Special Servicer, the Special Servicer shall endorse such check to the order of the Servicer and shall deliver promptly any such check to the Servicer, unless the Special Servicer determines, consistent with the Servicing Standard, that a particular item cannot be so endorsed and delivered because of a restrictive endorsement or other appropriate reason.

(b)     The Trustee shall establish and maintain the Certificate Distribution Account in trust for the benefit of the Certificateholders. The Trustee shall make or be deemed to have made deposits in and withdrawals from the Certificate Distribution Account in accordance with the terms of this Agreement.  The Servicer shall deliver to the Trustee each month on or before 1:00 p.m. New York City time on the Servicer Remittance Date, for deposit in the Certificate Distribution Account any trust fund expenses to be paid by the Trust Fund pursuant to this Agreement and that portion of the Total Distribution Amount for the related Distribution Date then on deposit in the Collection Account maintained by the Servicer.

Subject to Section 3.05, the Servicer shall, as and when required hereunder, deliver to the Trustee for deposit in the Certificate Distribution Account (without duplication):

(i)     any P&I Advances and Assumed Scheduled Payments required to be made by the Servicer in accordance with Section 4.07 (or, if the Trustee succeeds to the Servicer's obligations hereunder, Section 7.05);

(ii)     any Liquidation Proceeds paid by the Servicer in connection with the purchase of all of the Mortgage Loans and any REO Properties in the Trust Fund pursuant to Section 9.01 (exclusive of that portion thereof required to be deposited in the Collection Account pursuant to Section 9.01);

(iii)     [RESERVED]; and

(iv)     any other amounts required to be so delivered for deposit in the Certificate Distribution Account pursuant to any provision of this Agreement.

The Trustee shall, upon receipt, deposit in the Certificate Distribution Account any and all amounts received by the Trustee that are required by the terms of this Agreement to be deposited therein.  If, as of 4:00 p.m., New York City time, on any Servicer Remittance Date or on such other date as any amount referred to in the foregoing clauses (i) through (iv) is required to be delivered hereunder, the Servicer shall not have delivered to the Trustee for deposit in the Certificate Distribution Account the relevant portion of the Total Distribution Amount or any of the amounts referred to in the foregoing clauses (i) through (iv), then the Trustee shall provide notice of such failure to a Servicing Officer of the Servicer by facsimile

transmission sent to telecopy no. 215-328-3478 (or such alternative number provided by the Servicer to the Trustee in writing) and by telephone at telephone no. 215-328-1858 (or such alternative number provided by the Servicer to the Trustee in writing) as soon as possible, but in any event before 6:00 p.m., New York City time, on such day. To the extent the Servicer has not delivered to the Trustee for deposit in the Certificate Distribution Account such amounts as are required to be delivered on the Servicer Remittance Date, the Servicer shall pay interest thereon to the Trustee at an interest rate equal to the Reimbursement Rate then in effect for the period from and including the Servicer Remittance Date to and excluding the date such amounts are received for deposit by the Trustee.

(c)     Reserved.

(d)     Funds on deposit in a Collection Account may be invested only in Permitted Investments in accordance with the provisions of Section 3.06. Funds on deposit in the Certificate Distribution Account may be invested by the Trustee in Permitted Investments for the Trustee's benefit or remain uninvested. The Servicer shall give notice to the Trustee, the Special Servicer, the Rating Agencies and the Depositor of any new location of the Collection Account prior to any change thereof. As of the Closing Date (or the date such account is established, if later), the Certificate Distribution Account shall be located at the offices of the Trustee. The Trustee shall give notice to the Servicer, the Rating Agencies and the Depositor of any new location of the Certificate Distribution Account, prior to any change thereof.

Section 3.05    Permitted Withdrawals from the Collection Account and the Certificate Distribution Accounts.

(a)     The Servicer may, from time to time, make withdrawals from the Collection Account maintained by it for any of the following purposes (without duplication):

(i)     to remit to the Trustee for deposit in the Certificate Distribution Account the amount required to be remitted pursuant to Section 3.04(b) and the amount to be applied to make P&I Advances and Assumed Scheduled Payments by the Servicer pursuant to Section 4.07(a);

(ii)    to pay (x) to itself, unpaid Servicing Fees (net of any such amounts required to offset Prepayment Interest Shortfalls pursuant to Section 3.11(a)) and (y) to the Special Servicer, Liquidation Fees and Workout Fees in respect of each related Loan and related REO Loan, as applicable, the Servicer's rights and the Special Servicer's rights to payment pursuant to this clause (ii) with respect to any Mortgage Loan or REO Loan, as applicable, being limited to amounts received on or in respect of such Mortgage Loan (whether in the form of payments, Liquidation Proceeds or Insurance and Condemnation Proceeds) or such REO Loan (whether in the form of REO Revenues, Liquidation Proceeds or Insurance and Condemnation Proceeds) that are allocable as a recovery of interest thereon;

(iii)   to pay the Special Servicer unpaid Special Servicing fees from general collections;

(iv)     to reimburse itself or the Trustee, as applicable, for unreimbursed P&I Advances, the Servicer's or the Trustee's right to receive payment pursuant to this clause (iv) being limited to amounts received (net of any related Workout Fees) which represent collections of interest (net of the related Servicing Fees) on and principal of the particular Loans and REO Loans with respect to which such P&I Advances were made;

(v)      to reimburse itself or the Trustee, as applicable, for unreimbursed Servicing Advances, the Servicer's or the Trustee's respective rights to receive payment pursuant to this clause (v) with respect to any Loan or REO Loan being limited to, as applicable, related collections from the related Borrower in respect of which such Servicing Advance was made, Liquidation Proceeds, Insurance and Condemnation Proceeds and REO Revenues;

(vi)     to reimburse itself or the Trustee, as applicable, for Nonrecoverable Advances made, out of general collections on the Mortgage Loans and REO Properties; provided that notwithstanding anything to the contrary contained herein, upon a determination that a previously made Advance is a Nonrecoverable Advance, instead of obtaining reimbursement out of general collections on the Mortgage Loans immediately, any of the Servicer or the Trustee as applicable, may in its sole discretion, elect to obtain reimbursement for such Nonrecoverable Advance over a period of time (not to exceed 12 months or such longer period of time as the Trustee or the Servicer, as applicable, may elect and is approved in writing by the Directing Certificateholder) and the unreimbursed portion of such Servicing Advance will accrue interest at the Advance Rate in effect from time to time.  At any time after such a determination to obtain reimbursement over time in accordance with the preceding sentence, the Servicer or the Trustee, as applicable, may, in its sole discretion, decide to obtain reimbursement immediately.   The fact that a decision to recover such Nonrecoverable Advance over time, or not to do so, benefits some Classes of Certificateholders to the detriment of other Classes shall not constitute a violation of the Servicing Standard by the Servicer, or a breach of any fiduciary duty owed to the Certificateholders by the Trustee, or a breach of any other contractual obligation owed to the Certificateholders by any party to this Agreement;

(vii)    at such time as it reimburses itself or the Trustee, as applicable, for (a) any unreimbursed P&I Advance pursuant to clause (iv) above, to pay itself or the Trustee, as applicable, any Advance Interest thereon in accordance with Section 4.07(d), (b) any unreimbursed Servicing Advances pursuant to clause (v) above or pursuant to Section 3.03(a)(ii), to pay itself or the Trustee, as the case may be, any Advance Interest in accordance with Section 3.03(a)(ii), or (c) any Nonrecoverable Advances pursuant to clause (vi) above, to pay itself or the Trustee, as the case may be, any Advance Interest thereon.

(viii)   to reimburse itself, the Special Servicer, the Depositor or the Trustee, as the case may be, for any unreimbursed out-of-pocket expenses reasonably incurred by such Person in respect of any Breach or Defect relating to

a Mortgage Loan and giving rise to a repurchase obligation of the Seller under Section 7 of the Mortgage Loan Purchase Agreement, including, without limitation, any out-of-pocket expenses arising out of the enforcement of the repurchase obligation, each such Person's right to reimbursement pursuant to this clause (viii) with respect to any Mortgage Loan being limited to that portion of the Purchase Price paid for such Mortgage Loan that represents such expense in accordance with clause (vii) of the definition of Purchase Price;

(ix)     to reimburse itself, the Trustee or the Special Servicer, as the case may be, out of general collections on the Mortgage Loans and REO Properties for any unreimbursed out-of-pocket expense reasonably incurred by such Person relating to a Mortgage Loan required to be serviced by the Servicer in connection with the enforcement of the Seller's obligations under Section 7 of the Mortgage Loan Purchase Agreement, but only to the extent that such expenses are not reimbursable pursuant to clause (viii) above or otherwise;

(x)     to pay itself, as additional servicing compensation in accordance with Section 3.11(a), (a) interest and investment income earned in respect of amounts relating to the Trust Fund held in the Collection Account maintained by the Servicer as provided in Section 3.06(b) (but only to the extent of the Net Investment Earnings with respect to the Collection Account for any period from any Distribution Date to the immediately succeeding P&I Advance Date) to which it is entitled pursuant to Section 3.11(a), (b) Penalty Charges on any Mortgage Loan required to be serviced by the Servicer other than a Specially Serviced Loan, but only to the extent (x) collected from the related Borrower and (y) in excess of outstanding Advance Interest thereon with respect to such Loan, and to the extent that all amounts then due and payable with respect to such Loan have been paid, (c) all Prepayment Interest Excess in connection with the receipt of Principal Prepayments (except to the extent otherwise provided in Section 3.11(a)) and (d) other fees identified in Section 3.11(a); and to pay the Special Servicer, as additional servicing compensation in accordance with the last paragraph of Section 3.11(b), Penalty Charges on any Specially Serviced Loan (but only to the extent collected from the related Borrower and after all Advances on the Mortgage Loan, and Advance Interest thereon, have been paid and to the extent that all amounts then due and payable with respect to such Specially Serviced Loan have been paid);

(xi)     to recoup any amounts deposited in the Collection Account maintained by the Servicer in error;

(xii)     to pay itself, the Special Servicer, the Depositor or any of their respective directors, officers, employees and agents, as the case may be, any amounts payable to any such Person pursuant to Sections 6.03(a) or 6.03(b);

(xiii)     to pay out of general collections on the Mortgage Loans and REO Properties for (a) the cost of the Opinions of Counsel contemplated by Section 3.31(i) to the extent payable out of the Trust Fund, (b) the cost of any Opinion of

Counsel contemplated by Sections 10.01(a) or 10.01(c) in connection with an amendment to this Agreement requested by the Trustee or the Servicer, which amendment is in furtherance of the rights and interests of Certificateholders and (c) the cost of obtaining the REO Extension contemplated by Section 3.16(a);

(xiv)   to pay out of general collections on the Mortgage Loans and REO Properties any and all federal, state and local taxes imposed on any REMIC created hereunder or any of their assets or transactions, together with all incidental costs and expenses, to the extent that none of the Servicer, the Special Servicer or the Trustee is liable therefor;

(xv)   to reimburse the Servicer and the Special Servicer out of general collections on the Mortgage Loans and REO Properties for expenses incurred by and reimbursable to them by the Trust Fund;

(xvi)   to pay itself, the Special Servicer or the Seller, as the case may be, with respect to each Mortgage Loan, if any, previously purchased by such Person pursuant to this Agreement, all amounts received thereon subsequent to the date of purchase;

(xvii)   to reimburse itself or the Special Servicer for the cost of any environmental testing performed at the Special Servicer's direction pursuant to the last sentence of Section 3.09(d); and

(xviii)   to clear and terminate the Collection Account at the termination of this Agreement pursuant to Section 9.01.

The Servicer shall keep and maintain separate accounting records, on a loan-by-loan and property-by-property basis when appropriate, for the purpose of justifying any withdrawal from the Collection Account.

(b)   The Trustee, may, from time to time, make or be deemed to make withdrawals from the Certificate Distribution Account for any of the following purposes, without duplication:

(i)   to make distributions to Certificateholders in accordance with Section 9.01;

(ii)   to pay the Trustee accrued but unpaid Trustee Fees;

(iii)   to pay to the Trustee or any of its Affiliates, directors, officers, employees and agents, as the case may be, any amounts payable or reimbursable to any such Person hereunder, including pursuant to Section 3.31(k), 6.03(a), 6.03(b), 8.05(b) or 8.05(c);

(iv)   to pay for the cost of the Opinion of Counsel contemplated by Section 10.01(c) in connection with any amendment to this Agreement requested by the Trustee;

71

(v)     to clear and terminate the Certificate Distribution Account at the termination of this Agreement pursuant to Section 9.01;

(vi)    to recoup any amounts deposited in the Certificate Distribution Account in error;

(vii)   to pay any federal, state or local taxes imposed on the Trust; and

(viii)  to pay any Trust Fund expenses incurred pursuant to this Agreement.

(c)     Notwithstanding anything herein to the contrary, with respect to any Mortgage Loan, (i) if amounts on deposit in the related Collection Account and the Certificate Distribution Account are not sufficient to pay the full amount of the Servicing Fee listed in Section 3.05(a)(ii) and the Trustee Fee listed in Section 3.05(b)(ii), then the Trustee Fee shall be paid in full prior to the payment of any Servicing Fees payable under Section 3.05(a)(ii) and (ii) if amounts on deposit in the related Collection Account are not sufficient to reimburse the full amount of Advances listed in Sections 3.05(a) (iv), (v), (vi) and (vii), then reimbursements shall be paid first to the Trustee and then to the Servicer.

Section 3.06   Investment of Funds in the Collection Account, Servicing Accounts, REO Accounts, and the Cap Agreement Reserve Fund.

(a)     The Servicer may direct any depository institution maintaining for the Servicer a Collection Account and any Servicing Account, and the Special Servicer may direct any depository institution maintaining any REO Account (any of the foregoing accounts, for purposes of this Section 3.06, an "Investment Account"), to invest (or if such depository institution is a Servicer or Special Servicer, as applicable, it may itself invest) the funds held therein solely in one or more Permitted Investments bearing interest or sold at a discount, and maturing, unless payable on demand, (i) no later than the Business Day immediately preceding the next succeeding date on which such funds are required to be withdrawn from such account pursuant to this Agreement, if a Person other than the depository institution maintaining such account is the obligor thereon and (ii) no later than the date on which such funds are required to be withdrawn from such account pursuant to this Agreement, if the depository institution maintaining such account is the obligor thereon.  All such Permitted Investments shall be held to maturity, unless payable on demand.  Any investment of funds in an Investment Account shall be made in the name of the Trustee (in its capacity as such).  Funds on deposit in the the Cap Agreement Reserve Fund, and the Certificate Distribution Accounts may be invested by the Trustee in Permitted Investments for Certificate's benefit or may remain uninvested.

The Servicer (in the case of any Investment Account maintained by the Servicer other than the REO Account) or the Special Servicer (in the case of any REO Account), on behalf of the Trustee, shall maintain continuous possession of any Permitted Investment of amounts in such accounts that is either (i) a "certificated security," as such term is defined in the UCC or (ii) other property in which a secured party may perfect its security interest by possession under the UCC or any other applicable law.  Possession of any such Permitted Investment by the Servicer or Special Servicer shall constitute possession by the Trustee, as

secured party, for purposes of Section 9-313 of the UCC and any other applicable law.  In the event amounts on deposit in an Investment Account are at any time invested in a Permitted Investment payable on demand, the Servicer (in the case of any Investment Account maintained by the Servicer other than the REO Account) or the Special Servicer (in the case of the REO Account) shall:

> (i)    consistent with any notice required to be given thereunder, demand that payment thereon be made on the last day such Permitted Investment may otherwise mature hereunder in an amount equal to the lesser of (a) all amounts then payable thereunder and (b) the amount required to be withdrawn on such date; and

> (ii)    demand payment of all amounts due thereunder promptly upon determination by the Servicer or Special Servicer, as the case may be, that such Permitted Investment would not constitute a Permitted Investment in respect of funds thereafter on deposit in the Investment Account.

(b)    Interest and investment income realized on funds and deposited in each of the Collection Account and any Servicing Account, to the extent of the Net Investment Earnings, if any, with respect to such account for each period from any Distribution Date to the immediately succeeding P&I Advance Date, shall be for the sole and exclusive benefit of the Servicer to the extent not required to be paid to the related Borrower and shall be subject to its withdrawal, or withdrawal at its direction, in accordance with Section 3.03(a) or 3.05(a), as the case may be.  Interest and investment income realized on funds deposited in the REO Account, to the extent of the Net Investment Earnings, if any, with respect to such account for each period from any Distribution Date to the immediately succeeding P&I Advance Date, shall be for the sole and exclusive benefit of the Special Servicer, but shall be subject to withdrawal in accordance with Section 3.16(b).  If any loss, other than a loss due to the insolvency of the related institution, shall be incurred in respect of any Permitted Investment directed to be made by the Servicer or Special Servicer, as applicable, for its own account, and on deposit in any of the Collection Account, any Servicing Account or the REO Account, the Servicer (in the case of the Collection Account and any Servicing Account) or the Special Servicer (in the case of the REO Account) shall deposit therein, no later than the P&I Advance Date, without right of reimbursement, the amount of the Net Investment Loss, if any, with respect to such account for the period from the immediately preceding Distribution Date to such P&I Advance Date.

(c)    Interest and investment income realized on funds and deposited in each of the Certificate Distribution Account, to the extent of the Net Investment Earnings, if any, with respect to such account for each period from any Distribution Date to the immediately succeeding P&I Advance Date shall be for the sole and exclusive benefit of the Trustee and shall be subject to its withdrawal, or withdrawal at its direction, in accordance with Section 3.05(b), as the case may be.  If any loss, other than a loss due to the insolvency of the related institution, shall be incurred in respect of any Permitted Investment directed by the Trustee to be made by the Trustee for its own account, and on deposit in any of the Certificate Distribution Account, the Trustee shall deposit therein, no later than the P&I Advance Date, without right of reimbursement, the amount of the Net Investment Loss, if any, with respect to such account for the period from the immediately preceding Distribution Date to such P&I Advance Date.

(d)      Except as otherwise expressly provided in this Agreement, if any default occurs in the making of a payment due under any Permitted Investment, or if a default occurs in any other performance required under any Permitted Investment, the Trustee may and, subject to Section 8.02, upon the request of Holders of Certificates entitled to a majority of the Voting Rights allocated to any Class, shall take such action as may be appropriate to enforce such payment or performance, including the institution and prosecution of appropriate proceedings.

Notwithstanding the investment of funds held in a Collection Account pursuant to this Section 3.06, for purposes of calculating the Available Funds, the amounts so invested shall be deemed to remain on deposit in such account.

Section 3.07    Maintenance of Insurance Policies; Errors and Omissions and Fidelity Coverage.

(a)      The Servicer shall use its reasonable efforts to cause each Borrower to maintain, to the extent required by the terms of the related Note and Mortgage, or if any such Borrower does not so maintain, shall itself maintain, for each Loan any Insurance Policy coverage as is required under the related Mortgage (to the extent that the Trustee has an insurable interest and such Insurance Policy coverage is available at commercially reasonable rates, as determined by the Servicer in accordance with the Servicing Standard); provided, however, that, if any Mortgage permits the holder thereof to dictate to the Borrower the Insurance Policy coverage to be maintained on such Mortgaged Property, the Servicer or Special Servicer, as applicable, shall impose such insurance requirements as are consistent with the Servicing Standard.  Notwithstanding anything herein to the contrary, the Servicer shall not be required to call a default under a Loan if the related Borrower fails to maintain such insurance, and the Servicer shall not be required to maintain such insurance, if the Servicer determines, based upon information reasonably available to the Servicer after due inquiry in accordance with the Servicing Standard, that (a)(x) such insurance is not available at commercially reasonable rates and (y) similar real properties in the same geographic area as the Mortgaged Property do not commonly carry such insurance, (b) Trustee does not have an insurable interest in the related Mortgaged Property, or (c) such insurance is not available at any rate; provided, however, that the Servicer shall enforce any specific provisions of the related Loan Documents requiring the related Borrower to obtain policies at certain predetermined costs, and any related costs and expenses shall be paid by the Servicer as a Servicing Advance if not paid by such Borrower. Subject to Section 3.17(a), the Special Servicer shall attempt to cause to be maintained for each REO Property no less Insurance Policy coverage than was previously required of the Borrower under the related Loan or, at Special Servicer's election, coverage satisfying insurance requirements consistent with the Servicing Standard.  If the Servicer determines based on (a) or (b) above not to declare default as to such insurance requirements, the Servicer will send a temporary forbearance letter to the Borrower and notify the Directing Certificateholder with supporting documentation as to the reason for such forbearance.

All such Insurance Policies shall (i) contain a "standard" mortgagee clause, with loss payable to the Servicer on behalf of the Trustee (in the case of insurance maintained in respect of Loans other than REO Loans) or the Special Servicer on behalf of the Trustee (in the case of insurance maintained in respect of REO Properties), (ii) include coverage in an amount not less than the lesser of the full replacement cost of the improvements which are a part of the

74

Mortgaged Property or the outstanding principal balance owing on the related Loan, but in any case in such an amount so as to avoid the application of any co-insurance clause, (iii) include a replacement cost endorsement providing no deduction for depreciation (unless such endorsement is not permitted under the related Loan Documents) and (iv) be issued by either (x) a Qualified Insurer or (y) for any Insurance Policy being maintained by the related Borrower, an insurance carrier meeting the requirements of the related Mortgage; *provided* that such Qualified Insurer or other insurance carrier is authorized under applicable law to issue such Insurance Policies.  Any amounts collected by the Servicer or Special Servicer under any such Insurance Policies (other than amounts to be applied to the restoration or repair of the related Mortgaged Property or REO Property or amounts to be released to the related Borrower, in each case in accordance with the Servicing Standard and the provisions of the related Loan) shall be deposited in the Collection Account maintained by the Servicer, subject to withdrawal pursuant to Section 3.05(a).

Any out-of-pocket costs incurred by the Servicer in maintaining any such Insurance Policies in respect of Loans (other than with respect to REO Properties), if the Borrower defaults on its obligation to maintain such Insurance Policies, shall be advanced by the Servicer as a Servicing Advance.  Any cost incurred by the Special Servicer in maintaining any such Insurance Policies with respect to REO Properties shall be an expense of the Trust Fund payable out of the related REO Account pursuant to Section 3.16(c) or, if the amount on deposit therein is insufficient therefor, advanced by the Servicer as a Servicing Advance.

(b)      (i)      If the Servicer or Special Servicer (with respect to REO Loans) obtains and maintains a blanket Insurance Policy with a Qualified Insurer insuring against fire and hazard losses on all of the Loans or REO Properties and such Insurance Policy provides protection equivalent to the individual policies otherwise required, then the Servicer or Special Servicer, as the case may be, shall conclusively be deemed to have satisfied its obligation to cause fire and hazard insurance to be maintained on the related Mortgaged Properties or REO Properties.  Such blanket Insurance Policy may contain a deductible clause, in which case if there shall not have been maintained on the related Mortgaged Property or REO Property a fire and hazard Insurance Policy complying with the requirements of Section 3.07(a), and there shall have been one or more losses which would have been covered by such Insurance Policy, the Servicer or the Special Servicer, as applicable, shall promptly deposit into the Collection Account from its own funds the portion of such loss or losses that would have been covered under the individual policy (giving effect to any deductible limitation or, in the absence of such deductible limitation, the deductible limitation that is consistent with the Servicing Standard) but is not covered under the blanket Insurance Policy because of such deductible clause to the extent that any such deductible exceeds the deductible limitation that pertained to the related Loan, or, in the absence of any such deductible limitation, the deductible limitation which is consistent with the Servicing Standard.  In connection with its activities as administrator and servicer of the Loans, the Servicer agrees to prepare and present, on behalf of itself, the Trustee and the Certificateholders, claims under any such blanket Insurance Policy in a timely fashion in accordance with the terms of such policy.  The Special Servicer, to the extent consistent with the Servicing Standard, may maintain earthquake insurance on REO Properties, provided coverage is available at commercially reasonable rates or if required by the related loan documents.

(ii)      If the Servicer or Special Servicer, as applicable, causes any Mortgaged Property to be covered by a master single interest Insurance Policy

with a Qualified Insurer naming the Servicer or Special Servicer as the loss payee, then to the extent such Insurance Policy provides protection equivalent to the individual policies otherwise required, the Servicer or Special Servicer shall conclusively be deemed to have satisfied its obligation to cause such insurance to be maintained on the related Mortgage Properties.  If the Servicer or Special Servicer, as applicable, causes any Mortgaged Property or REO Property to be covered by such master single interest Insurance Policy, the incremental costs of such insurance applicable to such Mortgaged Property (i.e., other than any minimum or standby premium payable for such policy whether or not any Mortgaged Property is covered thereby) shall be paid by the Servicer as a Servicing Advance.  Such master single interest Insurance Policy may contain a deductible clause, in which case the Servicer or the Special Servicer, as applicable, shall, if (A) there shall not have been maintained on the related Mortgaged Property or REO Property a policy otherwise complying with the provisions of Section 3.07(a) and (B) there shall have been one or more losses which would have been covered by such policy had it been maintained, deposit into the Collection Account from its own funds the amount not otherwise payable under the master single interest Insurance Policy because of such deductible clause, to the extent that any such deductible exceeds the deductible limitation that pertained to the related Mortgage Loan, or, in the absence of any such deductible limitation, the deductible limitation which is consistent with the Servicing Standard.

(c)     The Servicer and Special Servicer shall maintain, at their own expense, a blanket fidelity bond (a "Fidelity Bond") and an errors and omissions insurance policy with a Qualified Insurer, with broad coverage on all officers or employees acting in any capacity requiring such persons to handle funds, money, documents or paper relating to the Loans ("Servicer Employees," in the case of the Servicer, and "Special Servicer Employees," in the case of the Special Servicer).  Any such Fidelity Bond and errors and omissions insurance shall protect and insure the Servicer or Special Servicer, as applicable, against losses, including forgery, theft, embezzlement, fraud, errors and omissions, failure to maintain any insurance policies or letters of credit required pursuant to the Agreement and negligent acts of such Servicer Employees or Special Servicer Employees, as applicable.  Such errors and omissions policy shall also protect and insure the Servicer or Special Servicer, as applicable, against losses in connection with the release or satisfaction of a Loan, in error, without having obtained payment in full of the indebtedness secured thereby.  No provision of this Section requiring such Fidelity Bond and errors and omissions insurance shall diminish or relieve the Servicer or Special Servicer from its duties and obligations as set forth in this Agreement.

The minimum coverage under any such Fidelity Bond and errors and omissions insurance policy shall be at least equal to the amount necessary for the Servicer or Special Servicer, as applicable, to qualify as a FNMA or FHLMC servicer.  Notwithstanding the foregoing, so long as the long-term debt or the deposit obligations or claims-paying ability of the Servicer or Special Servicer (or its immediate or remote parent) is rated at least "AA" by S&P, "Aa2" by Moody's and "AA" by Fitch, the Servicer or Special Servicer, respectively, shall be allowed to provide self-insurance with respect to a Fidelity Bond and such errors and omissions policy.  Coverage of the Servicer or the Special Servicer under a policy or bond obtained by an

Affiliate of the Servicer or the Special Servicer and providing the coverage required by this Section 3.07(c) shall satisfy the requirements of this Section 3.07(c).

The Special Servicer and the Servicer will promptly report in writing to the Trustee any material changes that may occur in their respective Fidelity Bonds, if any, and/or their respective errors and omissions Insurance Policies, as the case may be, and will furnish to the Trustee copies of all certificates evidencing that such bonds, if any, and insurance policies are in full force and effect.

(d)     If, as of the Closing Date, a Mortgaged Property (other than an REO Property) shall be in a federally designated special flood hazard area (if flood insurance has been made available), or if the Servicer becomes aware, in performing its duties under this Agreement, that a Mortgaged Property becomes located in such area by virtue of remapping conducted by the Federal Emergency Management Agency, the Servicer will use its reasonable efforts to cause the related Borrower (in accordance with applicable law and the terms of the Loan Documents) to maintain, and, if the related Borrower shall default in its obligation to so maintain, the Servicer shall itself maintain, to the extent available at commercially reasonable rates (as determined by the Servicer in accordance with the Servicing Standard), and the Trustee as Mortgagee has an insurable interest in the related Mortgaged Property, flood insurance in respect thereof, but only to the extent the related Loan permits the mortgagee to require such coverage and the maintenance of such coverage is consistent with the Servicing Standard.  Such flood insurance shall be in an amount equal to the least of (i) the unpaid principal balance of the related Loan, (ii) the maximum amount of insurance which is available under the Flood Disaster Protection Act of 1973, as amended and (iii) the amount required by the Loan.  If the cost of any insurance described above is not borne by the Borrower, the Servicer shall promptly make a Servicing Advance for such costs, subject to Section 3.03(c).

(e)     During all such times as any REO Property shall be located in a federally designated special flood hazard area, the Special Servicer will cause to be maintained, to the extent available at commercially reasonable rates (as determined by the Special Servicer in accordance with the Servicing Standard), a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration in an amount equal to the least of (i) the unpaid principal balance of the related Loan, (ii) the maximum amount of insurance which is available under the Flood Disaster Protection Act of 1973, as amended, and (iii) the amount required by the Loan.  The cost of any such flood insurance with respect to an REO Property shall be an expense of the Trust Fund payable out of the related REO Account pursuant to Section 3.16(c) or, if the amount on deposit therein is insufficient therefor, paid by the Servicer as a Servicing Advance.

(f)     With respect to the Loans that (i) require earthquake insurance, or (ii) (A) at the date of origination were secured by Mortgaged Properties on which the related Borrower maintained earthquake insurance and (B) have provisions which enable the Servicer to continue to require the related Borrower to maintain earthquake insurance, the Servicer shall require the related Borrower to maintain such insurance in the amount, in the case of clause (i), required by the Loan and in the amount, in the case of this clause (ii), maintained at origination, in each case, to the extent such amounts are available at commercially reasonable rates.  Any determination by the Servicer that such insurance is not available at commercially reasonable rates with respect to

a Loan for which any related Mortgaged Property has a "Probable Maximum Loss" (based on a 450-year lookback with a 10% probability of exceedance in a 50 year period), in excess of 20% shall be subject to confirmation by the Rating Agencies that such determination not to purchase such insurance will not, in and of itself, result in a downgrade, qualification or withdrawal of the then-current ratings assigned to the Certificates rated by such Rating Agency. The Servicer will not waive any such requirement without providing notice to the Directing Certificateholder with related supporting documentation. The Servicer shall use reasonable efforts to cause the related Borrower to pay the costs of such confirmation, otherwise, such costs shall be a Trust Fund expense. The cost of any engineering report required to determine the amount of coverage required under the Loan Documents and any legal fees incurred in connection with requiring the related Borrower to maintain earthquake insurance shall be paid by the Servicer as a Servicing Advance.

(g)     Within one week after the Closing Date, with respect to each of the Mortgage Loans identified on the Mortgage Loan Schedule as being covered by an Environmental Insurance Policy, the Depositor shall notify the insurer under such Environmental Insurance Policy and take all other action necessary for the Trustee, on behalf of the Certificateholders, to be an insured (and for the Servicer and Special Servicer, on behalf of the Trust, to make claims) under such Environmental Insurance Policy. In the event the Servicer or Special Servicer with respect to Specially Serviced Loans has actual knowledge of any event (an "Insured Environmental Event") giving rise to a claim under any Environmental Insurance Policy in respect of any Loan covered thereby, the Servicer or Special Servicer (with respect to Specially Serviced Loans) shall, in accordance with the terms of such Environmental Insurance Policy and the Servicing Standard, timely make a claim thereunder with the appropriate insurer and shall take such other actions in accordance with the Servicing Standard which are necessary under such Environmental Insurance Policy in order to realize the full value thereof for the benefit of the Certificateholders. With respect to each Environmental Insurance Policy that relates to one or more Mortgage Loans, the Servicer shall review and familiarize itself with the terms and conditions relating to enforcement of claims and shall monitor the dates by which any claim must be made or any action taken under such policy to realize the full value thereof for the benefit of the Certificateholders in the event the Servicer has actual knowledge of an Insured Environmental Event giving rise to a claim under such policy. Any premiums incurred under the Environmental Insurance Policy in accordance with the Servicing Standard or in connection with a resolution of such termination of an Environmental Insurance Policy shall be paid by the Servicer and shall be reimbursable to it as a Servicing Advance. Any legal fees or other out-of-pocket costs incurred under the Environmental Insurance Policy in accordance with the Servicing Standard or in connection with a resolution of such termination of an Environmental Insurance Policy shall be paid by the Servicer and to the extent not reimbursed by the related Borrower or from proceeds of the Environmental Insurance Policy, shall be reimbursable to it as an expense of the Trust Fund.

Section 3.08     Enforcement of Due-On-Sale and Due-On-Encumbrance Clauses; Assumption Agreements.

(a)     As to each Loan which contains a provision in the nature of a "due-on-sale" clause, which by its terms:

(i)      provides that such Loan shall (or, at the mortgagee's option, may) become due and payable upon the sale or other transfer of an interest in the related Mortgaged Property or the related Borrower or

(ii)      provides that such Loan may not be assumed without the consent of the mortgagee in connection with any such sale or other transfer,

the Servicer or the Special Servicer (if such Loan is a Specially Serviced Loan) shall provide notice to the Directing Certificateholder of any request for a waiver thereof, and the Servicer or the Special Servicer, as applicable, shall enforce such due-on-sale clause, unless the Servicer or Special Servicer, as applicable, determines, in accordance with the Servicing Standard, that (1) not declaring an Event of Default (as defined in the related Mortgage) or (2) granting such consent would be likely to result in a greater recovery (or an equal recovery; *provided* the other conditions for an assumption or waiver of a due-on-sale clause are met), on a present value basis discounting at the related Net Mortgage Rate), than would enforcement of such clause or the failure to grant such consent.  If the Servicer or Special Servicer, as applicable, determines that (1) not declaring an Event of Default (as defined in the related Mortgage) or (2) granting such consent would be likely to result in a greater recovery (or an equal recovery, *provided* the other conditions for an assumption or waiver of a due-on-sale clause are met), the Servicer or Special Servicer, as applicable, shall take or enter into an assumption agreement from or with the proposed transferee as obligor thereon, provided that the taking or entering into such assumption agreement complies with the Servicing Standard and the terms of the related Mortgage; *provided,* further that if the Stated Principal Balance of the related Mortgage Loan is two percent (2%) or more of the aggregate Stated Principal Balance of the Mortgage Loans at that time, the Servicer or Special Servicer, as applicable, must have received written notice from the Rating Agencies that such assumption or waiver will not result in the downgrade, qualification or withdrawal of any rating then assigned by such Rating Agency to any Class of Certificates. Notwithstanding the foregoing, the Servicer or Special Servicer, as applicable, shall not waive any rights under a "due-on-sale" clause with respect to any Loan unless (i) the Servicer shall have notified the Directing Certificateholder of such waiver, (ii) the Servicer or Special Servicer, as applicable, shall have submitted the Servicer's or Special Servicer's as applicable, written recommendation and analysis to the Directing Certificateholder, (iii) the Servicer or Special Servicer, as applicable, shall have submitted to the Directing Certificateholder the documents within the possession of the Servicer or Special Servicer, as applicable, that are reasonably requested by the Directing Certificateholder, and (iv) the Directing Certificateholder shall have approved such waiver (subject to the last paragraph of Section 3.21(e)).  Neither the Servicer nor the Special Servicer shall approve such waiver unless the Borrower shall agree to pay all fees and costs associated with such waiver (unless such condition shall have been waived by the Directing Certificateholder) and any such non-approval shall not be a violation of the Servicing Standard.

(b)      As to each Loan which contains a provision in the nature of a "due-on-encumbrance" clause, which by its terms:

(i)      provides that such Loan shall (or, at the mortgagee's option, may) become due and payable upon the creation of any additional lien or other encumbrance on the related Mortgaged Property or

(ii)     requires the consent of the mortgagee to the creation of any such additional lien or other encumbrance on the related Mortgaged Property,

the Servicer or the Special Servicer (if such Loan is a Specially Serviced Loan) shall provide notice to the Directing Certificateholder of any request for a waiver thereof, and the Servicer or the Special Servicer, as applicable, shall enforce such due-on-encumbrance clause and in connection therewith shall (i) accelerate payments thereon or (ii) withhold its consent to such lien or encumbrance unless the Servicer or Special Servicer, as applicable, determines, in accordance with the Servicing Standard, that (1) not accelerating payments on such Mortgage Loan or (2) granting such consent would be in the best interests of the Certificateholders. Notwithstanding the foregoing, the Servicer or Special Servicer, as applicable, shall not waive any rights under a "due-on-encumbrance" clause with respect to any Loan unless (i) the Servicer or Special Servicer, as applicable, shall have notified the Directing Certificateholder of such waiver, (ii) the Servicer or Special Servicer, as applicable, shall have submitted its written recommendation and analysis to the Directing Certificateholder, (iii) the Servicer or Special Servicer, as applicable, shall have submitted to the Directing Certificateholder the documents within the possession of the Servicer or Special Servicer, as applicable, that are reasonably requested by the Directing Certificateholder and (iv) the Directing Certificateholder shall have approved such waiver (subject to the last paragraph of Section 3.21(e)); *provided, further,* that if the Stated Principal Balance of the related Mortgage Loan is two percent (2%) or more of the aggregate Stated Principal Balance of the Mortgage Loans at that time, the Servicer or Special Servicer, as applicable, must have received written notice from the Rating Agencies that such assumption or waiver will not result in the downgrade, qualification or withdrawal of any rating then assigned by such Rating Agency to any Class of Certificates.  Neither the Servicer nor the Special Servicer shall approve such waiver unless the Borrower shall agree to pay all fees and costs associated with such waiver (unless such condition shall have been waived by the Directing Certificateholder), and any such non-approval shall not be a violation of the Servicing Standard.

(c)     Nothing in this Section 3.08 shall constitute a waiver of the Trustee's right, as the mortgagee of record, to receive notice of any assumption of a Loan, any sale or other transfer of the related Mortgaged Property or the creation of any additional lien or other encumbrance with respect to such Mortgaged Property.

(d)     Except as otherwise permitted by Section 3.20, the Special Servicer shall not agree to modify, waive or amend any term of any Mortgage Loan in connection with the taking of, or the failure to take, any action pursuant to this Section 3.08.

(e)     Notwithstanding any other provisions of this Section 3.08, the Servicer or Special Servicer, as applicable, may grant a Borrower's request for consent to subject the related Mortgaged Property to an easement or right-of-way for utilities, access, parking, public improvements or another purpose and may consent to subordination of the related Loan to such easement or right-of-way; provided that the Servicer or Special Servicer, as applicable, shall have determined (i) in accordance with the Servicing Standard that such easement or right-of-way will not materially interfere with the then-current use of the related Mortgaged Property or the security intended to be provided by such Mortgage and will not materially or adversely affect the value of such Mortgaged Property and (ii) that no REMIC will fail to qualify as a REMIC as a result thereof and that no tax on "prohibited transactions" or "contributions" after the Closing

Date would be imposed on any REMIC as a result thereof. Subject to the related Loan Documents and applicable law, and to the extent consistent with the Servicing Standard, the Servicer or Special Servicer, as applicable, shall not consent to such easement or right of way unless the Borrower, at the Borrower's expense, obtains legal advice to make the determination described in clause (ii). If the Servicer or Special Servicer, as applicable, is unable to cause the Borrower to obtain such legal advice, and the related Loan Documents do not provide that Borrower shall pay for such expense, the Servicer or Special Servicer, as applicable, shall obtain such legal advice, if necessary, in accordance with the Servicing Standard, and the cost thereof shall be deemed a Servicing Advance.

(f)    [Reserved]

(g)    Subject to the terms and conditions set forth in this Agreement, the Servicer or Special Servicer, as applicable, shall be entitled to approve a request from a Borrower for a partial release of the related Mortgaged Property, the granting of an easement thereon in favor of another Person, any alteration or demolition of the related Mortgaged Property or other similar matters if it has determined, in accordance with the Servicing Standard and exercising its good faith business judgment in the same manner as it would if it were the owner of the related Mortgage Loan, that the security for, and the timely and full collectibility of, such Mortgage Loan would not be adversely affected thereby and provided further that the Servicer or Special Servicer, as applicable, has determined (and may rely upon an Opinion of Counsel in making such determination) that the approval (or the taking) of any of the foregoing actions will (i) not cause a Mortgage Loan to cease to qualify as a "qualified mortgage loan" (within the meaning of Section 860G(a)(3) of the Code and Treasury Regulation Section 1.860G-2(a)) or (ii) or constitute a "significant modification" of a Mortgage Loan (within the meaning of Treasury Regulation Section 1.860G-2(b)).

With respect to any Mortgage Loan, subject to the related Loan Documents, neither the Servicer nor the Special Servicer, as applicable, shall permit the related Borrower to substitute any real property, any rights with respect to real property, or any other property interest whatsoever for the Mortgaged Property securing such Mortgage Loan as of the Closing Date without (i) receipt of an Opinion of Counsel, at the expense of the Borrower, to the effect that the substitution will not cause the related Mortgage Loan to fail to qualify as a "qualified mortgage" as defined under Section 860G(a)(3) of the Code while such Mortgage Loan is owned by the Lower-Tier REMIC and (ii) receipt of prior written confirmation from the Rating Agencies that such substitution would not, in and of itself, cause a downgrade, qualification or withdrawal of any of the then-current ratings assigned to the Certificates. To the extent provided in the Loan Documents, any costs to the Servicer or Special Servicer of obtaining such Opinion of Counsel and Rating Agency confirmation shall be borne by the related Borrower as a condition to the obligation to agree to any substitution referred to in the preceding sentence or to the extent not provided for in the Loan Documents on the Closing Date, borne by the Seller, and if the Seller fails to pay for the costs of such Opinion of Counsel or Rating Agency fees, the Servicer shall be entitled to make a withdrawal from the Collection Account as a Trust Fund expense (to pay for such costs with respect to any Mortgage Loan).

(h)    Except as provided in Section 3.08(b), with respect to any Loan pursuant to which the Borrower may not incur additional indebtedness encumbering the related

Mortgaged Property without the consent of the lender, neither the Servicer nor the Special Servicer shall consent to such additional debt without written confirmation to the Servicer or the Special Servicer, as applicable, and the Trustee by each Rating Agency that such modification or waiver would not, in and of itself, result in a downgrade, qualification or withdrawal of any of the current ratings assigned to the Certificates; provided, that such confirmation shall not be required if the Loan has a Stated Principal Balance no greater than $1,000,000.  To the extent provided in the Loan Documents, any costs to the Servicer or Special Servicer of obtaining the Rating Agency confirmations required by this Section 3.08(h) shall be borne by the related Borrower as a condition to the Servicer's or Special Servicer's agreement to any such consent to additional debt referred to in the preceding sentence, or to the extent not provided for in the Loan Documents,  if the related  Borrower fails to pay such costs and the Seller also fails to pay such costs, the Servicer or Special Servicer, as applicable, shall withhold such consent to additional debt or shall be entitled to make a withdrawal from the Collection Account to cover such costs if such costs would be "unanticipated expenses" within the meaning of the REMIC Provisions (and the Servicer may rely upon an Opinion of Counsel in making the determination of "unanticipated expenses," the costs of which may be withdrawn from the Collection Account as a Trust Fund expense.

Section 3.09   Realization upon Defaulted Mortgage Loans.

(a)   The Special Servicer shall, subject to subsections (b) through (d) of this Section 3.09, exercise reasonable efforts, consistent with the Servicing Standard, to foreclose upon or otherwise comparably convert (which may include an REO Acquisition) the ownership of any property securing such Mortgage Loans as come into and continue in default as to which no satisfactory arrangements can be made for collection of delinquent payments, and which are not released from the Trust Fund pursuant to any other provision hereof. In any case in which a Mortgaged Property shall have suffered damage such that the complete restoration of such property is not fully reimbursable by the hazard insurance policies or flood insurance policies required to be maintained pursuant to Section 3.07, the Servicer shall not be required to make a Servicing Advance and expend funds toward the restoration of such property unless the Special Servicer has determined in its reasonable judgment in accordance with the Servicing Standard that such restoration will increase the net proceeds of liquidation of such Mortgaged Property to Certificateholders after reimbursement to the Servicer for such Servicing Advance and Advance Interest thereon and the Servicer has determined that such Servicing Advance together with Advance Interest thereon will be recoverable by the Servicer out of the proceeds of liquidation of such Mortgaged Property, as contemplated in Section 3.05(a)(v).  The Special Servicer shall be responsible for all other costs and expenses incurred by it in any such proceedings (such costs and expenses to be advanced by the Servicer to the Special Servicer and recoverable by the Servicer as a Servicing Advance); provided that, in each case, such cost or expense would not, if incurred, constitute a Nonrecoverable Servicing Advance.

Nothing contained in this Section 3.09 shall be construed to require the Servicer or the Special Servicer, on behalf of the Trust Fund, to make a bid on any Mortgaged Property at a foreclosure sale or similar proceeding that is in excess of the fair market value of such property, as determined by the Servicer or the Special Servicer in its reasonable and good faith judgment taking into account the factors described in Section 3.18(e) and the results of any Appraisal obtained pursuant to the following sentence, all such offers to be made in a manner

consistent with the Servicing Standard. If and when the Special Servicer or the Servicer deems it necessary and prudent for purposes of establishing the fair market value of any Mortgaged Property securing a Defaulted Mortgage Loan, other than for the purpose of the Servicer or Special Servicer bidding to acquire a Defaulted Mortgage Loan or an REO Property on its own behalf at foreclosure or otherwise, the Special Servicer or the Servicer, as the case may be, is authorized to have an Appraisal performed with respect to such property, the out-of-pocket cost of which Appraisal shall be paid by the Servicer as a Servicing Advance.

(b)     The Special Servicer shall not acquire any personal property pursuant to this Section 3.09 unless either:

(i)                 such personal property is incident to real property (within the meaning of Section 856(e)(1) of the Code) so acquired by the Special Servicer; or

(ii)                 the Special Servicer shall have obtained an Opinion of Counsel (the out-of-pocket cost of which shall be a Servicing Advance) to the effect that the holding of such personal property by the Trust Fund will not cause the imposition of a tax on any REMIC created hereunder under the REMIC Provisions or cause any REMIC created hereunder to fail to qualify as a REMIC at any time that any Certificate is outstanding.

(c)     Notwithstanding any provision to the contrary in this Agreement, the Special Servicer shall not, on behalf of the Trust Fund, obtain title to any direct or indirect partnership interest or other equity interest in any Borrower pledged pursuant to any pledge agreement unless the Special Servicer shall have requested and received an Opinion of Counsel (which opinion shall be an expense of the Trust Fund) to the effect that the holding of such partnership interest or other equity interest by the Trust Fund will not cause the imposition of a tax on any REMIC created hereunder under the REMIC Provisions or cause any REMIC created hereunder to fail to qualify as a REMIC at any time that any Certificate is outstanding.

(d)     Notwithstanding the foregoing provisions of this Section 3.09, the Special Servicer shall not, on behalf of the Trustee, obtain title to a Mortgaged Property in lieu of foreclosure or otherwise, or take any other action with respect to any Mortgaged Property, if, as a result of any such action, the Trustee, on behalf of the Certificateholders, would be considered to hold title to, to be a "mortgagee-in-possession" of, or to be an "owner" or "operator" of such Mortgaged Property within the meaning of CERCLA or any comparable law, unless (as evidenced by an Officer's Certificate to such effect delivered to the Trustee) the related Mortgage Loan is insured under the Environmental Insurance Policy or Special Servicer has previously determined in accordance with the Servicing Standard or based on an Environmental Assessment of such Mortgaged Property performed within the preceding 12 months by an Independent Person who regularly conducts Environmental Assessments and/or the existence of an Environmental Insurance Policy covering such Mortgaged Property, that:

(i)     the Mortgaged Property is in compliance with applicable environmental laws and regulations or, if not, that taking such actions as are necessary to bring the Mortgaged Property in compliance therewith is reasonably

likely to produce a greater recovery on a present value basis discounted at the related Net Mortgage Rate than not taking such actions; and

(ii)     there are no circumstances or conditions present at the Mortgaged Property relating to the use, management or disposal of Hazardous Materials for which investigation, testing, monitoring, containment, clean-up or remediation could be required under any applicable environmental laws and regulations or, if such circumstances or conditions are present for which any such action could be required, that taking such actions with respect to such Mortgaged Property is reasonably likely to produce a greater recovery on a present value basis discounted at the related Net Mortgage Rate than not taking such actions.

The cost of any such Environmental Assessment and the cost of any remedial, corrective or other further action contemplated by clause (i) and/or clause (ii) of the preceding sentence shall be paid by the Servicer and reimbursable as a Servicing Advance.  If any such Environmental Assessment so warrants, the Special Servicer shall, at the expense of the Trust Fund, perform such additional environmental testing as it deems necessary and prudent to determine whether the conditions described in clauses (i) and (ii) of the second preceding sentence have been satisfied.

(e)     If (i) the environmental testing contemplated by subsection (d) above establishes that either of the conditions set forth in clauses (i) and (ii) of the first sentence thereof has not been satisfied with respect to any Mortgaged Property securing a Defaulted Mortgage Loan and (ii) there has been no breach of any of the representations and warranties set forth in or required to be made pursuant to Section 6 of the related Mortgage Loan Purchase Agreement for which the Seller could be required to repurchase such Defaulted Mortgage Loan pursuant to Section 7 of the related Mortgage Loan Purchase Agreement, then the Special Servicer shall take such action as it deems to be in the best economic interest of the Trust Fund and consistent with the Servicing Standard (other than proceeding to acquire title to the Mortgaged Property) and is hereby authorized at such time as it deems appropriate to release such Mortgaged Property from the lien of the related Mortgage.

(f)     The Special Servicer shall provide a copy of any Environmental Assessments to the Trustee, who shall forward such assessment to the Servicer and the Certificate Owners of the Controlling Class with respect to any Mortgaged Property securing a Defaulted Mortgage Loan as to which the environmental testing contemplated in subsection (d) above has revealed that either of the conditions set forth in clauses (i) and (ii) of the first sentence thereof has not been satisfied, in each case until the earlier to occur of satisfaction of both such conditions, repurchase of the related Loan by the Seller or release of the lien of the related Mortgage on such Mortgaged Property.  The Trustee shall, upon request, forward all such reports to the Certificateholders (at the expense of the requesting party) and each Rating Agency.

(g)     The Special Servicer shall report to the Internal Revenue Service and the related Borrower, in the manner required by applicable law, the information required to be reported regarding any Mortgaged Property related to a Loan that it is required to service and which is abandoned or foreclosed, the receipt of mortgage interests received in a trade or business and the forgiveness of indebtedness with respect to any mortgaged property required by

Sections 6050J, 6050H and 6050P, respectively, of the Code.  The Special Servicer shall deliver a copy of any such report to the Trustee and the Servicer.

(h)    The Special Servicer shall have the right to determine, in accordance with the Servicing Standard, the advisability of the maintenance of an action to obtain a deficiency judgment if the state in which the Mortgaged Property is located and the terms of the Loan permit such an action.

(i)    The Special Servicer shall maintain accurate records, signed by one of its Servicing Officers, of each Final Recovery Determination in respect of a Specially Serviced Loan or REO Property and the basis thereof.  Each Final Recovery Determination shall be evidenced by an Officer's Certificate delivered to the Trustee, Depositor and the Servicer no later than the 10th Business Day following such Final Recovery Determination.

Section 3.10    Trustee to Cooperate; Release of Mortgage Files.

(a)    Upon the payment in full of any Loan, or the receipt by the Servicer or the Special Servicer, as the case may be, of a notification that payment in full shall be escrowed in a manner customary for such purposes, the Servicer or Special Servicer, as the case may be, will immediately notify the Trustee and request delivery of the related Mortgage File.  Any such notice and request shall be in the form of a Request for Release (and shall include two copies) signed by a Servicing Officer (or in a mutually agreeable electronic format that will, in lieu of a signature on its face, originate from a Servicing Officer) and shall include a statement to the effect that all amounts received or to be received in connection with such payment which are required to be deposited in the Collection Account pursuant to Section 3.04 (a) or remitted to the Servicer to enable such deposit, have been or will be so deposited.  Within seven Business Days (or within such shorter period as release can reasonably be accomplished if the Servicer notifies the Trustee of an exigency) of receipt of such notice and request, the Trustee (or, to the extent provided in Section 3.01(b), the Servicer or the Special Servicer, as applicable) shall execute such instruments of satisfaction, deeds of reconveyance and other documents as shall have been furnished to it by the Servicer, and the Trustee shall release and deliver the related Mortgage File to the Servicer or Special Servicer, as the case may be and the Servicer is authorized to cause the removal from registration on the MERS® System of any such Mortgage Loan, if applicable.  No expenses incurred in connection with any instrument of satisfaction or deed of reconveyance shall be chargeable to the Collection Account.

(b)    From time to time as is appropriate for servicing or foreclosure of any Loan, the Servicer or the Special Servicer shall deliver to the Trustee two copies of a Request for Release signed by a Servicing Officer (or in a mutually agreeable electronic format that will, in lieu of a signature on its face, originate from a Servicing Officer).  Upon receipt of the foregoing, the Trustee shall deliver the Mortgage File or any document therein to the Servicer or the Special Servicer (or a designee), as the case may be.  Upon return of the Mortgage File to the Trustee, the Trustee shall execute an acknowledgment of receipt.

(c)    Within three Business Days (or within such shorter period as delivery can reasonably be accomplished if the Special Servicer notifies the Trustee of an exigency) of receipt thereof, the Trustee shall execute and deliver to the Servicer or Special Servicer, as applicable,

any court pleadings, requests for trustee's sale or other documents necessary to the release of a Loan or REO Loan, or to foreclosure or trustee's sale in respect of a Mortgaged Property or to any legal action brought to obtain judgment against any Borrower on the Note or Mortgage or to obtain a deficiency judgment, or to enforce any other remedies or rights provided by the Note or Mortgage or otherwise available at law or in equity.  The Servicer or Special Servicer, as applicable, shall be responsible for the preparation of all such documents and pleadings.  When submitted to the Trustee for signature, such documents or pleadings shall be accompanied by a certificate of a Servicing Officer or Special Servicing Officer, as applicable, requesting that such pleadings or documents be executed by the Trustee and certifying as to the reason such documents or pleadings are required, that the proposed action is in the best interest of the Certificateholders and that the execution and delivery thereof by the Trustee will not invalidate or otherwise affect the lien of the Mortgage, except for the termination of such a lien upon completion of the foreclosure or trustee's sale.

Section 3.11    Servicing Compensation.

(a)    As compensation for its activities hereunder, the Servicer shall be entitled to receive the Servicing Fee (subject to the second and last paragraphs of this Section 3.11(a)) with respect to each Mortgage Loan at the Servicing Fee Rate.  The Servicing Fee shall cease to accrue if a Liquidation Event occurs in respect thereof.  In no event will the Servicer be entitled to retain a Servicing Fee from the amount of any P&I Advance, regardless of whether the related Borrower is obligated to reimburse Servicing Fees.

The Servicer, on behalf of itself, shall be entitled to recover unpaid Servicing Fees in respect of any Mortgage Loan required to be serviced by it out of that portion of related payments, Insurance and Condemnation Proceeds, Liquidation Proceeds and REO Revenues (in the case of an REO Loan) allocable as recoveries of interest, to the extent permitted by Section 3.05(a).  Subject to this Section 3.11(a), the right to receive the Servicing Fee may not be transferred in whole or in part except in connection with the transfer of all of the Servicer's responsibilities and obligations under this Agreement.

Additional servicing compensation in the form of (i) 100% of all assumption application fees, 50% of all assumption fees paid by the Borrowers on all Loans that are not Specially Serviced Loans (but only to the extent that all amounts then due and payable with respect to such Loans have been paid), (ii) charges for beneficiary statements or demands and amounts collected for checks returned for insufficient funds and other ancillary amounts on Loans that are not Specially Serviced Loans, (iii) 100% of commercially reasonable fees received on or with respect to Loan modifications and extensions and similar items on Loans that are not Specially Serviced Loans (unless the Special Servicer's consent or approval is required hereunder, then 50% of such fees shall be payable to the Servicer and 50% of such fees shall be payable to the Special Servicer, or 100% of such fees shall be payable entirely to the Special Servicer with respect to the Specially Serviced Loans) pursuant to Section 3.20 (but only to the extent actually collected from the related Borrower and only to the extent that all amounts then due and payable after giving effect to any modification with respect to the related Loan have been paid), (iv) reasonable and customary consent fees and fees in connection with defeasance only to the extent actually paid by the related Borrower, if any, and (v) other customary charges, in each case only to the extent actually paid by the related Borrower, shall be retained by the

Servicer and shall not be required to be deposited in the Collection Account maintained by the Servicer pursuant to Section 3.04(a).

The Servicer also shall be entitled to additional servicing compensation in the form of, without duplication: (i) Penalty Charges received on each Mortgage Loan (other than Specially Serviced Loans) but only to the extent actually paid by the related Borrower and to the extent that all amounts then due and payable with respect to such Loan (including outstanding interest on Advances accrued with respect to such Loan) have been paid to the Servicer; (ii) interest or other income earned on deposits relating to the Trust Fund in the Collection Account (but only to the extent of the Net Investment Earnings, if any, with respect to each such account for each period from any Distribution Date to the immediately succeeding P&I Advance Date); (iii) Prepayment Interest Excess in excess of Prepayment Interest Shortfalls for that Collection Period; and (iv) interest earned on deposits in the Collection Account, Servicing Accounts and all other accounts maintained by the Servicer that is not required by applicable law or the related Loan to be paid to the Borrower.  Notwithstanding anything to the contrary in clause (i) of the first sentence of this paragraph or in the last paragraph of Section 3.11(b), (x) the Servicer shall be entitled to that portion, if any, of a Penalty Charge collected on a Specially Serviced Loan that accrued prior to the related Servicing Transfer Event and (y) if the Special Servicer has partially waived any Penalty Charge part of which accrued prior to the related Servicing Transfer Event, any collections in respect of such Penalty Charge shall be shared *pro rata* by the Servicer and the Special Servicer based on the respective portions of such Penalty Charge to which they would otherwise have been entitled.

In determining the compensation of the Servicer or Special Servicer, as applicable, with respect to Penalty Charges, on any Distribution Date, the aggregate Penalty Charges collected on any Mortgage Loan since the prior Distribution Date shall be applied to reimburse (i) the Servicer or the Trustee for Advance Interest thereon with respect to such Mortgage Loan due with respect to such Distribution Date and (ii) the Trust Fund for any Advance Interest or additional Trust Fund expenses (excluding any Special Servicing Fees, Workout Fees and Liquidation Fees) with respect to the related Mortgage Loan incurred since the Closing Date and not previously reimbursed out of Penalty Charges, and any Penalty Charges remaining thereafter shall be distributed *pro rata* to the Servicer and the Special Servicer based on the amount of Penalty Charges the Servicer or Special Servicer would otherwise have been entitled to receive during such period with respect to such Mortgage Loan without any such application.

Except as specifically provided herein, the Servicer shall be required to pay out of its own funds all expenses incurred by it in connection with its servicing activities hereunder (including, without limitation, payment of any amounts due, except for reasonably allocable premiums for any blanket Insurance Policy insuring against hazard losses pursuant to Section 3.07), if and to the extent such expenses are not payable directly out of the Collection Account and the Servicer shall not be entitled to reimbursement therefor except as expressly provided in this Agreement.

Notwithstanding anything herein to the contrary, the Servicer shall pay as Compensating Interest out of its own funds, to the extent not previously paid out of Prepayment Interest Excess, any Prepayment Interest Shortfalls in full as provided by Section 3.11 (up to the

Servicing Fee for the related Collection Period) resulting from a Principal Prepayment on any Loan.

(b)      As compensation for its activities hereunder, the Special Servicer shall be entitled to receive the Special Servicing Fee with respect to each Specially Serviced Loan and REO Loan.  As to each such Specially Serviced Loan and REO Loan, the Special Servicing Fee shall accrue at the Special Servicing Fee Rate (in accordance with the same terms of the related Note as are applicable to the accrual of interest at the Mortgage Rate) and shall be computed on the basis of the Stated Principal Balance of such Specially Serviced Loan and for the same period respecting which any related interest payment due on such Specially Serviced Loan or deemed to be due on such REO Loan is computed.  The Special Servicing Fee with respect to any Specially Serviced Loan or REO Loan shall cease to accrue if a Liquidation Event occurs in respect thereof.  The Special Servicing Fee shall be payable monthly, on a loan-by-loan basis, to the extent permitted by Section 3.05(a).  The right to receive the Special Servicing Fee may not be transferred in whole or in part except in connection with the transfer of all of the Special Servicer's responsibilities and obligations under this Agreement.

The Special Servicer shall also be entitled to additional servicing compensation in the form of a Workout Fee with respect to each Corrected Mortgage Loan at the Workout Fee Rate.  The "Workout Fee Rate" means 2.0% for any Loan, applied to each collection of interest and principal (including scheduled payments, prepayments, Balloon Payments and payments at maturity) received on such Loan for so long as it remains a Corrected Mortgage Loan.  The Workout Fee with respect to any Corrected Mortgage Loan will cease to be payable if such Loan again becomes a Specially Serviced Loan; *provided* that a new Workout Fee will become payable if and when such Loan again becomes a Corrected Mortgage Loan.  If the Special Servicer is terminated for other than cause, it shall retain the right to receive any and all Workout Fees payable with respect to (i) any Mortgage Loan that became a Corrected Mortgage Loan during the period that it acted as Special Servicer and was still such at the time of such termination or resignation and (ii) any Specially Serviced Loan for which the Special Servicer has resolved the circumstances and/or conditions causing any such Mortgage Loan to be a Specially Serviced Loan except that the related Borrower had not yet made at least three consecutive Monthly Payments as of the date of such termination or resignation and such Mortgage Loan otherwise meets the requirements of a Corrected Mortgage Loan, with the Workout Fee with respect to such Mortgage Loan payable only after such requirements have been met (and any successor Special Servicer shall not be entitled to any portion of such Workout Fees), in each case until the Workout Fee for any such loan ceases to be payable in accordance with the preceding sentence.

A Liquidation Fee will be payable to the Special Servicer with respect to each Specially Serviced Loan or REO Loan as to which the Special Servicer receives any Liquidation Proceeds subject to the exceptions set forth in the definition of Liquidation Fee.  As to each Specially Serviced Loan or REO Loan, the Liquidation Fee will be payable out of, and will be calculated by application of a "Liquidation Fee Rate" of 2.0% for any Loan, in each case expressed as a percentage of an amount equal to Liquidation Proceeds less Liquidation Expenses (other than Liquidation Fees and Workout Fees) received with respect to such Specially Serviced Loan or REO Loan.

Notwithstanding anything to the contrary described above, no Liquidation Fee will be payable based on, or out of, (i) Liquidation Proceeds received in connection with the repurchase of any Loan by the Seller pursuant to Section 7 of the Mortgage Loan Purchase Agreement, so long as such Loan is repurchased by the Seller within 180 days of its receipt of notice of such Breach or Defect, (ii) the purchase of any Specially Serviced Loan by the Special Servicer or Directing Certificateholder or any affiliate thereof or any affiliate of the Special Servicer or the Directing Certificateholder, for its sole benefit, (iii) the realization upon any deficiency judgment obtained against the borrower, or (iv) the purchase of all of the Loans and REO Properties in connection with an optional termination of the Trust Fund pursuant to Section 9.01.  If, however, Liquidation Proceeds are received with respect to any Corrected Mortgage Loan and the Special Servicer is properly entitled to a Workout Fee, such Workout Fee will be payable based on and out of the portion of such Liquidation Proceeds that constitute principal and/or interest on such Loan.

The Special Servicer will also be entitled to additional servicing compensation in the form of (i) 50% of all assumption fees, modification fees and any other fees paid by Borrowers on all Loans that are not Specially Serviced Loans (but only to the extent that the Special Servicer's consent or approval is required and that all amounts due and payable with respect to such Loans have been paid) and 100% of all assumption fees, modification fees, extension fees, charges for beneficiary statements, demands and other amounts paid by Borrowers on all Specially Serviced Loans (but only to the extent that all amounts due and payable with respect to such Loans have been paid) and (ii) Penalty Charges on each Specially Serviced Loan (but only to the extent actually collected from the related Borrower and to the extent that all amounts then due and payable with respect to such Specially Serviced Loan (including outstanding Advance Interest accrued with respect to such Specially Serviced Loan) have been paid to the Special Servicer). The Special Servicer shall remit to the Servicer all Penalty Charges with respect to a Specially Serviced Loan collected by the Special Servicer that accrued prior to a Servicing Transfer Event and the Servicer shall remit to the Special Servicer all Penalty Charges with respect to a Mortgage Loan that accrued while such Mortgage Loan was a Specially Serviced Loan and (iii) other amounts set forth herein without duplication.  The Special Servicer shall be required to pay out of its own funds all expenses incurred by it in connection with its servicing activities hereunder (including, without limitation, payment of any amounts, other than management fees in respect of REO Properties, due and owing to any of its Sub-Servicers and the premiums for any blanket Insurance Policy obtained by it insuring against hazard losses pursuant to Section 3.07) that are not payable directly out of the Collection Account or the REO Account.  The Special Servicer shall not be entitled to reimbursement for any expenses incurred by it except as expressly provided in this Agreement.

Section 3.12    Reports to the Trustee; Collection Account Statements.

(a)    The Servicer shall deliver to the Trustee and the Special Servicer, no later than 1:00 p.m. New York City time on the second Business Day prior to each related Distribution Date, the CMSA Loan Periodic Update File, with respect to the related Distribution Date.  As to each Mortgage Loan, the Servicer shall provide to the Special Servicer and Directing Certificateholder, by the close of business on each Distribution Date and in a mutually agreeable electronic format, the amount of each outstanding Advance and the interest accrued thereon as of such Distribution Date.  The Servicer's responsibilities under this Section 3.12(a)

with respect to Specially Serviced Loans and REO Loans shall be subject to the satisfaction of the Special Servicer's obligations under Section 3.21.

(b)     For so long as the Servicer makes deposits into and withdrawals from the Collection Account maintained by it, not later than 30 days after each Distribution Date, the Servicer shall forward to the Trustee by electronic means a statement setting forth the status of its Collection Account as of the close of business on the last Business Day of the related Collection Period showing the aggregate amount of deposits into and withdrawals from such Collection Account of each category of deposit specified in Section 3.04 and each category of withdrawal specified in Section 3.05 for the related Collection Period.

(c)     No later than 1:00 p.m. New York City time on the Servicer Remittance Date, the Servicer shall deliver or cause to be delivered to the (A) Trustee the following reports (i) a CMSA Delinquent Loan Status Report; (ii) a CMSA Historical Loan Modification Report; (iii) a CMSA Historical Liquidation Report; (iv) a CMSA REO Status Report, and (v) the CMSA Property File and (B) Rating Agencies and the Directing Certificateholder, the CMSA Comparative Financial Status Report.  Such reports shall be in an electronic format reasonably acceptable to both the Trustee and the Servicer.  The Servicer shall also deliver or cause to be delivered to the Trustee (with respect to the Servicer and the Special Servicer) on the Servicer Remittance Date and the CMSA Special Servicer Loan File.

The Depositor shall prepare the CMSA Loan Set-Up File with the reasonable cooperation of the Servicer and, except for data regarding yield maintenance charges, shall deliver such file to the Servicer and the Trustee on or prior to the first Determination Date after the Closing Date.

The Servicer's responsibilities under this Section 3.12(c) with respect to REO Loans and Specially Serviced Loans shall be subject to the satisfaction of the Special Servicer's obligations under Section 3.12(f).  In the absence of manifest error, the Servicer shall be entitled to conclusively rely upon, without investigation or inquiry, the information and reports delivered to it by the Special Servicer, and the Trustee shall be entitled to conclusively rely upon the Servicer's reports and the Special Servicer's reports without any duty or obligation to recompute, verify or recalculate any of the amounts and other information stated therein.

(d)     The Servicer shall deliver or cause to be delivered to the Rating Agencies and the Directing Certificateholder, if required by S&P, the following materials, in each case to the extent that such materials or the information on which they are based are required to be delivered pursuant to the Loan Documents and have been received by the Servicer:

(i)          Commencing March 31, 2007, with respect to each Loan and REO Loan (to the extent timely received from the Special Servicer pursuant to Section 3.12(f) in the case of any Specially Serviced Loan or REO Loan), a CMSA Operating Statement Analysis Report, on a monthly basis, and CMSA NOI Adjustment Worksheet, on an annual basis, for the related Mortgaged Property or REO Property as of the end of the preceding fiscal year, together, if required by S&P with copies of the operating statements and rent rolls (but only to the extent the related Borrower delivers such information to the Servicer and,

with respect to operating statements and rent rolls for Specially Serviced Loans and REO Properties, to the extent timely delivered by the Special Servicer to the Servicer), for the related Mortgaged Property or REO Property as of the end of the preceding fiscal year. The Servicer shall use its reasonable efforts, consistent with the Servicing Standard to obtain said annual operating statements and rent rolls with respect to each of such Loans, other than Specially Serviced Loans or REO Loans.

(ii)         On a monthly basis, commencing six months following the Closing Date, with respect to each Loan and REO Loan, a CMSA Financial File, which will be updated monthly and will include the operating statements received from the related Borrower without any adjustments (except for each Loan's annual review in connection with the CMSA NOI Adjustment Worksheet).

The Servicer's responsibilities under this Section 3.12(d) with respect to REO Loans and Specially Serviced Loans shall be subject to the satisfaction of the Special Servicer's obligations under Section 3.12(f) and Section 3.12(g). In the absence of manifest error, the Servicer shall be entitled to conclusively rely upon, without investigation or inquiry, the information and reports delivered to it by the Special Servicer, and the Trustee shall be entitled to conclusively rely upon the Servicer's reports and the Special Servicer's reports without any duty or obligation to recompute, verify or recalculate any of the amounts and other information stated therein.

(e)        No later than 1:00 p.m. New York City time on each Servicer Remittance Date, the Servicer shall prepare and deliver to the Rating Agencies, the Directing Certificateholder and the Special Servicer, a CMSA Servicer Watch List of all Loans, (ii) upon request, the Maturing Mortgage Loan Report listing all Balloon Loans that have a Maturity Date occurring in the next 90 days and (iii) upon request, a Financial Statements Report listing all Loans for which annual financial statements have not been received as of the time of the request.

(f)        By 4:00 p.m., New York City time, on each Determination Date, the Special Servicer shall deliver, or cause to be delivered, to the Servicer the following reports with respect to the Specially Serviced Loans (and, if applicable, the related REO Properties): (i) a CMSA Delinquent Loan Status Report; (ii) a CMSA Historical Liquidation Report; (iii) a CMSA Historical Loan Modification Report; (iv) a CMSA REO Status Report; and (v) the CMSA Property File. By 4:00 p.m., New York City time, on each Determination Date, the Special Servicer shall deliver, or cause to be delivered, to the Servicer the CMSA Comparative Financial Status Report and the CMSA Financial File with respect to the Specially Serviced Loans (and, if applicable, the related REO Properties). The CMSA Delinquent Loan Status Report shall provide information as of two Business Days preceding such Determination Date. The CMSA Historical Liquidation Report, CMSA Historical Loan Modification Report, CMSA REO Status Report, CMSA Property File and CMSA Comparative Financial Status Reports shall provide information as of two Business Days prior to such Determination Date. Such reports shall be presented in writing and in a medium and format reasonably acceptable to both the Servicer and the Special Servicer.

(g)     The Special Servicer shall deliver or cause to be delivered to the Servicer and, upon the request of the Depositor, the Directing Certificateholder or any Rating Agency, to any such requesting party, the following materials, in each case to the extent that such materials or the information on which they are based are required to be delivered by the Borrower pursuant to the Loan Documents and have been received by the Special Servicer:

(i)     On or before April 30 of each year, commencing in April 30, 2007, with respect to each Specially Serviced Loan and REO Loan, a CMSA Special Servicer Loan File and a CMSA Operating Statement Analysis Report, on a monthly basis, and a CMSA NOI Adjustment Worksheet, on an annual basis, both in written form and in electronic format reasonably acceptable to the Servicer, the Special Servicer and the Trustee for the related Mortgaged Property or REO Property as of the end of the preceding calendar year (but only to the extent the Special Servicer has received such information from the Servicer at the time of the servicing transfer pursuant to Section 3.21 necessary to prepare the related CMSA Operating Statement Analysis and CMSA NOI Adjustment Worksheet on a prospective basis), together with copies of the operating statements and rent rolls for the related Mortgaged Property or REO Property as of the end of the preceding calendar year. The Special Servicer shall use its reasonable efforts, consistent with the standards expected with respect to small balance commercial mortgage loans and REO properties that are comparable to those for which it is responsible hereunder, to obtain said annual operating statements and rent rolls with respect to each Mortgaged Property constituting security for a Specially Serviced Loan and each REO Property.

(h)     Reserved

(i)     The Servicer Reports and certain other portfolio and Loan information related to the Loans may be available at the Website of the Servicer solely to Privileged Persons.

Section 3.13     Annual Statement as to Compliance.

The Servicer and the Special Servicer (the "reporting person") each shall deliver to the Trustee who shall upon request deliver a copy to the Depositor and the Rating Agencies, on or before April 30 of each year, beginning with April 30, 2007, an Officer's Certificate stating, as to each signatory thereof, (i) that a review of the servicing operations of the reporting person during the preceding calendar year (or such shorter period from the Closing Date to the end of the related calendar year) and of its performance under this Agreement has been made under such officer's supervision, (ii) that, to the best of such officer's knowledge, based on such review, the reporting person has fulfilled all of its obligations under this Agreement in all material respects throughout such year (or such shorter period), or, if there has been a material default in the fulfillment of any such obligation, specifying each such default known to such officer, the nature and status thereof and what action it proposes to take with respect thereto, and (iii) whether it has received any notice regarding qualification, or challenging the status, of any REMIC created hereunder as a REMIC from the IRS or any other governmental agency or body. The Trustee shall deliver such Officer's Certificate, upon request, to any Certificateholder.  If the same entity acts as Servicer and Special Servicer, the foregoing may be delivered as a single

report.

Section 3.14    <u>Assessment of Compliance with Servicing Criteria.</u>

On or before April 30 of each calendar year, commencing in 2007:

Each of the Servicer and the Special Servicer shall deliver to the Directing Certificateholder, the Trustee, and the Rating Agencies a report (in form and substance reasonably satisfactory to the Trustee and Directing Certificateholder) regarding the Servicer's or the Special Servicer's as applicable, assessment of compliance with the Servicing Criteria during the immediately preceding calendar year.  Such report shall be signed by an authorized officer of such Person and shall address each of the Servicing Criteria specified on a certification substantially in the form of Exhibit 1 hereto.  To the extent any of the Servicing Criteria are not applicable to such Person, with respect to asset-backed securities transactions taken as a whole involving such Person and that are backed by the same asset type backing the Certificates, such report shall include such a statement to that effect.

Each of the Servicer and the Special Servicer shall deliver to the Directing Certificateholder, the Trustee, and the Rating Agencies a report, at such reporting person's expense, of a registered public accounting firm that attests to, and reports on, the assessment of compliance made by the paragraph.  Such attestation shall be in accordance with Rules 1-02(a)(3) and 2-02(g) of Regulation S-X under the Securities Act and the Exchange Act, including, without limitation, that in the event that an overall opinion cannot be expressed, such registered public accounting firm shall state in such report why it was unable to express such an opinion.  Such report must be available for general use and not contain restricted use language.  To the extent any of the Servicing Criteria are not applicable to such Person, with respect to asset-backed securities transactions taken as a whole involving such Person and that are backed by the same asset type backing the Certificates, such report shall include such a statement to that effect.

The Servicer shall cause each Subservicer and each Reporting Subcontractor to deliver to the Directing Certificateholder, the Trustee, and the Rating Agencies an assessment of compliance and accountant's attestation as and when provided in this Section 3.14.

The Special Servicer shall cause each Reporting Subcontractor to deliver to the Directing Certificateholder, the Trustee, and the Rating Agencies an assessment of compliance and accountant's attestation as and when provided in this Section 3.14.

Each assessment of compliance provided by a Subservicer pursuant to this Section 3.14 shall address each of the Servicing Criteria specified on a certification substantially in the form of Exhibit I hereto.  An assessment of compliance provided by a Subcontractor pursuant to Section 3.14 need not address any elements of the Servicing Criteria other than those specified by the Servicer or the Special Servicer, as applicable, pursuant to Section 3.14.

Section 3.15    <u>Access to Certain Information.</u>

Each of the Servicer and the Special Servicer shall provide reasonable access during its normal business hours at each of its principal servicing offices to any Certificateholder

or Certificate Owner that is, or is affiliated with, a federally insured financial institution, the Trustee, to the Servicer or to the Special Servicer, as applicable, and to the OTS, the FDIC, the Federal Reserve Board and the supervisory agents and examiners of such boards and such corporations, and any other federal or state banking or insurance regulatory authority that may exercise authority over any Certificateholder, access to any documentation regarding the Loans and the Trust Fund within its control which may be required by this Agreement or by applicable law.

Such access shall be afforded without charge (except that the Servicer and the Special Servicer may charge a reasonable fee for copies and out-of-pocket costs to parties other than the Rating Agencies) but only upon reasonable prior written request and during normal business hours at the offices of the Servicer or the Special Servicer, as the case may be, designated by it.  Nothing in this <u>Section 3.15</u> shall detract from the obligation of the Servicer and the Special Servicer to observe any applicable law or agreement prohibiting disclosure of information with respect to the Borrowers, and the failure of the Servicer or the Special Servicer to provide access as provided in this <u>Section 3.15</u> as a result of such obligation shall not constitute a breach of this <u>Section 3.15</u>.  Nothing herein shall be deemed to require the Servicer or Special Servicer to confirm, represent or warrant the accuracy of any other Persons' information or report, included in any communication from the Servicer, the Special Servicer or Borrower.  Notwithstanding the above, the Servicer and Special Servicer shall not have any liability to the Depositor, the Trustee, any Certificateholder, any Certificate Owner, the Initial Purchasers, any Rating Agency or any Person to whom it delivers information pursuant to and in accordance with this <u>Section 3.15</u> or any other provision of this Agreement for federal, state or other applicable securities law violations relating to the disclosure of such information.  The Servicer and the Special Servicer may each deny any of the foregoing persons access to confidential information or any intellectual property which the Servicer or the Special Servicer is restricted by license or contract from disclosing.  Notwithstanding the foregoing, the Servicer and the Special Servicer shall maintain separate from such confidential information and intellectual property, all documentation regarding the Loans that is not confidential.

Section 3.16    <u>Title to REO Property; REO Account.</u>

(a)    If title to any REO Property is acquired, the deed or certificate of sale shall be issued to the Trustee (or its nominee) on behalf of the Certificateholders, and the Special Servicer shall attempt to sell any REO Property prior to the close of the third taxable year beginning after the taxable year in which the Trust Fund acquires ownership of such REO Property for purposes of Section 860G(a)(8) of the Code, unless the Special Servicer either (i) is granted an extension of time (an "<u>REO Extension</u>") by the Internal Revenue Service to sell such REO Property (a copy of which shall be delivered to the Trustee) or (ii) obtains for the Trustee an Opinion of Counsel, addressed to the Trustee, to the effect that the holding by the Trust Fund of such REO Property after such period will not result in the imposition of taxes on "prohibited transactions" of the Trust Fund or any REMIC created hereunder as defined in Section 860F of the Code or cause any REMIC created hereunder to fail to qualify as a REMIC for federal or applicable state tax purposes at any time that any Certificates are outstanding.  If the Special Servicer is granted the REO Extension or obtains the Opinion of Counsel contemplated by clause (ii) above, the Special Servicer shall sell such REO Property within such period as is permitted by such REO Extension or such Opinion of Counsel.  Any expense incurred by the Special

94

Servicer in connection with its being granted the REO Extension or its obtaining the Opinion of Counsel contemplated by clause (ii) above shall be an expense of the Trust Fund payable out of the Collection Account pursuant to Section 3.05(a).

(b)     The Special Servicer shall segregate and hold all funds collected and received in connection with any REO Property separate and apart from its own funds and general assets.  If an REO Acquisition shall occur, the Special Servicer shall establish and maintain one or more REO Accounts, held on behalf of the Trustee in trust for the benefit of the Certificateholders and the Trustee, for the retention of revenues and other proceeds derived from each REO Property.  Any REO Account shall be an Eligible Account.  The Special Servicer shall deposit, or cause to be deposited, in the applicable REO Account, within one Business Day after receipt, all REO Revenues, Insurance and Condemnation Proceeds and Net Liquidation Proceeds received in respect of an REO Property.  Funds in any REO Account may be invested only in Permitted Investments in accordance with Section 3.06.  The Special Servicer shall be entitled to make withdrawals from the REO Account to pay itself, as additional servicing compensation in accordance with Section 3.11(b), interest and investment income earned in respect of amounts held in the REO Account as provided in Section 3.06(b) (but only to the extent of the Net Investment Earnings with respect to the REO Account for any Collection Period).  The Special Servicer shall give notice to the Trustee and the Servicer of the location of the REO Account when first established and of the new location of the REO Account prior to any change thereof.

(c)     The Special Servicer shall withdraw from the REO Account funds necessary for the proper operation, management, leasing, maintenance and disposition of any REO Property, but only to the extent of amounts on deposit in the REO Account relating to such REO Property.  On each Determination Date, the Special Servicer shall withdraw from the REO Account and deposit into the Collection Account, or deliver to the Servicer for deposit into the Collection Account, the aggregate of all amounts received in respect of each REO Property during the most recently ended Collection Period, net of any withdrawals made out of such amounts pursuant to the preceding sentence; provided, however, that the Special Servicer may retain in such REO Account, in accordance with the Servicing Standard, such portion of such balance as may be necessary to maintain a reasonable reserve for repairs, replacements, leasing, management and tenant improvements and other related expenses for the related REO Property.  In addition, on each Determination Date, the Special Servicer shall provide the Servicer and the Directing Certificateholder with a written accounting of amounts deposited in the Collection Account on such date.

(d)     The Special Servicer shall keep and maintain separate records, on a property-by-property basis, for the purpose of accounting for all deposits to, and withdrawals from, the REO Account pursuant to Section 3.16(b) or Section 3.16(c).

Section 3.17     Management of REO Property.

(a)     If title to any REO Property is acquired, the Special Servicer shall manage, conserve, protect, operate and lease such REO Property for the benefit of the Certificateholders and the Trustee solely for the purpose of its timely disposition and sale in a manner that does not cause such REO Property to fail to qualify as "foreclosure property" within the meaning of Section 860G(a)(8) of the Code or result in the receipt by the Trust Fund of any "income from

non-permitted assets" within the meaning of Section 860F(a)(2)(B) of the Code. Subject to the foregoing, however, the Special Servicer shall have full power and authority to do any and all things in connection therewith as are in the best interests of and for the benefit of the Certificateholders and the Trustee (as determined by the Special Servicer in its reasonable judgment and in accordance with the Servicing Standard) and, consistent therewith, shall withdraw from the REO Account, to the extent of amounts on deposit therein with respect to such REO Property, funds necessary for the proper operation, management, leasing and maintenance of such REO Property, including, without limitation:

(i)     all Insurance Policy premiums due and payable in respect of such REO Property;

(ii)     all real estate taxes and assessments in respect of such REO Property that may result in the imposition of a lien thereon;

(iii)     any ground rents in respect of such REO Property, if applicable; and

(iv)     all costs and expenses necessary to maintain, dispose of, protect, manage, operate, restore and lease such REO Property.

To the extent that amounts on deposit in the REO Account in respect of any REO Property are insufficient for the purposes set forth in clauses (i) through (iv) above with respect to such REO Property, subject to Section 3.03(c), the Servicer shall advance from its own funds, as a Servicing Advance, such amount as is necessary for such purposes unless (as evidenced by an Officer's Certificate delivered to the Trustee, the Depositor and the Directing Certificateholder) such advances would, if made, constitute Nonrecoverable Servicing Advances.

(b)     Without limiting the generality of the foregoing, the Special Servicer shall not:

(i)     permit the Trust Fund to enter into, renew or extend any New Lease with respect to any REO Property, if the New Lease by its terms will give rise to any income that does not constitute Rents from Real Property;

(ii)     permit any amount to be received or accrued under any New Lease other than amounts that will constitute Rents from Real Property;

(iii)     authorize or permit any construction on any REO Property, other than the repair or maintenance thereof or the completion of a building or other improvement thereon, and then only if more than 10% of the construction of such building or other improvement was completed before default on the related Loan became imminent, all within the meaning of Section 856(e)(4)(B) of the Code; or

(iv)     Directly Operate, or allow any other Person, other than an Independent Contractor, to Directly Operate, any REO Property on any date more than 90 days after its Acquisition Date;

unless, in any such case, the Special Servicer has obtained an Opinion of Counsel (the cost of which shall be paid by the Servicer as a Servicing Advance) to the effect that such action will not cause such REO Property to fail to qualify as "foreclosure property" within the meaning of Section 860G(a)(8) of the Code at any time that it is held by the Trust Fund, in which case the Special Servicer may take such actions as are specified in such Opinion of Counsel.  Except as limited above in this Section 3.17 and by Section 3.17(c), the Special Servicer shall be permitted to cause the Trust Fund to earn "net income from foreclosure property," subject to the Servicing Standard, if it determines, and so advises the Trustee and Directing Certificateholder in writing, that such method of operation is expected to provide a greater recovery to Certificateholders on a net after-tax basis than a different method of operating or net leasing such REO Property that would not subject the related REMIC to tax.

(c)     The Special Servicer may, and to the extent necessary to (i) preserve the status of the REO Property as "foreclosure property" under the REMIC Provisions or (ii) avoid the imposition of a tax on "income from nonpermitted assets" within the meaning of the REMIC Provisions, shall contract with any Independent Contractor for the operation and management of any REO Property within 90 days of the Acquisition Date thereof, provided that:

(i)     the terms and conditions of any such contract may not be inconsistent herewith and shall reflect an agreement reached at arm's length;

(ii)     the fees of such Independent Contractor (which shall be an expense of the Trust Fund) shall be reasonable and customary in light of the nature and locality of the Mortgaged Property;

(iii)    any such contract shall require, or shall be administered to require, that the Independent Contractor (A) pay out of related REO Revenues all costs and expenses incurred in connection with the operation and management of such REO Property, including, without limitation, those listed in subsection (a) hereof, and (B) remit all related revenues collected (net of its fees and such costs and expenses) to the Special Servicer upon receipt;

(iv)    none of the provisions of this Section 3.17(c) relating to any such contract or to actions taken through any such Independent Contractor shall be deemed to relieve the Special Servicer of any of its duties and obligations hereunder with respect to the operation and management of any such REO Property; and

(v)     the Special Servicer shall be obligated with respect thereto to the same extent as if it alone were performing all duties and obligations in connection with the operation and management of such REO Property.

The Special Servicer shall be entitled to enter into any agreement with any Independent Contractor performing services for it related to its duties and obligations hereunder for indemnification of the Special Servicer by such Independent Contractor, and nothing in this Agreement shall be deemed to limit or modify such indemnification.

(d)     When and as necessary, the Special Servicer shall send to the Trustee and the Servicer a statement prepared by the Special Servicer setting forth the amount of net income or net loss, as determined for federal income tax purposes, resulting from the operation and management of a trade or business on, the furnishing or rendering of a non-customary service to the tenants of, or the receipt of any other amount not constituting Rents from Real Property in respect of, any REO Property in accordance with Sections 3.17(a) and 3.17(b).

Section 3.18    Sale of Defaulted Mortgage Loans and REO Properties.

(a)     Each of the Servicer or the Special Servicer may sell or purchase, or permit the sale or purchase of, a Defaulted Mortgage Loan or REO Property only on the terms and subject to the conditions set forth in this Section 3.18 or as otherwise expressly provided in or contemplated by Section 2.03(b) and/or Section 9.01.

(b)     If any Mortgage Loan becomes a Defaulted Mortgage Loan, then the Servicer shall promptly so notify in writing the Trustee, the Special Servicer and the Directing Certificateholder.  Subject to Section 3.18(c) hereof, each of the Directing Certificateholder and the Special Servicer, in that order, shall have an assignable option (the "Purchase Option") to purchase such Defaulted Mortgage Loan out of the Trust Fund at a cash price (the "Option Price") equal to (i) pending determination of the Fair Value thereof pursuant to the succeeding sentence, the Purchase Price calculated in accordance with the definition of Purchase Price, plus any prepayment consideration or yield maintenance charge then payable with respect to such Defaulted Mortgage Loan, and (ii) following determination of the Fair Value pursuant to the succeeding sentence, the Fair Value.  The Directing Certificateholder and the Special Servicer may, after receipt of the notice described in the first sentence of this Section 3.18(b), assign its option granted pursuant to this Section 3.18(b) to any party, provided that the Directing Certificateholder, in connection therewith, shall deliver to the Trustee and the Special Servicer a copy of the related written assignment executed by the Directing Certificateholder.  Any option holder that exercises such option will be required to purchase the related Defaulted Mortgage Loan by the 30th Business Day following the exercise of the option.

If not exercised sooner, such purchase option with respect to any Defaulted Mortgage Loan will automatically terminate upon (i) the acquisition on behalf of the Trust of title to the related Mortgaged Property by foreclosure or deed in lieu of foreclosure, (ii) the modification, waiver or pay-off (full or discounted) of the Defaulted Mortgage Loan in connection with a workout, (iii) the repurchase of such Mortgage Loan by the Seller in the event of its breach of a representation in respect of the sale of the Mortgage Loan or a defect in the Mortgage File, or (iv) such Defaulted Mortgage Loan becoming a Corrected Mortgage Loan.

In furtherance of the foregoing, the Special Servicer shall promptly obtain an Appraisal (unless it has an Appraisal that is less than 12 months old and has no actual knowledge of, or notice of, any event which in the Special Servicer's judgment would materially affect the validity of such Appraisal), and shall, upon the request of an optionee, within the later of (i) 75 days following the date on which a Mortgage Loan becomes a Defaulted Mortgage Loan and (ii) the date which is 75 days after the Special Servicer's receipt of the related Servicing File and Mortgage File, determine the "Fair Value" thereof in accordance with the Servicing Standard.  In determining the Fair Value of any Defaulted Mortgage Loan the Special Servicer shall take into

account, among other factors, whether to the Special Servicer's actual knowledge the Mortgage Loan is in default to avoid a prepayment restriction, the period and amount of the delinquency on such Mortgage Loan, the occupancy level and physical condition of the related Mortgaged Property, the state of the local economy in the area where the Mortgaged Property is located, the expected recoveries from such Mortgage Loan if the Special Servicer were to pursue workout or foreclosure strategies instead of the purchase option being exercised.  In addition, the Special Servicer shall refer to all relevant information contained in the Servicing File, which may include (a) the most recent Appraisal obtained or conducted with respect to the related Mortgaged Property or (b) available objective third-party information obtained from generally available sources, as well as information obtained from vendors providing real estate services to the Special Servicer, concerning the market for distressed real estate loans and the real estate market for the subject property type in the area where the related Mortgaged Property is located based on the Appraisal, provided that the Special Servicer shall have no affirmative duty to obtain the information described in clause (b) above.  The Special Servicer must give prompt written notice of its Fair Value determination to the Trustee, the Servicer and the Directing Certificateholder.

Notwithstanding anything to the contrary in this Agreement, any out-of-pocket expenses incurred by the Servicer or the Special Servicer, as provided herein, in obtaining an Appraisal shall be paid for by the Servicer as a Servicing Advance.

The Special Servicer shall be required to change from time to time thereafter, its determination of the Fair Value of a Defaulted Mortgage Loan based upon changed circumstances or new information that have a material effect on the Fair Value, in accordance with the Servicing Standard.  If the most recent Fair Value calculation was made more than 60 days prior to the exercise date of a purchase option (under this Section 3.18(b) or Section 3.18(c)), then the Special Servicer shall confirm or revise the Fair Value determination, which Fair Value may be higher or lower.  Any such recalculation will be deemed to renew the option in the original priority at the recalculated price with respect to any party that previously waived its option or whose option expired unless the option has previously been exercised.  If the Special Servicer, the Directing Certificateholder or an Affiliate of either thereof elects to exercise the option, the Servicer shall be required to determine whether the Option Price constitute a fair price for the Mortgage Loan.  Upon request of the Special Servicer to make such a determination, the Servicer will do so within a reasonable period of time (but in no event more than 15 Business Days).  In doing so, the Servicer may rely on the opinion of an appraiser or other expert in real estate matters retained by the Servicer at the expense of the party exercising the option.  The Servicer may also rely on the most recent Appraisal of the related Mortgaged Property that was prepared in accordance with this Agreement.  If the Servicer were to determine that the Option Price does not constitute a fair price, then the Special Servicer shall redetermine the Fair Value taking into account the objections of the Servicer.

Unless and until the purchase option granted hereunder with respect to a Defaulted Mortgage Loan is exercised, the Special Servicer will be required to pursue such other resolution strategies available hereunder, including workout and foreclosure, consistent with the Servicing Standard, but the Special Servicer will not be permitted to sell the Defaulted Mortgage Loan other than pursuant to the exercise of such purchase option.

(c)     Notwithstanding the foregoing, the Directing Certificateholder or an assignee thereof shall have the exclusive right to exercise its Purchase Option prior to any exercise of the Purchase Option by the Special Servicer; provided, however, if the Purchase Option is not exercised by the Directing Certificateholder or an assignee thereof within 60 days of such Holders' having received notice of the calculation of Fair Value pursuant to Section 3.18(b), such option holder's right shall expire and the Trustee shall promptly send notice to the Special Servicer that such Mortgage Loan was not purchased by such Directing Certificateholder, and the Special Servicer may, at its exclusive option, within 15 days after receipt of such notice, exercise its Purchase Option.  Following the expiration of such fifteen day period, the Directing Certificateholder shall again have the exclusive right to exercise its Purchase Option.  The amount paid for any such Mortgage Loan purchased under Section 3.18(b) shall be deposited into the Collection Account, and the Trustee, upon receipt of an Officer's Certificate from the Servicer to the effect that such deposit has been made, shall release or cause to be released to the buyer the related Mortgage File, and shall execute and deliver such instruments of transfer or assignment, in each case without recourse, as shall be provided to it and are reasonably necessary to vest in the buyer the ownership of such Mortgage Loan.  In connection with any such purchase, the Special Servicer shall deliver the related Servicing File (to the extent it is in the Special Servicer's possession) to the buyer effecting such purchase (or to its designee).

(d)     The Special Servicer shall use reasonable efforts to solicit offers for each REO Property in such manner as will be reasonably likely to realize a fair price within the time period provided for by Section 3.16(a).  The Special Servicer shall accept the highest cash bid received from any Person for such REO Property in an amount at least equal to the Purchase Price therefor; provided, however, that in the absence of any such offer, the Special Servicer shall accept the highest cash offer received from any Person that is determined by the Special Servicer to be a fair price for such REO Property.  If the Special Servicer reasonably believes that it will be unable to realize a fair price for any REO Property within the time constraints imposed by Section 3.16(a), then the Special Servicer shall dispose of such REO Property upon such terms and conditions as the Special Servicer shall deem necessary and desirable to maximize the recovery thereon under the circumstances and, in connection therewith, shall accept the highest outstanding cash offer, regardless of from whom received.  If the Special Servicer determines with respect to any REO Property that the offers being made with respect thereto are not in the best interests of the Certificateholders and that the end of the period referred to in Section 3.16(a) with respect to such REO Property is approaching, the Special Servicer shall seek an extension of such period in the manner described in Section 3.16(a); provided, however, that the Special Servicer shall use its reasonable efforts, consistent with the Servicing Standard, to sell any REO Property prior to two years prior to the Rated Final Distribution Date.  Notwithstanding anything to the contrary contained in the immediately preceding sentence, any REO Property in any event shall be sold at whichever of the following times is applicable (i) if an REO Extension is obtained from the Internal Revenue Service, prior to the expiration of such REO Extension, (ii) if in accordance with Section 3.16(a) an Opinion of Counsel is obtained, prior to the expiration of such period as is specified in such Opinion during which the holding of the REO Property will not result in the imposition of taxes on "prohibited transactions" or cause any REMIC created hereunder to fail to qualify as a REMIC for federal and state tax purposes at any time that any Certificates are outstanding, or (iii) if neither clauses

(i) or (ii) applies, prior to the close of the third taxable year after the taxable year in which the Trust Fund acquires ownership of an REO Property.

The Special Servicer shall give the Trustee, Depositor, Directing Certificateholder, and the Servicer not less than ten (10) Business Days' prior written notice of its intention to sell any REO Property. No Interested Person shall be obligated to submit an offer to purchase any REO Property, and notwithstanding anything to the contrary herein, neither the Trustee, in its individual capacity, nor any of its Affiliates may offer for or purchase any REO Property pursuant hereto.

(e)     Whether any cash offer constitutes a fair price for any REO Property for purposes of <u>Section 3.18(d)</u>, shall be determined by the Special Servicer, if the highest offeror is a Person other than the Special Servicer or an Affiliate thereof, and by the Servicer, if the highest offeror is the Special Servicer or an Affiliate thereof. In determining whether any offer received from the Special Servicer or an Affiliate thereof represents a fair price for any REO Property, the Servicer shall obtain and may conclusively rely on an Appraisal obtained at the expense of the Trust Fund. In determining whether any offer constitutes a fair price for any REO Property, such Appraiser shall be instructed to take into account, as applicable, among other factors, the period and amount of any delinquency on the affected REO Loan and physical condition of the REO Property, the state of the local economy and the obligation to dispose of any REO Property within the time period specified in <u>Section 3.16(a)</u>. The Purchase Price for any REO Property shall in all cases be deemed a fair price.

(f)     Subject to subsections (d) and (e) above, the Special Servicer shall act on behalf of the Trustee in negotiating and taking any other action necessary or appropriate in connection with the sale of any REO Property, and the collection of all amounts payable in connection therewith. Any sale of any REO Property shall be final and without recourse to the Trustee or the Trust Fund, except, in the case of the Trust Fund, as shall be customary in deeds of real property, and if such sale is consummated in accordance with the terms of this Agreement, neither the Special Servicer nor the Servicer shall have any liability to any Certificateholder with respect to the purchase price therefor accepted by the Special Servicer or the Servicer.

Section 3.19     <u>Additional Obligations of the Servicer and Special Servicer;</u> <u>Inspections</u>.

(a)     The Servicer (or, with respect to each Specially Serviced Loan and REO Property and each Mortgage Loan described in <u>Section 3.19(d)</u> below, the Special Servicer at the expense of the Trust Fund) shall physically inspect or cause to be physically inspected (which inspection may be conducted by an independent third party contractor), at its own expense, (A)(i) each Mortgage Property if requested by the Directing Certificateholder, at least every 24 months, (ii) each Mortgage Property related to a Mortgage Loan with a Stated Principal Balance between $1,000,000 and $2,000,000, at least every 36 months, in each case commencing in April, 2007 (or at such lesser frequency as S&P shall have confirmed in writing to the Servicer, will not result in a downgrade, qualification or withdrawal of the then current ratings assigned to any Class of the Certificates and as approved by the Directing Certificateholder), or (iii) each Mortgage Property related to a Mortgage Loan with a Stated Principal Balance exceeding $2,000,000, at least every 24 months, in each case commencing in April, 2007 (or at such lesser

frequency as each Rating Agency shall have confirmed in writing to the Servicer, will not result in a downgrade, qualification or withdrawal of the then current ratings assigned to any Class of the Certificates and as approved by the Directing Certificateholder) and (B) if the Mortgage Loan becomes a Specially Serviced Loan as soon as practicable and thereafter at least once every 12 months for so long as such condition exists. The Servicer or Special Servicer, as applicable, shall send (i) to S&P, Moody's and the Directing Certificateholder, within 20 days of completion, each inspection report.

(b)     With respect to each Specially Serviced Loan that allows the Special Servicer (on behalf of the Trust Fund) to terminate, or cause the related Borrower to terminate, the related Manager upon the occurrence of certain events specified in such Mortgage Loan, the Special Servicer shall enforce the Trustee's rights with respect to the Manager under the related Mortgage Loan and Management Agreement. If the Special Servicer is entitled to terminate the Manager, the Special Servicer shall promptly give notice to the Directing Certificateholder and each Rating Agency. In accordance with the Servicing Standard, the Special Servicer shall cause the Borrower to terminate the Manager, and to recommend a Successor Manager (meeting the requirements set forth below) only if the Special Servicer determines in its reasonable discretion that such termination is not likely to result in successful litigation against the Trust Fund by such Manager or the related Borrower, or create a defense to the enforcement of remedies under such Mortgage Loan. With respect to any Mortgage Loan, subject to the related Loan Documents, neither the Servicer nor the Special Servicer (with respect to Specially Serviced Loans) shall permit the related Borrower to substitute any real property, any rights with respect to real property, or any other property interest whatsoever for the Mortgaged Property securing such Mortgage Loan as of the Closing Date without (i) receipt of an Opinion of Counsel, at the expense of the Borrower, to the effect that the substitution will not cause the related Mortgage Loan to fail to qualify as a "qualified mortgage" as defined under Section 860G(a)(3) of the Code while such Mortgage Loan is owned by the Lower-Tier REMIC and (ii) prior written confirmation from the Rating Agencies that such substitution would not, in and of itself, cause a downgrade, qualification or withdrawal of any of the then-current ratings assigned to the Certificates. To the extent provided in the Loan Documents, any costs to the Servicer or Special Servicer of obtaining such Opinion of Counsel and Rating Agency confirmation shall be borne by the related Borrower as a condition to the obligation to agree to any substitution referred to in the preceding sentence. No such substitution may be made unless the Borrower pays any such costs. If the Loan Documents specifically permit such substitution and do not require the related Borrower to pay such costs (or state law does not permit the Borrower to pay such costs) and Borrower refuses to pay such costs and the Seller also fails to pay such costs, the Servicer or Special Servicer, as applicable, shall withhold such consent to substitution or shall be entitled to make a withdrawal from the Collection Account as a Trust Fund expense to cover such costs.

(c)     Except as provided in Section 3.08(b), with respect to any Loan pursuant to which the Borrower may not incur additional indebtedness encumbering the related Mortgaged Property without the consent of the lender, neither the Servicer nor the Special Servicer shall consent to such additional debt without written confirmation to the Servicer or the Special Servicer, as applicable, and the Trustee by each Rating Agency that such modification or waiver would not, in and of itself, result in a downgrade, qualification or withdrawal of any of the current ratings assigned to the Certificates; provided, that such confirmation shall not be required if the Loan has a Stated Principal Balance no greater than $1,000,000. To the extent

provided in the Loan Documents, any costs to the Servicer or Special Servicer of obtaining the Rating Agency confirmations required by this Section 3.19(c) shall be borne by the related Borrower as a condition to the Servicer's or Special Servicer's agreement to any such consent to additional debt referred to in the preceding sentence, or to the extent not provided for in the Loan Documents, if the related Borrower fails to pay such costs, the Servicer or Special Servicer, as applicable, shall either withhold such consent to additional debt or shall be entitled to make a withdrawal from the Collection Account to cover such costs if such costs would be "unanticipated expenses" within the meaning of the REMIC Provisions (and the Servicer may rely upon an Opinion of Counsel in making the determination of "unanticipated expenses," the costs of which may be withdrawn from the Collection Account as a Trust Fund expense).

If a Manager is otherwise terminated or resigns under the related Specially Serviced Loan or Management Agreement and the related Borrower does not appoint a Successor Manager, the Special Servicer shall use its reasonable efforts to retain a Successor Manager (or the recommended Successor Manager, if any) on terms substantially similar to the Management Agreement or, failing that, on terms as favorable to the Trust Fund as can reasonably be obtained by the Special Servicer. For the purposes of this paragraph, a "Successor Manager" shall be a professional management corporation or business entity reasonably acceptable to the Special Servicer which (i) manages, and is experienced in managing, other comparable commercial and/or multifamily properties, and (ii) otherwise satisfies any criteria set forth in the Mortgage and related documents.

(d)      The Special Servicer shall be required to use reasonable efforts consistent with the Servicing Standard to obtain any Appraisal required in connection with an Appraisal Reduction Event within 90 days after the occurrence of such Appraisal Reduction Event (provided that in no event shall the period to receive such Appraisal exceed 120 days from the occurrence of the event that, with the passage of time, would become such Appraisal Reduction Event); provided, if the Stated Principal Balance of the related Mortgage Loan is two percent (2%) or more of the aggregate Stated Principal Balance of the Mortgage Loans at that time the appraisal required in connection with an Appraisal Reduction Event shall be the appraisal set forth in clause (vi) of the definition of Appraisal. Upon receipt, the Special Servicer shall send a copy of such Appraisal to the Servicer and the Directing Certificateholder. If a required Appraisal is not received by such date, the Appraisal Reduction Amount for such Mortgage Loan shall in either case be conclusively established to be 25% of the Stated Principal Balance of such Loan as of the date of the related Appraisal Reduction Event. On the first Determination Date occurring on or after the delivery of such Appraisal, and on each Determination Date thereafter, the Special Servicer shall calculate and report to the Servicer, and the Servicer shall report to the Trustee, the Appraisal Reduction Amount taking into account such Appraisal and such amount shall be used in place of the amount calculated pursuant to the third preceding sentence. The Servicer shall verify the accuracy of the mathematical computation of the Appraisal Reduction Amount by the Special Servicer and that the amounts used therein are consistent with the Servicer's records. Subject to this preceding sentence, the Servicer may conclusively rely on any report by the Special Servicer of an Appraisal Reduction Amount.

(e)      With respect to each Mortgage Loan as to which an Appraisal Reduction Event has occurred (unless such Mortgage Loan has become a Corrected Mortgage Loan) and with respect to which no other Appraisal Reduction Event has occurred and is continuing, the

Servicer or Special Servicer (with respect to Specially Serviced Loans) shall, within 30 days of each annual anniversary of such Appraisal Reduction Event, obtain an Appraisal (which may be an update of a prior Appraisal; provided, if the Stated Principal Balance of the Mortgage Loan is two percent or more of the Pool Balance at that time the appraisal required in connection with an Appraisal Reduction Event shall be the appraisal set forth in clause (vi) of the definition of Appraisal), the out-of-pocket cost of which shall be paid by the Servicer as a Servicing Advance. Upon receipt, the Special Servicer shall send a copy of such Appraisal to the Certificate Owners of the Controlling Class; provided, however, that as to each such Appraisal, if beneficial ownership of the Controlling Class resides in more than one Certificate Owner, the Special Servicer shall be responsible only for the expense of providing the first such copy thereof and shall be entitled to reimbursement from the Trust Fund for the expense of any additional copies so provided. Such Appraisal or percentage calculation of the Appraisal Reduction Amount described in the preceding paragraph, as the case may be, shall be used to determine the amount of the Appraisal Reduction Amount with respect to such Mortgage Loan for each Determination Date until the next Appraisal is required pursuant to this Section 3.19(e), and such redetermined Appraisal Reduction Amount shall replace the prior Appraisal Reduction Amount with respect to such Mortgage Loan. Notwithstanding the foregoing, the Special Servicer will not be required to obtain an Appraisal with respect to a Mortgage Loan which is the subject of an Appraisal Reduction Event if the Special Servicer has obtained an Appraisal with respect to the related Mortgaged Property within the 12-month period immediately prior to the occurrence of such Appraisal Reduction Event, unless the Special Servicer, in the exercise of its reasonable judgment, has reason to believe there has been a material adverse change in the value of the related Mortgaged Property. Instead, the Special Servicer may use such prior Appraisal in calculating any Appraisal Reduction Amount with respect to such Mortgage Loan.

Section 3.20    Modifications, Waivers, Amendments and Consents.

(a)    Subject to the provisions of this Section 3.20, the Servicer and the Special Servicer (with respect to each Specially Serviced Loan) may, on behalf of the Trust Fund, agree to any modification, waiver or amendment of any term of any Mortgage Loan without the consent of the Trustee or any Certificateholder; provided that the Servicer or the Special Servicer, as applicable, may agree to any such modification, waiver or amendment only if, in the Servicer's or Special Servicer's, as applicable, exercising its reasonable judgment and in accordance with the Servicing Standard, that a material default on such Loan has occurred or is reasonably foreseeable, and such modification, waiver or amendment is reasonably likely to produce a greater recovery to Certificateholders on a net present value basis discounted at the related Net Mortgage Rate.

(b)    Neither the Servicer nor the Special Servicer, as applicable, on behalf of the Trustee, shall agree or consent to any modification, waiver or amendment of any term of any Loan that is not a Specially Serviced Loan if such modification, waiver or amendment would:

(i)    affect the amount or timing of any related payment of principal, interest or other amount (including Prepayment Premiums, but excluding Penalty Interest and other amounts payable as additional servicing compensation) payable thereunder;

(ii)     relieve the obligation of the related Borrower to pay a Prepayment Premium or permit a Principal Prepayment during any period in which the related Note prohibits Principal Prepayments;

(iii)     except as expressly permitted by the related Mortgage, result in a release of the lien of the Mortgage on any material portion of the related Mortgaged Property without a corresponding Principal Prepayment in an amount not less than the fair market value (as determined by an appraisal by an appraiser delivered at the expense of the related Borrower and upon which the Servicer and the Special Servicer, as applicable, may conclusively rely) of the property to be released; or

(iv)     in the judgment of the Servicer or the Special Servicer, as applicable, otherwise materially impair the security for such Loan or reduce the likelihood of timely payment of amounts due thereon

*provided* that unless the Loan is in default or default is reasonably foreseeable, the Servicer or the Special Servicer, as applicable, has determined (and may rely upon an Opinion of Counsel in making such determination) that the modification, waiver or amendment will not be a "significant modification" of the Loan within the meaning of Treasury Regulations Section 1.860G-2(b) and *provided, further,* the Servicer or the Special Servicer, as applicable, may agree to any such modification, waiver or amendment only if, in the Servicer's or Special Servicer's, as applicable, reasonable and good faith judgment, a material default on such Loan has occurred or is reasonably foreseeable, and such modification, waiver or amendment is reasonably likely to produce a greater recovery to Certificateholders on a net present value basis, discounting at the related Net Mortgage Rate.

(c)     Notwithstanding the foregoing, the Special Servicer may (i) reduce the amounts owing under any Specially Serviced Loan by forgiving principal, or accrued interest, (ii) reduce the amount of the Monthly Payment on any Specially Serviced Loan, including by way of a reduction in the related Mortgage Rate, (iii) forbear in the enforcement of any right granted under any Note or Mortgage relating to a Specially Serviced Loan, and/or (iv) accept a Principal Prepayment; provided that the related Borrower is in default with respect to the Specially Serviced Loan or, in the judgment of the Special Servicer, such default is reasonably foreseeable.

Neither the Servicer nor the Special Servicer (with respect to Specially Serviced Loans) shall consent to, make or permit, in accordance with the Servicing Standard (i) any modification with respect to any Loan that would change the Mortgage Rate, reduce or increase the principal balance (except for reductions resulting from actual payments of principal) or change the final Maturity Date of such Loan unless both (A) the related Borrower is in default with respect to the Loan or, in the judgment of the Servicer or Special Servicer, as applicable, such default is reasonably foreseeable and (B) in the sole good faith judgment of the Servicer or Special Servicer, as applicable, and in accordance with the Servicing Standard, such modification would increase the recovery on the Loan to Certificateholders on a present value basis discounted at the related Net Mortgage Rate or (ii) any modification, waiver or amendment of any term of any Loan that would either (A) unless there shall exist a default with respect to the

Loan (or unless the Special Servicer determines that a default is reasonably foreseeable), constitute a "significant modification" under Treasury Regulations Section 1.860G-2(b) or (B) cause either Trust REMIC to fail to qualify as a REMIC under the Code or result in the imposition of any tax on "prohibited transactions" or "contributions" after the Startup Day under the REMIC Provisions; *provided,* that if the Stated Principal Balance of the related Mortgage Loan is two percent (2%) or more of the aggregate Stated Principal Balance of the Mortgage Loans at that time, the Servicer or Special Servicer, as applicable, must have received written notice from the Rating Agencies that such modification will not result in the downgrade, qualification or withdrawal of any rating then assigned by such Rating Agency to any Class of Certificates.  If the Borrower or the Seller fails to pay for the costs of such confirmation or written notice from the Rating Agencies, the Servicer shall be entitled to make a withdrawal from the Collection Account as a Trust Fund expense (to pay for such costs with respect to any Mortgage Loan).

Notwithstanding the foregoing, the Servicer and, with respect to any Specially Serviced Loan, the Special Servicer shall not extend the date on which any Balloon Payment is scheduled to be due unless the Servicer or Special Servicer, as applicable, has performed an internal valuation in connection with such extension, which internal valuation supports the determination of the Servicer or Special Servicer, as applicable, contemplated by clause (i)(B) of the immediately preceding paragraph or (y) the related Mortgage Loan has not been in default at any time during the twelve-month period preceding the Maturity Date of such Loan, in which case the Special Servicer, on one occasion only, may extend the date on which such Balloon Payment is due to a date not more than 60 days after such Maturity Date.

The determination of the Special Servicer contemplated by clause (i)(B) of the second paragraph of this Section 3.20(c) shall be evidenced by an Officer's Certificate to such effect delivered to the Trustee, the Servicer and the Directing Certificateholder and describing the basis for the Special Servicer's determination.

(d)     In no event shall the Special Servicer (i) extend the Maturity Date of a Specially Serviced Loan beyond a date that is two years prior to the earlier of (1) the Latest Possible Maturity Date or (2) the Rated Final Distribution Date; or (ii) if the Specially Serviced Loan is secured by a ground lease, extend the Maturity Date of such Mortgage Loan beyond a date which is 10 years prior to the expiration of the term of such ground lease; provided that with respect to clause (ii) above, the Special Servicer gives due consideration to the term of such ground lease prior to any extension beyond a date 20 years prior to the expiration of the term of such ground lease.

(e)     The Servicer and the Special Servicer may, as a condition to granting any request by a Borrower for consent, modification, waiver or indulgence or any other matter or thing, the granting of which is within its discretion pursuant to the terms of the instruments evidencing or securing the related Mortgage Loan and is permitted by the terms of this Agreement, require that such Borrower pay to it (i) as additional servicing compensation, a reasonable or customary fee for the additional services performed in connection with such request (provided, such fee does not constitute a "significant modification" of such Mortgage Loan under Treasury Regulations Section 1.860G-2(b)), and (ii) any related costs and expenses

incurred by it.  In no event shall the Servicer or Special Servicer be entitled to payment for such fees or expenses unless such payment is collected from the related Borrower.

(f)  With respect to Specially Serviced Loans, the Special Servicer shall notify the Servicer, who shall notify its Sub-Servicers and the Trustee, in writing, of any modification, waiver or amendment of any term of any Loan and the date thereof, and shall deliver to the Trustee (with a copy to the Servicer and Depositor) for deposit in the related Mortgage File, an original counterpart of the agreement relating to such modification, waiver or amendment, promptly following the execution thereof.  The Servicer or Special Servicer (with respect to Specially Serviced Loans) shall notify the Rating Agencies of any modification, waiver or amendment of any term of any Loan.

(g)  Notwithstanding the foregoing, with respect to Section 3.20(b) and 3.20(c), the Servicer or Special Servicer, as applicable, shall not agree or consent to any modification, waiver or amendment of any term of any Loan unless (i) the Servicer or Special Servicer, as applicable, shall have notified the Directing Certificateholder of such proposed modification waiver or amendment, (ii) the Servicer or Special Servicer, as applicable, shall have submitted the Servicer's or Special Servicer's, as applicable, written recommendation and analysis to the Directing Certificateholder, (iii) the Servicer or Special Servicer, as applicable, shall have submitted to the Directing Certificateholder the documents within the possession of Certificateholder, and (iv) the Directing Certificateholder shall have approved such modification, waiver or amendment of any term of any Loan; provided, the Servicer or the Special Servicer, as applicable may agree to such modification, waiver or amendment, in accordance with the Servicing Standard, notwithstanding the failure of the Directing Certificateholder to provide its consent.

Section 3.21   Transfer of Servicing Between Servicer and Special Servicer; Record Keeping.

(a)  Upon determining that a Servicing Transfer Event has occurred with respect to any Mortgage Loan, the Servicer shall promptly give notice thereof to the Special Servicer, each Rating Agency and the Trustee, shall deliver copies of the related Mortgage File and Servicing File to the Special Servicer and the Directing Certificateholder and shall use its reasonable best efforts to provide the Special Servicer with all information, documents and records (including records stored electronically on computer tapes, magnetic discs and the like) relating to such Mortgage Loan that are in the possession of the Servicer or available to the Servicer without undue burden or expense, and reasonably requested by the Special Servicer to enable it to assume its functions hereunder with respect thereto.  The Servicer shall use its reasonable best efforts to comply with the preceding sentence within five Business Days of the occurrence of each related Servicing Transfer Event and in any event shall continue to act as Servicer and administrator of such Mortgage Loan until the Special Servicer has commenced the servicing of such Mortgage Loan.  Such notice of a Servicing Transfer Event shall indicate if the related Mortgage Loan is the subject of an environmental insurance policy.

Upon determining that a Specially Serviced Loan (other than an REO Loan) has become a Corrected Mortgage Loan and that no other Servicing Transfer Event is continuing with respect thereto, the Special Servicer shall promptly give notice thereof and shall return the

related Mortgage File and Servicing File to the extent they are in its possession to the Servicer and, upon giving such notice and returning such Mortgage File and Servicing File to the Servicer, the Special Servicer's obligation to service such Corrected Mortgage Loan shall terminate and the obligations of the Servicer to service and administer such Mortgage Loan shall re-commence.

(b)     In servicing any Specially Serviced Loan, the Special Servicer will provide to the Trustee originals of new documents included within the definition of "Mortgage File" for inclusion in the related Mortgage File (with a copy of each such original to the Servicer), and provide the Servicer with copies of any material additional related Loan information including correspondence with the related Borrower.

(c)     [Reserved.]

(d)     The Servicer shall maintain ongoing payment records with respect to each of the Specially Serviced Loans and REO Properties and shall provide the Special Servicer with any information in its possession required by the Special Servicer to perform its duties under this Agreement.

(e)     No later than 30 days after receipt by the Special Servicer of the information reasonably required by the Special Servicer after a Servicing Transfer Event for any Specially Serviced Loan, the Special Servicer shall deliver a report to the Directing Certificateholder.  Such report shall set forth the following information to the extent reasonably determinable:

(i)     summary of the status of such Specially Serviced Loan;

(ii)     a discussion of the legal and environmental considerations reasonably known to the Special Servicer, consistent with the Servicing Standard, that are applicable to the exercise of remedies as aforesaid and to the enforcement of any related guaranties or other collateral for the related Loan and whether outside legal counsel has been retained;

(iii)     the most current rent roll and income or operating statement available for the related Mortgaged Property;

(iv)     the value of the Mortgaged Property as determined by an Appraisal, broker price opinion, or other customary valuation method used for small balance commercial mortgage loans together with the assumptions used in the calculation thereof;

(v)     the recommendations by the Special Servicer as to how such Specially Serviced Loan might be returned to performing status and returned to the Servicer for regular servicing or otherwise realized upon;

(vi)     a summary of any proposed actions and an analysis of whether or not taking such action is reasonably likely to produce a greater recovery on a present value basis, discounting at the related Net Mortgage Rate, than not taking

such action, setting forth the basis on which the Special Servicer made such determination;

(vii)   the status of any foreclosure actions or other proceedings undertaken with respect to such mortgaged real property, any proposed workouts with respect thereto and the status of any negotiations with respect to such workouts, and an assessment of the likelihood of additional events of default thereon; and

(viii)   such other information as the Special Servicer deems relevant in light of the Servicing Standard.

The Directing Certificateholder shall have 10 Business Days to comment on such report.  Notwithstanding the foregoing, the Special Servicer may, following the occurrence of an extraordinary event with respect to the related Mortgaged Property, take any action before the expiration of a ten (10) Business Day period if the Special Servicer has reasonably determined that failure to take such action would materially and adversely affect the interests of the Certificateholders and it has made a reasonable effort to contact the Directing Certificateholder.

Notwithstanding anything to the contrary contained in this Agreement, no direction of the Directing Certificateholder or failure of the Directing Certificateholder to consent or approve any matter for which such consent or approval is specified in this Agreement shall (a) require or cause the Servicer or the Special Servicer to violate the terms of a Mortgage Loan, applicable law or any provision of this Agreement, including the Special Servicer's and the Servicer's obligation to act in accordance with the Servicing Standard and to maintain the REMIC status of each Trust REMIC, or (b) result in the imposition of a "prohibited transaction" or "prohibited contribution" tax under the REMIC Provisions, or (c) expose the Servicer, the Special Servicer, the Depositor, either of the Sellers, the Trust Fund, the Trustee, or their Affiliates, officers, directors, employees or agents to any claim, suit or liability, or (d) materially expand the scope of the Special Servicer's or the Servicer's responsibilities under this Agreement; and the Special Servicer and the Servicer will neither follow any such direction if given by the Directing Certificateholder nor initiate any such actions or (e) will fail to take any such action not approved or consented to by the Directing Certificateholder.

(f)     Upon receiving notice of (i) the filing of a case under any federal or state bankruptcy, insolvency or similar law or the commencing of any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings with respect to a Specially Serviced Loan or the related Borrower, (ii) the existence of a material non-payment default with respect to a Specially Serviced Loan or (iii) the request by a Borrower for the amendment or modification of a Specially Serviced Loan required to be handled by the Special Servicer, the Servicer shall promptly give the Special Servicer notice thereof, and shall deliver copies of the related Mortgage File and Servicing File to the Special Servicer and shall use its reasonable best efforts to provide the Special Servicer with all information relating to the Loan and reasonably requested by the Special Servicer to enable it to negotiate with the related Borrower and prepare for any such proceedings.  The Servicer shall use its reasonable best efforts to comply with the preceding sentence within five (5) Business Days of the occurrence of each such event, and upon receiving such documents and information, the Special Servicer shall use its reasonable best

efforts to cause the related Borrower to cure any default and/or remedy any such event, work out or modify the Loan consistent with the terms of this Agreement, and/or prepare for such proceedings. Notwithstanding the foregoing, the occurrence of any of the above-referenced events shall not in and of itself be considered a Servicing Transfer Event.

Section 3.22    Sub-Servicing Agreements.

(a)    The Servicer and the Special Servicer may enter into Sub-Servicing Agreements to provide for the performance by third parties of any or all of its respective obligations under this Agreement; provided that the Sub-Servicing Agreement: (i) is consistent with this Agreement in all material respects and requires the Sub-Servicer to comply with all of the applicable conditions of this Agreement; (ii) provides that the Trustee for the benefit of the Certificateholders shall be a third-party beneficiary under such Sub-Servicing Agreement, but that none of the Trust Fund, the Trustee, any successor Servicer, Special Servicer or any Certificateholder shall have any duties under such Sub-Servicing Agreement or any liabilities arising therefrom; (iii) permits any purchaser of a Mortgage Loan or the Trustee pursuant to this Agreement to terminate such Sub-Servicing Agreement with respect to such purchased Mortgage Loan at its option and without penalty; (iv) does not permit the Sub-Servicer any direct rights of indemnification that may be satisfied out of assets of the Trust Fund; (v) does not permit the Sub-Servicer to foreclose on the related Mortgaged Property or consent to the modification of any Mortgage Loan without the prior consent of the Servicer or Special Servicer, as applicable; (vii) provides that the Sub-Servicer shall act in accordance with the Servicing Standard; and (vi) provides that in the event of an act or failure to act by the Sub-Servicer that causes the Servicer to be in default of its obligations under this Agreement, the Sub-Servicer shall be in default of its obligations under such Sub-Servicing Agreement; provided that this requirement shall not prevent the Special Servicer from hiring an Independent Contractor or an agent to assist it in the performance of its duties hereunder. Any successor Servicer or Special Servicer hereunder, upon becoming successor Servicer or Special Servicer, as applicable, shall have the right to be assigned and shall have the right to assume any Sub-Servicing Agreements from the predecessor Servicer or Special Servicer, as applicable. Upon a termination of the Servicer pursuant to this Agreement, the successor to the Servicer (other than the Trustee or its designee) shall automatically succeed to the rights and obligations of the prior Servicer under the Sub-Servicing Agreement, subject to the termination rights set forth therein, it being understood that any such succession by the Trustee or its designee shall not be automatic but shall be in the discretion of the Trustee or such designee.

In addition, each Sub-Servicing Agreement entered into by the Servicer may provide that the obligations of the Sub-Servicer thereunder shall terminate with respect to any Mortgage Loan serviced thereunder at the time such Mortgage Loan becomes a Specially Serviced Loan. The Servicer shall deliver to the Trustee copies of all Sub-Servicing Agreements, and any amendments thereto and modifications thereof, entered into by it promptly upon its execution and delivery of such documents. For purposes of this Agreement, the Servicer shall be deemed to have received any payment when a Sub-Servicer retained by it receives such payment. The Servicer shall notify the Special Servicer, the Trustee and the Depositor in writing promptly of the appointment by it of any Sub-Servicer. The Special Servicer shall notify the Servicer, the Trustee and the Depositor in writing promptly of the appointment by it of any Sub-Servicer.

(b)     Each Sub-Servicer shall be authorized to transact business in the state or states in which the related Mortgaged Properties it is to service are situated, if and to the extent required by applicable law.

(c)     As part of its servicing activities hereunder, the Servicer or the Special Servicer, as applicable, for the benefit of the Trustee and the Certificateholders, shall (at no expense to the Trustee, the Certificateholders or the Trust Fund) monitor the performance and enforce the obligations of each of its Sub-Servicers under the related Sub-Servicing Agreement. Such enforcement, including, without limitation, the legal prosecution of claims, termination of Sub-Servicing Agreements in accordance with their respective terms and the pursuit of other appropriate remedies, shall be in such form and carried out to such an extent and at such time as the Servicer would require were it the owner of the Mortgage Loans.  The Servicer or the Special Servicer, as applicable, shall have the right to remove a Sub-Servicer retained by it in accordance with the terms of the related Sub-Servicing Agreement upon the Events of Default and other termination events specified in its related Sub-Servicing Agreement.

(d)     If the Trustee or its designee becomes successor Servicer and elects or is required to assume the rights and obligations of the Servicer or the Special Servicer, as applicable, under any Sub-Servicing Agreement, the Servicer or the Special Servicer, as applicable, at its expense, shall deliver to the assuming party all documents and records relating to such Sub-Servicing Agreement and the Mortgage Loans then being serviced thereunder and an accounting of amounts collected and held on behalf of it thereunder, and otherwise use reasonable efforts to effect the orderly and efficient transfer of the Sub-Servicing Agreement to the assuming party.

(e)     Notwithstanding the provisions of any Sub-Servicing Agreement, each of the Servicer and the Special Servicer represents and warrants that it shall remain obligated and liable to the Trustee and the Certificateholders for the performance of its obligations and duties under this Agreement in accordance with the provisions hereof to the same extent and under the same terms and conditions as if it alone were servicing and administering the Mortgage Loans for which it is responsible, and the Servicer, or the Special Servicer, as applicable, shall pay the fees of any Sub-Servicer thereunder from its own funds.  In no event shall the Trust Fund bear any termination fee required to be paid to any Sub-Servicer as a result of such Sub-Servicer's termination under any Sub-Servicing Agreement.

(f)     Each Sub-Servicing Agreement shall provide that, in the event the Trustee or any other Person becomes a successor Servicer or the Special Servicer, as applicable, the Trustee or such successor Servicer or successor Special Servicer, as applicable, shall have the right to terminate such Sub-Servicing Agreement at its option and without a fee.

Section 3.23    Representations, Warranties and Covenants of the Servicer.

(a)     The Servicer hereby represents and warrants to the Trustee, for its own benefit and the benefit of the Certificateholders, and to the Depositor and the Special Servicer, as of the Closing Date, that:

(i)     The Servicer is a corporation, duly organized, validly existing and in good standing under the laws of California, and the Servicer is in compliance with the laws of each State in which any Mortgaged Property is located to the extent necessary to perform its obligations under this Agreement, except where the failure to so qualify or comply would not have a material adverse effect on the ability of the Servicer to perform its obligations hereunder;

(ii)     The execution and delivery of this Agreement by the Servicer, and the performance and compliance with the terms of this Agreement by the Servicer, will not violate Servicer's organizational documents or constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under, or result in the breach of, any material or other instrument to which it is a party or which applicable to it or any of its assets or result in the violation of any law, rule, regulation, order, judgment or decree binding on the Servicer which is likely to materially and adversely affect the Servicer's ability to perform hereunder;

(iii)     This Agreement, assuming due authorization, execution and delivery by the other parties hereto, constitutes a valid, legal and binding obligation of the Servicer, enforceable against the Servicer in accordance with the terms hereof, except as such enforcement may be limited by (A) applicable bankruptcy, insolvency, reorganization, liquidation, receivership, moratorium and other laws relating to or affecting creditors' rights generally, and (B) general principles of equity, regardless of whether such enforcement is considered in a proceeding in equity or at law;

(iv)     The Servicer is not in violation with respect to any law, any order or decree of any court, or any order, regulation or demand of any federal, state, municipal or governmental agency, which violations are reasonably likely to have consequences that would materially and adversely affect the financial condition or operations of the Servicer or its properties taken as a whole or are reasonably likely to have consequences that would materially and adversely affect its ability to perform its duties and obligations hereunder;

(v)     No litigation is pending or, to the best of the Servicer's knowledge, threatened against the Servicer which would prohibit the Servicer from entering into this Agreement or, in the Servicer's reasonable judgment, is likely to materially and adversely affect the ability of the Servicer to perform its obligations under this Agreement;

(vi)     No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Servicer, or compliance by the Servicer with, this Agreement or the consummation of the Servicer's transactions contemplated by this Agreement, except for any consent, approval, authorization or order which has been obtained or cannot be obtained prior to the actual performance by the Servicer of its obligations under this Agreement, or which, if not obtained would

not have a materially adverse effect on the ability of the Servicer to perform its obligations hereunder;

(vii)    The Servicer has full corporate power and authority to enter into and perform in accordance with this Agreement, has duly authorized the execution, delivery and performance of this Agreement, and has duly executed and delivered this Agreement;

(viii)   The Servicer is a member of MERS in good standing, and will comply in all material respects with the rules and procedures of MERS in connection with the servicing of the Mortgage Loans that are registered with MERS.

(ix)    The Servicer has examined each Sub-Servicing Agreement to which it is a party, and shall examine each Sub-Servicing Agreement to which it intends to become a party, and in each such case, the terms of such Sub-Servicing Agreements are not, or, in the case of any Sub-Servicing Agreement to be entered into by the Servicer at a future date, will not be, materially inconsistent with the terms of this Agreement; and

(x)    The Servicer has errors and omissions insurance coverage which is in full force and effect and complies with the coverage required by Section 3.07(c).

(b)    The representations and warranties set forth in paragraph (a) above shall survive the execution and delivery of the Agreement.

Section 3.24    <u>Representations, Warranties and Covenants of the Special Servicer.</u>

(a)    The Special Servicer hereby represents and warrants to the Trustee, for its own benefit and the benefit of the Certificateholders, and to the Depositor and the Servicer, as of the Closing Date, that:

(i)    The Special Servicer is a corporation, duly organized, validly existing and in good standing under the laws of California, and the Special Servicer is in compliance with the laws of each State in which any Mortgaged Property is located to the extent necessary to perform its obligations under this Agreement, except where the failure to so qualify or comply would not have a material adverse effect on the ability of the Special Servicer to perform its obligations hereunder;

(ii)    The execution and delivery of this Agreement by the Special Servicer, and the performance and compliance with the terms of this Agreement by the Special Servicer, will not (A) violate the Special Servicer's certificate of incorporation and by-laws or (B) constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under, or result in the breach of, any material agreement or other instrument to which it is a party or by

which it is bound, or (C) result in the violation of any law, rule, regulation, order, judgment or decree binding on the Special Servicer which, in the case of either (B) or (C) is likely to materially and adversely affect the Special Servicer's ability to perform hereunder;

(iii)     This Agreement, assuming due authorization, execution and delivery by the other parties hereto, constitutes a valid, legal and binding obligation of the Special Servicer, enforceable against the Special Servicer in accordance with the terms hereof, except as such enforcement may be limited by (A) applicable bankruptcy, insolvency, reorganization, liquidation, receivership, moratorium and other laws relating to or affecting creditors' rights generally, and (B) general principles of equity, regardless of whether such enforcement is considered in a proceeding in equity or at law;

(iv)     The Special Servicer is not in violation with respect to any law, any order or decree of any court, or any order, regulation or demand of any federal, state, municipal or governmental agency, which violations are reasonably likely to have consequences that would materially and adversely affect the financial condition or operations of the Special Servicer or its properties taken as a whole or are reasonably likely to have consequences that would materially and adversely affect its ability to perform its duties and obligations hereunder;

(v)     No litigation is pending or, to the best of the Special Servicer's knowledge, threatened against the Special Servicer which would prohibit the Special Servicer from entering into this Agreement or, in the Special Servicer's reasonable judgment, is likely to materially and adversely affect the ability of the Special Servicer to perform its obligations under this Agreement;

(vi)     No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Special Servicer, or compliance by the Special Servicer with, this Agreement or the consummation of the Special Servicer's transactions contemplated by this Agreement, except for any consent, approval, authorization or order which has been obtained or cannot be obtained prior to the actual performance by the Special Servicer of its obligations under this Agreement, or which, if not obtained would not have a materially adverse effect on the ability of the Special Servicer to perform its obligations hereunder;

(vii)     The Special Servicer has full corporate power and authority to enter into and perform in accordance with this Agreement, has duly authorized the execution, delivery and performance of this Agreement, and has duly executed and delivered this Agreement;

(viii)     The Special Servicer has examined each Sub-Servicing Agreement to which it is a party, and shall examine each Sub-Servicing Agreement to which it intends to become a party, and in each such case, the terms of such Sub-Servicing Agreements are not, or, in the case of any Sub-Servicing Agreement to

114

be entered into by the Special Servicer at a future date, will not be, materially inconsistent with the terms of this Agreement; and

(ix)    Each officer and employee of the Special Servicer that has responsibilities concerning the servicing and administration of Loans is covered by errors and omissions insurance and the fidelity bond in the amounts and with the coverage required by Section 3.07(c).

(b)    The representations and warranties set forth in paragraph (a) above shall survive the execution and delivery of the Agreement.

Section 3.25    Consultation Rights of the Directing Certificateholder.

(a)    The Special Servicer shall consult with the Directing Certificateholder prior to the taking by the Special Servicer of the following actions:

(i)    any proposed modification of a money term of a Mortgage Loan;

(ii)    any proposed sale of a Specially Serviced Loan;

(iii)    any proposed determination to bring an REO Property into compliance with applicable environmental laws;

(iv)    any proposed acceptance of substitute or additional collateral for a Mortgage Loan;

(v)    any proposed acceptance of a discounted payoff;

(vi)    any proposed waiver of a "due on sale" or "due on encumbrance" clause;

(vii)    and proposed comparable conversion of, which may include acquisitions of an REO Property, the ownership of the property or properties securing any Specially Serviced Mortgage Loans as come into and continue in default;

(viii)    any proposed acceptance of an assumption agreement releasing a Borrower from liability under a Loan; and

(ix)    any proposed release of collateral for a Specially Serviced Loan (other than in accordance with the terms of, or upon satisfaction of, such Mortgage Loan).

(b)    Notwithstanding the foregoing, no such advice, direction or objection contemplated by the foregoing may (i) require or cause the Special Servicer to violate any applicable law (ii) be inconsistent with the Servicing Standard, (iii) cause any REMIC created hereunder to fail to qualify as a REMIC or result in the imposition of federal, state or local tax on any REMIC created hereunder, (iv) violate any other provisions of this Agreement, (v) require or

cause the Special Servicer to violate the terms of a Loan, (vi) expose the Servicer, the Special Servicer, the Depositor, either Seller, the Trust Fund, the Trustee or their Affiliates, officers, directors, employees or agents to any claim, suit or liability, or (vii) materially expand the scope of the Servicer's or Special Servicer's responsibilities under this Agreement; and the Special Servicer will neither follow any such advice, direction or objection if given by the Directing Certificateholder nor initiate any such actions.

(c)     The Directing Certificateholder shall not request or direct the Servicer or the Special Servicer to take any action which would create a Prepayment Interest Shortfall unless the Directing Certificateholder pays out of its own pocket into the Collection Account such Prepayment Interest Shortfall.

Section 3.26    Limitation on Liability of the Directing Certificateholder.

By its acceptance of a Certificate, each Certificateholder confirms its understanding that the Directing Certificateholder may take actions that favor the interests of one or more Classes of the Certificates over other Classes of the Certificates and that the Directing Certificateholder may have special relationships and interests that conflict with those of Holders of some Classes of the Certificates and agrees to take no action against the Directing Certificateholder as a result of such a special relationship or conflict.

Section 3.27    Available Information.

(a)     The Servicer may, in accordance with such reasonable rules and procedures as it may adopt, also make available through its Website or otherwise, any information relating to the Mortgage Loans, the Mortgaged Properties or the Borrowers, for review by the Depositor, the Rating Agencies, and any other Persons to whom the Servicer believes such disclosure is appropriate, in each case except to the extent doing so is prohibited by applicable law or by the related Mortgage Loan.  In addition, the Servicer shall provide access to information and documentation in its possession regarding the Mortgage Loans to the Trustee and the Depositor, their agents and accountants upon reasonable request and during normal business hours, and to Certificateholders to comply with applicable regulations of the Office of Thrift Supervision, the FDIC or other regulatory authorities with respect to investment in the Certificates; provided that the Servicer shall be entitled to be reimbursed by each such Certificateholder for actual out-of-pocket expenses incurred by the Servicer in providing such reports and access.

(b)     The Servicer and the Special Servicer shall send the following items, in electronic form or otherwise, to any requesting party at the expense of such requesting party (other than the Rating Agencies, and except as otherwise provided in the penultimate sentence of this paragraph) for review by the Depositor, the Trustee, the Rating Agencies, any Certificateholder, any Person identified to the Servicer or the Special Servicer, as applicable, by a Certificateholder as a prospective transferee of a Certificate and any other Persons to whom the Servicer or the Special Servicer, as applicable, believes such disclosure to be appropriate: (i) the inspection reports prepared by or on behalf of the Servicer or the Special Servicer, as applicable, in connection with the property inspections pursuant to Section 3.19(a), (ii) any and all modifications, waivers and amendments of the terms of a Mortgage Loan entered into by the

Servicer or the Special Servicer, as applicable and (iii) any and all officer's certificates and other evidence delivered to the Trustee and the Depositor to support the Servicer's determination that any Advance was, or if made would be, a Nonrecoverable Advance. Copies of any and all of the foregoing items shall be available from the Servicer or the Special Servicer, as applicable, or the Trustee, upon request.  Copies of all such information shall be delivered by the Servicer or the Special Servicer, as applicable, upon request, not more frequently than quarterly to the Directing Certificateholder at the address specified by such Directing Certificateholder.  The Servicer and the Special Servicer shall send, in electronic form or otherwise, all financial statements, occupancy information, rent rolls, retail sales information, average daily room rates and similar information received by the Servicer or the Special Servicer, as applicable, from each Borrower to the Rating Agencies and the Directing Certificateholder, upon request, not more frequently than quarterly to the Rating Agencies or Directing Certificateholder, as applicable, at the address specified by such party.

(c)     Notwithstanding anything to the contrary herein, as a condition to the Servicer or Special Servicer making any report or information available upon request to any Person other than the parties hereto, the Servicer and Special Servicer may require that the recipient of such information acknowledge that the Servicer and Special Servicer may contemporaneously provide such information to the Depositor, the Trustee, the Initial Purchasers,  any Rating Agency and/or Certificateholders or Certificate Owners.  Each of the Servicer and the Special Servicer may condition such disclosure upon the recipient entering into a reasonable and customary confidentiality agreement reasonably acceptable to such servicer regarding such disclosure to it.  Any transmittal of information by the Servicer or Special Servicer to any Person other than the Trustee, the Rating Agencies or the Depositor may be accompanied by a letter from the Servicer or Special Servicer containing the following provision:

> **By receiving the information set forth herein, you hereby acknowledge and agree that the United States securities laws restrict any person who possesses material, non-public information regarding the Trust which issued CBA Commercial Assets, Commercial Mortgage Pass-Through Certificates, Series 2006-1 from purchasing or selling such Certificates in circumstances where the other party to the transaction is not also in possession of such information.  You also acknowledge and agree that such information is being provided to you for the purposes of, and such information may be used only in connection with, evaluation by you or another Certificateholder, Certificate Owner or prospective purchaser of such Certificates or beneficial interest therein.**

The Servicer and the Special Servicer may, at its discretion, make available by hard copy, electronic media, internet website or bulletin board service certain information and may make available by hard copy, electronic media, internet website or bulletin board service (in addition to making such information available as provided herein) any reports or information required by this Agreement that the Servicer or the Special Servicer is required to provide to the Trustee.  The Servicer, the Special Servicer and the Trustee shall reasonably cooperate with the

Rating Agencies to provide such information with respect to the Mortgage Loans as reasonably requested by the Rating Agencies in connection with its surveillance activities.

Section 3.28    Servicing Mortgage Accounts.  The Servicer shall administer each Servicing Account in accordance with the related Mortgage or Mortgage Loan Agreement, if any.

Section 3.29    [Reserved].

Section 3.30    Limitations on and Authorizations of the Servicer and Special Servicer with Respect to Certain Mortgage Loans.

(a)    Prior to taking any action with respect to a Specially Serviced Loan secured by any Mortgaged Properties located in a "one-action" state, the Special Servicer shall consult with legal counsel, the fees and expenses of which shall be a Servicing Advance.

(b)    With respect to any Specially Serviced Loan which permits the related Borrower, with the consent or grant of a waiver by the mortgagee, to incur additional indebtedness or to amend or modify the related Borrower's organizational documents, the Special Servicer may consent (subject, without limitation, to Section 3.20(d)) to either such action, or grant a waiver with respect thereto, only if the Special Servicer determines that such consent or grant of waiver is likely to result in a greater recovery on a present value basis, discounted at the related Net Mortgage Rate than the withholding of such consent or grant of waiver; provided, that if the Stated Principal Balance of the related Mortgage Loan is two percent or more of the aggregate Stated Principal Balance at that time, the Special Servicer must have received written notice from the Rating Agencies that such amendment or modification will not result in the downgrade, qualification or withdrawal of any rating then assigned by such Rating Agency to any Class of Certificates.  If the Borrower or the Seller fails to pay for the costs of such confirmation or written notice from the Rating Agencies, the Servicer shall be entitled to make a withdrawal from the Collection Account as a Trust Fund expense (to pay for such costs with respect to any Mortgage Loan).  The Servicer shall not be entitled or required to consent to, or grant a waiver with respect to, either action set forth in this paragraph (b).

(c)    With respect to any Specially Serviced Loan that permits the related Borrower to incur subordinate indebtedness secured by the related Mortgaged Property, the Special Servicer shall enforce the rights of the lender, if any, under the Loan Documents to require such borrower to require the lender of such subordinate indebtedness to enter into a subordination and standstill agreement with the lender.

(d)    The Depositor shall, as to each Mortgage Loan which is secured by the interest of the related Borrower under a ground lease, at its own expense, promptly (and in any event within 45 days of the Closing Date) notify the related ground lessor of the transfer of such Loan to the Trust pursuant to this Agreement and inform such ground lessor that any notices of default under the related ground lease should thereafter be forwarded to the Servicer or Special Servicer, as applicable.

In the event that the Servicer receives notice of any termination of any Environmental Insurance Policy that relates to one or more of the Mortgage Loans, the Servicer

shall, within three Business Days after receipt of such notice, notify the Special Servicer, the Directing Certificateholder, the Rating Agencies, and the Trustee of such termination in writing. Upon receipt of such notice, the Servicer or Special Servicer shall address such termination in accordance with <u>Section 3.07(a)</u> in the same manner as it would the termination of any other Insurance Policy required under the related Loan Documents.

Section 3.31 <u>REMIC Administration.</u>

(a)     The Preliminary Statement to this Agreement sets forth the designations for federal income tax purposes of all interests in each of the REMICs created hereby.  The Closing Date is hereby designated as the "Startup Day" of each REMIC within the meaning of Section 860G(a)(9) of the Code, and the latest possible maturity date for purposes of Treasury Regulation 1.860G-1(a)(4) will be the Latest Possible Maturity Date.  Each REMIC's fiscal year shall be the calendar year.

The Trustee shall:  (a) prepare and file, or cause to be prepared and filed, in a timely manner, a U.S. Real Estate Mortgage Investment Conduit Income Tax Return (Form 1066 or any successor form adopted by the Internal Revenue Service) and prepare and file or cause to be prepared and filed with the Internal Revenue Service and applicable state or local tax authorities income tax or information returns for each taxable year with respect to any such REMIC, containing such information and at the times and in the manner as may be required by the Code or state or local tax laws, regulations, or rules, and furnish or cause to be furnished to Certificateholders the schedules, statements or information at such times and in such manner as may be required thereby; (b) within thirty days of the Closing Date, furnish or cause to be furnished to the Internal Revenue Service, on Forms 8811 or as otherwise may be required by the Code, the name, title, address, and telephone number of the person that the holders of the Certificates may contact for tax information relating thereto, together with such additional information as may be required by such Form, and update such information at the time or time in the manner required by the Code; (c) make or cause to be made elections that such assets be treated as a REMIC on the federal tax return for its first taxable year (and, if necessary, under applicable state law); (d) prepare and forward, or cause to be prepared and forwarded, to the Certificateholders and to the Internal Revenue Service and, if necessary, state tax authorities, all information returns and reports as and when required to be provided to them in accordance with the REMIC Provisions, including without limitation, the calculation of any original issue discount using the Prepayment Assumption; (e) provide information necessary for the computation of tax imposed on the transfer of a Residual Certificate to a Person that is not a Permitted Transferee, or agent (including a broker, nominee or other middleman) of a Non-Permitted Transferee, or a pass-through entity in which a Non-Permitted Transferee is the record holder of an interest (the reasonable cost of computing and furnishing such information may be charged to the Person liable for such tax); (f) to the extent that they are under its control conduct matters relating to such assets at all times that any Certificates are outstanding so as to maintain the status as a REMIC under the REMIC Provisions; (g) not knowingly or intentionally take any action or omit to take any action that would cause the termination of any REMIC status; (h) pay, from the sources specified in the last sentence of this <u>Section 3.31(a)</u>, the amount of any federal or state tax, including prohibited transaction taxes as described below, imposed on any such REMIC prior to its termination when and as the same shall be due and payable (but such obligation shall not prevent the Trustee or any other appropriate Person from contesting any such

tax in appropriate proceedings and shall not prevent the Trustee from withholding payment of such tax, if permitted by law, pending the outcome of such proceedings); (i) ensure that federal, state or local income tax or information returns shall be signed by the Trustee or such other person as may be required to sign such returns by the Code or state or local laws, regulations or rules; (j) maintain records relating to any such REMIC, including but not limited to the income, expenses, assets and liabilities thereof and adjusted basis of the assets determined at such intervals as may be required by the Code, as may be necessary to prepare the foregoing returns, schedules, statements or information; and (k) as and when necessary and appropriate, represent any such REMIC in any administrative or judicial proceedings relating to an examination or audit by any governmental taxing authority, request an administrative adjustment as to any taxable year of any such REMIC, enter into settlement agreements with any governmental taxing agency, extend any statute of limitations relating to any tax item of any such REMIC, and otherwise act on behalf of any such REMIC in relation to any tax matter or controversy involving it.

In addition, the Trustee shall treat the Cap Agreement Reserve Fund as an outside reserve fund within the meaning of Treasury Regulation Section 1.860G-2(h) that is owned by the Holders of the Class X-1 Certificates (other than CBA Commercial LLC or any of its Affiliates to the extent that they hold such Certificates and, therefore, are not entitled to any payments under the Cap Agreement Reserve Fund) and not as an asset of any REMIC.  The Trustee shall treat the rights of the Holders of the Offered Certificates (other than the Holders of the Class X-1 Certificates and CBA Commercial LLC or any of its Affiliates to the extent that they hold Certificates and, therefore, are not entitled to any payments under the Cap Agreement Reserve Fund) to receive payments from the Cap Agreement Reserve Fund as rights in an interest rate cap contract written by the Holders of the Class X-1 Certificates on behalf and for the benefit of such Holders of Offered Certificates.  For information reporting requirements, the rights of the Offered Certificates (other than the Class X-1 Certificates) to receive payments from the Cap Agreement Reserve Fund shall be assumed to have zero or a de minimis value. This provision is intended to satisfy the requirements of Treasury Regulation Section 1.860G-2(i) for the treatment of property rights coupled with REMIC interests to be separately respected and shall be interpreted consistently with such regulation. On each Distribution Date, to the extent that any of the Offered Certificates (other than the Class X-1 Certificates) receive payments from the Cap Agreement Reserve Fund, such amounts will be treated as distributed by the Upper-Tier REMIC to the Class X-1 Certificates pro rata and then paid to the relevant Class of Certificates pursuant to Section 4.03(b).

In addition, prior to taking any action with respect to the Trust Fund or its assets, or causing the Trust Fund to take any action, which is not expressly permitted under the terms of this Agreement, each of the parties hereto will consult with the Trustee or its designee, in writing, with respect to whether such action could cause an Adverse REMIC Event to occur with respect to any REMIC created hereunder, and such party shall not take any such action, or cause any REMIC created hereunder to take any such action, as to which the Trustee has advised it in writing that an Adverse REMIC Event could occur.  The Trustee may consult with counsel to make such written advice, and the cost of same shall be borne by the party seeking to take the action not expressly permitted by this Agreement.  At all times as may be required by the Code, the Trustee will to the extent within its control and the scope of its duties as specifically set forth herein, maintain substantially all of the assets of the Trust Fund as "qualified mortgages" as

defined in Section 860G(a)(3) of the Code and "permitted investments" as defined in Section 860G(a)(5) of the Code.

(b)     The expenses of complying with <u>Section 3.31(a)</u> shall be borne by the Trustee without any right of reimbursement therefor.

(c)     Notwithstanding the priority and sources of payments set forth in Article VI or otherwise, the Trustee shall account for all distributions on the Certificates as set forth in this section. In no event shall any payments provided for in this section be treated as payments with respect to a "regular interest" in a REMIC within the meaning of Code Section 860G(a)(1).

(d)     The Trustee shall take such actions and shall cause the Trust Fund to take such actions as are reasonably within the Trustee's control and the scope of its duties more specifically set forth herein as shall be necessary to maintain the status of each REMIC created hereunder as a REMIC under the REMIC Provisions (and the Servicer and Special Servicer shall assist the Trustee, to the extent reasonably requested by the Trustee to do so).  None of the Servicer, the Special Servicer, the Depositor, or the Trustee shall knowingly or intentionally take any action, cause the Trust Fund to take any action or fail to take (or fail to cause to be taken) any action reasonably within its control and the scope of duties more specifically set forth herein, that, under the REMIC Provisions, if taken or not taken, as the case may be, could (i) cause any REMIC created hereunder to fail to qualify as a REMIC or (ii) result in the imposition of a tax under the REMIC Provisions upon any REMIC created hereunder (including but not limited to the tax on prohibited transactions as defined in Section 860F(a)(2) of the Code and the tax on contributions to a REMIC set forth in Section 860G(d) of the Code) (either such event, an "Adverse REMIC Event") unless such party receives an Opinion of Counsel (at the expense of the party seeking to take such action or, if such party fails to pay such expense, and such party determines that taking such action is in the best interest of the Trust Fund and the Certificateholders, at the expense of the Trust Fund, but in no event at the expense of such party) to the effect that the contemplated action will not, with respect to any REMIC created hereunder, cause such REMIC to fail to qualify as a REMIC or, unless such party (which is acceptable to the Trustee) determines that the monetary expense to any REMIC created hereunder is not material and in its sole discretion to indemnify (to the extent reasonably acceptable to the Trustee) the Trust Fund against such tax, result in the imposition of such a tax.  Wherever in this Agreement a contemplated action may not be taken because the taking of such action might result in the imposition of a tax on the Trust Fund, or may be taken only pursuant to an Opinion of Counsel that such action would not impose a tax on the Trust Fund, such action may nonetheless be taken so long as (x) the indemnity given in the preceding sentence with respect to any taxes that might be imposed on the Trust Fund has been given and (y) all other preconditions to the taking of such action have been satisfied.  The Trustee shall not take any action (whether or not authorized hereunder) as to which the Servicer has advised it in writing that it has received an Opinion of Counsel to the effect that an Adverse REMIC Event could occur with respect to such action.

(e)     In the event that any tax is imposed on "prohibited transactions" of  any REMIC created hereunder as defined in Section 860F(a)(2) of the Code, on "net income from foreclosure property" of any REMIC created hereunder as defined in Section 860G(c) of the Code, or any other tax is imposed by the Code or any applicable provisions of state or local tax laws, such tax shall be charged (i) to the Servicer, if such tax arises out of or results from a

breach, which breach constitutes negligence or willful misconduct of the Servicer, by the Servicer of any of its obligations under this Agreement and such breach is not caused by the breach of another party, (ii) to the Trustee, if such tax arises out of or results from a breach, which breach constitutes negligence or willful misconduct of the Trustee, by the Trustee of any of its obligations under this Agreement and such breach is not caused by the breach of another party, (iii) to the Special Servicer, if such tax arises out of or results from a breach, which breach constitutes negligence or willful misconduct of the Special Servicer, by the Special Servicer of any of its obligations under this Agreement and such breach is not caused by the breach of another party and (iv) otherwise, against amounts on deposit in the Collection Account, and on the Distribution Date(s) following such reimbursement the aggregate of such taxes shall be allocated in reduction of the Interest Remittance Amount.

(f)     None of the Servicer, the Special Servicer, the Depositor, or the Trustee shall accept any contributions of assets to any REMIC created hereunder unless the Servicer, the Special Servicer, the Depositor, and the Trustee shall have received an Opinion of Counsel (at the expense of the party seeking to make such contribution) to the effect that the inclusion of such assets in a REMIC will not cause that REMIC to fail to qualify as a REMIC at any time that any Certificates are outstanding or subject any REMIC created hereunder to any tax under the REMIC Provisions or other applicable provisions of federal, state and local law or ordinances.

(g)     None of the Servicer, the Special Servicer, the Depositor, or the Trustee shall enter into any arrangement by which any REMIC created hereunder will receive a fee or other compensation for services nor, to the extent reasonably within their control, permit any REMIC hereunder to receive an income from assets other than "qualified mortgages" as defined in Section 860G(a)(3) of the Code or "permitted investments" as defined in Section 860G(a)(5) of the Code.

(h)     Within 30 days after the Closing Date, the Trustee shall prepare and file with the Internal Revenue Service Form 8811, "Information Return for Real Estate Mortgage Investment Conduits (REMIC) and Issuers of Collateralized Debt Obligations" (or applicable successor form) for any REMIC created hereunder.

(i)     None of the Trustee, the Servicer, the Depositor, or the Special Servicer shall sell or dispose of or substitute for any of the Mortgage Loans (except as expressly provided hereunder, including in connection with (i) the default, imminent default or foreclosure of a Mortgage Loan, including but not limited to, the acquisition or sale of a Mortgaged Property acquired by deed in lieu of foreclosure, (ii) the bankruptcy of the Trust Fund, (iii) the termination of the Trust Fund pursuant to Article X of this Agreement or (iv) a purchase of Loans pursuant to Article II, Section 3.18 or Section 9.01 of this Agreement) nor acquire any assets for the Trust Fund or any REMIC created hereunder, nor sell or dispose of any investments in the Collection Account for gain, nor accept any contributions to any REMIC created hereunder after the Closing Date, unless it has received an Opinion of Counsel (at the expense of the Person seeking such sale or acquisition) that such sale or disposition will not affect adversely the status of any REMIC created hereunder as a REMIC or cause any REMIC created hereunder to be subject to a tax on "prohibited transactions" or "contributions" pursuant to the REMIC Provisions.  For tax reporting purposes, the Cap Agreements will be valued at zero.

(j)      The Depositor shall provide or cause to be provided to the Trustee, within ten (10) days after the Closing Date, and thereafter on an ongoing basis, all information or data requested by the Trustee that the Trustee reasonably determines to be relevant for tax purposes as to the valuations and Issue Prices of the Certificates, including without limitation, the price, yield, original issue discount, issue premium and projected cash flow of the Certificates.   In addition, the Servicer, the Special Servicer and the Depositor shall provide on a timely basis to the Trustee or its designee such information with respect to the Trust Fund as is in its possession and reasonably requested by the Trustee to enable it to perform its obligations under this Article. The Trustee shall be entitled to rely conclusively upon all such information so provided to it without recalculation or other investigation.

(k)      The Trustee shall be entitled to reasonable compensation and to the reimbursement of its reasonable expenses incurred in the performance of its duties under this Section 3.31 as may be agreed upon by the Trustee and the Depositor; provided, however, that the Trustee shall pay out of its own funds, without any right of reimbursement, any and all ordinary expenses of the Trust Fund incurred in the performance of its duties under this Article but shall be reimbursed, except as otherwise expressly provided for herein, by the Trust Fund for any of its extraordinary expenses, including any taxes or tax-related payments, any expenses involved in any tax examination, audit or proceeding, and the expense of any tax-related Opinion of Counsel or other professional advice requested by the Trustee for the benefit or protection of the Certificateholders.

Section 3.32      Servicer and Special Servicer May Own Certificates.

(a)      The Servicer and any agent of the Servicer in its individual or any other capacity may become the owner or pledgee of Certificates with the same rights it would have if it were not the Servicer or such agent, except with respect to Voting Rights, as set forth in the definition of "Certificateholder."

(b)      The Special Servicer and any agent of the Special Servicer in its individual or any other capacity may become the owner or pledgee of Certificates with the same rights it would have if it were not the Special Servicer or such agent, except with respect to Voting Rights, as set forth in the definition of "Certificateholder."

## ARTICLE IV

## PAYMENTS TO CERTIFICATEHOLDERS

Section 4.01      Distributions.

(a)      On each Distribution Date, the Trustee shall retain in the Certificate Distribution Account, and shall distribute, the Total Distribution Amount to Holders of the Certificates, in the amounts and priorities specified in this Section and shall allocate such amount to the Interests issued in respect of the Upper-Tier REMIC and the REMIC 1 as set forth in the Preliminary Statement to this Agreement.

(b)      On each Distribution Date, the Trustee shall distribute the Interest Remittance Amount for such date in the following order of priority:

(i)        concurrently to the Class X-1 and Class A Certificates, pro rata, Current Interest and any Carryforward Interest for such Classes and such Distribution Date; *provided, however*, that any amount otherwise distributable with respect to the Class X-1 Certificates based on the Class X-1 Pass-Through Rate, will be reduced to the extent necessary to pay any Net WAC Rate Carryover Amounts pursuant to paragraph (ii) and (xi) below;

(ii)       to the Cap Agreement Reserve Fund, for distribution to the Class A Certificates as set forth in Section 4.03(b), an amount equal to the aggregate related Net WAC Rate Carryover Amount (after giving effect to payments received on such Distribution Date from the Cap Agreement), up to the amount otherwise distributable with respect to the Class X-1 Certificates pursuant to paragraph (i) above;

(iii)      to the Class M-1 Certificates, Current Interest and any Carryforward Interest for such Class and such Distribution Date;

(iv)      to the Class M-2 Certificates, Current Interest and any Carryforward Interest for such Class and such Distribution Date;

(v)       to the Class M-3 Certificates, Current Interest and any Carryforward Interest for such Class and such Distribution Date;

(vi)      to the Class M-4 Certificates, Current Interest and any Carryforward Interest for such Class and such Distribution Date;

(vii)     to the Class M-5 Certificates, Current Interest and any Carryforward Interest for such Class and such Distribution Date;

(viii)    to the Class M-6 Certificates, Current Interest and any Carryforward Interest for such Class and such Distribution Date;

(ix)      to the Class M-7 Certificates, Current Interest and any Carryforward Interest for such Class and such Distribution Date;

(x)       to the Class M-8 Certificates, Current Interest and any Carryforward Interest for such Class and such Distribution Date; and

(xi)      to the Cap Agreement Reserve Fund, for distribution to the Subordinate Certificates as set forth in Section 4.03(b), an amount equal to the aggregate related Net WAC Rate Carryover Amount (after giving effect to payments received on such Distribution Date from the Cap Agreements in the case of the Class M-1 and Class M-2 Certificates), up to the amount otherwise distributable with respect to the Class X-1 Certificates pursuant to paragraph (i) above.

(c)       On each Distribution Date, the Trustee shall distribute the Principal Distribution Amount for such date in the following order of priority:

(i)      to the Class A Certificates, in reduction of their Certificate Balance, until the Certificate Balance of such class has been reduced to zero;

(ii)     to the Class M-1 Certificates, in reduction of their Certificate Balance, until the Certificate Balance of such class has been reduced to zero;

(iii)    to the Class M-2 Certificates, in reduction of their Certificate Balance, until the Certificate Balance of such class has been reduced to zero;

(iv)     to the Class M-3 Certificates, in reduction of their Certificate Balance, until the Certificate Balance of such class has been reduced to zero;

(v)      to the Class M-4 Certificates, in reduction of their Certificate Balance, until the Certificate Balance of such class has been reduced to zero;

(vi)     to the Class M-5 Certificates, in reduction of their Certificate Balance, until the Certificate Balance of such class has been reduced to zero;

(vii)    to the Class M-6 Certificates, in reduction of their Certificate Balance, until the Certificate Balance of such class has been reduced to zero;

(viii)   to the Class M-7 Certificates, in reduction of their Certificate Balance, until the Certificate Balance of such class has been reduced to zero; and

(ix)     to the Class M-8 Certificates, in reduction of their Certificate Balance, until the Certificate Balance of such class has been reduced to zero.

(d)      On each Distribution Date, the Trustee shall distribute all Prepayment Premiums received by the Servicer with respect to the Mortgage Loans so identified on the Mortgage Loan Schedule during the related Collection Period to the Class X-1 Certificates.

(e)      On each Distribution Date, to the extent the Servicer or Special Servicer shall have collected any amount in respect of a Mortgage Loan relating to a Realized Loss previously calculated for such Mortgage Loan ("Subsequent Recoveries") during the related Collection Period and have not withdrawn the amounts under Section 3.05, the Trustee shall distribute such amount to the Certificateholders as follows:

*first*, sequentially, in order of priority, to each Class of Certificates (other than the Class X-1 Certificates) then outstanding, in reduction of any amounts previously applied to such Class to reduce the Certificate Balance thereof pursuant to Section 4.04 (provided, however, that any such amounts distributed pursuant to this clause *first* to a Class of Certificates shall not reduce the Class Certificate Balance thereof); and

*second*, as part of the related Interest Remittance Amount and related Principal Distribution Amount for such Distribution Date for application pursuant to Section 4.01(b) and (c).

(f)     Upon termination of the Trust Fund, the Trustee shall distribute to each Class of Certificates the related Purchase Price therefor, as set forth in the Section 9.01.

Section 4.02   Disbursement of Funds.

All distributions shall be made pursuant to Section 4.05 by wire transfer of immediately available funds to the account of the Person entitled thereto at a bank or other entity having appropriate facilities therefor if such Person shall have so notified the Trustee in writing at least five Business Days prior to the Record Date immediately prior to such Distribution Date; or by check mailed to each such Certificateholder at such Holder's address appearing in the Certificate Register.

Section 4.03   Cap Agreement Reserve Fund.

(a)     The Trustee shall establish and maintain the Cap Agreement Reserve Fund.  The Trustee is hereby directed to enter into the Cap Agreements on behalf, and for the benefit, of Holders of the Offered Certificates (other than the Holders of the Class X-1 Certificates).  The Cap Agreement Reserve Fund shall at all times be an Eligible Account.  On each Distribution Date, the Trustee shall deposit in the Cap Agreement Reserve Fund all amounts received on the Cap Agreements or amounts received that were otherwise distributable on the Class X-1 Certificates as interest since the preceding Distribution Date but to be paid to the Cap Agreement Reserve Fund as set forth in Section 4.01(b)(ii) and Section 4.01(b)(xi).  Amounts on deposit in the Cap Agreement Reserve Fund may be invested by the Trustee in Permitted Investments for the Trustee's benefit or remain uninvested.  The Trustee or its Affiliates are permitted to receive additional compensation that could be deemed to be in the Trustee's economic self-interest for (i) serving as investment adviser, administrator, shareholder, servicing agent, custodian or sub-custodian with respect to certain of the Permitted Investments, (ii) using Affiliates to effect transactions in certain Permitted Investments and (iii) effecting transactions in certain Permitted Investments.  Such compensation is not payable or reimbursable under this Agreement.

(b)     (i) On each Distribution Date (before giving effect to the distributions pursuant to Section 4.01) for which any Net WAC Rate Carryover Amount exists with respect to the Class A Certificates, the Trustee will pay such amount, *first* from amounts on deposit in the Cap Agreement Reserve Fund in respect of the Cap Agreement related to the Class A Certificates, *second,* from amounts which would otherwise have been distributable to the Class X-1 Certificates and are on deposit in the Cap Agreement Reserve Fund pursuant to Section 4.01(b)(ii), *third* from amounts which would otherwise have been distributable to the Class M-1 Certificates and are on deposit in the Cap Agreement Reserve Fund in respect of the Cap Agreement related to the Class M-1 Certificates to the extent not previously distributed to the Class M-1 Certificates pursuant to Section 4.03(b)(ii) and *fourth* from amounts which would otherwise have been distributable to the Class M-2 Certificates and are on deposit in the Cap Agreement Reserve Fund in respect of the Cap Agreement related to the Class M-2 Certificates to the extent not previously distributed to the Class M-2 Certificates pursuant to Section 4.03(b)(iii).

(ii) On each Distribution Date for which any Net WAC Rate Carryover Amount exists with respect to the Class M-1 Certificates, the Trustee will pay such amount, *first* from amounts on deposit in the Cap Agreement Reserve Fund in respect of the Cap Agreement related to the Class M-1 Certificates, *second,* to the extent not previously distributed to the Class A Certificates in respect of any Net WAC Rate Carryover Amount, from amounts otherwise distributable to the Class X-1 Certificates and are on deposit in the Cap Agreement Reserve Fund pursuant to Section 4.01(b)(xi), *third* from amounts which would otherwise have been distributable to the Class A Certificates and are on deposit in the Cap Agreement Reserve Fund in respect of the Cap Agreement related to the Class A Certificates to the extent not previously distributed to the Class A Certificates pursuant to Section 4.03(b)(i) and *fourth* from amounts which would otherwise have been distributable to the Class M-2 Certificates and are on deposit in the Cap Agreement Reserve Fund in respect of the Cap Agreement related to the Class M-2 Certificates to the extent not previously distributed to the Class A Certificates pursuant to Section 4.03(b)(i) or the Class M-2 Certificates pursuant to Section 4.03(b)(iii).

(iii) On each Distribution Date for which any Net WAC Rate Carryover Amount exists with respect to the Class M-2 Certificates, the Trustee will pay such amount, *first* from amounts on deposit in the Cap Agreement Reserve Fund in respect of the Cap Agreement related to the Class M-2 Certificates, *second,* to the extent not previously distributed to the Class A and Class M-1 Certificates in respect of any Net WAC Rate Carryover Amount, from amounts otherwise distributable to the Class X-1 Certificates and are on deposit in the Cap Agreement Reserve Fund pursuant to Section 4.01(b)(xi), *third* from amounts which would otherwise have been distributable to the Class A Certificates and are on deposit in the Cap Agreement Reserve Fund in respect of the Cap Agreement related to the Class A Certificates to the extent not previously distributed to the Class A Certificates pursuant to Section 4.03(b)(i) or to the Class M-1 Certificates pursuant to Section 4.03(b)(ii) and *fourth* from amounts which would otherwise have been distributable to the Class M-1 Certificates and are on deposit in the Cap Agreement Reserve Fund in respect of the Cap Agreement related to the Class M-1 Certificates to the extent not previously distributed to the Class A Certificates pursuant to Section 4.03(b)(i) or the Class M-1 Certificates pursuant to Section 4.03(b)(ii).

(iv) On each Distribution Date for which any Net WAC Rate Carryover Amount exists with respect to the Fixed Certificates, the Trustee will pay such amount, to the extent not previously distributed to the LIBOR Certificates in respect of any Net WAC Rate Carryover Amount, from amounts which would otherwise have been distributable to the Class X-1 Certificates and are on deposit in the Cap Agreement Reserve Fund pursuant to Section 4.01(b)(xi) in the following order of priority:

(i)     to the Class M-3 Certificates, any Net WAC Rate Carryover Amount for such Class;

(ii)    to the Class M-4 Certificates, any Net WAC Rate Carryover Amount for such Class;

(iii)   to the Class M-5 Certificates, any Net WAC Rate Carryover Amount for such Class;

(iv)    to the Class M-6 Certificates, any Net WAC Rate Carryover Amount for such Class;

(v)     to the Class M-7 Certificates, any Net WAC Rate Carryover Amount for such Class; and

(vi)    to the Class M-8 Certificates, any Net WAC Rate Carryover Amount for such Class.

The Depositor will notify the Cap Provider under the Cap Agreements and the Trustee at least six Business Days prior to each Distribution Date of the aggregate Certificate Balance of any Certificates (other than the Class X-1 Certificates) owned by CBA Commercial, LLC on the Record Date prior to the such Distribution Date.

Notwithstanding the foregoing, no Certificate held by CBA Commercial, LLC or any of its Affiliates on the Record Date shall be entitled to any payments made pursuant to the Cap Agreements on the related Distribution Date.

The Cap Agreement Reserve Fund shall not be an asset of any REMIC created pursuant to this Agreement. Instead, the Cap Agreement Reserve Fund shall be treated as an "outside reserve fund" under Treasury Regulation Section 1.860G-2(h). In addition, in accordance with Treasury Regulation Section 1.860G-2(h)(i), the Trustee shall account for the contractual rights under the Cap Agreements as property that the Trustee holds separate and apart from the regular interests held by the Holders of the Offered Certificates. For federal, state and local income tax purposes, the Holders of the Class X-1 Certificates (other than CBA Commercial LLC or any of its Affiliates to the extent that they hold such Certificates and, therefore are not (as described above) entitled to any payments made pursuant to the Cap Agreements) shall be the beneficial owners of the Cap Agreement Reserve Fund, and for all federal tax purposes any amounts transferred by any REMIC created hereunder to the Cap Agreement Reserve Fund shall be treated as amounts distributed to such Holders.

Section 4.04    Allocation of Losses.

(a)    On each Distribution Date, the Trustee (after giving effect to all distributions made on such Distribution Date) shall allocate any Applied Loss Amount for such Distribution Date to reduce the Certificate Balance of the Certificates (other than the Class X-1 Certificates) in the following order of priority:

(i)     in reduction of the Certificate Balance of the Class M-8 Certificates, until the Certificate Balance thereof has been reduced to zero;

(ii)    in reduction of the Certificate Balance of the Class M-7 Certificates, until the Certificate Balance thereof has been reduced to zero;

(iii)   in reduction of the Certificate Balance of the Class M-6 Certificates, until the Certificate Balance thereof has been reduced to zero;

(iv)    in reduction of the Certificate Balance of the Class M-5 Certificates, until the Certificate Balance thereof has been reduced to zero;

(v)    in reduction of the Certificate Balance of the Class M-4 Certificates, until the Certificate Balance thereof has been reduced to zero;

(vi)    in reduction of the Certificate Balance of the Class M-3 Certificates, until the Certificate Balance thereof has been reduced to zero;

(vii)    in reduction of the Certificate Balance of the Class M-2 Certificates, until the Certificate Balance thereof has been reduced to zero;

(viii)    in reduction of the Certificate Balance of the Class M-1 Certificates, until the Certificate Balance thereof has been reduced to zero; and

(ix)    in reduction of the Certificate Balance of the Class A Certificates, until the Certificate Balance thereof has been reduced to zero.

(b)    Any Applied Loss Amount so allocated to a Class of Certificates shall be allocated among the Certificates of such Class in proportion to their respective principal balances. Any allocation of an Applied Loss Amount pursuant to this Section shall be accomplished by reducing the Certificate Balance of the applicable Class and the principal balance of each related Certificate on the applicable Distribution Date.

Section 4.05    Method of Distribution.

(a)    All distributions made with respect to each Class on each Distribution Date shall be allocated pro rata among the outstanding Certificates in such Class based on their respective Percentage Interests.  Except as otherwise specifically provided in Sections 4.02, 4.05(b), and 9.01, all such distributions with respect to each Class on each Distribution Date shall be made to the Certificateholders of record of the respective Class at the close of business on the related Record Date and shall be made by wire transfer of immediately available funds to the account of any such Certificateholder at a bank or other entity having appropriate facilities therefor, if such Certificateholder shall have provided the Trustee with written wiring instructions no less than five Business Days prior to the related Record Date (which wiring instructions may be in the form of a standing order applicable to all subsequent Distribution Dates) or by check mailed to the address of such Certificateholder as it appears in the Certificate Register.  The final distribution on each Certificate (determined without regard to any possible future disbursement of Subsequent Recoveries allocable to such Certificate) shall be made in like manner, but only upon presentation and surrender of such Certificate at the offices of the Trustee or such other location specified in the notice to Certificateholders of such final distribution.

Each distribution with respect to a Book-Entry Certificate shall be paid to the Depository, as Holder thereof, and the Depository shall be responsible for crediting the amount of such distribution to the accounts of its Depository Participants in accordance with its normal procedures.  Each Depository Participant shall be responsible for disbursing such distribution to the Certificate Owners that it represents and to each indirect participating brokerage firm (a "brokerage firm" or "indirect participating firm") for which it acts as agent.  Each brokerage firm

shall be responsible for disbursing funds to the Certificate Owners that it represents.  None of the Trustee, the Depositor, the Servicer, the Special Servicer, or the Initial Purchasers shall have any responsibility therefor except as otherwise provided by this Agreement or applicable law.

(b)      Except as otherwise provided in <u>Section 9.01</u>, whenever the Trustee expects that the final distribution with respect to any Class of Certificates (determined without regard to any possible future disbursement of Subsequent Recoveries allocable to such Class of Certificates) will be made on the next Distribution Date, the Trustee shall, no later than the related P&I Advance Determination Date, send a notice to the Certificateholders to the effect that no interest shall accrue on such Certificates from and after such Distribution Date.

Any funds not distributed to any Holder or Holders of Definitive Certificates of any Class on such Distribution Date because of the failure of such Holder or Holders to tender their Certificates shall, on such date, be set aside and held uninvested in trust and credited to the account or accounts of the appropriate non-tendering Holder or Holders.  If any Definitive Certificates as to which notice has been given pursuant to <u>Section 4.05(b)</u> shall not have been surrendered for cancellation within six months after the time specified in such notice, the Trustee shall mail a second notice to the remaining non-tendering Definitive Certificateholders to surrender their Certificates for cancellation in order to receive the final distribution with respect thereto.  If within one year after the second notice all such Definitive Certificates shall not have been surrendered for cancellation, the Trustee, directly or through an agent, shall take such steps to contact the remaining non-tendering Definitive Certificateholders concerning the surrender of their Certificates as it shall deem appropriate.  Subject to applicable escheatment laws, after two years all such Definitive Certificates that have not been surrendered, such terms shall be sent to the Depositor and the Holders shall thereafter look only to the Depositor for payment.  The costs and expenses of holding such funds in trust and of contacting such Definitive Certificateholders following the first anniversary of the delivery of such second notice to the non-tendering Certificateholders shall be paid out of such funds.  No interest shall accrue or be payable to any Definitive Certificateholder on any amount held in trust hereunder by the Trustee as a result of such Definitive Certificateholder's failure to surrender its Certificate(s) for final payment thereof in accordance with <u>Section 4.05(b)</u>.

Section 4.06    <u>Statements to Certificateholders; Reports by Trustee; Other Information Available to the Holders and Others.</u>

(a)      On each Distribution Date, based solely the information regarding the Mortgage Loans set forth in the CMSA Loan Periodic Update File prepared by the Servicer, the Trustee shall prepare and make available, and, upon request, forward, to any Privileged Person, a written report (a "<u>Statement to Certificateholders</u>") setting forth the following information:

(i)      the aggregate amount of the distribution to be made on such Distribution Date to the Holders of each Class of Certificates applied to reduce the respective Certificate Balance thereof;

(ii)     the aggregate amount of the distribution to be made on such Distribution Date to the Holders of each Class of Certificates;

(iii)     separately stated, the aggregate amounts of Applied Loss Amounts and indemnification expenses of the Trust Fund allocable to the Holders of each Class of Certificates on such Distribution Date;

(iv)     the aggregate Certificate Balance or aggregate Class Notional Balance, as the case may be, of each Class of Certificates, before and after giving effect to the distributions made on such Distribution Date, separately identifying any reduction in the aggregate Certificate Balance (or, in the case of the Class X-1 Certificates, the aggregate Class Notional Balance) of each such Class due to any Applied Loss Amount;

(v)     the Pass-Through Rate for each Class of Certificates applicable to such Distribution Date;

(vi)     the number of outstanding Mortgage Loans and the aggregate unpaid principal balance of the Loans at the end of the preceding Collection Period;

(vii)     the number and aggregate unpaid principal balance and the percentage of the aggregate unpaid principal balance of Mortgage Loans (A) delinquent 30 to 59 days, (B) delinquent 60 to 89 days, (C) delinquent 90 days or more, (D) that are Specially Serviced Loans and not delinquent, (E) as to which foreclosure proceedings have been commenced or (F) with respect to which the related Borrowers are in bankruptcy;

(viii)     with respect to any REO Loan as to which the related Mortgaged Property became an REO Property during the preceding Collection Period, the loan number, the city, state, property type, latest Debt Service Coverage Ratio, Stated Principal Balance, the date on which it became an REO Property and the unpaid principal balance of such Loan, including the amount of unreimbursed Advances for that period and in the aggregate;

(ix)     as to any Mortgage Loan repurchased by a Seller or otherwise liquidated or disposed of during the related Collection Period, the Loan Number of the related Mortgage Loan, the Stated Principal Balance, the amount of any Realized Losses, the borrower name, the unpaid principal balance and the amount of proceeds of any repurchase of a Mortgage Loan, Liquidation Proceeds and/or other amounts, if any, received thereon during the related Collection Period and the portion thereof included in the related Total Distribution Amount for such Distribution Date;

(x)     with respect to any REO Property included in the Trust Fund at the close of business on the related Collection Period (A) the loan number of the related Mortgage Loan, (B) the value of such REO Property based on the most recent Appraisal or valuation, (C) the Stated Principal Balance and (D) the unpaid principal balance;

(xi)     with respect to any REO Property sold or otherwise disposed of during the related Collection Period and for which a Final Recovery Determination has been made, (A) the loan number of the related Mortgage Loan, (B) the amount of sale proceeds and other amounts, if any, received in respect of such REO Property during the related Collection Period and the portion thereof included in the related Total Distribution Amount for such Distribution Date, (C) the date of the Final Recovery Determination, (D) the amount of any Liquidation Expenses, (E) the Stated Principal Balance, (F) the unpaid principal balance and (G) the amount of any Applied Loss Amount;

(xii)    the amount of Principal Prepayments (in the aggregate and broken out on a loan-by-loan basis) made during the related Collection Period, the amount of any Prepayment Premiums (in the aggregate and broken out or a loan-by-loan basis) paid during the related Collection Period and the aggregate amount of any Prepayment Interest Shortfalls not covered by the Servicer for such Distribution Date;

(xiii)   the amount of Servicing Advances and P&I Advances outstanding (net of reimbursed Advances) which have been made by the Servicer or the Trustee in the aggregate and by Mortgaged Property or Mortgage Loan, as the case may be;

(xiv)    the aggregate amount of Servicing Fees retained by or paid to the Servicer and Special Servicing Fees retained by or paid to the Special Servicer during the related Collection Period;

(xv)     amounts paid under the Cap Agreements, if any, for such Distribution Date;

(xvi)    the Applied Loss Amount, if any for such Distribution Date;

(xvii)   Trust Fund expenses incurred during the related Collection Period; and

(xviii)  original and current ratings of the Rating Agencies on all applicable Classes of Certificates.

In the case of information furnished pursuant to subclauses (i), (ii) and (iv) above, the amounts shall be expressed as a dollar amount in the aggregate for all Certificates of each applicable Class and per $1,000 of original Certificate Balance or Class Notional Balance, as the case may be.

On each Distribution Date, the Trustee shall make available, and, upon written request, forward to each Holder of a Class R Certificate a copy of the reports forwarded to the other Certificateholders on such Distribution Date and a statement setting forth the amounts, if any, actually distributed with respect to the Class R Certificates on such Distribution Date. Such obligation of the Trustee shall be deemed to have been satisfied to the extent that it provided substantially comparable information pursuant to any requirements of the Code as from time to

time in force.

Within a reasonable period of time after the end of each calendar year, the Trustee shall make available, and, upon written request, send to each Person who at any time during the calendar year was a Certificateholder of record, a report summarizing on an annual basis (if appropriate) the items provided to Certificateholders pursuant to this Section 4.06(a) and such other information as may be required to enable such Certificateholders to prepare their federal income tax returns. Such information shall include the amount of original issue discount accrued on each Class of Certificates held by Persons other than Holders exempted from the reporting requirements and information regarding the expenses of the Trust. Such requirement shall be deemed to be satisfied to the extent such information is provided pursuant to applicable requirements of the Code from time to time in force.

On or prior to each Distribution Date, the Trustee shall make available to Privileged Persons via its Website (i) the related Statement to Certificateholder, (ii) the CMSA Loan Periodic Update File, CMSA Loan Set-Up File, CMSA Bond Level File and CMSA Collateral Summary File, the CMSA Delinquent Loan Status Report, the CMSA Historical Loan Modification Report, the CMSA Historical Liquidation Report, the CMSA Property File, and the CMSA REO Status Report.

The Trustee shall not be liable for the dissemination of information in accordance with this Section 4.06(a).  The Trustee makes no representations or warranties as to the accuracy or completeness of any report, document, questions, answer, special event, or other information made available on the Website and assumes no responsibility therefor.  In addition, the Trustee may disclaim responsibility for any information distributed by the Trustee for which it is not the original source.

In connection with providing access to the respective Website, the Trustee or the Servicer, as applicable, may require registration and the acceptance of a disclaimer.

(b)     The Trustee shall make available at its offices, during normal business hours, upon reasonable written notice, for review by any Certificateholder, any prospective investor in a Certificate, the Depositor, the Servicer, the Special Servicer, any Rating Agency and any other Person to whom the Depositor believes such disclosure is appropriate, originals or copies of documents relating to the Loans and any related REO Properties to the extent in its possession, including, without limitation, the following items (except to the extent prohibited by applicable law or by the terms of any of the Mortgage Documents): (i) this Agreement and any amendments thereto; (ii) all Statements to Certificateholders delivered to the Certificateholders since the Closing Date; (iii) all annual Officers' Certificates and all accountants' reports delivered by the Servicer or Special Servicer to the Trustee since the Closing Date regarding compliance with the relevant agreements; (iv)  any and all Officers' Certificates and other evidence delivered to or by the Trustee to support the Servicer's or the Trustee's, as the case may be, determination that any Advance, if made, would be a Nonrecoverable Advance; and (v) any other materials not otherwise required to be provided to a requesting Certificateholder pursuant to this Agreement, in situations where such requesting Certificateholder declined to enter into a confidentiality agreement with the Servicer. The Trustee shall make available at its offices, during normal business hours, upon not less than ten Business Days' prior written notice, for

review by any Certificateholder, any prospective investor in a Certificate, the Depositor, the Trustee, the Servicer, the Special Servicer, any Rating Agency and any other Person to whom the Depositor believes such disclosure is appropriate, originals or copies of any and all modifications, waivers and amendments of the terms of a Loan entered into by the Servicer and/or the Special Servicer and delivered to the Trustee. The Servicer shall cooperate with the Trustee to make any of the above-mentioned items available to any Certificateholder upon its request and payment by it of reasonable costs. Copies of any and all of the foregoing items will be available from the Trustee upon written request therefor. The Trustee will be permitted to require payment by the requesting party (other than a Rating Agency, in which case costs and expenses shall be payable by the Trust) of a sum sufficient to cover the reasonable costs and expenses of providing any copies thereof. The Trustee's obligation under this Section 4.06(c) to make available any document is subject to the Trustee's receipt of such document.

(c)     Notwithstanding the foregoing provisions of this Article 4.06, the Trustee shall not be required to provide the full reporting provided for in Sections 4.06(b) and (c) unless and until the Servicer provides its related reporting to the Trustee in either CMSA or other format acceptable to the Rating Agencies and the Trustee.

(d)     The Servicer and the Special Servicer shall not be required to conduct research or obtain information that is not available to the Servicer or the Special Servicer, respectively, in the ordinary course of its servicing activities hereunder. In addition, the Servicer and the Special Servicer shall not be required to (i) answer commercially unreasonable questions, (ii) answer questions relating to matters that extend beyond the scope of its duties as Servicer or Special Servicer, respectively, (iii) answer questions that would, in the Servicer's or the Special Servicer's sole discretion, require the Servicer or the Special Servicer to devote an unreasonable amount of time or resources to answer, (iv) disclose information that would violate the terms of this Agreement, any of the Loan Documents or applicable law, rule or regulation or initiate contact with Borrowers or third parties except in connection with the ordinary course of its servicing duties hereunder or (v) express opinions or make recommendations under this Section 4.06(e) (it being understood that the Servicer and the Special Servicer may limit their responses to factual matters). The provision of information hereunder by the Servicer and the Special Servicer shall be subject to Section 3.27.

Section 4.07   P&I Advances.

(a)     On each P&I Advance Date, the Servicer (i) shall deliver to the Trustee for deposit into the Certificate Distribution Account from its own funds an amount equal to the aggregate amount of P&I Advances, if any, to be made in respect of the related Distribution Date, (ii) shall apply amounts held in the Collection Account that are not required to be part of the Total Distribution Amount for such Distribution Date to the aggregate amount of P&I Advances, if any, or (iii) shall make P&I Advances in the form of any combination of (i) and (ii) aggregating the aggregate amount of P&I Advances to be made. Any amounts held in the Collection Account not required to be a part of the Total Distribution Amount for such Distribution Date and so used to make P&I Advances shall be appropriately reflected in the Servicer's records and replaced by the Servicer by deposit in the Collection Account on or before the next succeeding P&I Advance Determination Date (to the extent not previously replaced through the deposit of collections of the delinquent principal and/or interest in respect of which

such P&I Advances were made).  If, as of 5:00 p.m., New York City time, on any Servicer Remittance Date, the Trustee shall not have received any P&I Advance required to be made by the Servicer pursuant to this Section 4.07(a) (and the Servicer shall not have delivered to the Trustee the requisite Officer's Certificate and documentation related to a determination of nonrecoverability of a P&I Advance), then the Trustee shall provide notice of such failure to a Servicing Officer of the Servicer by facsimile transmission sent to telecopy no. 215-328-3478 (or such alternative number provided by the Servicer to the Trustee in writing) and by telephone at telephone no. 215-328-1858 (Attention:  Servicing Manager) (or such alternative number provided by the Servicer to the Trustee in writing) as soon as possible, but in any event before 7:00 p.m., New York City time, on such day.  If after such notice the Trustee does not receive the full amount of such P&I Advances by 11:00 a.m., New York City time, on the Business Day immediately following such Servicer Remittance Date, then the Trustee shall make the portion of such P&I Advances that was required to be, but was not, made by the Servicer pursuant to this Section 4.07(a) subject to Section 7.05.

(b)     Subject to Sections 4.07(a), 4.07(c), and 4.07(e) below, the aggregate amount of P&I Advances to be made by the Servicer with respect to any Distribution Date shall equal the aggregate of: (i) all Monthly Payments (net, without duplication, of related Servicing Fees and Workout Fees, if any), other than Balloon Payments, that were due during any related Collection Period and delinquent as of the close of business on the last day of the Collection Period preceding the related P&I Advance Date (or not advanced by any Sub-Servicer on behalf of the Servicer); and (ii) with respect to each Loan as to which the related Balloon Payment was due during or prior to the related Collection Period and was delinquent as of the end of the related Collection Period (including any REO Loan as to which the Balloon Payment would have been past due), an amount equal to the Assumed Scheduled Payment (less, without duplication, the Workout Fees) therefor.  Notwithstanding the foregoing, if it is determined that an Appraisal Reduction Amount exists with respect to any Mortgage Loan or REO Loan, then the amount of each P&I Advance applicable to interest or Assumed Scheduled Payment applicable to interest, if any, required to be made under this Section 4.07  in respect of such Mortgage Loan or REO Loan, as the case may be, during the period that such Appraisal Reduction Amount continues to exist, shall be reduced to equal the product of (i) the amount of the subject P&I Advance that would otherwise be required without regard to this proviso, multiplied by (ii) a fraction, the numerator of which is equal to the then Stated Principal Balance of such Mortgage Loan or REO Loan, as the case may be, net of such Appraisal Reduction Amount, and the denominator of which is equal to the then Stated Principal Balance of such Mortgage Loan or REO Loan, as the case may be.  All P&I Advances for any Loans that have been modified shall be calculated on the basis of their terms as modified.  Subject to subsections (c) and (e) below, the obligation of the Servicer to make such P&I Advances is mandatory and, with respect to any Loan or REO Loan, shall continue until the Distribution Date on which the proceeds, if any, received in connection with a Liquidation Event with respect thereto are to be distributed.

(c)     Notwithstanding anything herein to the contrary, neither the Servicer nor the Trustee shall be required to make a P&I Advance, if the Servicer or the Trustee determines, in accordance with the definition thereof, that any such P&I Advance would be a Nonrecoverable Advance.   The Trustee may conclusively rely on any determination of nonrecoverability by the Servicer.  On the fourth Business Day before each Distribution Date, the Special Servicer shall report to the Servicer the Special Servicer's determination as to

135

whether each P&I Advance made with respect to any previous Distribution Date or required to be made with respect to such Distribution Date with respect to any Specially Serviced Loan or REO Loan is a Nonrecoverable P&I Advance. The Servicer shall be entitled to conclusively rely on (but shall not be bound by) such determination.

(d)     In connection with the recovery of any P&I Advance out of the Collection Account pursuant to <u>Section 3.05(a)</u>, the Servicer shall be entitled to pay itself or the Trustee, as the case may be, out of any amounts then on deposit in the Collection Account, Advance Interest accrued on the amount of such P&I Advance from the date made to but not including the date of reimbursement; provided, however, with respect to any Loan as to which the related Loan Documents provide a grace period for payments thereunder, interest shall not accrue on such P&I Advance during such grace period. The Servicer shall reimburse itself or the Trustee, as the case may be, for any outstanding P&I Advance as soon as practicably possible after funds available for such purpose are deposited in the Collection Account.

(e)     Notwithstanding the foregoing, (i) neither the Servicer nor the Trustee shall be required or permitted to make an advance in respect of Penalty Charges, Prepayment Premiums, or Balloon Payments, or (ii) if the monthly payment on any Loan has been reduced or the final maturity extended, in connection with a bankruptcy or similar proceeding involving the related Borrower or a modification, waiver or amendment granted or agreed to by the Special Servicer pursuant to <u>Section 3.20</u>, and the monthly payment due and owing during the extension period is less than the amount of the Monthly Payments prior to such modification, then the Servicer shall, as to such Loan only, advance only the amount of the Monthly Payment due and owing after taking into account such reduction (net of related Servicing Fees and Workout Fees), in the event of subsequent delinquencies thereon.

(f)     The Special Servicer shall not be required to make any P&I Advances.

## ARTICLE V

## THE CERTIFICATES

Section 5.01    <u>The Certificates.</u>

The Certificates shall be substantially in the forms attached hereto as <u>Exhibit A</u>. The Certificates shall be issuable in registered form, in the minimum denominations, integral multiples in excess thereof (except that one Certificate in each Class may be issued in a different amount which must be in excess of the applicable minimum denomination) and aggregate denominations per Class set forth in the Preliminary Statement to this Agreement (each a "<u>Denomination</u>").

Subject to <u>Section 9.01</u> respecting the final distribution on the Certificates, on each Distribution Date the Trustee shall make distributions to each Certificateholder of record on the preceding Record Date either by wire transfer in immediately available funds or by check, as provided in <u>Section 4.04</u>.

The Certificates shall be executed by manual or facsimile signature on behalf of the Certificate Registrar by an authorized signatory. Certificates bearing the manual or facsimile

signatures of individuals who were, at the time when such signatures were affixed, authorized to sign on behalf of the Certificate Registrar shall bind the Certificate Registrar, notwithstanding that such individuals or any of them have ceased to be so authorized prior to the authentication and delivery of such Certificates or did not hold such offices at the date of such Certificate. No Certificate shall be entitled to any benefit under this Agreement, or be valid for any purpose, unless authenticated by the Authenticating Agent by manual signature, and such authentication upon any Certificate shall be conclusive evidence, and the only evidence, that such Certificate has been duly executed and delivered hereunder. All Certificates shall be dated the date of their authentication. On the Closing Date, the Trustee shall countersign the Certificates to be issued at the direction of the Depositor, or any affiliate thereof. The Trustee is hereby initially appointed Authenticating Agent with power to act on the Trustee's behalf in the authentication and delivery of the Certificates in connection with transfers and exchanges as herein provided. If the Authenticating Agent resigns or is terminated, the Trustee shall appoint a successor Authenticating Agent which may be the Trustee or an Affiliate thereof.

The Certificates offered and sold in reliance on the exemption from registration under Rule 144A shall be issued initially in the form of one or more permanent global Certificates in definitive, fully registered form without interest coupons with the applicable legends set forth in Exhibit A added to the forms of such Certificates (each, a "Global Certificate"). The aggregate principal amounts of the Global Certificate may from time to time be increased or decreased by adjustments made on the records of the Certificate Registrar or the Depository or its nominee, as the case may be, as provided in Section 5.03.

The Depositor shall provide, or cause to be provided, to the Certificate Registrar on a continuous basis, an adequate inventory of Certificates to facilitate transfers.

Section 5.02    Certificate Register; Registration of Transfer and Exchange of Certificates.

(a)    At all times during the term of this Agreement, there shall be maintained at the office of the Certificate Registrar a Certificate Register in which, subject to such reasonable regulations as the Certificate Registrar may prescribe, the Certificate Registrar shall provide for the registration of Certificates and of transfers and exchanges of Certificates as herein provided. The Trustee is hereby initially appointed Certificate Registrar for the purpose of registering Certificates and transfers and exchanges of Certificates as herein provided. The Certificate Registrar may appoint, by a written instrument delivered to the Depositor, the Trustee, the Special Servicer and the Servicer, any other bank or trust company to act as Certificate Registrar under such conditions as the predecessor Certificate Registrar may prescribe, provided that the predecessor Certificate Registrar shall not be relieved of any of its duties or responsibilities hereunder by reason of such appointment.

If Deutsche Bank National Trust Company, resigns as Trustee, the entity succeeding Deutsche Bank National Trust Company, as Trustee shall immediately succeed to its predecessor's duties as Certificate Registrar. The Depositor, the Trustee, the Servicer and the Special Servicer shall have the right to inspect the Certificate Register or to obtain a copy thereof at all reasonable times, and to rely conclusively upon a certificate of the Certificate Registrar as to the information set forth in the Certificate Register. The names and addresses of all

Certificateholders and the names and addresses of the transferees of any Certificates shall be registered in the Certificate Register; *provided, however,* in no event shall the Certificate Registrar be required to maintain in the Certificate Register the names of Certificate Owners. In addition, upon the request of the Depositor, the Servicer or the Special Servicer (and at such requesting party's expense or, if the Trustee needs such information, at the expense of the Trust Fund), the Trustee shall acquire from DTC (which request may be made to the proxy unit of DTC's reorganization department) a Security Position Listing and deliver a copy of such Security Position Listing to such requesting party.

The Person in whose name any Certificate is so registered shall be deemed and treated as the sole owner and Holder thereof for all purposes of this Agreement and the Certificate Registrar, the Servicer, the Trustee, the Special Servicer and any agent of any of them shall not be affected by any notice or knowledge to the contrary. A Definitive Certificate is transferable or exchangeable only upon the surrender of such Certificate to the Certificate Registrar at the Corporate Trust Office (the "Registrar Office") together with an assignment and transfer (executed by the Holder or his duly authorized attorney).

Subject to the requirements of Sections 5.02(b), (c) and (d), the Certificate Registrar shall execute and authenticate in the name of the designated transferee or transferees, in the case of a Definitive Certificate being surrendered in exchange for one or more new Definitive Certificates, one or more new Certificates in Denominations equal in the aggregate to the Denomination of the Definitive Certificate being surrendered. Such new Certificates shall be delivered by the Certificate Registrar in accordance with Section 5.02(e).

Each Certificate surrendered for registration of transfer shall be canceled, and the Certificate Registrar shall hold such canceled Certificate in accordance with its standard procedures.

(b)     No transfer of any Certificate shall be made unless that transfer is made pursuant to an effective registration statement under the Securities Act, and effective registration or qualification under applicable state securities laws, or is made in a transaction which does not require such registration or qualification. If a transfer (other than one by the Depositor to an Affiliate thereof) of a Certificate is to be made in reliance upon an exemption from the Securities Act, and under the applicable state securities laws, then either:

(i)     the Certificate Registrar shall require the transferee to deliver to the Certificate Registrar an investment representation letter substantially in the form of Exhibit D-1 attached hereto (a "QIB Investment Representation Letter"), which shall certify, among other things, that the transferee is a "qualified institutional buyer" as defined in Rule 144A under the Securities Act (a "Qualified Institutional Buyer");

(ii)     the Certificate Registrar shall require the transferee to deliver to the Certificate Registrar an investment representation letter substantially in the form of Exhibit D-2 attached hereto (a "Regulation S Investment Representation Letter"), which will certify, among other things, that the transferee is not a "U.S. Person" within the meaning of Regulation S under the Securities Act; or

(iii)    the Certificate Registrar shall require the transferee to deliver to the Certificate Registrar an investment representation letter substantially in the form of Exhibit D-3 attached hereto, which shall certify, among other things, that the transferee is an institutional "accredited investor" as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act (an "<u>Institutional Accredited Investor</u>") and is acquiring such Certificate for investment, either for its own account (and not for the account of others) or as a fiduciary or agent for others (which others also are Accredited Investors), and not with a view to, or for offer or sale in connection with, the public distribution thereof.

If the certification described in the preceding clause (i) cannot be provided, (a) the Certificate Registrar shall require an Opinion of Counsel reasonably satisfactory to the Certificate Registrar that such transfer may be made pursuant to an exemption, describing the applicable exemption and the basis therefor, from registration or qualification under the Securities Act, applicable state securities laws and other relevant laws, which Opinion of Counsel shall not be at the expense of the Trust Fund, the Certificate Registrar, the Depositor or the Trustee and (b) the Certificate Registrar shall require the transferor (other than the Initial Purchasers, in connection with their initial transfer of the Certificate being transferred) to execute a certification in form and substance satisfactory to the Certificate Registrar setting forth the facts surrounding such transfer; *provided, however,* that a transfer of a Certificate of any such Class may be made to a trust if the transferor provides to the Certificate Registrar and to the Trustee a certification that interests in such trust may only be transferred subject to requirements substantially to the effect set forth in this <u>Section 5.02</u>.  Notwithstanding the foregoing, the provisions of this <u>Section 5.02</u> shall not apply to the initial transfer of the Class R, Class M-6, Class M-7 and Class M-8 Certificates to the initial Holder of such Certificates or the reregistering of such Certificates to any repurchase agreement counterparty.

In accordance with the direction of the Depositor, the Trustee shall furnish, or cause to be furnished, upon the request of any Holder of a Certificate, any such information in the Trustee's possession as is specified in paragraph (d)(4) of Rule 144A with respect to the Trust Fund, unless, at the time of such request, the entity with respect to which such information is to be provided is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act.  None of the Depositor, the Trustee, the Servicer, the Special Servicer or the Certificate Registrar is obligated to register or qualify any Class of Certificates under the Securities Act or any other securities law or to take any action not otherwise required under this Agreement to permit the transfer of any Certificate without registration or qualification.  Any Holder of a Certificate desiring to effect such a transfer shall, and does hereby agree to, indemnify the Depositor, the Trustee, the Servicer, the Special Servicer and the Certificate Registrar against any liability that may result if the transfer is not so exempt or is not made in accordance with such federal and state laws.  Unless the Certificate Registrar determines otherwise in accordance with applicable law and the rules and procedures of, or applicable to, the Depository (the "<u>Depository Rules</u>"), transfers of a beneficial interest Global Certificate that is not rated in one of the top four rating categories by a nationally recognized statistical rating organization may be effectuated only by means of an "SRO Rule 144A System" approved for such purpose by the Commission.

(c)     Unless a Class of Global Certificates has been registered under the Securities Act, each Certificate of such Class shall bear a legend substantially in the form of Exhibit N hereto.

(d)     Unless a Class of Definitive Certificates has been registered under the Securities Act, each Certificate of such Class shall bear a legend substantially in the form of Exhibit O hereto.

(e)     No transfer of an ERISA-Restricted Certificate shall be made unless the Trustee shall have received either (A) a representation from the transferee of such Certificate acceptable to and in form and substance satisfactory to the Trustee (substantially in the form of Exhibits E-1 and E-2, or in the event such ERISA-Restricted Certificate is a Residual Certificate substantially in the form of Exhibit P), to the effect that (i) such transferee is neither a Plan nor a person acting for, on behalf of, or with the assets of, any such Plan to effect such transfer, (ii) in the case of an ERISA-Restricted Certificate, if the ERISA-Restricted Certificate has been the subject of an ERISA Qualifying Underwriting and the purchaser is an insurance company which is purchasing such Certificates with funds contained in an "insurance company general account" (as such term is defined in Section (V)(e) of prohibited transaction class exemption 95-60 ("PTCE 95-60")), the purchase and holding of ERISA-Restricted Certificates are covered under Sections I and III of PTCE 95-60 or (B) in the case of any such ERISA-Restricted Certificate presented for registration in the name of a Plan or a person acting for, on behalf of, or with the assets of, a Plan, an Opinion of Counsel satisfactory to the Trustee, which Opinion of Counsel shall not be an expense of any of the Trustee, the Depositor, the Servicer, the Seller or the Trust Fund, addressed to the Trustee to the effect that the purchase and holding of such ERISA-Restricted Certificate will not result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code and will not subject any of the above entities to any obligation in addition to those expressly undertaken in this Agreement.  For purposes of the preceding sentence, with respect to an ERISA-Restricted Certificate that is not a Residual Certificate, in the event the representation letter referred to in the preceding sentence is not so furnished, such representation shall be deemed to have been made to the Trustee by the transferee's (including an initial acquirer's) acceptance of the ERISA-Restricted Certificates. Notwithstanding anything else to the contrary herein, any purported transfer of an ERISA-Restricted Certificate to or on behalf of a Plan without the delivery to the Trustee of an Opinion of Counsel or representation letter satisfactory to the Trustee as described above shall be void and of no effect.

To the extent permitted under applicable law (including, but not limited to, ERISA), the Trustee shall be under no liability to any Person for any registration of transfer of any ERISA-Restricted Certificate that is in fact not permitted by this Section 5.02(e) or for making any payments due on such Certificate to the Holder thereof or taking any other action with respect to such Holder under the provisions of this Agreement so long as the transfer was registered by the Trustee in accordance with the foregoing requirements.

(f)     (i)  Each Person who has or who acquires any Ownership Interest in a Residual Certificate shall be deemed by the acceptance or acquisition of such Ownership Interest to have agreed to be bound by the following provisions and to have irrevocably authorized the Trustee under clause (ii) below to deliver payments to a Person other than such Person.  The

rights of each Person acquiring any Ownership Interest in a Residual Certificate are expressly subject to the following provisions:

(A)     No Person holding or acquiring any Ownership Interest in a Residual Certificate shall be a Disqualified Organization or agent thereof (including a nominee, middleman or similar person) (an "<u>Agent</u>"), a Plan or a Person acting on behalf of or investing the assets of a Plan (such Plan or Person, an "<u>ERISA Prohibited Holder</u>") or a Non-U.S. Person and shall promptly notify the Servicer, the Special Servicer, the Trustee and the Certificate Registrar of any change or impending change to such status;

(B)     In connection with any proposed Transfer of any Ownership Interest in a Residual Certificate, the Certificate Registrar shall require delivery to it, and no Transfer of any Residual Certificate shall be registered until the Certificate Registrar receives, an affidavit substantially in the form attached hereto as Exhibit E-1 (a "<u>Transfer Affidavit</u>") from the proposed Transferee, in form and substance satisfactory to the Certificate Registrar, representing and warranting, among other things, that such Transferee is not a Disqualified Organization or Agent thereof, an ERISA Prohibited Holder or a Non-U.S. Person, and that it has reviewed the provisions of this <u>Section 5.02(g)</u> and agrees to be bound by them;

(C)     Notwithstanding the delivery of a Transfer Affidavit by a proposed Transferee under clause (B) above, if a Responsible Officer of the Certificate Registrar has actual knowledge that the proposed Transferee is a Disqualified Organization or Agent thereof, an ERISA Prohibited Holder or a Non-U.S. Person, no Transfer of an Ownership Interest in a Residual Certificate to such proposed Transferee shall be effected;

(D)     Each Person holding or acquiring any Ownership Interest in a Residual Certificate shall agree (1) to require a Transfer Affidavit from any prospective Transferee to whom such Person attempts to transfer its Ownership Interest in such Residual Certificate and (2) not to transfer its Ownership Interest in such Residual Certificate unless it provides to the Certificate Registrar a letter substantially in the form attached hereto as Exhibit E-2 (a "<u>Transferor Letter</u>") certifying that, among other things, it has no actual knowledge that such prospective Transferee is a Disqualified Organization or Agent thereof, an ERISA Prohibited Holder or a Non-U.S. Person and that (if the Transferor is not a U.S. Person) such transfer does not have the effect of allowing the Transferor to avoid tax on accrued excess inclusions; and

(E)     In addition, the Certificate Registrar may as a condition of the registration of any such transfer require the transferor to furnish such other certifications, legal opinions or other information (at the transferor's

expense) as it may reasonably require to confirm that the proposed transfer is being made pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and other applicable laws.

(ii)     If any purported Transferee shall become a Holder of a Residual Certificate in violation of the provisions of this <u>Section 5.02(f)</u>, then the last preceding Holder of such Residual Certificate that was in compliance with the provisions of this <u>Section 5.02(f)</u> shall be restored, to the extent permitted by law, to all rights as Holder thereof retroactive to the date of registration of such Transfer of such Residual Certificate.  None of the Trustee, the Servicer, the Special Servicer, the Authenticating Agent and the Certificate Registrar shall be under any liability to any Person for any registration of Transfer of a Residual Certificate that is in fact not permitted by this <u>Section 5.02(t)</u> or for making any payments due on such Certificate to the Holder thereof or for taking any other action with respect to such Holder under the provisions of this Agreement.

(iii)     The Trustee shall make available to the Internal Revenue Service and those Persons specified by the REMIC Provisions all information in its possession and necessary to compute any tax imposed as a result of the Transfer of an Ownership Interest in a Residual Certificate to any Person who is a Disqualified Organization or Agent thereof, including the information described in Treasury Regulations Sections 1.860D-1(b)(5) and 1.860E-2(a)(5) with respect to the "excess inclusions" of such Residual Certificate.

(g)     Subject to the restrictions on transfer and exchange set forth in this <u>Section 5.02</u>, the Holder of any Definitive Certificate may transfer or exchange the same in whole or in part (with a Denomination equal to any authorized denomination) by surrendering such Certificate at the designated office of the Certificate Registrar or any successor Certificate Registrar or transfer agent appointed by the Certificate Registrar, together with an instrument of assignment or transfer (executed by the Holder or its duly authorized attorney), in the case of transfer, and a written request for exchange in the case of exchange.

Following a proper request for transfer or exchange, the Certificate Registrar shall, within ten Business Days of such request if made at such Registrar Office, or within fifteen Business Days if made at the office of a transfer agent (other than the Certificate Registrar), execute and deliver at such Registrar Office or at the office of such transfer agent, as the case may be, to the transferee (in the case of transfer) or Holder (in the case of exchange) or send by first-class mail (at the risk of the transferee in the case of transfer or Holder in the case of exchange) to such address as the transferee or Holder, as applicable, may request in writing, a Definitive Certificate or Certificates, as the case may require, for a like aggregate Denomination and in such Denomination or Denominations as may be requested.  The Certificate Registrar may decline to accept any request for an exchange or registration of transfer of any Certificate during the period of 15 days preceding any Distribution Date.

(h)     If a Responsible Officer of the Certificate Registrar obtains actual knowledge that a Definitive Certificate is being held by or for the benefit of a Person who is not

Qualified Institutional Buyer or an Institutional Accredited Investor, or that, in either case, such holding is unlawful under the laws of a relevant jurisdiction, then the Certificate Registrar shall have the right, but not the obligation, to void such transfer, if permitted under applicable law, or to require the investor to sell (x) such Global Certificate to an Qualified Institutional Buyer or (y) the beneficial interest in such Definitive Certificate to an Qualified Institutional Buyer or an Institutional Accredited Investor, within 14 days after notice of such determination, and each Certificateholder by its acceptance of a Certificate authorizes the Certificate Registrar to take such action.

(i)     The Certificate Registrar shall provide notice to the Trustee and the Depositor of the transfer of any Definitive Certificate.  The Certificate Owner of a Definitive Certificate that wishes to receive the information described in <u>Section 5.02(a)</u> shall provide notice to the Trustee, the Servicer, the Special Servicer and the Depositor of the transfer of any beneficial ownership in such Definitive Certificate and of the address to which such information should be sent.  Upon the written request of the Trustee, the Servicer, the Special Servicer or the Depositor, the Certificate Registrar shall provide each such Person with an updated copy of the Certificate Register at the expense of the requesting party.

(j)     No fee or service charge shall be imposed by the Certificate Registrar for its services in respect of any registration of transfer or exchange referred to in this <u>Section 5.02</u>. With respect to any transfer or exchange of any Certificate, the Certificate Registrar may require payment by each transferor of a sum sufficient to cover any tax, expense or other governmental charge payable in connection with any such transfer or exchange.

(k)     All Certificates surrendered for transfer and exchange shall be physically canceled by the Certificate Registrar, and the Certificate Registrar shall hold or destroy such canceled Certificates in accordance with its standard procedures.

Section 5.03    <u>Book-Entry Certificates.</u>

(a)     The Certificates initially shall be issued as one or more Certificates registered in the name of the Depository or its nominee and, except as provided in subsection (c) below, transfer of such Certificates may not be registered by the Certificate Registrar unless such transfer is to a successor Depository that agrees to hold such Certificates for the respective Certificate Owners with Ownership Interests therein.  Such Certificate Owners shall hold and transfer their respective Ownership Interests in and to such Certificates through the book-entry facilities of the Depository.  All transfers by Certificate Owners of their respective Ownership Interests in the Book-Entry Certificates shall be made in accordance with the procedures established by the Depository Participant or brokerage firm representing such Certificate Owner. Each Depository Participant shall transfer the Ownership Interests in the Book-Entry Certificates of Certificate Owners it represents or of brokerage firms for which it acts as agent only in accordance with the Depository's normal procedures.  Neither the Trustee nor the Certificate Registrar shall have any responsibility to monitor or restrict the transfer of any ownership interest in a Book-Entry Certificate transferable through the book-entry facilities of the Depository.

(b)      The Trustee, the Servicer, the Special Servicer, the Depositor and the Certificate Registrar may for all purposes, including the making of payments due on the Book-Entry Certificates, deal with the Depository as the authorized representative of the Certificate Owners with respect to such Certificates for the purposes of exercising the rights of Certificateholders hereunder.  The rights of Certificate Owners with respect to the Book-Entry Certificates shall be limited to those established by law and agreements between such Certificate Owners and the Depository Participants and brokerage firms representing such Certificate Owners.  Multiple requests and directions from, and votes of, the Depository as Holder of the Book-Entry Certificates with respect to any particular matter shall not be deemed inconsistent if they are made with respect to different Certificate Owners.  The Trustee may establish a reasonable record date in connection with solicitations of consents from or voting by Certificateholders and shall give notice to the Depository of such record date.

(c)      Upon the request of any Certificate Owner of Global Certificates, or the transferee of such Certificate Owner, that its interest in such Global Certificates be exchanged for Definitive Certificates, such Certificate Owner or transferee, upon presentation of appropriate documentation to the Trustee as required by this Article V and subject to the rules and procedures of the Depositary, shall be entitled to be issued one or more Definitive Certificates in denominations authorized pursuant to Section 5.01 equal in the aggregate to the Denomination of such interest in such Global Certificates.

(d)      If (A)(1) the Depositor advises the Trustee and the Certificate Registrar in writing that the Depository is no longer willing or able to properly discharge its responsibilities with respect to the Book-Entry Certificates and (2) the Depositor is unable to locate a qualified successor, or (B) the Depositor at its option advises the Trustee and the Certificate Registrar in writing that it elects to terminate the book-entry system through the Depository with respect to some or all of the Classes, or (C) the Trustee determines that Definitive Certificates are required in accordance with the provisions of Section 5.03(e), the Trustee shall notify the affected Certificate Owners, through the Depository with respect to all Classes, any Class or any portion of any Class of the Certificates, of the occurrence of any such event and of the availability of Definitive Certificates to Certificate Owners requesting the same.

Upon surrender to the Certificate Registrar of the Book-Entry Certificates by the Depository or any custodian acting on behalf of the Depository, accompanied by registration instructions from the Depository for registration of transfer, the Certificate Registrar shall execute, authenticate and deliver, within ten Business Days of such request if made at the Registrar Office, or within fifteen Business Days if made at the office of a transfer agent (other than the Certificate Registrar), the Definitive Certificates to the Certificate Owners identified in such instructions.  None of the Depositor, the Servicer, the Trustee, the Special Servicer and the Certificate Registrar shall be liable for any delay in delivery of such instructions and may conclusively rely on, and shall be protected in relying on, such instructions.  Upon the issuance of Definitive Certificates for purposes of evidencing ownership of any Class of Certificates, the registered Holders of such Definitive Certificates shall be recognized as Certificateholders hereunder and, accordingly, shall be entitled directly to receive payments on, to exercise Voting Rights with respect to, and to transfer and exchange such Definitive Certificates.

For purposes of any provision of this Agreement requiring or permitting actions

with the consent of, or at the direction of, Holders of Certificates evidencing a specified percentage of the Voting Rights, such consent or direction may be given by a combination of Certificate Owners (acting through the Depository and the Depository Participants) owning Book-Entry Certificates, and Certificateholders owning Definitive Certificates, evidencing in the aggregate such specified percentage of the Voting Rights.

(e)     The Book-Entry Certificates (i) shall be delivered by the Certificate Registrar to the Depository, or pursuant to the Depository's instructions, and shall be registered in the name of Cede & Co. and (ii) shall bear a legend substantially to the following effect:

> **Unless this certificate is presented by an authorized representative of The Depository Trust Company, a New York corporation ("DTC"), to the Certificate Registrar or its agent for registration of transfer, exchange or payment, and any certificate issued is registered in the name of Cede & Co. or in such other name as is requested by an authorized representative of DTC (and any payment is made to Cede & Co. or to such other entity as is requested by an authorized representative of DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL inasmuch as the registered owner hereof, Cede & Co., has an interest herein.**

The Book-Entry Certificates may be deposited with such other Depository as the Certificate Registrar may from time to time designate, and shall bear such legend as may be appropriate.

(f)     If the Trustee has instituted or has been directed to institute any judicial proceeding in a court to enforce the rights of the Certificateholders under the Certificates, and the Trustee has been advised by counsel that in connection with such proceeding it is necessary or appropriate for the Trustee to obtain possession of all or any portion of the Certificates evidenced by Book-Entry Certificates, the Trustee may in its sole discretion determine that such Certificates shall no longer be represented by such Book-Entry Certificates.  In such event, the Certificate Registrar will execute, authenticate and deliver, in exchange for such Book-Entry Certificates, Definitive Certificates in a Denomination equal to the aggregate Denomination of such Book-Entry Certificates to the party so requesting such Definitive Certificates.  In such event, the Trustee shall notify the affected Certificate Owners and make appropriate arrangements for the effectuation of the purpose of this clause.

(g)     Upon acceptance for exchange or transfer of a beneficial interest in a Book-Entry Certificate for a Definitive Certificate, as provided herein, the Certificate Registrar shall endorse on a schedule affixed to the related Book-Entry Certificate (or on a continuation of such schedule affixed to such Book-Entry Certificate and made a part thereof) an appropriate notation evidencing the date of such exchange or transfer and a decrease in the Denomination of such Book-Entry Certificate equal to the Denomination of such Definitive Certificate issued in exchange therefor or upon transfer thereof.

(h)     If a Holder of a Definitive Certificate wishes at any time to transfer such Certificate to a Person who wishes to take delivery thereof in the form of a beneficial interest in the Book-Entry Certificate, such transfer may be effected only in accordance with Depository Rules and this <u>Section 5.03(h)</u>.  Upon receipt by the Certificate Registrar at the Registrar Office of (i) the Definitive Certificate to be transferred with an assignment and transfer pursuant to <u>Section 5.02(a)</u>, (ii) written instructions given in accordance with Depository Rules directing the Certificate Registrar to credit or cause to be credited to another account a beneficial interest in the related Book-Entry Certificate, in an amount equal to the Denomination of the Definitive Certificate to be so transferred, (iii) a written order given in accordance with the Depository Rules containing information regarding the account to be credited with such beneficial interests (iv) a QIB Investment Representation Letter, the Certificate Registrar shall cancel such Definitive Certificate, execute and deliver a new Definitive Certificate for the Denomination of the Definitive Certificate not so transferred, registered in the name of the Holder or the Holder's transferee (as instructed by the Holder), and the Certificate Registrar shall instruct the Depository or the custodian holding such Book-Entry Certificate on behalf of the Depository to increase the Denomination of the related Book-Entry Certificate by the Denomination of the Definitive Certificate to be so transferred, and to credit or cause to be credited to the account of the Person specified in such instructions a corresponding Denomination of such Book-Entry Certificate.

Section 5.04    <u>Mutilated, Destroyed, Lost or Stolen Certificates.</u>

If (i) any mutilated Certificate is surrendered to the Certificate Registrar, or the Certificate Registrar receives evidence to its satisfaction of the destruction, loss or theft of any Certificate and (ii) there is delivered to the Trustee and the Certificate Registrar such security or indemnity as may be required by them to save each of them harmless, then, in the absence of actual notice to the Trustee or the Certificate Registrar that such Certificate has been acquired by a bona fide purchaser, the Certificate Registrar shall execute and authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Certificate, a new Certificate of the same Class and of like Percentage Interest.  Upon the issuance of any new Certificate under this Section, the Trustee and the Certificate Registrar may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee and the Certificate Registrar) connected therewith.  Any replacement Certificate issued pursuant to this Section shall constitute complete and indefeasible evidence of ownership in the Trust Fund, as if originally issued, whether or not the lost, stolen or destroyed Certificate shall be found at any time.

Section 5.05    <u>Persons Deemed Owners.</u>

Prior to due presentation of a Certificate for registration of transfer, the Depositor, the Servicer, the Special Servicer, the Trustee, the Certificate Registrar and any agents of any of them may treat the person in whose name such Certificate is registered as the owner of such Certificate for the purpose of receiving distributions pursuant to <u>Section 4.01</u> and for all other purposes whatsoever, except as and to the extent provided in the definition of "Certificateholder," and none of the Depositor, the Servicer, the Special Servicer, the Trustee, the Certificate Registrar and any agent of any of them shall be affected by notice to the contrary except as provided in <u>Section 5.03(d)</u>.

Section 5.06    Access to List of Certificateholders' Names and Addresses.

(a)    If any Certificateholder, the Special Servicer or the Servicer (for purposes of this Section 5.06, an "Applicant") applies in writing to the Certificate Registrar, and such application states that the Applicant desires to communicate with other Certificateholders, the Certificate Registrar shall furnish or cause to be furnished to such Applicant a list of the names and addresses of the Certificateholders as of the most recent Record Date, at the expense of the Applicant, in the case of any Certificateholder and the expense of the Trust Fund in the case of the Servicer or the Special Servicer.

(b)    Every Certificateholder, by receiving and holding its Certificate, agrees with the Trustee and the Certificate Registrar that the Trustee and the Certificate Registrar shall not be held accountable in any way by reason of the disclosure of any information as to the names and addresses of the Certificateholders hereunder, regardless of the source from which such information was derived.

From time to time, upon the request of and at no expense to the Trustee, the Certificate Registrar shall deliver to the Trustee the list of Certificateholders and their addresses as currently reflected in the Certificate Register.

Section 5.07    Maintenance of Office or Agency.

The Certificate Registrar will maintain or cause to be maintained at its expense an office or offices or agency or agencies in New York City where Certificates may be surrendered for registration of transfer or exchange.  The Certificate Registrar initially designates its Corporate Trust Office for such purposes.  The Certificate Registrar will give prompt written notice to the Certificateholders of any change in such location of any such office or agency.

**ARTICLE VI**

**THE DEPOSITOR, THE
SERVICER AND THE SPECIAL SERVICER**

Section 6.01    Liability of the Depositor, the Servicer and the Special Servicer.

The Depositor, the Servicer and the Special Servicer shall be liable in accordance herewith only to the extent of the respective obligations specifically imposed upon and undertaken by the Depositor, the Servicer and the Special Servicer herein.

Section 6.02    Merger, Consolidation or Conversion of the Depositor, the Servicer or the Special Servicer.

(a)    Subject to subsection (b) below, the Depositor, the Servicer and the Special Servicer each will keep in full effect its existence, rights and franchises under the laws of the jurisdiction of its incorporation or organization, and each will obtain and preserve its qualification to do business as a foreign corporation or limited partnership in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this

Agreement, the Certificates or any of the Loans and to perform its respective duties under this Agreement.

(b)     The Depositor, the Servicer and the Special Servicer each may be merged or consolidated with or into any Person (other than the Trustee), or transfer all or substantially all of its assets to any Person (other than the Trustee), in which case any Person resulting from any merger or consolidation to which the Depositor, the Servicer or the Special Servicer shall be a party, or any Person succeeding to the business of the Depositor, the Servicer or the Special Servicer, shall be the successor of the Depositor, the Servicer and the Special Servicer, as the case may be, hereunder, without the execution or filing of any paper (other than an assumption agreement wherein the successor shall agree to perform the obligations of and serve as the Depositor, the Servicer or the Special Servicer, as the case may be, in accordance with the terms of this Agreement) or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding; provided, however, that such merger, consolidation or succession will not or has not resulted in a withdrawal, downgrading or qualification of the then-current ratings of the Classes of Certificates that have been so rated (as evidenced by a letter to such effect from each Rating Agency).

Section 6.03    <u>Limitation on Liability of the Trustee, the Depositor, the Servicer, the Special Servicer and Others.</u>

(a)     None of the Depositor, the Trustee, the Servicer, the Special Servicer nor any of the Affiliates, directors, partners, members, managers, shareholders, officers, employees or agents of any of them shall be under any liability to the Trust Fund, the parties hereto, the Certificateholders, or any other Person, for any action taken or for refraining from the taking of any action in good faith pursuant to this Agreement, or for errors in judgment; provided, however, that this provision shall not protect the Depositor, the Trustee, the Servicer or the Special Servicer against any breach of warranties or representations made herein or any liability which would otherwise be imposed by reason of willful misfeasance, bad faith or negligence in the performance of duties or by reason of negligent disregard of obligations and duties hereunder.  The Depositor, the Servicer, the Special Servicer, the Trustee and any director, officer, employee or agent of the Depositor, the Trustee, the Servicer or the Special Servicer may rely in good faith on any document of any kind which, <u>prima facie</u>, is properly executed and submitted by any Person respecting any matters arising hereunder.

The Depositor, the Servicer, the Special Servicer, the Trustee and any Affiliate, director, shareholder, member, partner, manager, officer, employee or agent of any of the foregoing shall be indemnified and held harmless by the Trust Fund against any loss, liability or expense incurred in connection with or relating to this Agreement, the Mortgage Loans or the Certificates, other than any loss, liability or expense: (i) specifically required to be borne thereby pursuant to the terms hereof; (ii) incurred in connection with any breach of a representation or warranty made by it herein; (iii) incurred by reason of bad faith, willful misconduct or negligence in the performance of its obligations or duties hereunder, or by reason of negligent disregard of such obligations or duties or (iv) in the case of the Depositor and any of its directors, officers, employees and agents, incurred in connection with any violation by any of them of any state or federal securities law.

(b)     None of the Depositor, the Trustee, the Servicer or the Special Servicer shall be under any obligation to appear in, prosecute or defend any legal or administrative action, proceeding, hearing or examination that is not incidental to its respective duties under this Agreement and which in its opinion may involve it in any expense or liability which it is not reasonably assured of reimbursement thereof by the Trust; provided, however, that the Depositor, the Servicer, the Special Servicer or the Trustee may in its discretion undertake any such action, proceeding, hearing or examination that it may deem necessary or desirable in respect to this Agreement and the rights and duties of the parties hereto and the interests of the Certificateholders hereunder.   In such event, the legal expenses and costs of such action, proceeding, hearing or examination and any liability resulting therefrom shall be expenses, costs and liabilities of the Trust Fund, and the Depositor, the Servicer, the Special Servicer and the Trustee shall be entitled to be reimbursed therefor out of amounts attributable to the Loans on deposit in the Collection Account as provided by <u>Section 3.05(a)</u>.

Section 6.04    <u>Servicer and Special Servicer Not to Resign; Assignment of Servicing by Servicer or Special Servicer.</u>

(a)     Subject to the provisions of <u>Section 6.02</u>, none of the Servicer and the Special Servicer shall resign from their respective obligations and duties hereby imposed on each of them except upon (1) a determination that such party's duties hereunder are no longer permissible under applicable law or (2) upon the appointment of, and the acceptance of such appointment by, a successor Servicer or Special Servicer, as applicable and receipt by the Trustee of written confirmation from each applicable Rating Agency that such resignation and appointment will not cause such Rating Agency to downgrade, withdraw or qualify any of then-current ratings assigned by such Rating Agency to any Class of Certificates.   Any such determination permitting the resignation of the Servicer or the Special Servicer pursuant to above clause (1) above shall be evidenced by an Opinion of Counsel (the cost of which, together with any other expenses of such resignation, shall be at the expense of the resigning party) to such effect delivered to the Trustee.   No such resignation by the Servicer or the Special Servicer shall become effective until the Trustee or a successor Servicer shall have assumed the Servicer's or Special Servicer's, as applicable, responsibilities and obligations in accordance with <u>Section 7.02</u>.

(b)     Notwithstanding anything else in <u>Section 6.02</u> and this <u>Section 6.04</u> to the contrary, each of the Servicer and the Special Servicer may assign all of its rights and delegate all of its duties and obligations under this Agreement; provided that the Person accepting such assignment or delegation shall be a Person that is qualified to service multifamily mortgage loans on behalf of FNMA or FHLMC, is reasonably satisfactory to the Trustee and the Depositor, is willing to service the Loans and executes and delivers to the Depositor and the Trustee an agreement, in form and substance reasonably satisfactory to the Depositor and the Trustee, which contains an assumption by such Person of the due and punctual performance and observance of each covenant and condition to be performed or observed by the Servicer or the Special Servicer, as the case may be, under this Agreement; provided, further, that such assignment or delegation will not result in the downgrade, qualification or withdrawal of the then-current ratings of the Classes of Certificates that have been rated (as evidenced in writing delivered to the Trustee).   In the case of any such assignment and delegation, the Servicer or the Special Servicer, as the case may be, shall be released from its obligations under this Agreement, except that the Servicer or

the Special Servicer, as the case may be, shall remain liable for all liabilities and obligations incurred by it, or arising from its conduct, hereunder prior to the satisfaction of the conditions to such assignment and delegation set forth in the preceding sentence.  Notwithstanding anything above to the contrary, each of the Servicer and the Special Servicer may, in its sole discretion, appoint Sub-Servicers in accordance with Section 3.22 and independent contractors or agents to perform select duties thereof, provided that the Servicer or the Special Servicer shall not be relieved from such duties solely by virtue of such appointment.

Section 6.05   Rights of the Depositor in Respect of the Servicer and the Special Servicer.

The Depositor may, but is not obligated to, enforce the obligations of the Servicer and the Special Servicer hereunder and may, but is not obligated to, perform, or cause a designee to perform, any defaulted obligation of the Servicer and the Special Servicer hereunder or exercise the rights of the Servicer or Special Servicer, as applicable, hereunder; *provided, however,* that the Servicer and the Special Servicer shall not be relieved of any of their respective obligations hereunder by virtue of such performance by the Depositor or its designee.  The Depositor shall not have any responsibility or liability for any action or failure to act by the Servicer or the Special Servicer and is not obligated to supervise the performance of the Servicer or the Special Servicer under this Agreement or otherwise.

## ARTICLE VII

## DEFAULT

Section 7.01   Events of Default; Servicer and Special Servicer Termination.

(a)      "Event of Default," wherever used herein, means any one of the following events:

(i)      any failure by the Servicer to make (x) any remittance (including a P&I Advance) required to be made by the Servicer to the Collection Account, Servicing Accounts or Certificate Distribution Account on the Servicer Remittance Date, which is not cured by 11:00 a.m. New York City time on the related Distribution Date, (y) any Servicing Advance when required to be made pursuant to this Agreement, which failure to make a Servicing Advance remains uncured for a period of three Business Days (or such shorter time as is necessary to avoid the lapse of any required Insurance Policy or the foreclosure of any tax lien on the related Mortgaged Property) or (z) any failure by the Servicer to deposit into the Collection Account, any other amount required to be so deposited or remitted by the Servicer pursuant to the terms of this Agreement within  two Business Days of receipt; or

(ii)      any failure by the Special Servicer to deposit into the REO Account, or to remit to the Servicer for deposit into, the Collection Account, any amount required to be so deposited or remitted by the Servicer or the Special

Servicer pursuant to the terms of this Agreement which failure continues unremedied for one Business Day; or

(iii)     any failure on the part of the Servicer or the Special Servicer duly to observe or perform in any material respect any other of the covenants or agreements on the part of the Servicer or the Special Servicer contained in this Agreement which continues unremedied for a period of 30 days (60 days so long as the Servicer is in good faith diligently pursuing such cure) after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer or the Special Servicer, as the case may be, by any other party hereto; or

(iv)     any breach on the part of the Servicer or the Special Servicer of any representation or warranty contained in <u>Section 3.23</u> or <u>Section 3.24</u>, as applicable, which materially and adversely affects the interests of any Class of Certificateholders and which continues unremedied for a period of 30 days after the date on which notice of such breach, requiring the same to be remedied, shall have been given to the Servicer or the Special Servicer, as the case may be, by the Depositor or the Trustee, or to the Servicer, the Special Servicer, the Depositor and the Trustee by the Holders of Certificates of any Class evidencing, as to such Class, Percentage Interests aggregating not less than 25%, provided, however, if such breach is capable of being cured and the Servicer or Special Servicer, as applicable, is diligently pursuing such cure, such thirty day period shall be extended for an additional thirty days; or

(v)     a decree or order of a court or agency or supervisory authority having jurisdiction in the premises in an involuntary case under any present or future federal or state bankruptcy, insolvency or similar law for the appointment of a conservator, receiver, liquidator, trustee or similar official in any bankruptcy, insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the Servicer or the Special Servicer and such decree or order shall have remained in force undischarged or unstayed for a period of 60 days; or

(vi)     the Servicer or the Special Servicer shall consent to the appointment of a conservator, receiver, liquidator, trustee or similar official in any bankruptcy, insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to the Servicer or the Special Servicer or of or relating to all or substantially all of its property; or

(vii)     the Servicer or the Special Servicer shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable bankruptcy, insolvency or reorganization statute, make an assignment for the benefit of its creditors, voluntarily suspend payment of its obligations or take any corporate action in furtherance of the foregoing; or

(viii)   Moody's places the ratings of any Class of Certificates on "watchlist" status in contemplation of a ratings downgrade or withdrawal (or Moody's has downgraded or withdrawn its rating for any Class of Certificates) citing servicing concerns with respect to the Servicer or Special Servicer as the sole or contributory factor in such rating action and such "watchlist" status is not withdrawn by Moody's within 60 days; or

(ix)   the Servicer or Special Servicer is removed as either a "U.S. Commercial Mortgage Master Servicer" or "U.S. Commercial Mortgage Special Servicer" as applicable from S&P's Select Servicer List, as the case may be, and the either (x) such Servicer is not reinstated within 60 days or (y) the ratings of any of the Certificates by S&P are downgraded, qualified, or withdrawn (including, without limitation, placed on "negative credit watch") in connection with such Servicer or Special Servicer continuing to act as such; or

(x)   the Trustee shall have received written notice from the Rating Agencies that the continuation of the Servicer or the Special Servicer in their respective capacities would result in the downgrade, qualification or withdrawal of any rating then assigned by such Rating Agency to any Class of Certificates as long as the Rating Agencies notice indicates that the primary reason for such notice is the actions or omissions of the Servicer or Special Servicer.

(b)   If any Event of Default with respect to the Servicer or Special Servicer (in either case, for purposes of this <u>Section 7.01(b)</u>, the "<u>Defaulting Party</u>") shall occur and be continuing, then, and in each and every such case, so long as such Event of Default shall not have been remedied, the Trustee may, and at the written direction of the Holders of Certificates entitled to at least 25% of the Voting Rights, shall, terminate, by notice in writing to the Defaulting Party (a "<u>Termination Notice</u>"), with a copy of such notice to the Depositor and the Certificate Registrar, all of the rights and obligations of the Defaulting Party under this Agreement and in and to the Loans and the proceeds thereof (other than any rights of the Defaulting Party as a Certificateholder); provided, however, that the Defaulting Party shall be entitled to the payment of accrued and unpaid compensation and reimbursement through the date of such termination, as well as amounts due to it thereafter, if any, subject to this Agreement.

From and after the receipt by the Defaulting Party of such written notice, all authority and power of the Defaulting Party under this Agreement, whether with respect to the Certificates (other than as a Holder of any Certificate) or the Mortgage Loans or otherwise, shall pass to and be vested in the Trustee pursuant to and under this Section, and, without limitation, the Trustee is hereby authorized and empowered to execute and deliver, on behalf of and at the expense of the Defaulting Party, as attorney-in-fact or otherwise, any and all documents and other instruments, and to do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement or assignment of the Loans and related documents, or otherwise.

The Servicer and Special Servicer each agree that if it is terminated pursuant to this <u>Section 7.01(b)</u>, it shall promptly (and in any event no later than 20 Business Days after its receipt of the notice of termination) provide the Trustee with all documents and records

requested by it to enable the Trustee or the successor Servicer or Special Servicer to assume the Servicer's or the Special Servicer's, as the case may be, functions hereunder, and shall cooperate with the Trustee in effecting the termination of the Servicer's or the Special Servicer's, as the case may be, responsibilities and rights hereunder, including, without limitation, the transfer within five Business Days to the Trustee for administration by it of all cash amounts which shall at the time be or should have been credited by the Servicer to the Collection Account, or any Servicing Account (if it is the Defaulting Party) or by the Special Servicer to the REO Account (if it is the Defaulting Party) or thereafter be received with respect to the Loans or any REO Property (*provided, however,* that the Servicer and Special Servicer each shall, if terminated pursuant to this Section 7.01(b), continue to be entitled to receive all amounts accrued or owing to it under this Agreement on or prior to the date of such termination, whether in respect of Advances (in the case of the Servicer) or otherwise, as well as amounts due to it thereafter, if any, and it and its directors, officers, employees and agents shall continue to be entitled to the benefits of Section 6.03 notwithstanding any such termination).

If Advances made by both the Trustee and the Servicer shall at any time be outstanding, or any interest on any Advance shall be accrued and unpaid, all amounts available to repay such Advances and the interest thereon hereunder shall be applied entirely to the Advances outstanding to the Trustee, until such Advances shall have been repaid in full, together with all interest accrued thereon, prior to reimbursement of the Servicer for such Advances. The Trustee shall be entitled to conclusively rely on any notice given with respect to a Nonrecoverable Advance hereunder. If the Servicer fails to make an Advance it is required to make hereunder and the Servicer has not determined that such Advance is to be nonrecoverable, the Trustee shall be repaid in full for such Advances with Advance Interest thereon within two Business Days of such Advance, from the Servicer's own funds.

(c)    The Directing Certificateholder shall be entitled to terminate the rights and obligations of the Special Servicer under this Agreement, with or without cause, upon 10 Business Days notice to the Servicer, the Special Servicer and the Trustee, and to appoint a successor Special Servicer; provided, however, that (i) such successor will meet the requirements set forth in Section 7.02 and (ii) as evidenced in writing by each of the Rating Agencies, the proposed successor of the Special Servicer will not, in and of itself, result in a downgrading, withdrawal or qualification of the then-current ratings provided by the Rating Agencies in respect to any Class of then outstanding Certificates that is rated. No penalty or fee shall be payable to the Special Servicer with respect to any termination pursuant to this Section 7.01(c). Any expenses of the trust as a result of any termination pursuant to this Section 7.01(c) shall be paid by the Holders who effected such termination. Notwithstanding anything else herein to the contrary, any Special Servicer terminated pursuant to this Section 7.01(c) shall continue to be indemnified for its actions hereunder pursuant to Section 6.03.

Section 7.02    Trustee to Act; Appointment of Successor.

On and after the time the Servicer or the Special Servicer receives a notice of termination for cause pursuant to Section 7.01(b), and provided that no acceptable successor has been appointed, the Trustee shall be and become the successor to the Servicer or Special Servicer, as the case may be, in all respects in its capacity as Servicer or Special Servicer (other than with respect to certain Workout Fees, as provided in Section 3.11(b)) under this Agreement

and the transactions set forth or provided for herein and shall be subject to all the responsibilities, duties, liabilities and limitations on liability relating thereto and that arise thereafter placed on or for the benefit of the Servicer or Special Servicer by the terms and provisions hereof; *provided, however*, that any failure to perform such duties or responsibilities caused by the terminated party's failure under Section 7.01 to provide information or moneys required hereunder shall not be considered a default by such successor hereunder.

The appointment of a successor Servicer shall not affect any liability of the predecessor Servicer which may have arisen prior to its termination as Servicer, and the appointment of a successor Special Servicer shall not affect any liability of the predecessor Special Servicer which may have arisen prior to its termination as Special Servicer. The Trustee in its capacity as successor to the Servicer or the Special Servicer, as the case may be, shall not be liable for any of the representations and warranties of the Servicer or the Special Servicer, respectively, herein or in any related document or agreement, for any acts or omissions of the predecessor Servicer or Special Servicer or for any losses incurred by the Servicer pursuant to Section 3.06 hereunder, nor shall the Trustee be required to purchase any Mortgage Loan hereunder.

As compensation therefor, the Trustee as successor Servicer shall be entitled to the Servicing Fees and all fees relating to the Mortgage Loans which the Servicer would have been entitled to if the Servicer had continued to act hereunder, including but not limited to any income or other benefit from any Permitted Investment pursuant to Section 3.06, and as successor to the Special Servicer shall be entitled to the Special Servicing Fees to which the Special Servicer would have been entitled if the Special Servicer had continued to act hereunder (other than any Workout Fees owed to the Special Servicer with respect to any Corrected Mortgage Loan). Should the Trustee succeed to the capacity of the Servicer or the Special Servicer, the Trustee shall be afforded the same standard of care and liability as the Servicer or the Special Servicer, as applicable, hereunder notwithstanding anything in Section 8.01 to the contrary, but only with respect to actions taken by it in its role as successor Servicer or successor Special Servicer, as the case may be, and not with respect to its role as Trustee hereunder.

Notwithstanding the above, the Trustee may, if it shall be unwilling to act as successor to the Servicer or Special Servicer, or shall, if it is unable to so act, or if the Trustee is not approved as a servicer or special servicer, as applicable, by each Rating Agency, or if the Holders of Certificates entitled to at least 51% of the Voting Rights so request in writing to the Trustee, promptly appoint, or petition a court of competent jurisdiction to appoint, any established mortgage loan servicing institution which meets the criteria set forth herein, as the successor to the Servicer or the Special Servicer, as applicable, hereunder in the assumption of all or any part of the responsibilities, duties or liabilities of the Servicer or Special Servicer hereunder. No appointment of a successor to the Servicer or the Special Servicer under this Section 7.02 shall be effective (i) until each of the Rating Agencies shall have confirmed in writing that its then-current rating (if any) of each Class of Certificates will not be qualified (as applicable), downgraded or withdrawn by reason thereof and (ii) until the assumption in writing by the successor to the Servicer or the Special Servicer of all its responsibilities, duties and liabilities hereunder that arise thereafter. Pending appointment of a successor to the Servicer or the Special Servicer hereunder, unless the Trustee shall be prohibited by law from so acting, the Trustee shall act in such capacity as herein above provided.

In connection with such appointment and assumption of a successor to the Servicer or Special Servicer as described herein, subject to <u>Section 3.11(a)</u>, the Trustee may make such arrangements for the compensation of such successor out of payments on Mortgage Loans as it and such successor shall agree; *provided, however,* that no such compensation with respect to a successor Servicer or successor Special Servicer, as the case may be, shall be in excess of that permitted the terminated Servicer or Special Servicer, as the case may be, hereunder, excluding, with respect to the Servicer *provided, further,* that if no successor can be obtained for such compensation, then, subject to confirmation by the Rating Agencies that such action will not result in a downgrade, qualification or withdrawal of any rating assigned to the Certificates, additional amounts shall be paid to such successor and such amounts in excess of that permitted the terminated Servicer or Special Servicer, as the case may be, shall be treated as an Applied Loss Amount.  The Trustee, the Servicer or the Special Servicer (whichever is not the terminated party) and such successor shall take such action, consistent with this Agreement, as shall be necessary to effectuate any such succession.  Any out-of-pocket costs and expenses associated with the transfer of the servicing function (other than with respect to a termination for cause, in which case such costs and expenses shall be borne by the predecessor Servicer or Special Servicer) under this Agreement shall be borne by the successor Servicer or Special Servicer.

In connection with the termination or resignation of the Servicer or Special Servicer hereunder, either (i) the successor servicer, including the Trustee if the Trustee is acting as successor Servicer or Special Servicer, shall  represent and warrant that it is a member of MERS in good standing and shall agree to comply in all material respects with the rules and procedures of MERS in connection with the servicing of the Mortgage Loans that are registered with MERS, in which case the predecessor Servicer or Special Servicer shall cooperate with the successor Servicer or Special Servicer in causing MERS to revise its records to reflect the transfer of servicing to the successor Servicer or Special Servicer as necessary under MERS' rules and regulations, or (ii) the predecessor Servicer or Special Servicer shall cooperate with the successor Servicer or Special Servicer in causing MERS to execute and deliver an assignment of Mortgage in recordable form to transfer the Mortgage from MERS to the Trustee and to execute and deliver such other notices, documents and other instruments as may be necessary or desirable to effect a transfer of such Mortgage Loan or servicing of such Mortgage Loan on the MERS® System to the successor Servicer or Special Servicer.  The predecessor Servicer or Special Servicer shall file or cause to be filed any such assignment in the appropriate recording office.  The predecessor Servicer or Special Servicer shall bear any and all fees of MERS, costs of preparing any assignments of Mortgage, and fees and costs of filing any assignments of Mortgage that may be required under this Section 7.02(c).

Section 7.03    <u>Notification to Certificateholders.</u>

(a)     Upon any resignation of the Servicer or the Special Servicer pursuant to <u>Section 6.04</u>, any termination of the Servicer or the Special Servicer pursuant to <u>Section 7.01</u> or any appointment of a successor to the Servicer or the Special Servicer pursuant to <u>Section 7.02</u>, the Trustee shall give prompt written notice thereof to the parties hereto, Certificateholders at their respective addresses appearing in the Certificate Register.

(b)     Not later than the later of (i) 60 days after the occurrence of any event which constitutes or, with notice or lapse of time or both, would constitute an Event of Default and (ii) 5 days after the Trustee would be deemed to have notice of the occurrence of such an event in accordance with Section 8.02(vii), the Trustee shall transmit by mail to the Depositor and all Certificateholders, unless such default shall have been cured.

Section 7.04    Waiver of Events of Default.

The Holders of Certificates representing at least 66 2/3% of the Voting Rights allocated to each Class of Certificates affected by any Event of Default hereunder may waive such Event of Default within 20 days of the receipt of notice from the Trustee of the occurrence of such Event of Default; *provided, however,* that an Event of Default under (x) and (y) of clause (i) of Section 7.01(a) may be waived (i) by 100% of the Certificateholders of the affected Classes and the Trustee or (ii) by the Trustee, in its sole discretion.  Upon any such waiver of an Event of Default and reimbursement by the party requesting such waiver to the Trustee of all reasonable costs and expenses incurred by it in connection with such Event of Default and prior to its waiver, such Event of Default shall cease to exist and shall be deemed to have been remedied for every purpose hereunder.  No such waiver shall extend to any subsequent or other Event of Default or impair any right consequent thereon except to the extent expressly so waived.  Notwithstanding any other provisions of this Agreement, for purposes of waiving any Event of Default pursuant to this Section 7.04, Certificates registered in the name of the Depositor or any Affiliate of the Depositor shall be entitled to the same Voting Rights with respect to the matters described above as they would if any other Person held such Certificates.

Section 7.05    Trustee Advances.

If the Servicer fails to fulfill its obligations hereunder to make any Advances, the Trustee shall perform such obligations on the earlier of (x) within one Business Day of such failure (a failure only occurring after the Servicer's three Business Day cure period under Section 7.01(a)(i)(y) has expired) by the Servicer with respect to Servicing Advances to the extent a Responsible Officer of the Trustee has been notified in writing of such failure with respect to such Servicing Advances and (y) by 1:00 p.m., New York City time, on the related Distribution Date with respect to P&I Advances.  With respect to any such Advance made by the Trustee, the Trustee shall succeed to all of the Servicer's rights with respect to Advances hereunder, including, without limitation, the Servicer's rights of reimbursement and the right to interest on each Advance at the Reimbursement Rate, and rights to determine that a proposed Advance is a Nonrecoverable Advance (without regard to any impairment of any such rights of reimbursement caused by the Servicer's default in its obligations hereunder).

## ARTICLE VIII

## CONCERNING THE TRUSTEE

Section 8.01    Duties of Trustee.

(a)     The Trustee, prior to the occurrence of an Event of Default and after the curing or waiving of all Events of Default which may have occurred, undertakes to perform such

duties and only such duties as are specifically set forth in this Agreement.  If an Event of Default occurs and is continuing, then (subject to Section 8.02(vii) below) the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.  Any permissive right of the Trustee contained in this Agreement shall not be construed as a duty.

(b)     The Trustee, upon receipt of all resolutions, certificates, statements, opinions, reports, documents, orders or other instruments furnished to the Trustee which are specifically required to be furnished pursuant to any provision of this Agreement (other than the Mortgage Files, the review of which is specifically governed by the terms of Article II), shall examine them to determine whether they conform on their face to the requirements of this Agreement.  If any such instrument is found not to conform to the requirements of this Agreement in a material manner, the Trustee shall make a request to the responsible party to have the instrument corrected.  The Trustee shall not be responsible for the accuracy or content of any resolution, certificate, statement, opinion, report, document, order or other instrument furnished by the Depositor, the Servicer or the Special Servicer, and accepted by the Trustee in good faith, pursuant to this Agreement.

(c)     No provision of this Agreement shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct; provided, however, that:

(i)     Prior to the occurrence of an Event of Default, and after the curing of all such Events of Default which may have occurred, the duties and obligations of the Trustee shall be determined solely by the express provisions of this Agreement, the Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Agreement, no implied covenants or obligations shall be read into this Agreement against the Trustee and, in the absence of bad faith on the part of the Trustee, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee and conforming to the requirements of this Agreement;

(ii)    The Trustee shall not be liable for an error of judgment made in good faith by a Responsible Officer or Responsible Officers of the Trustee, unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts;

(iii)   The Trustee shall not be liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of Holders of Certificates entitled to at least 25% of the Voting Rights relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Agreement (unless a higher percentage of Voting Rights is required for such action); and

(iv)     Subject to the other provisions of this Agreement and without limiting the generality of this Section 8.01, the Trustee shall have no duty except in the capacity as successor Servicer or successor Special Servicer (A) to see to any recording, filing or depositing of this Agreement or any agreement referred to herein or any financing statement or continuation statement evidencing a security interest, or to see to the maintenance of any such recording or filing or depositing or to any re-recording, refiling or redepositing of any thereof, (B) to see to any insurance, and (C) notwithstanding its capacity as Servicer or Special Servicer, to confirm or verify the contents of any reports or certificates of the Servicer or Special Servicer delivered to the Trustee pursuant to this Agreement reasonably believed by the Trustee to be genuine and to have been signed or presented by the proper party or parties.

Section 8.02   Certain Matters Affecting the Trustee.

Except as otherwise provided in Section 8.01:

(i)     The Trustee may rely upon and shall be protected in acting or refraining from acting upon any resolution, Officer's Certificate, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, Appraisal, bond or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties;

(ii)     The Trustee may consult with counsel and the written advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in accordance therewith;

(iii)     The Trustee shall be under no obligation to exercise any of the trusts or powers vested in it by this Agreement or to make any investigation of matters arising hereunder or to institute, conduct or defend any litigation hereunder or in relation hereto at the request, order or direction of any of the Certificateholders, pursuant to the provisions of this Agreement, unless, in the Trustee's reasonable opinion, such Certificateholders shall have offered to the Trustee security or indemnity reasonably satisfactory to it against the costs, expenses and liabilities which may be incurred therein or thereby; the Trustee shall not be required to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or indemnity reasonably satisfactory to it against such risk or liability is not reasonably assured to it; nothing contained herein shall, however, relieve the Trustee of the obligation, upon the occurrence of an Event of Default which has not been cured, to exercise such of the rights and powers vested in it by this Agreement, and to use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs;

158

(iv)    The Trustee shall not be liable for any action reasonably taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Agreement;

(v)    Prior to the occurrence of an Event of Default hereunder and after the curing of all Events of Default which may have occurred, the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing to do so by Holders of Certificates entitled to at least 25% of the Voting Rights; provided, however, that if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not reasonably assured to the Trustee by the security afforded to it by the terms of this Agreement, the Trustee may require indemnity reasonably satisfactory to it against such expense or liability as a condition to taking any such action;

(vi)    The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, accountants or attorneys and the Trustee shall not be responsible for any misconduct or negligence on the part of any agents (other than an Affiliate of the Trustee), accountants or attorneys appointed with due care by it hereunder; provided, however, that the appointment of such agents, accountants or attorneys shall not relieve the Trustee of its own liability to perform its duties or obligations hereunder;

(vii)    For all purposes under this Agreement, the Trustee shall not be required to take any action with respect to, or be deemed to have notice or knowledge of any default or Event of Default unless a Responsible Officer of the Trustee has actual knowledge thereof or shall have received written notice thereof.  In the absence of receipt of such notice and such actual knowledge otherwise obtained, the Trustee may conclusively assume that there is no default or Event of Default;

(viii)    The Trustee shall not be responsible for any act or omission of the Servicer, the Special Servicer or the Directing Certificateholder (unless the Trustee is acting as Servicer, Special Servicer or the Directing Certificateholder, as the case may be at the time such action or omission is made) or of the Depositor;

(ix)    The Trustee shall not be required to give any bond or surety in respect of the execution of the Trust Fund created hereby or the power granted hereunder; and

(x)    In order to comply with laws, rules and regulations applicable to banking institutions, including those relating to the funding of terrorist activities and money laundering, the Trustee is required to obtain, verify and record certain

159

information relating to individuals and entities which maintain a business relationship with the Trustee.  Accordingly, each of the parties agrees to provide to the Trustee upon its request from time to time such party's complete name, address, tax identification number and such other identifying information together with copies of such party's constituting documentation, securities disclosure documentation and such other identifying documentation as may be available for such party.

Section 8.03    Trustee Not Liable for Validity or Sufficiency of Certificates or Mortgage Loans.

The recitals contained herein and in the Certificates, other than the acknowledgments of the Trustee in Section 2.02, shall be taken as the statements of the Depositor, the Servicer or the Special Servicer, as the case may be, and the Trustee assumes no responsibility for their correctness.  The Trustee does not make any representations as to the validity or sufficiency of this Agreement or of any Certificate or of any Mortgage Loan or related document or of any Mortgage Loan or related document or of MERS or the MERS® System.  The Trustee shall not be accountable for the use or application by the Depositor of any of the Certificates issued to it or of the proceeds of such Certificates, or for the use or application of any funds paid to the Depositor in respect of the assignment of the Mortgage Loans to the Trust Fund, or any funds deposited in or withdrawn from the Collection Account or any other account by or on behalf of the Depositor, the Servicer, the Special Servicer or the Trustee.  The Trustee shall not be responsible for the accuracy or content of any resolution, certificate, statement, opinion, report, document, order or other instrument furnished by the Depositor, the Servicer or the Special Servicer, and accepted by the Trustee, in good faith, pursuant to this Agreement.

Section 8.04    Trustee May Own Certificates.

The Trustee in its individual capacity and not as Trustee, may become the owner or pledgee of Certificates, and may deal with the Depositor, the Servicer, the Special Servicer, and the Initial Purchasers in banking transactions, with the same rights it would have if it were not Trustee.

Section 8.05    Fees and Expenses of Trustee; Indemnification of Trustee.

(a)    As compensation for the performance of its duties, the Trustee shall be paid the Trustee Fee, equal to one month's interest at the Trustee Fee Rate on the Stated Principal Balance of each Mortgage Loan or REO Loan, which shall cover recurring and ordinary expenses of the Trustee.  The Trustee Fee (which shall not be limited to any provision of law in regard to the compensation of a trustee of an express trust) shall constitute the Trustee's sole form of compensation for all services rendered by it in the execution of the trusts hereby created and in the exercise and performance of any of the powers and duties of the Trustee hereunder.

(b)    The Trustee shall be paid or reimbursed by the Trust Fund upon its request for all reasonable expenses and disbursements incurred by the Trustee pursuant to and in accordance with any of the provisions of this Agreement (including the reasonable compensation

and the expenses and disbursements of its counsel and of all persons not regularly in its employ) except any such expense, disbursement or advance as may arise from its negligence, bad faith or willful misconduct; provided, however, that subject to Section 8.07, respectively, the Trustee shall not refuse to perform any of its duties hereunder solely as a result of the failure to be paid the Trustee Fee or the Trustee's expenses.

(c)     The Trustee and any Affiliate, director, officer, employee or agent of the Trustee shall be indemnified and held harmless by the Trust Fund against any loss, liability or expense (including, without limitation, costs and expenses of litigation, and of investigation, counsel fees, damages, judgments and amounts paid in settlement, and expenses incurred in becoming successor servicer, to the extent not otherwise paid hereunder) arising out of, or incurred in connection with, this Agreement, the Cap Agreements, the Loans, the Certificates or any act or omission of the Trustee relating to the exercise and performance of any of the powers and duties of the Trustee hereunder; provided, however, that neither the Trustee nor any of the other above specified Persons shall be entitled to indemnification pursuant to this Section 8.05(c) for (i) allocable overhead, (ii) routine expenses or disbursements incurred or made by or on behalf of the Trustee in the normal course of the Trustee's performing its duties in accordance with any of the provisions hereof, which are not "unanticipated expenses of the REMIC" within the meaning of Treasury Regulations Section 1.860G-1(b)(3)(ii), (iii) any expense or liability specifically required to be borne thereby pursuant to the terms hereof or (iv) any loss, liability or expense incurred by reason of willful misfeasance, bad faith or negligence in the performance of the Trustee's obligations and duties hereunder, or by reason of negligent disregard of such obligations or duties, or as may arise from a breach of any representation, warranty or covenant of the Trustee made herein. The provisions of this Section 8.05(c) shall survive any resignation or removal of the Trustee and appointment of a successor thereto.

Section 8.06    Eligibility Requirements for Trustee.

The Trustee hereunder shall at all times be, and will be required to resign if it fails to be, (i) a corporation, national bank or national banking association, organized and doing business under the laws of any state or the United States of America, authorized under such laws to exercise corporate trust powers and to accept the trust conferred under this Agreement, having a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal or state authority and shall not be an Affiliate of the Servicer or the Special Servicer (except during any period when the Trustee is acting as, or has become successor to, the Servicer or the Special Servicer, as the case may be, pursuant to Section 7.02), (ii) an institution insured by the Federal Deposit Insurance Corporation and (iii) an institution whose long-term senior unsecured debt is rated "AA-" or higher by S&P (or A+ if its short term unsecured debt is rated at least A-1 by S&P), "Aa3" or higher by Moody's and "AA" by Fitch (or such entity as would not, as evidenced in writing by such Rating Agency, result in the qualification (as applicable), downgrading or withdrawal of any of the then-current ratings assigned thereby to the Certificates).

If such corporation, national bank or national banking association publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section the combined capital and surplus of such corporation, national bank or national banking association shall be deemed to

be its combined capital and surplus as set forth in its most recent report of condition so published.  In the event the place of business from which the Trustee administers the REMICs is in a state or local jurisdiction that imposes a tax on the Trust Fund on the net income of a REMIC (other than a tax corresponding to a tax imposed under the REMIC Provisions), the Trustee shall elect either to (i) resign immediately in the manner and with the effect specified in Section 8.07, (ii) pay such tax at no expense to the Trust Fund or (iii) administer the Trust REMICs from a state and local jurisdiction that does not impose such a tax.

Section 8.07    Resignation and Removal of the Trustee.

(a)    The Trustee may at any time resign and be discharged from the trusts hereby created by giving written notice thereof to the Depositor, the Servicer, the Special Servicer, and all Certificateholders not less than 60 days before the date specified in such notice. Upon receiving such notice of resignation, the Depositor shall promptly appoint a successor trustee acceptable to the Rating Agencies (as evidenced in writing by such Rating Agency that such appointment would not result in the qualification (as applicable), downgrading or withdrawal of any of then-current ratings then assigned thereby to the Certificates) by written instrument, in duplicate, which instrument shall be delivered to the resigning Trustee and to the successor trustee.  A copy of such instrument shall be delivered to the Servicer, the Special Servicer, and the Certificateholders by the Depositor. If no successor trustee shall have been so appointed and have accepted appointment within 30 days after the giving of such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor trustee.  The resigning Trustee shall be responsible for the payment of all reasonable expenses incurred in connection with such resignation and discharge and the appointment of a successor trustee

(b)    If at any time the Trustee shall cease to be eligible in accordance with the provisions of Section 8.06 or if the Depositor has received notice from the Rating Agencies that failure to remove the Trustee will result in a downgrade or withdrawal of the then-current rating assigned to any Class of Certificates, and shall fail to resign after written request therefor by the Depositor or the Servicer, or if at any time the Trustee shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or a receiver of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then the Depositor may remove the Trustee and appoint a successor trustee acceptable to the Rating Agencies (as evidenced in writing by such Rating Agency that such removal and appointment would not result in the qualification (as applicable), downgrading or withdrawal of any of then-current ratings then assigned thereby to the Certificates), by written instrument, in duplicate, which instrument shall be delivered to the Trustee so removed and to the successor trustee.  A copy of such instrument shall be delivered to the Servicer, the Special Servicer, and the Certificateholders by the Depositor.

(c)    The Holders of Certificates entitled to at least 51% of the Voting Rights may at any time remove the Trustee and appoint a successor trustee by written instrument or instruments, in triplicate, signed by such Holders or their attorneys-in-fact duly authorized, one complete set of which instruments shall be delivered to the Servicer, one complete set to the Trustee so removed and one complete set to the successor so appointed. A copy of such

instrument shall be delivered to the Depositor, the Special Servicer, and the remaining Certificateholders by the Servicer.  The Trustee shall be reimbursed for all costs and expenses incurred by it in connection with such removal within 30 days of demand therefor from amounts on deposit in the Certificate Distribution Account.

Any resignation or removal of the Trustee and appointment of a successor Trustee pursuant to any of the provisions of this Section 8.07 shall not become effective until acceptance of appointment by the successor Trustee as provided in Section 8.08.

Within 30 days following any succession of the Trustee under this Agreement, the predecessor Trustee shall be paid all accrued and unpaid compensation and reimbursement as provided for under this Agreement for services rendered and expenses incurred.  No Trustee shall be liable for any action or omission of any successor Trustee.

Section 8.08    Successor Trustee.

(a)    Any successor Trustee appointed as provided in Section 8.07 shall execute, acknowledge and deliver to the Depositor, the Servicer, the Special Servicer and to its predecessor Trustee, an instrument accepting such appointment hereunder, and thereupon the resignation or removal of the predecessor Trustee, shall become effective and such successor Trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor hereunder, with the like effect as if originally named as Trustee herein.  The predecessor Trustee shall deliver to the successor trustee all Mortgage Files and related documents and statements held by it hereunder, and the Depositor, the Servicer, the Special Servicer and the predecessor Trustee shall execute and deliver such instruments and do such other things as may reasonably be required to more fully and certainly vest and confirm in the successor Trustee all such rights, powers, duties and obligations, and to enable the successor Trustee to perform its obligations hereunder.

(b)    No successor Trustee shall accept appointment as provided in this Section 8.08 unless at the time of such acceptance such successor trustee shall be eligible under the provisions of Section 8.06.

(c)    Upon acceptance of appointment by a successor Trustee as provided in this Section 8.08, the Servicer shall mail notice of the succession of such Trustee hereunder to the Depositor and the Certificateholders.  If the Servicer fails to mail such notice within 10 days after acceptance of appointment by the successor Trustee, such successor Trustee shall cause such notice to be mailed at the expense of the Servicer.

Section 8.09    Merger or Consolidation of Trustee.

Any Person into which the Trustee may be merged or converted or with which it may be consolidated or any Person resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any Person succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee, hereunder; *provided* that, in the case of the Trustee, such successor Person shall be eligible under the provisions of Section 8.06, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

163

Section 8.10    Appointment of Co-Trustee or Separate Trustee.

(a)    Notwithstanding any other provisions hereof, at any time, for the purpose of meeting any legal requirements of any jurisdiction in which any part of the Trust Fund or property securing the same may at the time be located, the Servicer and the Trustee acting jointly shall have the power, with the consent of the Directing Certificateholder, and shall execute and deliver all instruments to appoint one or more Persons approved by the Trustee to act as co-trustee or co-trustees, jointly with the Trustee, or separate trustee or separate trustees, of all or any part of the Trust Fund, and to vest in such Person or Persons, in such capacity, such title to the Trust Fund, or any part thereof, and, subject to the other provisions of this Section 8.10, such powers, duties, obligations, rights and trusts as the Servicer and the Trustee may consider necessary or desirable.  If the Servicer shall not have joined in such appointment within 15  days after the receipt by it of a request to do so, or in case an Event of Default shall have occurred and be continuing, the Trustee alone shall have the power to make such appointment.  No co-trustee or separate trustee hereunder shall be required to meet the terms of eligibility as a successor trustee under Section 8.06 hereunder and no notice to Holders of Certificates of the appointment of co-trustee(s) or separate trustee(s) shall be required under Section 8.08.

(b)    In the case of any appointment of a co-trustee or separate trustee pursuant to this Section 8.10, all rights, powers, duties and obligations conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee and such separate trustee or co-trustee jointly, except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed (whether as Trustee hereunder or as successor to the Servicer or the Special Servicer hereunder), the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of title to the Trust Fund or any portion thereof in any such jurisdiction) shall be exercised and performed by such separate trustee or co-trustee at the direction of the Trustee.

(c)    Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the then-separate trustees and co-trustees, as effectively as if given to each of them.  Every instrument appointing any separate trustee or co-trustee shall refer to this Agreement and the conditions of this Article VIII.  Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Trustee or separately, as may be provided therein, subject to all the provisions of this Agreement, specifically including every provision of this Agreement relating to the conduct of, affecting the liability of, or affording protection to, the Trustee.  Every such instrument shall be filed with the Trustee and a copy thereof given to the Servicer and the Depositor.

(d)    Any separate trustee or co-trustee may, at any time, constitute the Trustee, its agent or attorney-in-fact, with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Agreement on its behalf and in its name.  If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

(e)     The appointment of a co-trustee or separate trustee under this <u>Section 8.10</u> shall not relieve the Trustee of its duties and responsibilities hereunder.

Section 8.11     [Reserved.]

Section 8.12     <u>Rule 144A Information.</u>

(a)     For so long as any of the Certificates are "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act, the Trustee agrees to provide to any holder of Certificates and to any prospective purchaser of Certificates designated by such a Certificateholder, upon the request of such Certificateholder or prospective purchaser, the information specified below, which is intended to satisfy the condition set forth in Rule 144A(d)(4) under the Securities Act; provided that this Section shall require, as to the Depositor, the Trustee or the Servicer, only that the Trustee provide publicly available information regarding it, the Depositor, the Trust Fund or the Servicer in response to any such request:

(i)     the Cap Agreements and Mortgage Loan Agreement, Purchase Agreement and any amendments thereto;

(ii)     the Servicer's certificate required pursuant to this Agreement;

(iii)     copies of each statement or report sent to Certificateholders pursuant to this Agreement during the 12 months immediately prior to such request; and

(iv)     such other information as is reasonably available to the Trustee and is directly related to the distributions on the Certificates and the servicing and performance of the Mortgage Loans.

(b)     Any recipient of information provided pursuant to this Section shall agree that such information shall not be disclosed or used for any purpose other than the evaluation of the Certificates by the prospective purchaser.  The Depositor and the Trustee shall have no responsibility for the sufficiency under Rule 144A of any information so provided by the Trustee to any Certificateholder or prospective purchaser of Certificates.

Section 8.13     <u>Representations, Warranties and Covenants of the Trustee.</u>

The Trustee hereby represents and warrants to the Depositor, the Servicer and the Special Servicer and for the benefit of the Certificateholders, as of the Closing Date, that:

(i)     The Trustee is a national banking association, duly organized, validly existing and in good standing under the laws of the United States;

(ii)     The execution and delivery of this Agreement by the Trustee, and the performance and compliance with the terms of this Agreement by the Trustee, will not violate the Trustee's organizational documents or constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default)

under, or result in the breach of, any material agreement or other instrument to which it is a party or which is applicable to it or any of its assets;

(iii)    The Trustee has the full power and authority to enter into and consummate all transactions contemplated by this Agreement, has duly authorized the execution, delivery and performance of this Agreement, and has duly executed and delivered this Agreement;

(iv)    This Agreement, assuming due authorization, execution and delivery by each of the other parties hereto, constitutes a valid, legal and binding obligation of the Trustee, enforceable against the Trustee in accordance with the terms hereof, subject to (a) applicable bankruptcy, insolvency, reorganization, moratorium and other laws affecting the enforcement of creditors' rights generally and the rights of creditors of banks specifically and (b) general principles of equity, regardless of whether such enforcement is considered in a proceeding in equity or at law;

(v)    The Trustee is not in violation of, and its execution and delivery of this Agreement and its performance and compliance with the terms of this Agreement will not constitute a violation of, any law, any order or decree of any court or arbiter, or any order, regulation or demand of any federal, state or local governmental or regulatory authority, which violation, in the Trustee's reasonable judgment, is likely to affect materially and adversely the ability of the Trustee to perform its obligations under this Agreement;

(vi)    No litigation is pending or, to the best of the Trustee's knowledge, threatened against the Trustee which would prohibit the Trustee from entering into this Agreement or, in the Trustee's reasonable judgment, is likely to materially and adversely affect the ability of the Trustee to perform its obligations under this Agreement; and

(vii)    No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Trustee, or compliance by the Trustee with, this Agreement or the consummation of the transactions contemplated by this Agreement, except for any consent, approval, authorization or order which has not been obtained or cannot be obtained prior to the actual performance by the Trustee of its obligations under this Agreement, and which, if not obtained would not have a materially adverse effect on the ability of the Trustee to perform its obligations hereunder.

# ARTICLE IX

# TERMINATION

Section 9.01    Termination Upon Repurchase or Liquidation of All Mortgage Loans.

Subject to Section 9.02, the Trust Fund and the respective obligations and responsibilities under this Agreement of the Depositor, the Servicer, the Special Servicer and the Trustee (other than the obligations of the Trustee to provide for and make payments to Certificateholders as hereafter set forth) shall terminate upon payment (or provision for payment) to the Certificateholders of all amounts held by or on behalf of the Trustee and required hereunder to be so paid on the Distribution Date following the earliest to occur of (i) the purchase by the Directing Certificateholder or the Servicer of all the Mortgage Loans and each REO Property remaining in the Trust Fund at a price equal to (a) the sum of (1) the aggregate Purchase Price of all the Mortgage Loans (exclusive of REO Loans) included in the Trust Fund and (2) the Fair Value of each REO Property, if any, included in the Trust Fund minus (b) solely in the case where the Servicer is effecting such purchase, the aggregate amount of unreimbursed Advances, together with any Advance Interest accrued and payable to the Servicer and any unpaid Servicing Fees, remaining outstanding (which items shall be deemed to have been paid or reimbursed to the Servicer in connection with such purchase), (ii) the Rated Final Distribution Date and (iii) the final payment or other liquidation (or any advance with respect thereto) of the last Mortgage Loan or REO Property remaining in the Trust Fund; *provided, however,* that in no event shall the trust created hereby continue beyond the earlier of (i) the Latest Possible Maturity Date and (ii) the expiration of 21 years from the death of the last survivor of the descendants of Joseph P. Kennedy, the late ambassador of the United States to the Court of St. James's, living on the date hereof.

The Directing Certificateholder may, at its option, elect to purchase all of the Mortgage Loans and each REO Property remaining in the Trust Fund as contemplated by clause (i) of the preceding paragraph by giving written notice to the Trustee and the other parties hereto within 30 days of the first Distribution Date on which the aggregate Stated Principal Balances of the Mortgage Loans and any REO Loans remaining in the Trust Fund is less than ten percent of the aggregate Cut-off Date Principal Balance of the Mortgage Loans set forth in the Preliminary Statement.  If the Directing Certificateholder does not exercise such option within 30 days after it becomes exercisable by the Directing Certificateholder, Servicer may notify the Directing Certificateholder and the Trustee of its intention to exercise such option and if the Directing Certificateholder does not exercise such option within ten Business Days thereafter, Servicer shall be entitled to exercise such option.

If the Directing Certificateholder or the Servicer purchases all of the Mortgage Loans and each REO Property remaining in the Trust Fund in accordance with the preceding paragraph, the Directing Certificateholder or the Servicer, as applicable, shall deposit in the Certificate Distribution Account not later than the P&I Advance Date relating to the Distribution Date on which the final distribution on the Certificates is to occur, an amount in immediately available funds equal to the above-described purchase price (exclusive of any portion thereof payable to any Person other than the Certificateholders pursuant to Section 3.05(a), which

portion shall be deposited in the Collection Account.  In addition, the Servicer shall transfer to the Certificate Distribution Account all amounts required to be transferred thereto on such P&I Advance Date from the Collection Account pursuant to the first paragraph of Section 3.04(b), together with any other amounts on deposit in the Collection Account that would otherwise be held for future distribution.  Upon confirmation that such final deposits have been made, the Trustee shall release or cause to be released to the Directing Certificateholder or the Servicer, as applicable, the Mortgage Files for the remaining Mortgage Loans, and the Trustee shall execute all assignments, endorsements and other instruments furnished to it by the Directing Certificateholder or the Servicer, as applicable, as shall be necessary to effectuate transfer of the Loans and REO Properties remaining in the Trust Fund and its rights under the Mortgage Loan Purchase Agreement.

Notice of any termination pursuant to this Section 9.01 shall be given promptly by the Trustee by letter to the Certificateholders, and each Rating Agency and, if not previously notified pursuant to this Section 9.01, to the other parties hereto mailed (a) in the event such notice is given in connection with the purchase of all of the Mortgage Loans and each REO Property remaining in the Trust Fund, not earlier than the 15th day and not later than the 25th day of the month next preceding the month of the final distribution on the Certificates, or (b) otherwise during the month of such final distribution on or before the P&I Advance Determination Date in such month, in each case specifying (i) the Distribution Date upon which the Trust Fund will terminate and final payment of the Certificates will be made, (ii) the amount of any such final payment and (iii) that the Record Date otherwise applicable to such Distribution Date is not applicable, payments being made only upon presentation and surrender of the Certificates at the offices of the Trustee or such other location therein designated.

Upon presentation and surrender of the Certificates by the Certificateholders on the final Distribution Date, the Trustee shall distribute to each Certificateholder so presenting and surrendering its Certificates such Certificateholder's Percentage Interest of that portion of the amounts then on deposit in the Certificate Distribution Account that are allocable to payments on the Class of Certificates so presented and surrendered, in the amounts and in accordance with the priority set forth in Section 4.01.  Any funds not distributed on such Distribution Date shall be set aside and held uninvested in trust for the benefit of Certificateholders not presenting and surrendering their Certificates in the aforesaid manner and shall be disposed of in accordance with this Section 9.01 and Section 4.03(b).

Section 9.02    Additional Termination Requirements.

(a)    If the Directing Certificateholder or the Servicer purchases all of the Mortgage Loans and each REO Property remaining in the Trust Fund as provided in Section 9.01, the Trust Fund shall be terminated in accordance with the following additional requirements, unless the Trustee has been supplied with an Opinion of Counsel, at the expense of the Person exercising such purchase option, to the effect that the failure to comply with the requirements of this Section 9.02 will not (i) result in the imposition of taxes on "prohibited transactions" on any REMIC as defined in section 860F of the Code, or (ii) cause any REMIC to fail to qualify as a REMIC at any time that any Certificates are outstanding:

(i)        Within 90 days prior to the final Distribution Date set forth in the notice given by the terminating party under Section 9.01, the terminating party shall prepare and the Trustee, at the expense of the terminating party, shall adopt a plan of complete liquidation within the meaning of section 860F(a)(4) of the Code which, as evidenced by an Opinion of Counsel (which opinion shall not be an expense of the Trustee), meets the requirements of a qualified liquidation; and

(ii)        Within 90 days after the time of adoption of such a plan of complete liquidation, the Trustee shall sell all of the assets of the Trust Fund to the Person exercising the purchase option for cash.

(b)        The Trustee as agent for any REMIC hereby agrees to adopt and sign such a plan of complete liquidation upon the written request of the terminating party, and the receipt of the Opinion of Counsel referred to in Section 9.02(a)(i) and to take such other action in connection therewith as may be reasonably requested by the terminating party.

(c)        By their acceptance of the Certificates, the Holders thereof hereby authorize the terminating party to prepare and the Trustee to adopt and sign a plan of complete liquidation.

## ARTICLE X

## MISCELLANEOUS PROVISIONS

Section 10.01  Amendment.

(a)        This Agreement may be amended from time to time by the parties hereto, without the consent of any of the Certificateholders:

(i)        to cure any ambiguity;

(ii)        to correct or supplement any provisions herein or therein, which may be inconsistent with any other provisions herein or therein or to correct any error or to correct any error or conform the provisions hereof, to statements made in the Private Placement Memorandum;

(iii)        to modify, eliminate or add to any of its provisions to such extent as shall be necessary to maintain the qualification of any REMIC as a REMIC under the Code, or to avoid or minimize the risk of the imposition of any tax on the Trust Fund or any REMIC pursuant to the Code that would be a claim against the Trust Fund or any REMIC, or comply with any other provisions of the Code, provided that (a) the Trustee has received an Opinion of Counsel to the effect that (a) such action is necessary or desirable to maintain such qualification or to avoid or minimize the risk of the imposition of any such tax, (b) such action will not adversely affect in any material respect the interests of any Certificateholder, and (c) such change shall not result in the withdrawal, downgrade or qualification of the then-current rating assigned to any Class of Certificates, as evidenced by a letter from each Rating Agency to such effect;

(iv)    to change the timing and/or nature of deposits into the Collection Account, the Certificate Distribution Accounts or REO Account or to change the name in which the Collection Account is maintained, provided that (a) the P&I Advance Date shall in no event be later than the related Distribution Date, (b) such change shall not, as evidenced by an Opinion of Counsel addressed to the Trustee, adversely affect in any material respect the interests of any Certificateholder and (c) such change shall not result in the withdrawal, downgrade or qualification of the then-current rating assigned to any Class of Certificates, as evidenced by a letter from each Rating Agency to such effect;

(v)    to modify, eliminate or add to any of the provisions hereof restricting transfer of the Residual Certificates by virtue of their being the REMIC "residual interests," provided that (a) such change shall not result in the withdrawal, downgrade or qualification of the then-current rating assigned to any Class of Certificates, as evidenced by a letter from each Rating Agency to such effect, and (b) such change shall not, as evidenced by an Opinion of Counsel addressed to the Trustee (at the expense of the requesting party), cause the Trust Fund or  any REMIC or any of the Certificateholders (other than the Transferor) to be subject to a federal tax caused by a Transfer to a Person that is a Disqualified Organization or a Non-U.S. Person or a Transfer from a Person other than a U.S. Person;

(vi)    to make any other provisions with respect to matters or questions arising under this Agreement, provided that such action shall not, as evidenced by an Opinion of Counsel addressed to the Trustee, adversely affect in any material respect the interests of any Certificateholder not consenting thereto; and

(vii)    to amend or supplement any provision hereof to the extent necessary to maintain the then-current rating or ratings assigned to each Class of Certificates by each Rating Agency as confirmed in writing.

(b)    This Agreement may also be amended from time to time by the parties hereto with the consent of the Holders of Certificates evidencing in the aggregate not less than 66 2/3% of the Percentage Interests of each Class of Certificates affected thereby for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Agreement or of modifying in any manner the rights of the Holders of Certificates of such Class; provided, however, that no such amendment shall:

(i)           reduce in any manner the amount of, or delay the timing of, payments which are required to be distributed on any Certificate without the consent of the Holder of such Certificate; or

(ii)           reduce the aforesaid percentage of Certificates of any Class the Holders of which are required to consent to any such amendment, in any such case without the consent of the Holders of all Certificates of such Class then outstanding; or

(iii)           adversely affect the Voting Rights of any Class of Certificates without the consent of the Holders of all Certificates of such Class then outstanding; or

(iv)           modify the Servicing Standard in any manner which adversely affects Certificateholders without the consent of the Holders of all Certificates.

(c)      Notwithstanding the foregoing, the Trustee and the Servicer will not be required to consent to any amendment hereto without having first received an Opinion of Counsel to the effect that such amendment or the exercise of any power granted to the Servicer, the Depositor, the Special Servicer, the Trustee or any other specified person in accordance with such amendment will not result in the imposition of a tax on the Trust Fund or any REMIC or cause any REMIC to fail to qualify as a REMIC or the remaining portion of the Trust Fund to fail to qualify as a grantor trust.

(d)      Promptly after the execution of any such amendment, the Trustee shall furnish a copy of such amendment to the parties hereto, each Rating Agency, and each Certificateholder.

(e)      It shall not be necessary for the consent of Certificateholders under this Section 10.01 to approve the particular form of any proposed amendment, but it shall be sufficient if such consent shall approve the substance thereof.  The manner of obtaining such consents and of evidencing the authorization of the execution thereof by Certificateholders shall be subject to such reasonable regulations as the Trustee may prescribe.

(f)      The Trustee may, but shall not be obligated to, enter into any amendment pursuant to this Section that affects its rights, duties and immunities under this Agreement or otherwise.

(g)      The cost of any Opinion of Counsel to be delivered pursuant to Section 10.01(a), (b) or (c) shall be borne by the Person seeking the related amendment, except that if the Servicer, the Special Servicer or the Trustee requests any amendment of this Agreement in furtherance of the rights and interests of Certificateholders, the cost of any Opinion of Counsel required in connection therewith pursuant to Section 10.01(a) or (c) shall be payable out of the Collection Account as a Trust Fund expense.

(h)      Any material change or amendment to this Agreement shall not be effective unless and until the party requesting such amendment has received confirmation in writing from the Rating Agencies that such amendment will not result in a withdrawal, downgrade or qualification of the then-current rating assigned to any Class of Certificates.

Section 10.02  Recordation of Agreement; Counterparts.

(a)      To the extent permitted by applicable law, this Agreement is subject to recordation in all appropriate public offices for real property records in all the counties or other comparable jurisdictions in which any or all of the properties subject to the Mortgages are situated, and in any other appropriate public recording office or elsewhere, such recordation to be

effected by the Servicer at the expense of the Depositor on direction by the Trustee, but only upon direction accompanied by an Opinion of Counsel (the cost of which shall be paid by the Depositor) to the effect that such recordation materially and beneficially affects the interests of the Certificateholders.

(b)     For the purpose of facilitating the recordation of this Agreement as herein provided and for other purposes, this Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.

Section 10.03   Limitation on Rights of Certificateholders.

(a)     The death or incapacity of any Certificateholder shall not operate to terminate this Agreement or the Trust Fund, nor entitle such Certificateholder's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Trust Fund, nor otherwise affect the rights, obligations and liabilities of the parties hereto or any of them.

(b)     No Certificateholder shall have any right to vote (except as expressly provided for herein) or in any manner otherwise control the operation and management of the Trust Fund, or the obligations of the parties hereto, nor shall anything herein set forth, or contained in the terms of the Certificates, be construed so as to constitute the Certificateholders from time to time as partners or members of an association; nor shall any Certificateholder be under any liability to any third party by reason of any action taken by the parties to this Agreement pursuant to any provision hereof.

(c)     No Certificateholder shall have any right by virtue of any provision of this Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Agreement or any Loan, unless, with respect to any suit, action or proceeding upon or under or with respect to this Agreement, such Holder previously shall have given to the Trustee a written notice of default hereunder, and of the continuance thereof, as hereinbefore provided, and unless also (except in the case of a default by the Trustee) the Holders of Certificates of any Class evidencing not less than 25% of the related Percentage Interests in such Class shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as Trustee hereunder and shall have offered to the Trustee such reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred therein or thereby, and the Trustee, for 60 days after its receipt of such notice, request and offer of indemnity, shall have neglected or refused to institute any such action, suit or proceeding. The Trustee shall be under no obligation to exercise any of the trusts or powers vested in it hereunder or to institute, conduct or defend any litigation hereunder or in relation hereto at the request, order or direction of any of the Holders of Certificates unless such Holders have offered to the Trustee reasonable security against the costs, expenses and liabilities which may be incurred therein or hereby.

It is understood and intended, and expressly covenanted by each Certificateholder with every other Certificateholder and the Trustee, that no one or more Holders of Certificates shall have any right in any manner whatsoever by virtue of any provision of this Agreement to

affect, disturb or prejudice the rights of the Holders of any other of such Certificates, or to obtain or seek to obtain priority over or preference to any other such Holder, which priority or preference is not otherwise provided for herein, or to enforce any right under this Agreement, except in the manner herein provided and for the equal, ratable and common benefit of all Certificateholders.  For the protection and enforcement of the provisions of this Section 10.03(c), each and every Certificateholder and the Trustee shall be entitled to such relief as can be given either at law or in equity.

Section 10.04  Governing Law; Consent to Jurisdiction; Waiver of Jury Trial.

(a)     THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW), AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

(b)     THE SERVICER, THE SPECIAL SERVICER, THE DEPOSITOR AND THE TRUSTEE HEREBY SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND THE UNITED STATES DISTRICT COURT LOCATED IN THE BOROUGH OF MANHATTAN IN NEW YORK CITY, SOLELY WITH RESPECT TO MATTERS ARISING UNDER THIS AGREEMENT, AND EACH WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT AND CONSENTS THAT ALL SUCH SERVICE OF PROCESS BE MADE BY REGISTERED MAIL DIRECTED TO THE ADDRESS SET FORTH IN SECTION 10.05 AND SERVICE SO MADE SHALL BE DEEMED TO BE COMPLETED UPON RECEIPT THEREOF.  THE SERVICER, THE SPECIAL SERVICER, THE DEPOSITOR AND THE TRUSTEE EACH HEREBY WAIVES ANY OBJECTION BASED ON FORUM NON CONVENIENS, AND ANY OBJECTION TO VENUE OF ANY ACTION INSTITUTED HEREUNDER AND CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY THE COURT. NOTHING IN THIS SECTION SHALL AFFECT THE RIGHT OF THE SERVICER, THE SPECIAL SERVICER, THE DEPOSITOR AND THE TRUSTEE TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR AFFECT THE RIGHT OF ANY SUCH PERSON TO BRING ANY ACTION OR PROCEEDING IN THE COURTS OF ANY OTHER JURISDICTION.

(c)     THE SERVICER, THE SPECIAL SERVICER, THE DEPOSITOR AND THE TRUSTEE EACH HEREBY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE ARISING OUT OF, CONNECTED WITH, RELATED TO, OR IN CONNECTION WITH THIS AGREEMENT. INSTEAD, ANY DISPUTE RESOLVED IN COURT WILL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

Section 10.05  Notices.

Any communications provided for or permitted hereunder shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given if

personally delivered at or mailed by registered mail, postage prepaid (except for notices to the Trustee which shall be deemed to have been duly given only when received), to:

If to the Servicer, to:

GMAC Commercial Mortgage Corporation
118 Welsh Road
Horsham, Pennsylvania 19044
Attention: Managing Director Commercial Servicing Operations

Telephone:  215-328-1858
Telecopier:  215-328-3478

With a copy to:
GMAC Commercial Mortgage Corporation
200 Witmer Road
Horsham, Pennsylvania 19044
Attention: General Counsel

If to the Trustee, to:

Deutsche Bank National Trust Company
1761 East St. Andrew Place
Santa Ana, California 92705
Attention: Trust Administration-CC0601

If to the Depositor, to:

CBA Commercial Assets, LLC
Financial Centre
695 East Main Street
Stamford, Connecticut 06901
Telephone:  (203) 548-9250
Facsimile:  (203) 548-9251

With a copy to
Phillip J. Kardis II
Kirkpatrick & Lockhart Nicholson Graham, LLP
1601 K Street, NW
Washington, DC 20006

If to the Rating Agencies, to:

Standard & Poor's Ratings Services
55 Water Street, 41st Floor
New York, New York 10041
Attn: CMBS Survellance Group

174

Telephone: (212) 438-2000
Telecopier: (212) 438-2661

Fitch, Inc.
One State Street Plaza, 30th Floor
New York, New York 10004
Attn: CBA Commercial Mortgage Pass-Through Certificates, Series 2006-1
Telephone: (212) 908-0500
Telecopier: (212) 480-4435

Moody's Investors Service, Inc.
99 Church Street 21W
New York, New York 10007
Attn: CBA Commercial Mortgage Pass-Through Certificates, Series 2006-1
Telephone: (212)
Telecopier: (212)

Any communication required or permitted to be delivered to a Certificateholder shall be deemed to have been duly given when mailed first Class, postage prepaid, to the address of such Holder as shown in the Certificate Register.  Any notice so mailed within the time prescribed in this Agreement shall be conclusively presumed to have been duly given, whether or not the Certificateholder receives such notice.

Section 10.06  Severability of Provisions.

If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be for any reason whatsoever held invalid, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement or of the Certificates or the rights of the Holders thereof.

Section 10.07  Grant of a Security Interest; Intended Characterization.

(a)    It is intended that the conveyance by the Depositor to the Trustee of the Mortgage Loans and other assets in the Trust Fund, as provided for in Section 2.01 be construed as a sale by the Depositor to the Trustee of such assets for the benefit of the Certificateholders.  Further, it is not intended that any such conveyance be deemed to be a pledge of the Mortgage Loans by the Depositor to the Trustee to secure a debt or other obligation of the Depositor.  In the event that the Mortgage Loans, however, are held to be property of the Depositor or if for any reason this Agreement is held or deemed to create, however, a security interest in the Mortgage Loans and other assets in the Trust Fund, then it is intended that (X) this Agreement shall also be deemed to be a security agreement within the meaning of Articles 8 and 9 of the New York UCC (or the Relevant UCC if not the New York UCC); (b) the conveyances provided for in Section 2.01 shall be deemed to be (1) a grant by the Depositor to the Trustee of a security interest in all of the Depositor's right (including the power to convey title thereto), title and interest, whether now owned or hereafter acquired, in and to (A) the Mortgage Loans, including with respect to each Mortgage Loan, the Mortgage Notes, the Mortgages, any related insurance policies and all

other documents in the related Mortgage Files, (B) all amounts payable pursuant to the Mortgage Loans in accordance with the terms thereof, (C) any Eligible Investments held in any Trust Account, and (D) any and all general intangibles consisting of, arising from or relating to any of the foregoing, and all proceeds of the conversion, voluntary or involuntary, of the foregoing into cash, instruments, securities or other property, including without limitation all amounts from time to time held or invested in the Trust Accounts, whether in the form of cash, instruments, securities or other property and (2) an assignment by the Depositor to the Trustee of any security interest in any and all of the Depositor's right (including the power to convey title thereto), title and interest, whether now owned or hereafter acquired, in and to the property described in the foregoing clauses (1)(A), (B), (C), and (D), (Y) the possession by the Trustee or any agent of the Trustee on behalf of Certificateholders of Mortgage Notes or such other items of property as constitute instruments, money, negotiable documents or chattel paper shall be deemed to be "possession by the secured party," or possession by a purchaser or a person designated by such secured party, for purposes of perfecting the security interest pursuant to the New York UCC and any other Relevant UCC (including, without limitation, Section 9-313, 8-313 or 8-321 thereof); and (Z) notifications to persons holding such property, and acknowledgments, receipts or confirmations from persons holding such property, shall be deemed notifications to, or acknowledgments, receipts or confirmations from, financial intermediaries, bailees or agents (as applicable) of the Trustee on behalf of Certificateholders for the purpose of perfecting such security interest under applicable law.

(b)     The Depositor and, at the Depositor's direction, the Trustee on behalf of Certificateholders shall, to the extent consistent with this Agreement, take such reasonable actions as may be necessary to ensure that, if this Agreement were deemed to create a security interest in the Mortgage Loans and the other property described above, such security interest would be deemed to be a perfected security interest of first priority under applicable law and will be maintained as such throughout the term of this Agreement. Without limiting the generality of the foregoing, the Depositor shall prepare and forward for filing, or shall cause to be forwarded for filing, at the expense of the Depositor, all filings necessary to maintain the effectiveness of any original filings necessary under the Relevant UCC to perfect the Trustee's security interest in or lien on the Mortgage Loans as evidenced by an Officer's Certificate of the Depositor, including without limitation (x) continuation statements, and (y) such other statements as may be occasioned by (1) any change of name of the Seller, the Depositor or the Trustee, (2) any change of location of the place of business or the chief executive office of the Seller or the Depositor or (3) any transfer of any interest of the Seller or the Depositor in any Mortgage Loan.

The Depositor shall not organize under the law of any jurisdiction other than the State under which it is organized as of the Closing Date (whether changing its jurisdiction of organization or organizing under an additional jurisdiction) without giving 30 days prior written notice of such action to its immediate and mediate transferee, including the Trustee. Before effecting such change, the Depositor shall prepare and file in the appropriate filing office any financing statements or other statements necessary to continue the perfection of the interests of its immediate and mediate transferees, including the Trustee, in the Mortgage Loans. In connection with the transactions contemplated by the Basic Documents, the Depositor authorizes its immediate or mediate transferee, including the Trustee, to file in any filing office any initial financing statements, any amendments to financing statements, any continuation statements, or any other statements or filings described in this Section 10.07(b) (it being understood that the

Trustee has no obligation to make such filings).

(c)     The Depositor shall not take any action inconsistent with the sale by the Depositor of all of its right, title and interest in and to the Trust Fund and shall indicate or shall cause to be indicated in its records and records held on its behalf that ownership of each Mortgage Loan and the other property of the Trust Fund is held by the Trustee on behalf of Certificateholders. In addition, the Depositor shall respond to any inquiries from third parties with respect to ownership of a Mortgage Loan or any other property of the Trust Fund by stating that it is not the owner of such Mortgage Loan and that ownership of such Mortgage Loan or other property of the Trust Fund is held by the Trustee on behalf of the Certificateholders.

Section 10.08  Successors and Assigns; Beneficiaries.

The provisions of this Agreement shall be binding upon and inure to the benefit of the respective successors and assigns of the parties hereto, and all such provisions shall inure to the benefit of the Certificateholders. No other person, including, without limitation, any Borrower, shall be entitled to any benefit or equitable right, remedy or claim under this Agreement.

Section 10.09  Article and Section Headings.

The article and Section headings herein are for convenience of reference only, and shall not limit or otherwise affect the meaning hereof.

Section 10.10  Notices to Rating Agencies.

(a)     The Trustee shall use reasonable efforts promptly to provide notice to each Rating Agency with respect to each of the following of which a Responsible Officer of the Trustee has actual knowledge:

(i)      any material change or amendment to this Agreement;

(ii)     the occurrence of any Event of Default that has not been cured;

(iii)    the resignation or termination of the Servicer or the Special Servicer;

(iv)     any change in the location of the Certificate Distribution Accounts;

(v)      the repurchase of Mortgage Loans by a Seller pursuant to Section 7 of the related Mortgage Loan Purchase Agreement; and

(vi)     the final payment to any Class of Certificateholders.

(b)     The Servicer shall use reasonable efforts promptly to provide notice to each Rating Agency with respect to each of the following of which it has actual knowledge:

(i)      the resignation or removal of the Trustee; and

177

(ii)     any change in the location of the Collection Account.

(c)     Each of the Servicer and the Special Servicer shall promptly furnish to each Rating Agency copies of the following:

(i)     each of its annual statements as to compliance described in <u>Section 3.13</u>;

(ii)     each of its annual independent public accountants' servicing reports described in <u>Section 3.14</u>; and

(iii)     any other document that shall be reasonably requested by any Rating Agency.

(d)     The Trustee shall promptly after each Distribution Date make available to each Rating Agency a copy of the related Statement to Certificateholders.

IN WITNESS WHEREOF, the parties hereto have caused their names to be signed hereto by their respective officers thereunto duly authorized, in each case as of the day and year first above written.

CBA COMMERCIAL ASSETS, LLC
    as Depositor

By: CBA COMMERCIAL MANAGEMENT, INC.,
    its Manager

By: _____
    Name:  Clayton E. Andrews
    Title:   President

GMAC COMMERCIAL MORTGAGE
    CORPORATION
    as Servicer

By: _____
    Name:
    Title:

GMAC Commercial Mortgage Corporation
    as Special Servicer

By: _____
    Name:
    Title:

DEUTSCHE BANK NATIONAL TRUST COMPANY
    as Trustee

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

IN WITNESS WHEREOF, the parties hereto have caused their names to be signed hereto by their respective officers thereunto duly authorized, in each case as of the day and year first above written.

CBA COMMERCIAL ASSETS, LLC
as Depositor

By: CBA COMMERCIAL MANAGEMENT, INC.,
its Manager

By: _____
Name:
Title:

GMAC COMMERCIAL MORTGAGE
CORPORATION
as Servicer

By: _____
Name:  Edward R. Finkenstaedt
Title:  Senior Vice President

GMAC Commercial Mortgage Corporation
as Special Servicer

By: _____
Name:
Title:

DEUTSCHE BANK NATIONAL TRUST COMPANY
as Trustee

By: _____
Name:
Title:

By: _____
Name:
Title:

CBAC 2006-1 PSA

IN WITNESS WHEREOF, the parties hereto have caused their names to be signed hereto by their respective officers thereunto duly authorized, in each case as of the day and year first above written.

CBA COMMERCIAL ASSETS, LLC
    as Depositor

By: CBA COMMERCIAL MANAGEMENT, INC.,
    its Manager

By: _____
    Name:
    Title:

GMAC COMMERCIAL MORTGAGE
    CORPORATION
    as Servicer

By: _____
    Name:
    Title:

GMAC Commercial Mortgage Corporation
    as Special Servicer

By: _Michael Carp_____
    Name: Michael Carp
    Title: Sr. Vice President

DEUTSCHE BANK NATIONAL TRUST COMPANY
    as Trustee

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

CBAC 2006-1 PSA

IN WITNESS WHEREOF, the parties hereto have caused their names to be signed hereto by their respective officers thereunto duly authorized, in each case as of the day and year first above written.

CBA COMMERCIAL ASSETS, LLC
    as Depositor

By: CBA COMMERCIAL MANAGEMENT, INC.,
    its Manager

By: _____
    Name:
    Title:

GMAC COMMERCIAL MORTGAGE
    CORPORATION
    as Servicer

By: _____
    Name:
    Title:

GMAC Commercial Mortgage Corporation
    as Special Servicer

By: _____
    Name:
    Title:

DEUTSCHE BANK NATIONAL TRUST COMPANY
    as Trustee

By: _____
    Name: Barbara Campbell
    Title: Vice President

By: _____
    Name: Valerie Delgado
    Title: Assistant Vice President

CBAC 2006-1 PSA