**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

**JUAN VALDERA**
**SOBIEDA VALDERA**
**BAHIJ BOUTROS**

  **Vs**         **CA No. 20-cv-470**

**PHH MORTGAGE CORPORATION**
**DEUTSCHE BANK NATIONAL TRUST**
**COMPANY AS TRUSTEE FOR THE REGISTERED HOLDERS OF**
**CBA COMMERCIAL ASSETS,**
**SMALL BALANCE COMMERCIAL MORTGAGE PASS-THROUGH**
**CERTIFICATES, SERIES 2006-1**

## MEMORANDUM IN SUPPORT OF OBJECTION TO MOTION FOR SUMMARY JUDGMENT

   This matter is before the Court on Defendants' Motion for Summary Judgment. Plaintiffs' complaint consists of two claims. The first is a Declaratory Judgment action which requests that the Court declare that the Promissory Note executed by the Plaintiffs is not a negotiable instrument and as a result cannot be transferred pursuant to Article 3 of the Rhode Island Uniform Commercial Code by and endorsement in blank.  The second Count is a complaint under the Fair Debt Collection Practices Act, in which Juan Valdera, a resident of the property located at 273-277  Rand Street, Central Falls, Rhode Island since he purchased it with the other Plaintiffs on August 1, 2005 sued PHH Mortgage Corporation for violations of the

FDCPA for threatening to exercise the statutory power of sale without the ability to do so due to the fact that Deutsche Bank as Trustee had not been transferred an interest in the promissory note and because forty five days prior to mailing this particular Notice of Sale the Plaintiffs were not provided a Notice of Foreclosure Counseling pursuant to R.I.G.L. 34-27-3.1.

Plaintiffs  filed this complaint seeking a Temporary Restraining Order against  Deutsche Bank National Trust Company alleging that the Defendant does not own the note and is not the agent for the owner of the note and because the Plaintiffs were not mailed a Notice of Foreclosure Counseling prior to this Notice of Sale. They have made certain allegations which supported their Motion. Plaintiff Juan Valdera ("Juan") is a resident of the State of Rhode Island with an address of  273-275 Rand Street, Central Falls, Rhode Island. Plaintiff Sobieda Valdera ("Sobieda") is a resident of the City of Warwick, Rhode Island. Plaintiff, Bahij Boutros ("Boutros") is a resident of the City of Cranston. They own the property located at 273-275 Rand Street, Central Falls, Rhode Island. The Plaintiffs as Borrowers executed a Promissory Note in the amount of $300,000.00 to New Century Mortgage Corporation on August 1, 2006 in conjunction with the purchase of said property, which when Plaintiffs purchased this property,

2

they moved into this multi unit property as their residence. Juan Valdera still lives in this property as his residence.

On August 1, 2006, Plaintiffs executed a mortgage to New Century  to secure the promissory note.   A copy of the Note is attached as Exhibit A and a copy of the mortgage is attached as Exhibit B.     Deutsche Bank National Trust Company as Trustee for the Holders of Commercial Assets, Small Balance Commercial Mortgage Pass-through Certificates, Series 2006-1 ("Deutsche Bank") is the owner of the mortgage.    Defendant, PHH Mortgage Corporation ("PHH"), is a loan servicer and is the loan servicer for our mortgage.   Korde & Associates, PC ("Korde")  scheduled a foreclosure sale for the Plaintifff's  property and Juan Valdera's  residence on November 4, 2020 at 12:00 PM.   A copy of this Notice of Sale mailed on September 11, 2020 is attached as Exhibit C.  The Plaintiffs have alleged that the note has not been endorsed. However since the  note is  not a negotiable instrument as defined by the Rhode Island Uniform Commercial Code, a blank endorsement will not transfer the Note, since Article 3 of the Uniform Commercial Code will not apply.

## R.I.G.L. 34-27-3.1 MANDATES THAT A NOTICE OF FORECLOSURE COUNSELING BE PROVIDED TO THE MORTGAGOR PRIOR TO MAILING ANY NOTICE OF SALE

In this case there is no dispute that prior to the mailing of the second Notice of Sale that PHH on behalf of Deutsche Bank did not provide a Notice of Foreclosure Counseling to  Plaintiffs  pursuant to R.I.G.L. § 34-27-3.1 at least 45 days prior to the mailing of that second notice of sale. This statute states:

### § 34-27-3.1. Foreclosure counseling.

(a) No less than forty-five (45) days **prior to initiating any** foreclosure of real estate pursuant to subsection 34-27-4(b), the **mortgagee shall provide to an individual consumer mortgagor** written notice of default and the mortgagee's right to foreclose by first class mail at the address of the real estate and, if different, at the address designated by the mortgagor by written notice to the mortgagee as the mortgagor's address for receipt of notices.

(b) The written notice required by this section shall be in English and Spanish and, provided the same is then available, shall advise the mortgagor of the availability of counseling through HUD-approved mortgage counseling agencies and, the toll-free telephone number and website address

4

maintained to provide information regarding no-cost HUD-approved mortgage counseling agencies in Rhode Island. The written notice may also contain any other information required under federal law. A form of written notice meeting the requirements of this section shall be promulgated by the department of business regulation for use by mortgagees at least thirty (30) days prior to the effective date of this section. Counseling shall be provided at no cost to the mortgagee.

(c) Failure of the mortgagee to provide notice to the mortgagor as provided herein shall render the foreclosure void, without limitation of the right of the mortgagee thereafter to reexercise its power of sale or other means of foreclosure upon compliance with this section. The mortgagee shall include in the foreclosure deed an affidavit of compliance with this section.

(d) As used herein and in this chapter, the term "HUD" means the United States Department of Housing and Urban Development and any successor to such department.

This statute provides that failure to provide Plaintiffs a separate Notice of Foreclosure Counseling at least forty five days before initiating any foreclosure by mailing a Notice of Sale will render the sale void. PHH had previously mailed the Plaintiffs a prior Notice of Sale which had

purportedly been accompanied by a Notice of Foreclosure Counseling.
There is a no dispute that it did not the second time provide this legally
mandated notice. The current Notice of Sale was not  preceded by a new
Notice of Foreclosure counseling provided to Plaintiffs in regard to this
Notice of Sale at least 45 days prior to July 7, 2021. There is no dispute
about this allegation. This statute clearly requires that there be proof that the
mortgagor receive this Notice.   This precondition was for "any Notice of
sale" and was a remedial statute to be read together with the other statutes in
that Chapter of the General Laws. R.I.G.L. 34-27-3.2 requires mediation
notice compliance with limitations, such as the default date of the loan.
Here there is no such limitation and instead the legislation states:

No less than forty-five (45) days prior to initiating any foreclosure of
real estate pursuant to subsection 34-27-4(b), the **mortgagee shall provide
to an individual consumer mortgagor** written notice of default and the
mortgagee's right to foreclose by first class mail

The use of the terms "initiating any foreclosure" clarifies that this
must be part of the procedure any time a foreclosure is initiated.  The
General Assembly has these two sections next to each other in the same
Chapter. The temporal use of 45 days prior to any initiating suggests that
there is no logical reason to allow a mortgagee to initiate one foreclosure
preceeded by a Notice of Foreclosure Counseling but not be required to

comply with the statute the next time it initiates a foreclosure, such as in this case.  Strict compliance in mortgage cases has been set forth by this Court previously and the Rhode Island Supreme Court in *Woel v. Christiana Trust*, 228 a. 2d 339 (R.I., 2020) without having to demonstrate prejudice. Here the statute is clear that before any foreclosure a Notice must be provided. A Notice of Foreclosure Counseling provides information to the mortgagor when that person is facing foreclosure and does not provide a blank check for a mortgagee to foreclose without complying with the statute.

The failure to provide such a Notice precluded PHH from mailing a Notice of Sale to the Plaintiffs and creates liability for the FDCPA action and the breach of contract. Thus Summary Judgment should be denied on this issue.

## THE PLAINTIFFS INCURED CONSUMER DEBT WHEN THEH PURCHASED THEIR HOME AND ARE CONSUMERS FOR PURPOSES OF THE FDCPA

The Plaintiffs have raised a genuine issue of material fact that the loan extended to them by New Century Mortgage Corporation was for personal and family purposes.  The standard  for determining whether a loan is for commercial purposes is to examine the transaction as a whole. The FDCPA

7

protects consumers from unlawful debt collection practices. Consequently, the Act applies to consumer debts and not business loans. The term "debt" is defined as:

[A]ny obligation or alleged obligation *of a consumer* to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are *primarily for personal, family, or household purposes* ...

15 U.S.C. § 1692a(5) (emphasis added).

In this case, the Plaintiffs have established the following facts which indicate that this loan was primarily for personal, family or household purposes. In their affidavit they established the following facts, which mitigate against Summary Judgment:

 5.    We  purchased this property as our home on August 1, 2005 for $375,000.00 and  executed a Promissory Note in the amount of $300,000.00 to New Century Mortgage Corporation on August 1, 2006 in conjunction with the purchase of our home.

6.    Exhibit A-1 is a copy of our Purchase and Sales agreement for this property.

7.    We hired a realtor to help us find a house  to live in Central Falls.

8.     Bahij Boutros, Sobeida Valdera and her two minor children were living at 34 Parker Street, Central Falls, Rhode Island, when a realtor was hired to find a house for us.

9.     We hired Jorge Jimenez of Albert Realty to find us a house for us to live in. He found this property for us.

10.    We were referred to the Rhode Island Mortgage Store to obtain  a mortgage.

11.    We told the sales person at Rhode Island Mortgage Store that we planned on living in this house

12.    We all moved into  our home shortly after we purchased 273-277 Rand Street, Central Falls, after we finished cleaning up the apartments to make them habitable for us to live in. This clean up work was finished approximately two months after the closing.

13.    Bahij Boutros, Sobeida Valdera and her two minor children moved into 273 Rand Street, 1st Floor Rear Unit, Central Falls, Rhode Island shortly after the August 1, 2005 closing.

14.    Sobeida Valdera,'s son Omar Gomez and his wife Keidy Gomez moved into 273 Rand Street, 1st Floor Front  Unit, Central Falls, Rhode Island shortly  after the August 1, 2005 closing.

15.    Juan Valdera and his wife Cecelia Novas moved into 277 Rand Street, 3rd Floor Front  Unit, Central Falls, Rhode Island shortly  after the August 1, 2005 closing.

16.    Sobeida Valdera's cousin, Raymond Novas and his girlfriend moved into 277 Rand Street, 3rd Floor  Rear  Unit, Central Falls, Rhode Island shortly  after the closing in August , 2005.

17.    The two units on the second floor were not occupied by tenants for several months after the closing.

18.    We purchased this property as a family for personal and family purposes and not for commercial purposes.

19.    We had never owned a house and made it clear to the mortgage broker and the realtor that we were buying a house for our family to live in.

19.    Sobeida Valdera's parents, Juan Valdera and Cecelia Novas baby sat for her children when she was at work.

20.    273-277 Rand Street, Central Falls, Rhode Island is zoned residential, as an R3 Zone as indicated by Exhibit A-2, the Tax Assessor's Card for this property in Central Falls.

21.    Sobeida Valdera met Brian Lewis, the mortgage broker, Brian Lewis of Rhode Island Mortgage Store at his office in Warwick, Rhode Island after have been referred to that company.

22.    She went to that office only once to speak with him about obtaining a mortgage loan to purchase a house for her family to live in.

23.    At no time did she tell Brian Lewis, the mortgage broker that the loan was for investment or business purposes.

24.    Originally the mortgage broker was trying to have us obtain two mortgages for the property, 80% and 20% despite the fact that we were putting more than $75,000.00 down on this purchase of our home.

25.    All communications and documents which were given to Brian Lewis through our realtor, Jorge Jimenez.

26.    Juan Valdera does not read English.

27.    In 2005 Sobeida Valdera had limited proficiency in English.

28.    We did not notice that there was a reference to investment purposes in the Loan Application.

29.    None of the check marks on the loan application were marked by any of us.

30.    The date of 7-9-05 on the loan application was not marked by any of us.

31.    We did not sign the Loan Application on July 9, 2005.

32.    We were provided the Loan Application to sign on August 1, 2005 at the closing.

33.    None of the terms of the Loan Application were explained to us at the closing.

34.    When we signed the closing documents, including the Affidavit of Commercial Purpose and the Uniform Residential Loan Application at the closing we did not understand that  we were signing documents which indicated that this loan was for commercial purposes.

35.    It was always our intent to purchase this house for personal and family purposes, not for any commercial purposes.

36.    This loan closed on August 1, 2005 and for some reason, this mortgage was not recorded until August 4, 2005.

37.    Sobeida Valdera and  Bahij Boutros lived in our home until 2013, when Sobeida Valdera purchased another house to live in.

38.    Juan Valdera still lives in our home.

39.    Omar Gomez and his wife lived in our home for several years.

40.    The Uniform Residential Loan Application was signed by us on the day of the closing, not at any time in July, 2005.

41.    We were given a large number of documents to sign at the closing and did not read the documents closely.

41.    We did not notice that there was a check mark for commercial purposes on the application nor did we read the application which had been dated by the mortgage broker.

42.    Due to the large amount of paperwork to sign at the closing we were overwhelmed and the closing took close to two hours.

43.    We signed one document after another and did not fully comprehend what we were signing when our names were signed on the Affidavit of Commercial Purpose.

44.    We paid in excess of $10,000.00 in prepaid escrows and  closing costs at the closing for our home.

45.    Despite the documentation which was given to us to sign and which we did not read carefully or understand, we did not  purchase our home at 273-277 Rand Street, Central Falls, Rhode Island, the house which we lived in for commercial purposes.

46.    Starting with the first payment to New Century until the loan was serviced by Litton Loan Servicing and Ocwen Loan Servicing, LLC,  all mortgage statements from the lender were mailed to our home.

47.    New Century was aware that the property was owner occupied and that our insurance policy which was provided to New Century at the closing indicated that the property was owner occupied.

48.     This $300,000.00 loan to New Century Mortgage Corporation was for

personal and family use, specifically to purchase a house for us to live in as

a family.

49.     There was no business purpose for this purchase of our home,

regardless of any signed documents.

50.     Sobeida Valdera and Juan Valdera registered their motor vehicle at

273 Rand Street Central Falls, Rhode Island when we purchased our home.

Bahij Boutros had a company motor vehicle and did not register it at our

home.

51.     Our water bill for the house from Pawtucket Water was mailed to 273

Rand Street, Central Falls, Rhode Island after the closing.

There is a genuine issue of material fact that the Plaintiffs obtained this loan

for personal and family purposes.  Established case law provides that such a

family and personal purpose, regardless of the intent of the creditor at the

time of the loan, made this loan a consumer loan.

        In *Slenk v. Transworld*, 236 F.3d 1072,  (Ninth Cir., 2001), the Ninth

Circuit reversed Summary Judgment for the Debt Collector finding that

there was a genuine issue of material fact as to the purpose of the loan:

We have found it necessary when classifying a loan to "`examine the
transaction as a whole,' paying particular attention to `the purpose for which
the credit was extended in order to determine whether [the] transaction was
primarily consumer or commercial in nature.'" *Bloom,* 972 F.2d at

1068 (quoting *Tower v. Moss,* 625 F.2d 1161, 1166 (5th Cir.1980)). In making this determination, we have elevated substance over form, holding that "[n]either the lender's motives nor the fashion in which the loan is memorialized are dispositive of this inquiry." *Id.* We must therefore "look to the substance of the transaction and the borrower's purpose in obtaining the loan, rather than the form alone." *Riviere, et al. v. Banner Chevrolet, Inc.,* 184 F.3d 457, 462 (5th Cir.1999).

*Slenk* at p. 1075.

The Court found significant evidence which warranted the reversal:

The record is replete with undisputed objective facts which, when viewed in the aggregate, create a genuine issue of material fact. First, the loan instrument itself connotes that the debt was consumer in nature, providing that the loan was secured for the purpose of purchasing "excavation equipment and *other* personal goods." (emphasis added). Second, Slenk used the backhoe to build his family home. There could not be a more quintessential personal, family, or household purpose. Third, Slenk has presented uncontroverted testimony that he never once used the backhoe for any other purpose, including in his capacity as the owner of Slenk's Builders. Fourth, while the purchase of a backhoe by the owner of a construction company for personal use does invoke suspicion, Slenk has presented uncontroverted evidence proving that Slenk's Builders was not even licensed to use a backhoe. Fifth, the fact that Slenk immediately sold the 1076*1076 backhoe upon completing his home illustrates that he was not harboring an ulterior motive to use the backhoe for business purposes in the future.

With all respect, the district court appears to have overlooked the foregoing facts in concluding that no genuine issue of material fact existed as to whether the Credit Union Loan constituted a consumer debt. By focusing exclusively on select documentary evidence, rather than looking to the facts illustrating the actual use to which the backhoe was put, the forest was lost for the trees. The undisputed evidence in the case at bar proves that the backhoe was used strictly for personal use, and was never used by Slenk's Builders. While this fact contradicts the representations made on the Invoice, Slenk's tax returns, and Slenk's building permit applications, it is not the province of the district court to weigh conflicting evidence for purposes of

summary judgment. *See Musick v. Burke,* 913 F.2d 1390, 1394 (9th Cir. 1990).

*Slenk* at pp 1075-1076

This case is quite similar to *Slenk*, in that there can be no more quintessential personal and family purpose than obtaining a mortgage loan to purchase a home to live in. The motivation of the original lender to avoid its responsibilities under the Truth in Lending Act and the Real Estate Settlement Procedures Act when this loan was originated should not have any bearing on whether the Plaintiffs were actually consumers for purposes of the FDCPA.

The Ninth Circuit has adopted the same test in *Glawe v. Carpenter Hazelton, Delgado & Bolen, PLC,* No. 19-17090 (Ninth Cir, June 8, 20210 and reversed summary judgment. In Glawe, the Court reversed because there was a genuine issue of material fact as to the original purpose of the purchase of the property:

 The relevant inquiry, then, is whether the purchase of the Mohave Property was primarily consumer or commercial in nature. *See In re Cherrett,* 873 F.3d 1060, 1067 (9th Cir. 2017) ("Courts determine the debtor's purpose as of the time the debt was incurred.").

In *Miller v. McCalla Raymer*, 214 F.3d 872 (5th Cir., 2000), the Fifth Circuit reversed Summary Judgment holding that a property purchased for an individual purpose to live in at origination constituted a consumer debt:

The plaintiff bought a house in Atlanta in 1992, and took out a mortgage. He lived in the house until 1995, when he accepted a job in Chicago; from then on, he rented the house. He received the dunning letter from one of the defendant law firms on behalf of the mortgagee in 1997. By this time, renting the property to strangers, the plaintiff was making a business use of the property and so the mortgage loan was financing a business rather than a consumer debt. But he argues that the relevant time for determining the nature of the debt is when the debt first arises, not when collection efforts begin. The defendants riposte that since the Act under which the plaintiff is suing, unlike the Truth in Lending Act, governs debt *collection,* the relevant time is when the attempt at collection is made. Oddly, there are no reported appellate decisions on the issue, though it was assumed in *Bloom v. I.C. System, Inc., 972 F.2d 1067, 1068-69 (9th Cir.1992),* that the relevant time is when the loan is made, not when collection is attempted.

*Miller* at p. 874.

Despite the language of the Memorandum in Support of the Motion for Summary Judgment, the pleadings indicate that Korde & Associates was acting on behalf of PHH Mortgage Corporation, which was acting on behalf of Deutsche Bank. There is no affidavit, which indicates that Korde & Associates was acting on its own behalf and not on behalf of PHH. Its answers state the contrary and thus it is not entitled to Summary Judgment on this basis.

The Plaintiffs alleged and PHH Mortgage Corporation has not disputed the allegation that the Plaintiffs were in default when Ocwen Loan Servicing, LLC commenced servicing of the mortgage loan. Ocwen merged with PHH Mortgage Corporation and thus is the same entity as indicated in

Defendant's exhibits.  These crucial allegations were either admitted or not answered:

63. The principal business purposes of PHH is not the enforcement of security interests.

Denied. Defendants further state that the principal purpose of PHH in pursuing foreclosure of the subject Mortgage was the enforcement of Deutsche Bank's security interest.

However no affidavit was provided to establish that the primary business of PHH was the enforcement of security interests, not just in regard to Plaintiffs' mortgage.

Defendant admitted paragraph 64 which alleged that  PHH at all the times referenced in this complaint and previously collected mortgage payments from mortgagors, paid taxes from escrow proceeds to municipal tax collectors and paid property insurance payments due to insurance companies from escrow which it maintained for mortgagors. It also admitted 65, 66 and 67.   However inexplicably it could neither admit nor deny the allegation of paragraph 68, which alleged:

 At the time that PHH commenced servicing Plaintiffs' mortgage, they were in default and PHH treated this loan as if it were in default.

This under the Federal Rules constitutes an admission.   How a loan servicer could not determine the status of the loan when it (Ocwen)commenced servicing is beyond belief.  However a refusal to answer is either an admission and certainly not the basis for disputing the allegation at summary judgment. Thus the definition of a loan servicer debt collector has been met and summary judgment cannot be granted on this issue.

The Plaintiffs have raised genuine issues of material fact that establish that they were in fact consumers and that they purchased the property located at 273-277 Rand Street, Central Falls, Rhode Island to live in the premises. Thus Summary Judgment should be denied on this count.

## THE PROMISSORY NOTE IS A NON-NEGOTIABLE INSTRUMENT AND CANNOT BE TRANSFERRED BY AN ENDORSEMENT IN BLANK.

The Plaintiffs have alleged that the note has not been endorsed. However since the  note is  not a negotiable instrument as defined by the Rhode Island Uniform Commercial Code, a blank endorsement will not transfer the Note, since Article 3 of the Uniform Commercial Code will not apply.

As an unendorsed, non-negotiable instrument, the Note has not been conveyed by the original owner, New Century Mortgage Corporation to any

entity and cannot be conveyed by a blank endorsement.    As a result,

Deutsche Bank is not the owner of the note or the agent for the owner of the

note and has no interest in the Note.    This note does not meet the criteria

for a negotiable instrument pursuant to R.I.G.L 6A-3-104. Specifically it

made numerous undertakings other than the promise to make payments of

money or to provide for acceleration or to secure collateral and stated the

following non-monetary undertakings which made  a non-negotiable

instrument, which does not comply with the provisions of the Uniform

Commercial Code, R.I.G.L 6A03-104, which defines a promissory note as

follows:

## § 6A-3-104. Negotiable instrument.

(a) Except as provided in subsections (c) and (d), "negotiable instrument" means an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it:

(1) Is payable to bearer or to order at the time it is issued or first comes into possession of a holder;

(2) Is payable on demand or at a definite time; and

(3) **Does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money**, but the promise or order may contain (i) an undertaking or power to give, maintain, or protect collateral to secure payment, (ii) an authorization or power to the holder to confess judgment or realize on or dispose of collateral, or (iii) a waiver of the benefit of any law intended for the advantage or protection of an obligor. (emphasis added)

(b) "Instrument" means a negotiable instrument.

(c) An order that meets all of the requirements of subsection (a), except paragraph (1), and otherwise falls within the definition of "check" in subsection (f) is a negotiable instrument and a check.

(d) A promise or order other than a check is not an instrument if, at the time it is issued or first comes into possession of a holder, it contains a conspicuous statement, however expressed, to the effect that the promise or order is not negotiable or is not an instrument governed by this chapter.

(e) An instrument is a "note" if it is a promise and is a "draft" if it is an order. If an instrument falls within the definition of both "note" and "draft," a person entitled to enforce the instrument may treat it as either.

(f) "Check" means (i) a draft, other than a documentary draft, payable on demand and drawn on a bank or (ii) a cashier's check or teller's check. An instrument may be a check even though it is described on its face by another term, such as "money order."

(g) "Cashier's check" means a draft with respect to which the drawer and drawee are the same bank or branches of the same bank.

(h) "Teller's check" means a draft drawn by a bank (i) on another bank, or (ii) payable at or through a bank.

(i) "Traveler's check" means an instrument that (i) is payable on demand, (ii) is drawn on or payable at or through a bank, (iii) is designated by the term "traveler's check" or by a substantially similar term, and (iv) requires, as a condition to payment, a countersignature by a person whose specimen signature appears on the instrument.

(j) "Certificate of deposit" means an instrument containing an acknowledgment by a bank that a sum of money has been received by the bank and a promise by the bank to repay the sum of money. A certificate of deposit is a note of the bank.

History of Section.
(P.L. 2000, ch. 238, § 3; P.L. 2000, ch. 421, § 3.)

When the UCC was adopted in Rhode Island, it contained Official

Comments, which the Supreme Court has analyzed to determine the scope of

the UCC. The relevant portions of official comment for 6A-3-104 discuss

the need for no other promises:

1. The definition of "negotiable instrument" defines the scope of Article 3 since Section 3-102 states: "This Article applies to negotiable instruments." The definition in Section 3-104(a) incorporates other definitions in Article 3. An instrument is either a "promise," defined in Section 3-103(a)(12), or "order," defined in Section 3-103(a)(8). A promise is a written undertaking to pay money signed by the person undertaking to pay. An order is a written instruction to pay money signed by the person giving the instruction. Thus, the term "negotiable instrument" is limited to a signed writing that orders or promises payment of money. "Money" is defined in Section 1-201(24) and is not limited to United States dollars. It also includes a medium of exchange established by a foreign government or monetary units of account established by an intergovernmental organization or by agreement between two or more nations. Five other requirements are stated in Section 3-104(a): First, the promise or order must be "unconditional." The quoted term is explained in Section 3-106. Second, the amount of money must be "a fixed amount … with or without interest or other charges described in the promise or order." Section 3-112(b) relates to "interest." Third, the promise or order must be "payable to bearer or to order." The quoted phrase is explained in Section 3-109. An exception to this requirement is stated in subsection (c). Fourth, the promise or order must be payable "on demand or at a definite time." The quoted phrase is explained in Section 3-108**. Fifth, the promise or order may not state "any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money" with three exceptions**. The quoted phrase is based on the first sentence of N.I.L. Section 5 which is the precursor of "no other promise, order, obligation or power given by the maker or drawer" appearing in former Section 3-104(1)(b). The words "instruction" and "undertaking" are used instead of "order" and "promise" that are used in the N.I.L. formulation because the latter words are defined terms that include only orders or promises to pay money. The three exceptions stated in Section 3-104(a)(3) are based on and are intended to have the same meaning as former Section 3-112(1)(b), (c), (d), and (e), as well as N.I.L. § 5(1), (2), and

(3). Subsection (b) states that "instrument" means a "negotiable instrument." This follows former Section 3-102(1)(e) which treated the two terms as synonymous.

2. Unless subsection (c) applies, the effect of subsection (a)(1) and Section 3-102(a) is to exclude from Article 3 any promise or order that is not payable to bearer or to order. There is no provision in revised Article 3 that is comparable to former Section 3-805. The comment to former Section 3-805 states that the typical example of a writing covered by that section is a check reading "Pay John Doe." Such a check was governed by former Article 3 but there could not be a holder in due course of the check. Under Section 3-104(c) such a check is governed by revised Article 3 and there can be a holder in due course of the check. But subsection (c) applies only to checks. The comment to former Section 3-805 does not state any example other than the check to illustrate that section. Subsection (c) is based on the belief that it is good policy to treat checks, which are payment instruments, as negotiable instruments whether or not they contain the words "to the order of." These words are almost always pre-printed on the check form. Occasionally the drawer of a check may strike out these words before issuing the check. In the past some credit unions used check forms that did not contain the quoted words. Such check forms may still be in use but they are no longer common. Absence of the quoted words can easily be overlooked and should not affect the rights of holders who may pay money or give credit for a check without being aware that it is not in the conventional form.

Total exclusion from Article 3 of other promises or orders that are not payable to bearer or to order serves a useful purpose. It provides a simple device to clearly exclude a writing that does not fit the pattern of typical negotiable instruments and which is not intended to be a negotiable instrument. If a writing could be an instrument despite the absence of "to order" or "to bearer" language and a dispute arises with respect to the writing, it might be argued that the writing is a negotiable instrument because the other requirements of subsection (a) are somehow met. Even if the argument is eventually found to be without merit it can be used as a litigation ploy. Words making a promise or order payable to bearer or to order are the most distinguishing feature of a negotiable instrument and such words are frequently referred to as "words of negotiability." Article 3 is not meant to apply to contracts for the sale of goods or services or the sale or lease of real property or similar writings that may contain a promise to pay money. The use of words of negotiability in such contracts would be an

aberration. Absence of the words precludes any argument that such contracts might be negotiable instruments.

An order or promise that is excluded from Article 3 because of the requirements of Section 3-104(a) may nevertheless be similar to a negotiable instrument in many respects. Although such a writing cannot be made a negotiable instrument within Article 3 by contract or conduct of its parties, nothing in Section 3-104 or in Section 3-102 is intended to mean that in a particular case involving such a writing a court could not arrive at a result similar to the result that would follow if the writing were a negotiable instrument. For example, a court might find that the obligor with respect to a promise that does not fall within Section 3-104(a) is precluded from asserting a defense against a bona fide purchaser. The preclusion could be based on estoppel or ordinary principles of contract. It does not depend upon the law of negotiable instruments. An example is stated in the paragraph following Case # 2 in Comment 4 to Section 3-302.

Moreover, consistent with the principle stated in Section 1-102(2)(b), the immediate parties to an order or promise that is not an instrument may provide by agreement that one or more of the provisions of Article 3 determine their rights and obligations under the writing. Upholding the parties' choice is not inconsistent with Article 3. Such an agreement may bind a transferee of the writing if the transferee has notice of it or the agreement arises from usage of trade and the agreement does not violate other law or public policy. An example of such an agreement is a provision that a transferee of the writing has the rights of a holder in due course stated in Article 3 if the transferee took rights under the writing in good faith, for value, and without notice of a claim or defense.

Even without an agreement of the parties to an order or promise that is not an instrument, it may be appropriate, consistent with the principles stated in Section 1-102(2), for a court to apply one or more provisions of Article 3 to the writing by analogy, taking into account the expectations of the parties and the differences between the writing and an instrument governed by Article 3. Whether such application is appropriate depends upon the facts of each case.

3. Subsection (d) allows exclusion from Article 3 of a writing that would otherwise be an instrument under subsection (a) by a statement to the effect that the writing is not negotiable or is not governed by Article 3. For example, a promissory note can be stamped with the legend NOT NEGOTIABLE. The effect under subsection (d) is not only to negate the possibility of a holder in due course, but to prevent the writing from being a negotiable instrument for any purpose. Subsection (d) does not, however,

apply to a check. If a writing is excluded from Article 3 by subsection (d), a court could, nevertheless, apply Article 3 principles to it by analogy as stated in Comment 2.
 (emphasis added)

In *Rotelli v. Catanzaro*, 686 AS. 2d 91, 94 (R.I., 1996), the Supreme Court

discussed negotiable instruments and applied the official comment in a

footnote:

[2] The parties have assumed that the promissory note is a negotiable instrument subject to § 6A-3-119 and have offered differing interpretations of Comment 3 to that section. **We note, however, that the promissory note contains a condition that destroys its negotiability, namely, that the note was subject to plaintiff's materially performing his obligations under a Release and Indemnification Covenant, a separate agreement signed by plaintiff on January 17, 1985. The promise to pay was thus conditional and could not form the basis of a negotiable instrument.** *See* **§§ 6A-3-104(1)(b) and 6A-3-105(2)(a).**(emphasis added)

The Rhode Island Supreme Court has reviewed negotiable instruments

and cited UCC 3-104 in *Note Capital Groups, Inc. v. Perretta*, 207 A. 2d

998 (2019). In that case, the  Court applied UCC 3-309 regarding lost notes

which were lost by a prior owner. The Court initially defined allonges in

footnote 4 as:

 "[a] slip of paper sometimes attached to a negotiable instrument for the

purpose of receiving further indorsements when the original paper is filled

with indorsements." *Black's Law Dictionary* 92 (10th ed. 2014).

The Court also defined a negotiable instrument  by citing UCC 3-104 in note

10:

[10] General Laws 1956 § 6A-3-104 defines a "negotiable instrument," in pertinent part, as:

"an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it:

"(1) Is payable to bearer or to order at the time it is issued or first comes into possession of a holder;

"(2) Is payable on demand or at a definite time; and

"(3) Does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money, but the promise or order may contain (i) an undertaking or power to give, maintain, or protect collateral to secure payment, (ii) an authorization or power to the holder to confess judgment or realize on or dispose of collateral, or (iii) a waiver of the benefit of any law intended for the advantage or protection of an obligor."

In *Labor Ready Northeast, Inc. v McConaghy*, 849 A. 2d 340 (2004),

the Rhode Island Supreme Court cited UCC 3-104 for the basic definition of

negotiable instruments in construing a case involving instruments which

were not negotiable, but nevertheless were instruments for other purposes.

In *Onewest Bank v FMCDH Realty*, 165 A.D.3d 128, 133 (NY App, 2018)

the Appellate Division of the New York Supreme Court held that a note was

not negotiable, citing a seminal case:

In 1846, a negotiable instrument was famously compared, by Justice Gibson of the Supreme Court of Pennsylvania, to a 133*133 "courier without

luggage" (*Overton v Tyler,* 3 Pa 346, 347 [1846]), in recognition of the fact that such instruments must be "framed in the fewest possible words, and those importing the most certain and precise contract" (*id.* at 347).

Negotiable instruments have changed considerably in the intervening 172 years. While they are no longer spare as they once were (*see* Grant Gilmore, *Formalism and the Law of Negotiable Instruments,* 13 Creighton L Rev 441, 453 [1979]), Justice Gibson's description has proved to be remarkably resilient—though it may be more accurate to describe the modern negotiable instrument as a courier with a personal item and one carry-on bag.

The Rhode Island UCC provides some leeway for additional

provisions in UCC 3-106, which allows additional promises but only for

limited purposes:

## § 6A-3-106. Unconditional promise or order.

(a) Except as provided in this section, for the purposes of § 6A-3-104(a), a promise or order is unconditional unless it states (i) an express condition to payment, (ii) that the promise or order is subject to or governed by another writing, or (iii) that rights or obligations with respect to the promise or order are stated in another writing. A reference to another writing does not of itself make the promise or order conditional.

(b) A promise or order is not made conditional (i) by a reference to another writing for a statement of rights with respect to collateral, prepayment, or acceleration, or (ii) because payment is limited to resort to a particular fund or source.

(c) If a promise or order requires, as a condition to payment, a countersignature by a person whose specimen signature appears on the promise or order, the condition does not make the promise or order conditional for the purposes of § 6A-3-104(a). If the person whose specimen signature appears on an instrument fails to countersign the instrument, the failure to countersign is a defense to the obligation of the issuer, but the

failure does not prevent a transferee of the instrument from becoming a holder of the instrument.

(d) If a promise or order at the time it is issued or first comes into possession of a holder contains a statement, required by applicable statutory or administrative law, to the effect that the rights of a holder or transferee are subject to claims or defenses that the issuer could assert against the original payee, the promise or order is not thereby made conditional for the purposes of § 6A-3-104(a); but if the promise or order is an instrument, there cannot be a holder in due course of the instrument.

As will be demonstrated in this memorandum, the Loan agreement contains

numerous conditions and promises, which do not fit within UCC 3-104 or 3-

106 and thus is a non-negotiable instrument.

In *Madeiros v. Savino,* 418 A. 2d 839 (1980), the Rhode Island

Supreme Court followed 3-14 and found that a note was not negotiable

because this note was not payable to order or to bearer:

[1] The second note is not payable "to the order of" or "to the bearer" and therefore does not meet the requirement of negotiability found in G.L. 1956 (1969 Reenactment) § 6A-3-104(1)(d).

Other cases in other jurisdictions indicate the criteria for non-

negotiability which is present in this note.  In *Farouki v. Petra International*,

968 F. Supp 2d 216, 220  (D. D.C., 2013) the Court first defined a

Negotiable Instrument as:

"unconditional promise or order to pay a fixed amount of money" that (1) is

payable to order; (2) is payable on demand; and (3) does not state any other

undertaking or instruction. D.C.Code § 28:3-104.

The court then found it was not negotiable because if failed every other

prong of the statutory definition:

*First,* is not unconditional because the rights and obligations under the Note
are defined by reference to the Secured Credit Facility Agreement. *See* Note
at 2.; *see also* 6 William D. Hawkland & Lary Lawrence, UCC Series § 3-
106:2 ("[A] writing is conditional if it states that rights or obligations with
respect to the promise or order are stated in another writing.").

Another case which demonstrates non-negotiability of a note is *Holly*

*Acres, Ltd. V Charter Bank of Gainesville* 314 So.2d 209 (Fl. App 1975), in

which the Florida Appellate Court held that the note by incorporating the

terms of the mortgage was not negotiable:

The note having incorporated the terms of the purchase money mortgage
was not negotiable. The appellee Bank was not a holder in due course,
therefore, the appellant was entitled to raise against the appellee any
defenses which could be raised between the appellant and Rogers and
Blythe. Since appellant asserted an affirmative defense of fraud, it was
incumbent on the appellee to establish the non-existence of any genuine
issue of any material fact or the legal insufficiency of appellant's affirmative
defense. Having failed to do so, appellee was not entitled to a judgment as a
matter of law; hence, we reverse.

The note, incorporating by reference the terms of the mortgage, did not
contain the unconditional promise to pay required by Fla. Stat. § 673.3-
104(1) (b).[1] Rather, the note falls within the scope of Fla. Stat. § 673.3-

105(2) (a).[2] Although negotiability is now governed by the Uniform
Commercial Code,[3] this was the Florida view even before the U.C.C. was
adopted. *E.g.,* the Supreme Court in Brown v. Marion Mortgage Co., 1932,
107 Fla. 727, 145 So. 413, held that certain bonds which were "to be
received and held subject to" a certain mortgage were non-negotiable. *See
also,* First Bank of Marianna v. Havana Canning Co., 1940, 142 Fla. 554,
195 So. 188; Voges v. Ward, 1929, 98 Fla. 304, 123 So. 785; Mason v.
Flowers, 1926, 91 Fla. 224, 107 So. 334.

Appellee Bank relies upon Scott v. Taylor, 1912, 63 Fla. 612, 58 So. 30, as
authority for the proposition that its note is negotiable. *Scott,* however,
involved a note which stated: "this note secured by mortgage." Mere
reference to a note being secured by mortgage is a common commercial
practice and such reference in itself does not impede the negotiability of the
note. There is, however, a significant difference in a note stating that it is
"secured by a mortgage" from one which provides, "the terms of said
mortgage are by this reference made a part hereof." In the former instance
the note merely refers to a separate agreement which does not impede its
negotiability, while in the latter instance the note is rendered non-
negotiable. *See* Fla. Stat. §§ 673.3-105(2) (a); 673.3-119.[4]

Another case which held that negotiability was destroyed by

incorporating obligations of other documents was *Schumckie v, Alvey*,

758 S.W.2d 31, 34 (Ky., 1988), in which the Kentucky Supreme Court

noted:

A negotiable instrument is an *unconditional* order or promise to pay a sum
certain in money.[2] KRS 355.3-104. If the instrument is "subject to or
governed by another agreement," its negotiability is destroyed, and the
determination of whether an instrument is unconditional must be made from
the content of the instrument itself. KRS 355.3-105(2)(a).

This note clearly incorporates obligation of other documents explicitly,

rendering it non-negotiable.

In *DZ Bank v. McCranie*, No 16-14773 (11th Cir. January 10, 2018)

the 11th Circuit reviewed a Note and discussed the criteria for negotiability

and non-negotiability:

A hallmark of negotiability, however, is the self-contained nature of
the instrument and the ability to determine the entirety of the parties' rights
and duties without consulting additional writings. See 6 William D.
Hawkland & Larry Lawrence, Uniform Commercial Code Series § 3-106:2
(rev. supp. 2016) ("An instrument does not freely circulate in commerce if a
purchaser must examine a separate agreement to determine whether payment
of the instrument is conditioned upon the performance of some act or event. .
. . The mere existence of the requirement that another writing be consulted is
sufficient to destroy negotiability; it is irrelevant that examination of the
other writing does not reveal a condition precedent to payment."). In general,
a *mere reference* to a separate document does not preclude a note from being
deemed a negotiable instrument. See A.I. Trade Fin., Inc. v. Laminaciones
de Lesaca, S.A., 41 F.3d 830, 836 (2d Cir. 1994) ("[A] note containing an
otherwise unconditional promise is not made conditional merely because it
refers to, or states that it arises from, a separate agreement or transaction.");
see also Williams v. Regency Fin. Corp., 309 F.3d 1045, 1049 (8th Cir.
2002) ("[W]here there is a paucity of [controlling] case law interpreting a
provision of the U.C.C., . . . courts . . . look for guidance to decisions of
other jurisdictions. . . ."); Black v. Don Schmid Motor, Inc., 657 P.2d 517,
523-24 (Kan. 1983) (looking to other jurisdictions). Mere references provide
context for the commercial transactions giving rise to the instrument and do
not, on their face, suggest the promise to pay is subject to additional terms,
conditions, or promises. . .

The distinction between when a note's reference to another writing does or
does not defeat negotiability, therefore, rests on two factors: the
completeness and clarity of the note itself in setting forth the parties'
obligations and the clarity and completeness of the reference. This is true
regardless of whether the separate writing actually amends the material
terms of the parties' agreement. It is the need to consult the other writing that
makes the note incomplete on its face and defeats negotiability. The
applicable official U.C.C. comment makes this clear:

[A] promissory note is not [a negotiable] instrument . . . if it contains any of the following statements: 1. "This note is subject to a contract of sale dated . . . between the payee and maker of this note." 2. "This note is subject to a loan and security agreement dated . . . between the payee and maker of this note." 3. "Rights and obligations of the parties with respect to this note are stated in an agreement dated . . . between the payee and maker of this note." *It is not relevant whether any condition to payment is or is not stated in the writing to which reference is made. The rationale is that the holder of a negotiable instrument should not be required to examine another document to determine rights with respect to payment.* But subsection (b)(i) permits reference to a separate writing for information with respect to collateral, prepayment, or acceleration.

For example, a note would not be made conditional by the following statement: "This note is secured by a security interest in collateral described in a security agreement dated . . . between the payee and maker of this note. Rights and obligations with respect to the collateral are [stated in][governed by] the security agreement." The bracketed words are alternatives, either of which complies.

This note does not merely reference other documents and obligations, but instead imposes those obligations as part of the obligations in the note.

A review of this purported Promissory Note indicates the following additional obligations which render it a non-negotiable instrument:

The DEFAULT section on page one provides for default upon the following conditions, not related to the payment of the note:

**OTHER DEFAULTS** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note **or in any of the related documents or to comply with or perform any term, obligation, covenant or condition contained in any other agreement** between Lender and Borrower.

**ENVIRONMENTAL DEFAULT** Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with any loan.

**FALSE STATEMENTS** Any warranty, representation or statement made or furnished to lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, wither now or at the time made or furnished or becomes false or misleading at any time thereafter.

**DEATH OR INSOLVENCY** The death of Borrower or the dissolution of termination of Borrower's existence as a gong business, the insolvency of Borrower, the appointment of a receiver for any party of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of proceeding under any bankruptcy or insolvency laws by or against Borrower.

**CREDITOR OR FOREITURE PROCEEDINGS.** Commencement of foreclosure or forfeiture proceeding, whether by judicial proceeding, self-help repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower  as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute. . .

**ADVERSE CHANGE** A material adverse change occurs in Borrower's financial condition or Lender believes the prospect of payment or performance of this Note is impaired.

**INSECURITY** Lender in good faith believes itself insecure.

**ATTORNY FEES; EXPENSES**  Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's Attorney fees and Lender's legal expenses, whether or note there is

a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction) and appeals. If not prohibited by  applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

These conditions imposed by this document to require Plaintiffs to comply with the terms of the mortgage and any other related agreements renders this a non-negotiable instrument, which cannot be transferred under Article 3 by negotiation and a blank endorsement.  Article 9 of the Uniform Commercial Code applies to transfers of this note and requires proof of each sale of the note from New Century. The first sale of notes in this Trust were by New Century to CBA Commercial, LLC. The second sale of the notes in this Trust were by CBA Commercial, LLC to CBA Commercial Assets, LLC. Deutsche Bank purchased all the notes in the trust from CBA Commercial Assets, LLC. There is no documentation which verifies and confirms any transactions from the originator to Deutsche Bank.        The Note thus was not a negotiable instrument and could not be transferred to Deutsche Bank by a blank endorsement.

R.I.G.L 6A-9-109(a)(3) which provides:

**6A-9-109. Scope.**

(a) *General scope of chapter.* Except as otherwise provided in subsections (c) and (d), this chapter applies to:

(1) A transaction, regardless of its form, that creates a security interest in personal property or fixtures by contract;

(2) An agricultural lien;

(3) A sale of accounts, chattel paper, payment intangibles, or promissory notes;

Due to the non-negotiable nature of the Note, Deutsche Bank can not enforce any obligations under the note and exercise the statutory power of sale.   As a result Deutsche Bank has no ownership interest in the Note.

The Rhode Island Supreme Court in *Bucci v. Lehman*, 68 A.3d 1069 (2013)  held that the power of the statutory power of sale could be exercised by a mortgagee provided that it was the holder of the note or an agent for the owner of the note:

1087*1087 Similarly, we do not believe that our General Assembly "intended to proscribe [the] application of general agency principles in the context of mortgage foreclosure sales." *Eaton,* 969 N.E.2d at 1131. Therefore, we interpret the term "mortgagee" in our statutes in a similar fashion as did the Supreme Judicial Court of Massachusetts. Thus, it is our opinion that none of the statutes that plaintiffs rely upon prohibit MERS from foreclosing on the Bucci mortgage, because in so doing, MERS would be acting as an agent on behalf of the note owner. Furthermore, under our reading of these statutes, any of the obligations placed upon a "mortgagee" may be fulfilled by either the mortgage holder or the owner of the note, provided that an agency relationship exists between the two.

The Supreme Court further analyzed the ability to enforce the note under the Restatement of Mortgages, stating:

this view is supported by the Restatement (Third) *Property (Mortgages)* § 5.4(c) at 380 (1997), which provides that "[a] mortgage may be enforced only by, *or in behalf of,* a person who is entitled to enforce the obligation the mortgage secures." (Emphasis added.)

Comment *e.* to that section provides further guidance. That comment says that "in general a mortgage is unenforceable if it is held by one who has no right to enforce the secured obligation." Restatement (Third) *Property* § 5.4, cmt. *e.* at 385. However,

"This result is changed if [the mortgage holder] has authority from [the note owner] to enforce the mortgage on [the note owner]'s behalf. For example, [the mortgage holder] may be a trustee or agent of [the note owner] with responsibility to enforce the mortgage at [the note owner]'s direction. [The mortgage holder]'s enforcement of the mortgage in these circumstances is proper. * * * The trust or agency relationship 1089*1089 may arise from the terms of the assignment, from a separate agreement, or from other circumstances. Courts should be vigorous in seeking to find such a relationship, since the result is otherwise likely to be a windfall for the mortgagor and the frustration of [the note owners]'s expectation of security." *Id.* at 385-86.

The Plaintiff's complaint seeks relief to preclude Deutsche Bank from exercising the statutory power of sale until it is able to demonstrate that it is the owner of the New Century Note or is the agent for the owner of the note.

Finally the Supreme Court in *Note Capital v. Perretta* , 207 A. 2d 998 (2019) recognized that a lost note could not be enforced under the Uniform Commercial Code unless the entity seeking to enforce it and foreclose had in fact lost the note.  The Court noted that any hardship arising from this result was based on the statute, which the Legislature had created in UCC 6A-3-309. Thus the provisions of the UCC mandate that this note be deemed non-

negotiable. Under *Bucci* and the Restatement, Deutsche Bank cannot foreclose this non-negotiable instrument.

---

The language of the Uniform Commercial Code in Rhode Island also supports Plaintiffs' argument. Article 3 of the UCC provides the rules that govern the obligations of parties to a negotiable instrument, and the enforcement of those obligation. This issue is discussed in the  PERMANENT EDITORIAL BOARD FOR THE UNIFORM COMMERCIAL CODE, APPLICATION OF THE UNIFORM COMMERCIAL CODE TO SELECTED ISSUES RELATING TO MORTGAGE NOTES (Nov. 14, 2011) (hereinafter "P.E.B. Rept.") (https://tinyurl.com/y5z4f6ck). If a negotiable instrument is payable to an identified person who is also in possession of the note, that person is generally authorized — as the note's "holder" — to "enforce" the instrument. R.I.G.L. 6A-3-301.  Under the Rhode Island UCC "Holder" means: (A) The person in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession….). If a negotiable instrument that is payable to an identified person is indorsed in blank, or specially indorsed to the order of a third party who possesses the instrument, that third party is also authorized — as the note's "holder" — to

"enforce" the instrument, pursuant to R.I.G.L. 6A-3-205. However, "[t]he concept of "person entitled to enforce" a note is not synonymous with the "owner" of the note.[4] A person need not be the owner of a note to be the person entitled to enforce it, and not all owners will qualify as persons entitled to enforce" as referenced in P.E.B. Rept at 4 n. 15.

A promissory note that fails to satisfy the definition of a "negotiable instrument" is tautologically "non-negotiable. The promissory note at issue here contains multiple undertakings, not related to the payment of money.  These include the following obligations:

The transfer, sale, or assignment of a note that is not a negotiable instrument is not controlled by Article 3 of the UCC. For a note or any other contractual right that is not a negotiable instrument, indorsements on the instrument alone will not effectuate a lawful assignment. The assignee must satisfy traditional contract law, including the "doctrine of privity," which mandates that "only parties to a contract may bring suit to enforce it,"and it must satisfy Article 9 of the Uniform Commercial Code. Article 9 of the UCC governs the

sale of most payment rights, including the sale of both negotiable and non-negotiable notes." Article 9 of the UCC, 6A-9-101, et seq. — controls how a promissory note that is not a negotiable instrument may be "sold" (i.e., transferred), R.I.G.L. 6A-1-201(35) defines Security interest" as including a "promissory note in a transaction that is subject to Article 9 of this title" In *Morgan v. Farmers & Merchants Bank*, 856 So. 2d 811, 819 (Ala. 2003) the court found the "broad definition [in UCC § 9-105(1)(i)] of `instrument' has been held to include negotiable notes, nonnegotiable notes, certificates of deposit, debt securities, and other kinds of nonnegotiable writings that evidence a right to payment of money and are customarily transferred by indorsement and delivery").

R.I.G.L. 6A-9-109(a)(3) "applies to: … A sale of accounts, chattel paper, payment intangibles, or promissory notes". 11-9-102(64) "'Promissory note' means an instrument that evidences a promise to pay a monetary obligation, does not evidence an order to pay, and does not contain an acknowledgment by a bank that the bank has received for deposit a sum of money or funds." *See Garrison v. Jackson Nat'l. Life Ins. Co.*, 908 F. Supp. 2d 1293, 1301 (N.D. Ga. 2012);

Grasping the often unintuitive definitions of Article 9's terminology is key to understanding how it works. For example, "the seller of … [an Article 9 payment right is defined as the 'debtor,' the buyer as the 'secured party,' and the sold payment right as the 'collateral. P.E.B. Rept. at 9; R.I.G.L. § 6A-9-102(a)(29) provides that "Debtor" means "A seller of accounts, chattel paper, payment intangibles, or promissory notes"). R.I.G.L.6A-9-102(a)(72) defines a "Secured party" as a "person to which accounts, chattel paper, payment intangibles, or promissory notes have been sold). R.I.G.L. § 6A-9-102(a)(13) defines "Collateral" as the property subject to a security interest," including "promissory notes that have been sold").A "sale" for purposes of Article 9 is defined as "the passing of title from the seller to the buyer for a price as indicated in R.I.G.L. 6A-2-106(1) which states" A 'sale' consists in the passing of title from the seller to the buyer for a price". A "security interest" for purposes of Article 9 includes a "promissory note in a transaction that is subject to Article 9 of this title, as stated in R.I.G.L. 6A-2-106(1).

Under R.I.G.L. Section 9-203(b) three criteria must be fulfilled in order for foreclosing entity to be able to enforce "a security interest … against the debtor and third parties with respect to the "collateral."

40

The first criterion is that "'value' must be given." The second criterion is that the debtor/seller must have "rights in the collateral or the power to transfer rights in the collateral to a secured party….R.I.G.L. § 6A-9-203(b)(1). The third criterion is that the debtor/seller must either "authenticate" (i.e., sign) a 'security agreement that describes the note; or, the secured party / buyer must take possession of the note pursuant to the debtor / seller's security agreement. The term "authenticate" means … [t]o sign; or … with present intent to adopt or accept a record, to attach to or logically associate with such record an electronic sound, symbol, or process. R.I.G.L. 6A-102(a)(7).

A "security agreement" is "an agreement that creates or provides for a security interest (including the rights of a buyer arising upon the outright sale of a payment right)." R.I.G.L. § 6A-9-102(a)(73).

A debtor/borrower may challenge a foreclosure sale where the foreclosing entity hasn't received an executed "transfer and assignment of the security deed and promissory note…. Any party claiming authority to enforce any type of contract to which it was not an original party (other than an Article 3 negotiable instrument) must demonstrate an unbroken "chain of written assignments," that would put the party in contractual privity with the original contracting party and any

successor. Thus under R.I.G.L. 6A-9-203there must be a showing that

(1) that value was given;

(2) that the seller had the right to transfer the note; and,

 (3) that either a "security agreement" is in place or that the foreclosing

entity has possession of the instrument pursuant to the security

agreement.

The foreclosing entity must also be able prove that each buyer in the

chain of assignments of the note satisfied each of the three 6A-9-203

criteria. The official commentary to this section of the UCC

emphasizes that a foreclosing entity cannot evade Code Section  6A-9-

203's criteria through the backdoor of an assignment of the collateral

itself — i.e. In  *Commercial Credit Counsel. v. W.W. Grainger,*  840

N.E.2d 843, 848–49  (Ind. 2006)  the Indiana Supreme Court  held  that

the failure to provide "evidence showing the extent to which value was

given" to transfer the "the security interest" defeats its attachment

under Article 9).

The term debtor is defined by R.I.G.L. 6A-9-102(28)(c) as a seller of a

promissory note.  This section does not provide that an owner of nonnegotiable

promissory note can transfer the note by endorsement and negotiation. Under UCC

Article 9-109(a)(3) a certain process must be followed to transfer a nonnegotiable

note. The seller (debtor under Article 9) does not retain a legal or equitable interest in the collateral sold under Article 9-318. The sale of notes is enforceable against the seller of the note under Article 9-203(b) when there is a contract, **value is given and the note which is sold is described with particularity in the sales agreement**, which were not provided in this case. There was no evidence presented that the Loan Agreement had been sold by Beneficial to LSF8 Master Participation Trust for consideration. The purported assignment of mortgage made no reference to the  promissory note.

   The original note was purportedly endorsed by an endorsement without any additional documentation. This endorsement was not on the note when Deutsche Bank filed a Superior Court action in  PC-2016-5232, which contained two copies of the promissory note of Plaintiffs, which was not endorsed. On this issue alone there is a genuine issue of material fact as to whether any endorsement ever was made on this note.

   These conditions which are  imposed by this document incorporated the terms of the mortgage and required Plaintiffs to comply with the terms of

the mortgage and any other related loan agreements render this Note a non-negotiable instrument, which cannot be transferred under Article 3 by negotiation and a blank endorsement. As noted above, Article 9 of the Uniform Commercial Code applies, which requires proof of each sale of the note from New Century.

Plaintiff has alleged in the complaint the following:

26.     The first sale of the notes in the trust was by New Century to CBA Commercial, LLC.

27.     The second sale of the notes in the trust was by CBA Commercial, LLC to CBA Commercial Assets, LLC.

28.     Deutsche Bank purchased all the notes in the trust from CBA Commercial Assets, LLC.

29.     The Loan Agreement thus was not a negotiable instrument and could not be transferred to Deutsche Bank by an endorsement.

30.     Instead the note has to be transferred pursuant to Article 9 of the UCC or by contract with each change of ownership requiring documentation indicating the sales contract, an identification that the Loan Agreement was included in that sales contract and proof of consideration.

Defendants' only argument for Summary Judgment consists of a citation to a law review article, which ignores the statute and case law.  Plaintiffs cite the

Uniform Commercial Code, Permanent Editorial Board report on negotiable instruments attached to this Memorandum, which disputes Whitman's law review article.

For these reasons, the Plaintiffs have established that their promissory note was a non-negotiable instrument which cannot be transferred by negotiation pursuant to R.I.G.L. 6A-3-204 or any manner under Article 3. Since there is a failure to transfer the note, it cannot be enforced by a mortgagee.

Without an obligation, a mortgage is a nullity. Rhode Island is a Title State, in which the mortgage is a conveyance of land to the mortgagee. This conveyance is made pursuant to the statutory condition and with the statutory power of sale.   R.I.G.L. 34-11-20 defines the mortgage covenants which indicate the nature of this conveyance of land:

**§ 34-11-20.  Meaning of mortgage covenants.**

In any conveyance of real estate the words "with mortgage covenants" shall have the full force, meaning, and effect of the following words, and shall be applied and construed accordingly: "The mortgagor, for himself or herself and for his or her heirs, executors, and administrators, covenants with the mortgagee and his or her heirs and assigns, that he or she is lawfully seised in fee simple of the mortgaged premises; that the same are free from all

incumbrances; that he or she has good right, full power, and lawful authority

to sell and convey the same to the mortgagee and his or her heirs and

assigns; that the mortgagee and his or her heirs and assigns shall at all times

hereafter peaceably and quietly have and enjoy the mortgaged premises and

that the mortgagor will, and his or her heirs, executors, and administrators

shall, warrant and defend the premises to the mortgagee and his or her heirs

and assigns forever against the lawful claims and demands of all persons,

and that the mortgagor and his or her heirs and assigns, in case a sale shall

be made under the power of sale, will, upon request, execute, acknowledge,

and deliver to the purchaser or purchasers such deed or deeds confirmatory

of the sale as may be required; and that insurance against loss by fire shall be

kept and maintained on the buildings, if any, on the mortgaged premises in

such office or offices as the mortgagee or his or her heirs, executors,

administrators, or assigns shall approve, **in a sum not less than the amount**

**secured by the mortgage deed**, or as otherwise provided herein, and that

the policy or policies of such insurance shall be delivered to and held by the

mortgagee and assigned and transferred, or made payable in case of loss, to

the mortgagee or his or her heirs, executors, administrators or assigns, **as**

**collateral security hereto**, and in default thereof, that the mortgagee or his

or her heirs, executors, administrators or assigns may effect such insurance

in the name of the mortgagor or his or her heirs or assigns, payable in case of

loss to the mortgagee or his or her heirs, executors, administrators or assigns,

and that the premium or premiums paid therefor shall be a further charge

upon the mortgaged premises."  This statute references monies due and

rightfully so because it has been a basic tenant of all case law that a

mortgage secures the obligation of a maker of an obligation, who conveys

property owned by the mortgagor and maker of the note to act as security for

this obligation.

　　　　The statutory condition of R.I.G.L 34-11-21 makes it clear that a

mortgagee can exercise the statutory power of sale only when it has an

interest in the promissory note:

## § 34-11-21.  Statutory mortgage condition.

The following condition shall be known as the "statutory condition", and
may be incorporated in any mortgage by reference:

(Condition)

Provided, nevertheless, and this conveyance is made upon the express

condition, that if the mortgagor or his or her heirs, executors, administrators

or assigns **shall pay to the mortgagee or his or her heirs, executors,**

**administrators, or assigns the principal and interest of that certain**

**promissory note bearing even date with this deed and secured by this**

**deed,** and shall perform every other obligation secured by this deed, at the

47

time provided in the promissory note or in this deed, and shall also pay all taxes and assessments of every kind levied or assessed upon or in respect of the mortgaged premises, then this deed, **as also the promissory note**, shall become and be absolutely void to all intents and purposes whatsoever.

These two statutes render a mortgage without a note executed by a mortgagor a nullity because a mortgage can only secure an obligation of the mortgagor, not an obligation of a third party.  There is a common misconception that a mortgage is declared in default and a mortgage is accelerated. However those actions apply  to the note, not the mortgage. The Assignment of Mortgage statute also upholds this basic framework. R.I.G.L. 34-11-24 states:

**§ 34-11-24.  Effect of assignment of mortgage.**

An assignment of mortgage substantially following the form entitled "Assignment of Mortgage" shall, when duly executed, have the force and effect of granting, bargaining, transferring and making over to the assignee, his or her heirs, executors, administrators, and assigns, the mortgage deed **with the note and debt thereby secured**, and all the right, title and interest of the mortgagee by virtue thereof in and to the estate described therein, to have and to hold the mortgage deed with the privileges and appurtenances thereof to the assignee, his or her heirs, executors, administrators and assigns

in as ample manner as the assignor then holds the same, thereby substituting

and appointing the assignee and his or her heirs, executors, administrators

and assigns as the attorney or attorneys irrevocable of the mortgagor under

and with all the powers in the mortgage deed granted and contained.

In *Bucci*    the Rhode Island Supreme Court recognized that a note

and mortgage are inseparable:

To support their respective arguments regarding the various statutory provisions, the parties cite to case law that this Court will now address. Both plaintiffs and defendants point out the principle of property law providing that a mortgage and note are inseparable. *See, e.g., Carpenter v. Longan,* 16 Wall. 271, 83 U.S. 271, 274, 21 L.Ed. 313 (1872). The parties differ, however, in their assessment of whether the transactional structure in this case violates that principle. The plaintiffs contend that the rule is violated because MERS holds the mortgage but does not hold the note. By contrast, defendants argue that "MERS, as nominee, stands in the shoes of the note owner * * * with respect to the mortgage such that there is no separation."

It quoted the *Carpenter v. Longan* case, in which the  United States Supreme

Court long ago that:

 The note and mortgage are inseparable; the former as essential, the latter as an incident. An assignment of the note carries the mortgage with it, while an assignment of the latter alone is a nullity.[*]

In the case of *In Re D'Ellena*, 640 A.2d 530 (1994), the Supreme

Court discussed the essential nature of a mortgage in a Title Theory state. In

*D'Ellena*, during the 1990 Banking Crisis DEPCO as successor in interest to

the mortgagee sought to foreclose on the mortgagor's property, which was

condemned by the State of Rhode Island. The mortgage and note were silent

as to the disposition of condemnation proceeds. The Court held that DEPCO

was entitled to said funds because the mortgage secured the obligation and

on equitable grounds:

> Furthermore, when viewed in light of the fact that Rhode Island is a title-theory state, we think the equitable considerations are heightened. This is so because in Rhode Island, a mortgage not only obtains a lien upon the real estate by virtue of the grant of the mortgage deed but also obtains legal title to the property **subject to defeasance upon payment of the debt.** *See Houle v. Guilbeault,* 70 R.I. 421, 423, 40 A.2d 438, 440 (1944); *Simmons v. Brown,* 7 R.I. 427, 428 (1863); *see also* G.L. 1956 (1984 Reenactment) §§ 34-11-20 and 34-11-21. When the condemning authority deprives the mortgagee of his, her, or its legal title, a fortiori the mortgagee would be entitled to an equitable lien upon the condemnation proceeds. The distinction between the result if a mortgage is considered a lien, as opposed to being considered a transfer of legal title, is not significant in the context of condemnation. However, any distinction would favor the mortgagee as legal title holder. For example, this distinction would obviate the need of a statute or contractual language to protect the interest of a mortgagee as legal title holder in the event of condemnation.

*D'Ellena* at p. 533. (emphasis added).

The Supreme Court made it clear that a mortgage is granted subject to

defeasance pursuant to R.I.G.L 34-11-20 and 34-11-21 cited by Defendant in

its original memorandum.

In *Lister v. Bank of America*, 90 F 3d 20, 25 (First Cir., 2015) the First

Circuit recited the nature of a Rhode Island mortgage:

"Rhode Island is a title-theory state, in which `a mortgagee not only obtains a lien upon the real estate by virtue 25*25 of the grant of the mortgage deed but also obtains legal title to the property subject to defeasance upon payment of the debt.'" *Bucci v. Lehman Bros. Bank, FSB,* 68 A.3d 1069, 1078 (R.I.2013) (quoting *140 Reservoir Ave. Assoc. v. Sepe Inv., LLC,* 941 A.2d 805, 811 (R.I.2007)). Put another way, the title theory of mortgage law "splits the title [to a property] in two parts: the legal title, which becomes the mortgagee's and secures the underlying debt, and the equitable title, which the mortgagor retains." *Lemelson,* 721 F.3d at 23 (citing *Bevilacqua v. Rodriguez,* 460 Mass. 762, 955 N.E.2d 884, 894 (2011)) (internal quotation marks omitted); *see also Houle v. Guilbeault,* 40 A.2d 438, 439-40 (R.I.1944). A mortgagor can reacquire this defeasible legal title by paying the debt which the mortgage secures. *Lemelson,* 721 F.3d at 23-24 (citing *Abate v. Freemont Inv. & Loan,* No. 12 MISC 464855(RBF), 2012 WL 6115613, at *4 (Mass.Land Ct. Dec. 10, 2012)); *see In re D'Ellena,* 640 A.2d 530, 533 (R.I.1994) (stating that a mortgagee's legal interest is "subject to defeasance upon payment of the debt").

The Court noted the similarity with Massachusetts law regarding mortgages since both are title theory states. The underlying obligation of the mortgagor must be satisfied for the defeasance and discharge of the mortgage. Thus without the obligation to secure, a mortgage is a nullity.

For these reasons, Summary Judgment must be denied as to all counts.

**JUAN VALDERA**
**SOBEIDA VALDERA**
**BAHIJ BOUTROS**
By their attorney,

May 10, 2022

/s/ John B. Ennis
John B. Ennis, Esq. #2135
1200 Reservoir Avenue
Cranston, RI 02920
401-943-9230
jbelaw75@gmail.com

Certificate of Service

I hereby certify that I emailed a copy of this Memorandum of Law to John McNicholas, Esq. on May 10, 2022.

/s/ John B. Ennis